STEPHEN M. BRIGANDI, ESQ. Pro hac vice
3624 Caminito Cielo Del Mar
San Diego, CA 92130
858-775-4213
brigandilaw@gmail.com


MURPHY LAW GROUP P.C.
Timothy Murphy, Attorney at Law
333 NE Russell St., Suite 200
Portland, OR 97212
Phone: 503 550 4894
tim@oregonlandlord.net

# UNITED STATES DISTRICT COURT
# MEDFORD DIVISION

| | |
|---|---|
| Joanne Couvrette, Trustee on behalf of Ann M. Wisnovsky<br>　　　Plaintiff,<br><br>　　　vs.<br>MARK A. WISNOVSKY, an individual; and MICHAEL J. WISNOVSKY, an individual; et al.<br>　　　Defendant. | Case No.: 1:21-CV-00157-CL<br><br>DECLARATION OF JOANNE COUVRETTE IN SUPPORT OF MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS |

I, Joanne Couvrette, declare as follows:

1.　　I am the Trustee of the Ann M. Wisnovsky Trust, and I filed the Original Complaint in this Matter on Behalf of my mom, Ann Wisnovsky, in the above-entitled matter. I make this declaration in support of Plaintiffs' Motion to Dismiss the Defendant's Counterclaims for Lack of Subject Matter Jurisdiction.

1

DECLARATION OF JOANNE COUVRETTE

2.　My mom died on March 16, 2023.  My brother Robert, my daughter Anna Maria Couvrette and I were at my mom's beside in the days prior to her death in San Diego, where she had been living for the prior four years.

3.　Ann had four children, Joanne Couvrette, Robert Wisnovsky, Mark Wisnovsky, and Michael Wisnovsky.  Robert and I are the only two Qualified Beneficiaries (Principal and Interest Beneficiaries) of the Ann M. Wisnovsky Trust.

4.　The Principal Place of Administration of the Ann M. Wisnovsky Trust is and has always been San Diego County, California.

5.　Attorney Jeff Frasier appeared in that case on April 3, 2023 on behalf of Mark and Mike Wisnovsky objecting to that a Special Administrator was unnecessary.  After four hearings, where all four of Ann's children appeared and were heard by the Court, the San Diego Court specifically advised the parties that it could not and would not appoint an Oregon professional fiduciary in this matter, and the Court granted my Petition to name San Diego Attorney, Michelle Sullivan as Special Administrator.

6.　Although this matter has involved three different Courts, only the San Diego County Superior Court has jurisdiction over Ann's four children and is the only forum where all four children have appeared.

7.　For approximately the past ninth months, Ann's children have engaged in discussions to settle the estate and legal issues surrounding the Trust.  Now, over a full year after Ann's death, Robert has notified me, as Trustee, of his intent to Petition the San Diego Probate Court for Distribution of his share of the Trust assets, which includes a one-half interest of Wisnovsky Land, LLC and Upper Applegate LLC.  The San Diego Superior Court retains jurisdiction over the Administration of the Estate and Trust of Ann M. Wisnovsky.

**ELDER ABUSE**

2

DECLARATION OF JOANNE COUVRETTE

8. During the period of 2015 through 2019, I began to notice an effort on behalf of Mark and Mike Wisnovsky to control my mom, Ann Wisnovsky's finances, and to exhibit control over the physical environment of her home in their efforts to gain control over her significant assets.

9. As it relates to the Motion to Dismiss, I discovered voluminous evidence, including through Discovery during this matter, that will be used during the trial of Elder Abuse against Mark and Mike Wisnovsky. This evidence is primarily focused on the emails, memos and other communications between Mark, Mike and Pat Huycke leading to the creation of the Winery Lease, Vineyard Lease and Agreement to Make Payments, which were used to deprive my mother of her significant assets and dramatically impacted the final years of her life.

10. Additionally, there is a significant evidence related to Mark and Mike's creation of an Alter-Ego company, Third Generation Farms LLC, which was used as a vehicle to divert revenues from their Cannabis business to themselves to avoid their obligations to pay my mom under the "Agreement to Make Payments," which was allegedly the consideration for Ann's transferring her majority share of Valley View Winery to Mark and Mike. Financial records indicate hundreds of thousands of dollars transferred to Mark and Mike from Third Generation, without paying a cent as required by the Agreement.

11. Upon information and belief, Mark and Mike's Cannabis business, which was supposed to be hemp, was in fact marijuana. Neighbors and employees have related shipments of Cannabis being driven out of state, sold for cash, and the cash being flown via private plane. Trash bags of cash were unloaded from vehicles in front of neighbors. None of this was done in secret, as friends report Kim Wisnovsky complained that they had so much cash to count, they needed to purchase a cash counter. Michael informed neighbors how long it took to run a hefty bag full of cash through the cash counter.

12. Financial transactions indicate dozens of peculiar money order deposits into the accounts of Valley View Winery. Upon information and belief, the use of money orders is a

DECLARATION OF JOANNE COUVRETTE

commonly employed form of money laundering used to transfer cash from drug operations into legitimate business.

13. This evidence is distinctly different from that which comprises the basis for Defendants counterclaims regarding the alleged lease breaches and defaults between Wisnovsky Land and Valley View Winery, which is vastly different in the time period involved, the scope of evidence, and the nature of the evidence.

**PHYSICAL ABUSE AND CONTROL**

14. Unlike the counterclaims involving alleged lease breaches, which involved one or two clauses of the two leases between the Valley View and Wisnovsky Land, there is an alarming physical and emotional abuse in Defendants abuse of my mom.

15. Defendants assumed control over Ann's purchasing, and sometime in 2018, purchased a non-functional, used disabled access chair for Ann's house (Exhibit 1). Ann had been involved in a serious car accident, resulting in a fracture of her spine that impacted her mobility. Concerned about her ability to climb the stairs, Ann wanted to move her bedroom downstairs, which required a remodeling of the downstairs bathroom to include a shower.

16. Ann told me that Mark advised her this was "too expensive", and he instead purchased a used device that purportedly would transport Ann up the stairs. This use, non-functional, improperly sized elevator was installed at Mark's direction by unlicensed contractors who proceeded to remove the second story railing of Ann's balcony. Ann was unable to use the device, as it left her feet dangling 18" above the second story landing at the top of the stairs. In removing the bannister, the carpet was left loose, creating a trip hazard. In Exhibit 1-3, this hazardous condition is shown in photos.

17. The Defendants deducted the cost of the stair device and its installation from the rent payments to Ann in a document they provided to me in 2019, where they claim an unsupported right to make purchases on behalf of my mom and deduct them from the rent.

18. Ann began having mobility issues in 2019, especially with climbing stairs. Unbeknownst to me at the time, Ann was showing symptoms that would later be diagnosed as

4

DECLARATION OF JOANNE COUVRETTE

a rare form of Adult-Onset Hemophilia, which initially manifested as generalized joint pain, as blood began to accumulate in her joint spaces.

19.    In 2019, my mom had concerns about the income she was receiving from Valley View Winery, and she began to question some of the decisions she had made regarding her Estate Plan.  She terminated her relationship with Huycke and retained attorney Gary Turner.  Mom made several changes to her Estate plan, including a change in the controls of the Co-Trustees.  On my next visit to Oregon, my mom and I visited Turner's office. Turner and my mom met for well over an hour, before I was called into his office to sign another Trust Amendment.  Although I was not involved in the discussions, I was told that the 5th Amendment of the Ann M. Wisnovsky Trust was created to affirm Mom's estate plan and to require both Co-Trustees to sign together on behalf of the Trust.  Ann's 5th Trust Amendment states:

> *I previously executed a First Amendment, a Second Amendment, and a Third Amendment to that Trust Agreement, and all three of those amendments were superceded and revoked by the Fourth Amendment that I executed on May 31, 2019.* **After consultation with counsel,** *I wish to further amend the Trust Agreement pursuant to the powers reserved to me in Section 11 of the Trust Agreement as follows:*
> 1. *The second sentence of Section 10.1 is deleted and replaced by the following sentence: "When Co-Trustees are serving hereunder, the Co-Trustees must act together to perform any act that purports to bind the trust, and any writing requiring the signature of Trustees of the trust must be signed by both Trustees in order to be binding and have any legal force or effect. Any provision elsewhere in the Trust Agreement inconsistent with the previous sentence shall be construed in a manner to be consistent with the previous sentence."*
>
> **In all other respects, the Trust Agreement dated August 2, 2012, as amended by the Fourth Amendment, shall remain in full force and effect.**

20.    I left Oregon and returned to San Diego, thinking that my mom's concerns were addressed, her interests protected, and she was physically safe, as I had asked my niece, Sophia Wisnovsky, to stay with mom for the summer, as I had noticed Mom was developing mobility problems.

DECLARATION OF JOANNE COUVRETTE

21. After I returned home, upon my mom's request, I sent my brothers a June 19th email notifying them of the change in mom's Trust requiring both our signatures. Unbeknownst to me until months later, my email triggered a series of disturbing events. (Exhibit 4)

22. On June 20th, with full knowledge that it would take two signatures to bind the Trust, Mark visited my mom with one of his VVW employees and documents to sign, including an agreement to build a warehouse on her property, along with a handwritten note. The event was photographed and sent to Turner.

23. On June 24th, I received a frantic call from my niece, who had arrived at my mom's house to find Mark attempting to lift my mom into his truck to take her to a doctor's appointment. My mom, a tiny lady of 4' 8", could not get her leg into the vehicle and was crying out in pain. My niece understood Grandma did not actually have a doctor's appointment, and attempted to intervene, but Mark insisted that the appointment had been changed and sped away.

24. On June 25th, I received a call from mom's physician, Dr. Alan Binet. I had accompanied my mom to a few doctor's appointments and was Mom's medical contact listed in the file. He described his concern over Mark's appearance at his office, without an appointment, with the request to find my mom incompetent. Dr. Binet's exact words are seared in memory, Mark "buttonholed me in the hallway and demanded I examine Ann" Binet went on to express concerns about Mark's visit and wondered aloud what "he was up to". Binet confirmed my mom's cognitive function, and suggested that at her age (86), we might want to consider getting a baseline CT scan. He also suggested that I bring her to San Diego, a suggestion he said was made in light of Mark's disturbing visit and the more readily available geriatric medical resources in San Diego. The June 24th chart notes, included as Exhibit 5, state:

DECLARATION OF JOANNE COUVRETTE

(ANN)…. who is brought in her by son, Mark. He feels that she has had several months of fairly pronounced decline in mental acuity. The patient does not feel that that is the case. She is **scrappy nearly 87-year-old**, who has been the matriarch of the Wisnovsky family since the inception and is to me **clinically quite collected and capable**. A Mini Mental Status exam is **performed and passed without difficulty**. Her son Is concerned about her memory loss…… **The patient seems quite capable to me, and I cannot help but feel that her may be an unspoken agenda on the part of her son.** All of her questions were answered.

25.    I began to realize that my initial belief that my mom was safe in Oregon was naïve, so I returned to Oregon. My mom and I again visited her attorney, Gary Turner, where he shared a photo that he had received via email from Mark (Exhibit 6). The photo featured my mom, eyes downcast, holding that day's Medford Mail Tribune, as though she were a hostage demonstrating proof of life, with handwritten note stating she "did not want to make any changes to her estate plan." When Gary asked her why she had allowed that picture to be taken, she was embarrassed and with tears in her eyes stated, "they made me." It was a heartbreaking moment. But my mom then lifted her head and with a twinkle in her eye, she said "besides it's too late, I already changed the estate" because she truly was the "scrappy" lady Dr. Binet described in his clinical notes.

26.    Gary suggested to me that, in light of recent events, it might be a good idea to bring my mom back with me to San Diego. The meeting with Gary, and his revelation of the hostage photo had taken a toll on my mom, and she developed gastric issues, so we hurried home, skipping a lunch date that we had planned. We arrived at mom's house to find my nephews exiting her home. We later discovered, in every drawer of her kitchen and dining room, copies of a document entitled "My Estate Plan", some were even laminated. (Exhibit 7 is a sample of some of these). We later discovered her safe had also been opened and most of her cash was gone. Afraid for our safety, I asked my brother Robert to come over and stay with us. He stayed until we left for San Diego a few days later.

27.    Covid hit in early 2020, and my mom remained with me in San Diego. We didn't realize it at the time, the move to San Diego saved my mom's life. She was diagnosed

DECLARATION OF JOANNE COUVRETTE

with hemophilia and was treated at UCSD by one of the leading hematologist researchers in the world.  She convinced the hospital to provide over $250,000 in lifesaving clotting factor to mom at no charge after Medicare declined coverage.  She devised a treatment plan that worked, and discovered a Medicare loophole, delivered ongoing medication to my home, so that I could administer bi-weekly injections of the medication that saved her life.

28.    Although mom developed dementia in her final years, she never forgot my name and never lost her gregarious, outspoken self.  She had a happy final few years, close to the ocean with frequent visits from Robert and his family, and with the ongoing care provided by my daughter and me and the extraordinary healthcare providers at UCSD.

29.    My mom died on March 16, 2023.  My brother Robert, my daughter Anna Maria Couvrette and I were at my mom's beside in the days prior to her death in San Diego, where she had been living for the prior four years.  I wrote her obituary (Exhibit 8) while sitting at her bedside.  We made several attempts to contact Mark and Mike during those final days via email and phone, with no reply.  Again, after her death, we called and emailed. Again, no reply.

**CURRENT ASSETS AND BENEFICIARES OF THE TRUST**

30.    Section 3.3 of the Trust is titled "Final Distribution."   Section 3.3 A lists Ann's personal property such as household goods, photos, etc.  Mom began personally gifting these items to her children and grandchildren many years before she died.   There was no personal property titled to the Trust and none to transfer into the trust at the time of Ann's death, as she had gifted all of it during her lifetime.

31.    Section 3.3 B of the Trust specifically discusses the Shares of Valley View Winery Stock.

DECLARATION OF JOANNE COUVRETTE

**3.3B. The stock of Valley View Winery, Inc., an Oregon corporation, has been previously transferred or gifted to MARK A. WISNOVSKY and MICHAEL J. WISNOVSKY;**

32.     Section 3.3 C of the Trust discusses the rest, residue and remainder of the Trust, which constitutes ALL of the Assets of the Trust at this time:

**C. The rest, residue and remainder of this trust shall be divided into two (2) equal shares. One of such shares shall be distributed JOANNE COUVRETTE and one of such shares shall be distributed to ROBERT F. WISNOVSKY.**

33.     The only assets remaining in the Trust currently are the membership in two Limited Liability Companies, Wisnovsky Land LLC and Upper Applegate LLC, one savings account and one checking account and contingent future interest in the Elder Abuse Litigation.

34.     Each LLC currently has one tenant, and there is no net income flowing from the LLC to the Trust.  The LLCs are organized as "manager managed" entities, I am the manager of both LLCs in my capacity as an individual with my eventual 50% membership interest. The Trust does not manage the LLCs, nor does it control the LLCs.

35.     In November 2023, Wisnovsky Land LLC notified VVW that their lease was in default due to their failure to pay property taxes in 2022 and 2023.  It appeared that they had made a payment within the 10-day cure period, however that was not the case.  This was the third time we had been forced to send default letters for failure to pay rent.

36.     In December of 2023, I was notified by an escrow agent that Valley View Winery's property tax payment for their leased property had been returned "NSF."  We were in the final stages of the land partition process to separate a 2-acre parcel from the larger acreage.  I immediately paid the property tax to make sure the lot partition would not stall.

37.     Wisnovsky Land issued a letter terminating Valley View's leases after their failure to cure their rent defaults.  Valley View refuses to vacate the property and has not paid rent since December.

9

DECLARATION OF JOANNE COUVRETTE

38.     The property owned by Wisnovsky Land is currently subject to a Lis Pendens Lien by Valley View Winery, rendering it currently unsaleable, which states:

> The object of the action is: Adjudication of certain of the pmiies' rights and obligations with respect to commercial and agricultural **leasehold interests** in the real properly described below and adjudication of plaintiffs' purported right or rights to control, use, occupancy, and disposition of the described property. Wisnovsky Defendants seek declaratory relief and money damages.

39.     The ten Counterclaims in this Elder Abuse litigation are either Probate related or Permissive Counterclaims that do not relate to the underlying claims as in either time, law or evidence as briefly demonstrated here.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

DATED this 10th day of May, 2024.


By: */s/ Joanne Couvrette*

10

DECLARATION OF JOANNE COUVRETTE