UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Medford Division

JOANNE COUVRETTE, as trustee )
of the Ann M. Wisnovsky )
Trust; and WISNOVSKY LAND, )   Case No.
LLC, )   1:21-CV00157-CL
)
      Plaintiffs, )
)
  vs )
)
MARK A. WISNOVSKY, an )
individual; MICHAEL J. )
WISNOVSKY, an individual; )
PATRICK HUYCKE, an )
individual; VALLEY VIEW )
WINERY, INC., an Oregon )
corporation; JARVIS, DREYER, )
GLATTE & LARSEN, LLP, an )
Oregon partnership, fka )
Huycke O'Connor Jarvis, LLP, )
)
      Defendants. )

DEPOSITION OF JOANNE COUVRETTE

Taken in behalf of the Defendants

December 6, 2022

IBA
SYMONDS
&DUNN
(503) 224-4438

A.  Yes.

Q.  Does that tax lot that includes some of the vineyard, is it owned by Upper Applegate, LLC?

A.  No.

Q.  Do you know who owns that one?

A.  Wisnovsky Land.

Q.  Is there a reason you associate tax lot 201 with the address 1352 Upper Applegate even though it does not encompass Ann's home?

A.  I don't associate it.  It is how it is numbered by the state of Oregon or Jackson County.

Q.  Do you know the tax lot number of the parcel that encompasses Ann's former home?

A.  200.  But it could be that they're flipped, 200 and 201.  I'm not sure which is which.  One is 200 and one is 201.

Q.  Okay.  How long have you lived at your current address?

A.  20 years.

Q.  Where did you live before that?

A.  La Mesa.

Q.  How long did you live in La Mesa?

A.  11 years.

Q.  Where did you live before La Mesa?

Q.   So between 1970 and 1982 you lived in Oregon?

A.   Yes.

Q.   Did you like living in Oregon during that period of your life?

A.   Yes.

Q.   Why did you move away?

A.   For a job.

Q.   Do I correctly understand you've never moved back to Oregon since you moved away in 1982?

A.   Yes.

Q.   Any particular reason you've never moved back?

A.   My employment has been in California.

Q.   What job did you obtain in 1982 that brought you away from Oregon?

A.   I was working for Kraft Foods.

Q.   What was your position then?

A.   I held several positions.

Q.   What was the first position you took with Kraft Foods that took you away from Oregon?

A.   Assistant production supervisor.

Q.   Did you apply for that job?

A.   Yes.

Q.   What about commercial leasing?

A.   No.

Q.   How about property valuation, as in real property?  Do you have any training or education in that subject?

A.   No.

Q.   What about lease valuation?

A.   No.

Q.   Do you have any training or education related to, I'm talking formal, not just self-investigation, but formal training or education related to any legal subjects?

A.   No.

Q.   And do you understand legal subjects would include identification of claims such as undue influence or elder abuse?

A.   Yes.

Q.   Okay.  And do you understand that legal subjects would also include the interpretation of trust documents?

A.   Yes.

Q.   And the drafting of trust documents?

A.   Yes.

Q.   How about the valuation of businesses?  Do you have any training or education in that?

sign certain documents?

A.   Yes.

MR. FOSTER:   Exhibit 543.

[EXB. 543 identified]

Q.   Does Exhibit 543 contain emails you exchanged with Michael Wisnovsky on April 13, 2016?

A.   Yes, it seems to.

Q.   Do you recall exchanging these emails with him on that date?

A.   I don't remember, no.

Q.   Do you recall that Michael gave you copies of the vineyard and winery leases on April 13, 2016?

A.   I -- I don't specifically recall that, but he's saying he did.

Q.   You do not deny that that happened, correct?

A.   No.

Q.   And do you agree that on April 13, 2016, you wrote -- you emailed Michael regarding a problem you had with the vineyard or winery lease?

A.   Yes.

Q.   You wrote "Here is my problem.  This lease

seems to make the land unsaleable," correct?

A. Yes.

Q. You wrote "There is no clause that terminates the lease on the land upon sale. So that is a huge problem for me. The land value would be capped at a 10 cap rate, because who would buy it subject to the lease," question mark. You wrote all that?

A. I think so, yes.

Q. You were expressing a problem you saw with the lease that you were given, correct?

A. Yes.

Q. And in fact, you were given both -- two -- two leases, right? The vineyard and winery lease.

MS. RICHARDSON: Object to the form of that question.

Q. I should be more clear. Do you understand there is a vineyard lease and a winery lease and those are two separate leases?

A. I understand that they are two separate leases.

Q. And do you understand those were entered into in March 2016?

A. I -- I don't specifically remember the

date.

Q. Your problem with the leases was comment to both the vineyard and winery leases, correct?

A. I don't think so, because it just says "Re: vineyard land and Ann's home."

Q. When you first became aware of the vineyard lease, did you think it was a problem?

A. It appears that I did, yes.

Q. And that was because it had a long duration, correct? That could potentially last for decades, correct?

A. No. It was a combination of several things.

Q. Okay. Could you explain?

A. It was the long duration, plus nothing seemed to me to terminate the lease upon the sale.

Q. And why did you see that as a problem?

A. Because the lease would transfer to the buyer and would set the value based upon the lease.

Q. And why was that a problem?

A. Well, I don't -- at this time it seemed to me that I didn't know enough about how the land should be valued or how the lease should be

valued to know if this lease was a good deal for the owners of the land.

Q. So you had concerns about whether the lease was a good deal for the owner of the land, namely your mother, correct?

A. Yes.

Q. And you perceived that concern would carry over after your mother's death to whoever owned the land thereafter, correct?

A. Well, yes. Whoever owned the land during the course of the 80 years would be sort of shackled by this lease if in fact it couldn't be terminated upon the sale.

Q. And that would affect the market value of the land, correct?

A. Yes, if -- it would affect it if the lease price was too low based upon what the land price was, which I did not have an idea of at the time. It could affect it. And at that time, I'm not sure that I had the information to know.

Q. Didn't have the information to know what?

A. How dramatically it would be affected.

Q. You've come to the conclusion that the lease terms were unconscionably bad for the landowner, correct?

A.   I don't know enough about the legal term unconscionably bad, but if we're just talking about it as a moral term, then, yes.

Q.   Is there another term that you would be more comfortable using that you're more familiar with other than unconscionably?

A.   No, we can go with that.

Q.   Okay.  Do you believe the lease has harmed your mother's interests when they were entered into in 2016?

A.   Possibly, at -- I mean, now?  Yes, I know that.

Q.   Now you do.

A.   Now I do.

Q.   And in April 2016 you were concerned that might have been the case, correct?

A.   Yes, I was.

Q.   What did you do to investigate that concern after April 13, 2016?

A.   I talked to my mother.  My mother said, talk to Mark and Mike, they can explain it.  She had asked them to provide me with more documents. And at some point, I talked to Mark and Mike.

            MR. FOSTER:  Exhibit 530.

                [EXB. 530 identified]

Q. Does Exhibit 530 appear to contain the winery lease that you reviewed in April 2016 that your brother Mike sent you?

A. Well, I'm not sure when Michael sent me. It looks like he sent me on April 13 the vineyard lease, not the 16th.

MS. RICHARDSON: Do you have an email that actually has the attachments so we can see what was sent at that time?

MR. FOSTER: I don't have it here.

MS. RICHARDSON: Okay.

Q. So just looking back at Exhibit 543, do you agree Mike wrote "Here are the leases"?

A. Yes, that's what this email says.

Q. Okay. Do you agree that Exhibit 530 is in fact a winery lease, and it was signed by Ann, Mark, and Michael on page 14? Sorry. It's -- it's page 14 of 17 of the exhibit.

A. Well, I can't read when it was signed, actually, but it looks like there are signatures on page 14.

Q. Okay. Do you agree that is your mother's signature on page 14 of Exhibit 530?

A. It seems to be.

Q. Okay. Do you agree that page also contains

Mark and Michael's signatures?

A.   I don't know Mark and Michael's signatures, but they -- they could be.

Q.   When you first learned about this lease, did you believe it was the product of undue influence?

MS. RICHARDSON:  Object to the extent you're asking for her to draw a legal conclusion.

But you can answer.

A.   I -- I don't think at the time I had enough knowledge of how this lease occurred to make a lot of conclusions about it.

Q.   At what point did you come to believe it was the product of undue influence?

A.   After -- sometime after receiving some of Pat's files in the summer of 2019, and then again more in the beginning of 2020.

MR. FOSTER:  Exhibit 531.

[EXB. 531 identified]

Q.   Is Exhibit 531 the vineyard lease?

A.   It appears to be the vineyard lease, yes.

Q.   Is this one of the leases that you allege in this lawsuit to have been the product of undue influence?

MS. RICHARDSON:  I'm going to object to

Q.  Ann did not require the leases to include a place for your signature, correct?

MS. RICHARDSON:  I'm going to object to the word "require."

A.  I have no idea who -- who did what.

Q.  You're not aware of Ann ever asking Huycke to include a signature line in the leases for your signature, correct?

A.  I don't know who asked what or did what.

Q.  And as of March 24, 2016, was Ann competent to handle her affairs?

A.  I think competent to analyze this lease. I'm not sure that she was competent to understand this lease.  And I'm not sure competent is the right word.  I don't think she had the skill set. I had trouble with it myself.

Was she competent to state her general desires for how she wanted her estate to be dealt with?  Yes.

Q.  Do you know if anybody prevented Ann from obtaining the advice of another attorney before entering into the leases other than Huycke?

A.  No, I have no idea if anyone did that.

Q.  You mentioned that Mark had moved in with Ann around that time when the leases were signed,

[EXB. 549 identified]

Q.   Page 1 of Exhibit 549 contains an email from Robert Wisnovsky to you dated August 30, 2016, correct?

A.   It is titled that, yes, to me -- well, to me, Pat Huycke, Mark, and Mike.

Q.   Correct.  Do you recall receiving this email from Robert at that time?

A.   I don't really recall it, no.

Q.   Do you dispute that you received it at or around that time, August 30, 2016?

A.   No.

Q.   Below there, at the bottom of page 1 of Exhibit 549, do you see a header of an email from you to Robert, Mr. Huycke, Mark and Mike dated August 30, 2016?

A.   Yes.

Q.   Do you see the text of that email on the next two pages?

A.   Yes.

Q.   Do you recall writing that email?

MS. RICHARDSON:  Would you like her to read it first?

MR. FOSTER:  If she wants.

MS. RICHARDSON:  Well, I think it would

be important if you're going to ask her that type of question to go ahead and read it to yourself all the way through, and then he can ask you what you recall about that.

MR. FOSTER:  I would suggest she needs to read as much as it takes to refresh her memory so she can answer the question.

MS. RICHARDSON:  And I'd like her to read it in context of the entire email.

A.  Yes, I remember this now.

Q.  Did you send the email dated August 30, 2016, shown on pages 1, 2, and 3 of Exhibit 549?

A.  Yes.

Q.  And those are your words in that email, correct?

A.  Yes.

Q.  Now, the paragraph second to the bottom on page 2 of Exhibit 549 uses the word "adversarial" on one and two.  Do you see that?

A.  Yes.

Q.  The sentence says "With the transfer of the stock to Mark and Mike, the winery is also instantly in an adversarial position against the trust, as the corporation is a debtor to the trust for both paid-in capital and years of

that somebody wanted her to sign.  She wasn't -- she didn't communicate what it was.

Q.  Did it appear to you that she did not fully understand her estate plan as it existed at that time?

A.  Yes.

Q.  In May 2019 she was with you in San Diego, correct?

A.  She was with me for part of her trip, yes, in San Diego.  Excuse me.  In San Diego for part of her trip.

Q.  And when she was with you in San Diego in part of May 2019, did she meet with any attorneys in that area?

A.  No.

Q.  Did she have any phone calls with Mr. Huycke during that part of time?

A.  She had a phone call with Mr. Huycke's office.  She left him a message.

Q.  Any other communications between her and Huycke in May 2019 that you recall?

A.  No.  Oh, verbally you mean?

Q.  Yes.  I'm talking about communications between Ann and Mr. Huycke by phone or -- yeah, by phone in May 2019.  Any others?

in Exhibit 549, correct?

A.   I don't know.

Q.   Okay.  We can look at the stack in front of you if it will help.  549.  Is that it?

A.   Yes.  "What happens if mom needs to have medical care or move into a residential care facility?  Her cash has been depleted, and she no longer owns the winery.  Who pays"?

MR. FOSTER:  Exhibit 562.

[EXB. 562 identified]

Q.   Is Exhibit 562 an Oregon advance directive of Ann Wisnovsky?

A.   Yes.

Q.   Did she sign it on May 31, 2019?

A.   Yes.

Q.   Didn't she fly home to Oregon that same day?

A.   Yes.

Q.   So what was the purpose of this advance directive?

A.   She asked me to do it.  She -- this was -- this was the document that she was so concerned about, making sure that her -- you know, that I'm the one making those decisions for her.

Q.   Where did you get the form used to create

Q.  Who's she?

A.  She used to work for me.

MR. FOSTER:  Exhibit 560.

THE WITNESS:  I'm sorry?

MS. RICHARDSON:  He's handing it to us.

[EXB. 560 identified]

Q.  Is Exhibit 560 the fourth amendment to inter vivos revocable trust, The Ann M Wisnovsky Trust?

A.  Yes.

Q.  Are those her signatures on page 1 of 560?

A.  Yes.

Q.  Where was she when she signed this document?

A.  In the office of a notary at Wells Fargo Bank in San Diego, California.

Q.  Who wrote this document?

A.  I typed it when my mother told me what she wanted it to contain.

Q.  How did -- so you're saying that the words on page 1 of Exhibit 560 were dictated to you by your mother?

A.  My mother told me what her intentions were, and I made those into a format that I found -- well, between two sources, the previous

amendments that we had just gotten, and again, an online law source.

Q.   So you had received Huycke's file when you drafted Exhibit 560?

A.   It -- it had been -- it had been picked up by my brother, and he did -- brought it and scanned some of it to answer the critical questions that my mom was most concerned about. So not the entire file.

Q.   So you recall that Robert scanned portions of Huycke's file after he picked it up, correct?

A.   Yes.

Q.   Do you know which day he picked it up?

A.   No.

Q.   Did he email those portions of the file to you?

A.   I don't remember how I got them.

Q.   Is there any way other than email that he could have gotten them to you within a day?

A.   Well, he called me and told me what he thought they -- what they said, and read them to me.  And I'm not -- I really don't remember how he gave them to me.

Q.   Okay.  So you recall being on the phone with him, getting his descriptions of portions of

MS. RICHARDSON:  Object to that use of the word.

MR. FOSTER:  Noted.

A.  Well, I don't think that she depended on me.  I -- she's my mom, and so I did her laundry sometimes, she did my laundry sometimes.  I cooked sometimes, she cooked sometimes.  The driving was done by me or my daughter.

Q.  Did -- was Ann depending on you to help her prepare the fourth trust amendment?

A.  She was -- she requested that I take her wishes and turn them into a document so that they could become part of her estate plan.

Q.  And she had already given you power of attorney, correct?

A.  Yes.

Q.  That gave you broad power to take actions on her behalf, correct?

A.  It was done because I had -- in order to speak to, initially to -- to the Jarvis firm.

Q.  And she also gave you medical -- power over her medical decisions, correct? based on the advance directive?

A.  Yes, but I actually believe I already had all of this, so -- it was just not clear from the

C E R T I F I C A T E

I, Chris Villano Iba, a Certified Shorthand Reporter of the State of Oregon, do hereby certify that JOANNE COUVRETTE personally appeared before me at the time and place mentioned in the caption herein; that the witness was first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to print; and that the foregoing transcript, Pages 1 to 234, inclusive, constitutes a full, true and accurate record of said examination of and testimony by said witness, and of all other oral proceedings had during the taking of said proceedings, and of the whole thereof.

Witness my hand and seal as Certified Shorthand Reporter at Portland, Oregon, this 3rd day of January, 2023.

Chris Villano Iba
Certified Shorthand Reporter
Certificate No. 90-0062
Expires September 30, 2024

**Sent:**     Wed, 13 Apr 2016 21:15:49 +0000 (UTC)
**From:**     Joanne Couvrette <jcouvrette@sbcglobal.net>
**To:**     Mike Wisnovsky <mike@valleyviewwinery.com>
**Subject:**     Re: Vineyard Land and Ann's Home

Here is my problem.  This lease seems to make the land un-saleable.   There is no clause that terminates the lease on the land upon sale.  So that is a huge problem for me.  The land value would be capped at a 10 cap rate....because who would buy it subject to the lease?

Please correct me if I am wrong, but this is not good for the owners of the land at all.

Joanne Couvrette
Executive Director
Canyon Crest Academy Foundation

858-350-0253 Ext. 4005

Home:
13274 Jacarte Court
San Diego, CA  92130
619-750-8509

---

**From:** Mike Wisnovsky <mike@valleyviewwinery.com>
**To:** 'Joanne Couvrette' <jcouvrette@sbcglobal.net>
**Sent:** Wednesday, April 13, 2016 1:48 PM
**Subject:** FW: Vineyard Land and Ann's Home

Here are the leases

Cheers,

Michael Wisnovsky

Valley View Winery
Jacksonville Oregon
1.800.781.9463

Check us out on the web at www.valleyviewwinery.com

JCOUVRETTE004932

Ex. 543
Page 1 of 1

**From:** Robert Wisnovsky <robert.wisnovsky@skyoak.com>
**Sent:** Tue, 30 Aug 2016 17:53:51 -0700
**To:** Joanne Couvrette <jcouvrette@sbcglobal.net>, pgh@medfordlaw.net, mark@valleyviewwinery.com, mike@valleyviewwinery.com
**Subject:** RE: Lease

Hi All,

Very well said Joanne. We most likely will not hear from any of them as their comps and motives are clearly fraudulently and most likely criminal. Taking advantage of an 84 year old woman and negotiating your own lease terms at the detriment of your siblings are an issue most juries would find reprehensible. I welcome the fight against all of you. That includes you too Pat.

Sincerely,

Robert

Robert Wisnovsky

Senior Financial Advisor

SkyOak Wealth Management, Inc.

229 N. Barlett Street

Medford, OR  97501

541-601-4232

**From:** Joanne Couvrette [mailto:jcouvrette@sbcglobal.net]
**Sent:** Tuesday, August 30, 2016 12:54 PM
**To:** Robert Wisnovsky; pgh@medfordlaw.net; mark@valleyviewwinery.com; mike@valleyviewwinery.com
**Subject:** Re: Lease

All,

VALLEYVIEW_001755

I concur, that one of the most troubling parts of this scheme seems to be the conflict of interest of having the owners of the winery have enough interest in the land they are leasing to block both the land sale and the re-negotiation of the lease. And yes, of course, the sale of the corporation will be subject to the lease, the legal entity of the lessee will not change, just the names of the stockholders.

While on the surface, the current shareholders argue "We are part owners of the land, why would we want to get less money than the market rate?"....that seemed to be an argument persuasive to Mom, however, the reality is why split a dollar four ways (as lease income), when you can keep the money in the winery and split it 50/50 or just continue trading away winery assets and getting tax-free income with the bonus of artificially suppressing one's income available for support?

And an artificially low lease rate...for 80 years...makes the winery much more valuable, and of course, all proceeds from the sale of the winery inure to the benefit of the winery shareholders only. These types of insider deals are usually only in place when all the parties have equal interest on both sides of the deal.

This was most definitely not the brainchild of my mother, but more likely that of the winery owners, who want not only to be the sole beneficiaries of our parents' investments and legacy, but who apparently need to tilt the table in their benefit at every turn.

Another troubling aspect is that the attorney fees are apparently being paid by the corporation. As trustee, I would not waive that conflict on the trust's behalf, as that would likely not be in the fiduciary interest of the trust.

With the transfer of the stock to Mark and Mike, the winery is also instantly in an adversarial position against the trust, as the corporation is a debtor to the trust for both paid-in-capital and years of delinquent lease payments. This is compounded by the additional issue of both shareholders also being personally indebted to the trust, as both have borrowed 41% of the trust's cash assets. What happens if mom needs to have medical care or to move into a residential care facility? Her cash has been depleted, and she no longer owns the winery. Who pays? Well, easy answer to that one, Bob and I....the only asset that can be sold is the house. Or, in the alternative, if we want to protect that asset, I pay.

This estate plans seems more consistent with values of Machiavelli and Marx than Frank and Ann Wisnovsky.

VALLEYVIEW_001756

That's my two cents....or in other words...my share of the estate.

Joanne

Joanne Couvrette

Home:

13274 Jacarte Court

San Diego, CA  92130

619-750-8509

""

---

**From:** Robert Wisnovsky <robert.wisnovsky@skyoak.com>
**To:** "pgh@medfordlaw.net" <pgh@medfordlaw.net>; "mark@valleyviewwinery.com" <mark@valleyviewwinery.com>; "mike@valleyviewwinery.com" <mike@valleyviewwinery.com>; "'Joanne Couvrette' (jcouvrette@sbcglobal.net)" <jcouvrette@sbcglobal.net>
**Sent:** Tuesday, August 30, 2016 11:22 AM
**Subject:** Lease

Hi All,

I am not sure if you incorporated the lease draft as written into the estate but I did a little research on it. I contacted one of the largest vineyard operators in Southern Oregon and their leases expire after 15 years not 80. Secondly, they lease brand new vineyards where the crops do not get to full production for 5 years effectively making the grape production to 10 years. Lastly, since when do the lessees get to dictate the terms of the lease? Reminds me of how Pat complained when Chamberlain was insisting his management company be retained by any new owners of his facility effectively lowering the value of that facility. Lastly, what is to stop Mark and Mike from selling the winery and attaching the lease too it?

VALLEYVIEW_001757

Sincerely,

Robert

Robert Wisnovsky

Senior Financial Advisor

SkyOak Wealth Management, Inc.

229 N. Barlett Street

Medford, OR  97501

541-601-4232

VALLEYVIEW_001758

Ex. 549
Page 4 of 4