STEPHEN M. BRIGANDI, ESQ. Pro hac vice
3624 Caminito Cielo Del Mar
San Diego, CA 92130
858-775-4213
brigandilaw@gmail.com


MURPHY LAW GROUP P.C.
Timothy Murphy, Attorney at Law
333 NE Russell St., Suite 200
Portland, OR 97212
Phone: 503 550 4894
tim@oregonlandlord.net

# UNITED STATES DISTRICT COURT

## MEDFORD DIVISION

| | |
|---|---|
| Michelle Sullivan on behalf of Ann M. Wisnovsky<br>        Plaintiff,<br><br>        vs.<br>MARK A. WISNOVSKY, an individual; and MICHAEL J. WISNOVSKY, an individual; Valley View Winery, et al.<br>        Defendant. | Case No.: 1:21-CV-00157-CL<br><br>DECLARATION OF JOANNE COUVRETTE IN SUPPORT OF Opposition to Defendant's Motion for Partial Summary Judgment |

I, Joanne Couvrette, declare as follows:

1.      Ann had four children, Joanne Couvrette, Robert Wisnovsky, Mark Wisnovsky, and Michael Wisnovsky

2.      I am the eldest child and only daughter of Ann and Frank Wisnovsky. My mother, Ann Wisnovsky, was a hardworking and generous woman who dedicated her life to our family and to preserving the winery and vineyard my father built. However, in her later years, my two youngest brothers, Mark and Michael Wisnovsky, "the Defendants" or "Mark and Michael",

1

DECLARATION OF JOANNE COUVRETTE

engaged in a pattern of financial elder abuse that systematically stripped her of her assets and left her without control over the land and business she had spent decades protecting.

3.      Mark and Michael, with the assistance of their attorney, Patrick Huycke, manipulated my mother into signing a series of agreements, including two leases, an Agreement to Make Payments and a Redemption Agreement which benefited them exclusively while depriving her of financial security. These agreements were created at their direction and to their specifications, using Huycke as their legal scribe to draft terms that were grossly unfair and unconscionable.  These documents, which Defendants now refer to as a related group of "Inheritance Contracts", were procured as part of a conspiracy of undue influence that deprived my mom, Ann, of the resources she needed at the end of her life.

4.      The unconscionable leases the Defendants coerced my mother into signing are 90 years long, and encumber the largest asset in her trust—74 acres of agricultural land, including a vineyard, winery, tasting room, and equipment. As a result, the appraisal of what was once over a $4 million-dollar property was reduced to zero (Exhibit 9). Because of the egregious lease terms, my mother's trust was unable to borrow against the land, rent it to anyone else, use it, or sell it. My brothers had effectively taken everything from my mother, ensuring they maintained full control of all assets and preventing my mother from taking care of her financial needs.

**Timeline 1972-1999**

5.      In 1972, my father, Frank Wisnovsky, purchased approximately 76 acres in Jackson County, Oregon, and planted grapevines. He had a vision of building a modern winery in Southern Oregon, and in 1980, he officially established Valley View Winery, "winery" or "VVW". Tragically, my father died that same year in an accident, leaving behind my mother and four children. My mother, Ann, inherited the land, the vineyards, and Valley View Winery.

6.      At the time of my father's death, I was in college. My younger brother, Robert,

DECLARATION OF JOANNE COUVRETTE

later put his own career on hold to help run VVW, and my mother credited him with saving the winery during those difficult years. In 1988 and 1991, Mark and Michael, the two youngest in our family, began working at VVW.

7. My mother had a high school education and had worked as a secretary before becoming a homemaker. After my father's death, she managed the winery's bookkeeping and vendor relations, while the winemaker handled the day-to-day business operations. She relied on trusted advisors to help her make financial and legal decisions.

**Mark and Michael's Early Efforts to Gain Control: 1999-2014**

8. In 1999, Ann Wisnovsky retained attorney Patrick Huycke to provide legal services for both Valley View Winery and her estate planning. Initially consulting him for restructuring the business, Ann later relied on him for guidance regarding her personal and financial affairs. At the time of engaging Huycke, Ann was the President and sole shareholder of Valley View Winery. She had an existing 1989 lease agreement with VVW, providing rental income of $5,000 per month, along with employee benefits, including a company car, insurance, and an expense account. (Exhibit 4: 1989 Lease).

9. On December 16, 2002, Huycke drafted a letter to Ann regarding her Estate Planning, discussing both estate tax planning and estate distribution planning (Exhibit 54: 2002 Huycke Letter to Ann). In the letter Hucke states several items of note, including:

- Existing $5,000/month lease and the Accrued Rent due to Ann on the VVW books (Exhibit 50: Example Rent Check VVW to Ann)

- Proposed a gift of minority share to Mark and Mike to limit inheritance tax.

- Huycke admits that: "I have no knowledge concerning the fair market value rent for the vineyard acreage and winery buildings and grounds."

- After distributing the stock 30% each to Mark and Mike, 25% to Robert and 15% to Joanne "The rest of your Estate will be divided equally."

10. By approximately 2005, Ann began transferring 49% of her VVW stock to them

3

DECLARATION OF JOANNE COUVRETTE

as part of an estate planning strategy designed to minimize estate. However, Ann retained controlling interest in the company. Over time, Mark and Michael assumed full managerial control of VVW.

11.　These minority interest stock transfers were conducted in Attorney Huycke's office with witnesses and a notary.  (Exhibits 32: 3-19-2007 Stock Transfer) For example, the March 19, 2007, transfer of stock included:

- A properly witnessed, dated and executed stock share transfer.

- A properly witnessed, dated "A Consent to Action without Meeting."

- A properly witnessed and <u>notarized</u> "Declaration of Gift"

12.　Each stock share contains this written statement, in all CAPS:

"NOTICE: THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE, WHATEVER.

13.　In 2008, Mark and Michael made it clear they wanted to acquire additional assets from Ann. On January 14, 2008, Michael emailed Huycke outlining their request. (Exhibit 33: 1-14-2008 Email Mike to Huycke with Estate Proposal). In this email, Michael wrote:

*"Hi Pat, Regarding the meeting on the 23rd, our mother would like to see something in writing outlining the proposal as well as our discussing it.* ***We thought it would be more effective coming from you.*** *Here are our ideas as to an 'outline' of the plan."*

14.　This statement falsely suggested to Huycke that Ann had directed Mark and Michael to send the email. Additionally, their belief that the proposal would carry more weight if it were presented as Huycke's idea underscores their effort to manipulate both Ann and her attorney. However, when Ann received the proposed plan, she was livid. She responded with an email to Huycke (Exhibit 34: 3-18-2008 Letter Ann to Huycke), asserting unequivocally that she, and not her sons, was the client, and that if she wanted them to contact him, she would let Huycke know.  It was very clear that Mark and Mike's statement "our mom would like to see

DECLARATION OF JOANNE COUVRETTE

something in writing" was a fabrication.

15.     The proposal drafted at Mark and Michael's request urged Ann to transfer her remaining VVW stock and to either sell them the vineyard property outright or lease it to them at a highly discounted rate. Instead of discussing this directly with Ann, they relied on Huycke to draft it and present it as though it were part of his suggestion for her estate. Huycke, in an email to Mark and Michael (Exhibit 35: Email from Huycke to Mark and Mike with Estate Plan Memorandum), noted, *"We should discuss this a bit before I call Ann,"* signaling his complicity in framing the plan as his own and actively working with Ann's sons, instead of his client, Ann.

16.     This pattern of conduct—where Mark and Michael funneled their self-serving requests through Ann's attorney—continued until Ann, weakened by multiple surgeries and a serious car accident, began signing complex documents favoring them in 2016 and 2017.

17.     Importantly, Mark and Michael, via Huycke, provided contemporaneous property valuation information based on tax assessments. In 2008, the assessed value of Ann's properties totaled $2,144,280, as presented in Mark, Mike and Huycke's proposal, which was titled "Memorandum", and her personal residence was valued at $390,400 (Exhibit 35: 2008 Email from Huycke to Mark and Mike with Estate Plan Memorandum). They proposed to purchase the property and land from Ann at a significantly reduced rate, secured by a trust deed, with an arrangement allowing the trust deed to be forgiven upon Ann's death.

18.     The 2008 proposal was structured to mislead Ann into believing she was achieving her goal of equal division of her estate between her children. By manipulating property valuations and presenting their plan under the guise of estate equalization, Mark and Michael set the groundwork for future undue influence.  Huycke tallies up Mark and Mike's valuation of Ann's Estate (notably excluding the VVW stock, which Ann's Will at that date distributed equally, 25% to each child) and then split the assets equally between Mark/Mike and Joanne/Robert. It seemed to me that Huycke, Mark and Mike all clearly understood Ann's desire

DECLARATION OF JOANNE COUVRETTE

to divide her Estate equally, as every proposal made the claim to do exactly that.

19.     When Ann discovered that Huycke had drafted Mark and Michael's proposal without her knowledge and at her expense, he billed her for the work, she felt deeply betrayed and accused Huycke of having a conflict of interest. Outraged, she immediately halted the stock transfer plan before reaching the full 49% allocation initially contemplated.

20.     Ann immediately took affirmative steps to prevent further manipulation. She sent a directive to Huycke (Exhibit 34: 3-8-2008 Letter from Ann to Huycke) reiterating that she alone was his client, and that legal work should be performed only at her direction, not at the request of her sons. Additionally, she revoked the Powers of Attorney previously granted to Mark and Michael, appointing Robert Wisnovsky and Joanne Couvrette in their place. Sadly, she did not seek other counsel at that time, or Ann may not have fallen victim to the eventual taking of her entire estate that eventually occurred.

21.     Recognizing the risk that Mark and Michael were intercepting her legal mail, Ann instructed that all future correspondence be sent to her trusted neighbors, Bruce and Teri Gieg, instead of her residence or the winery, which is documented in Huycke's file notes. (Exhibit 37: Huycke Office Note). While this directive remained in place, years later, internal office communications reveal that Huycke's office inexplicably resumed sending Ann's mail to her residence without her consent.

22.     Along with her email to Huycke, Ann enclosed a "Review of Memorandum Regarding Purchase of Valley View Winery," which provided an analysis of the proposal. (Exhibit 36: 2008 Review of Memorandum). The identity of the reviewer remains unknown, although I recall my mom discussing it. Regardless of the author, their opinion or even the methodology, this external analysis was the exact type of review that an estate of this size demanded. It should have been conducted or recommended by Ann's own attorney, rather than being required as an independent safeguard against self-dealing by Mark and Michael.

DECLARATION OF JOANNE COUVRETTE

23.     Significantly, it expresses some of the same concerns and issues that Huycke himself mentioned in his 2002 Letter to Ann (Exhibit 54: 12-16-2002 Letter from Huycke to Ann), which concerns Huycke seemed to have abandoned by 2008.

24.     The review noted that Ann had a 1989 lease agreement in place of $5,000 per month, (Exhibit 4: 1989 Lease), which rent she paid herself as needed, allowing the rest to accrue on the balance sheet. This accrued rental income should have been accounted for in any estate planning or gifting strategy, as it directly impacted Ann's financial security and the division of her assets.  The accrued rent had also previously been mentioned in Huycke's 2002 Letter to Ann (Exhibit 54: 12-16-2002 Letter from Huycke to Ann).

25.     The 2008 Review also highlighted significant financial concerns regarding VVW and Ann's personal assets. It itemized a total of $626,000 in loans and paid-in capital that Ann had provided to VVW, which was due back to her. This was Ann's investment in creating Valley View Winery. These funds represented a tax-free income stream that Ann could access at any time. When the eventual taking of Ann's properties occurred in 2016, these monies were seemingly neither considered nor repaid. Huycke's 2002 Letter expressed the need to look at the balance sheet for items like this, yet none of the concerns expressed by Ann's 2008 Review of Memorandum were considered or mentioned in later years.

26.     One of the items in the $626,000 due to Ann originated with the refinance of her residence at 1352 Upper Applegate Road. Those funds, $179,000, had previously been "invested into VVV," meaning that **VVW owed her this sum**.

27.     On July 21, 2014, 54,230 Shares of VVW stock were transferred from Ann Wisnovsky to "Ann Wisnovsky and Joanne Couvrette, Trustees of the Ann M. Wisnovsky Trust, UTD 8/2/2012." This transfer, though only moving stock from Ann as an individual to her trust, also occurred in Huycke's office, with both Ann and Mark signing the new stock certificate as officers (Exhibit 55: 3-12-2014 Huycke File Document Regarding 2014 Stock Transfer).

7

DECLARATION OF JOANNE COUVRETTE

**Mark and Michael Take Control: 2015 to 2019**

28.    Around 2015, my brother Mark separated from his wife and moved in with my then-82-year-old mother, Ann Wisnovsky, who had previously been living alone. By this time, my mother had already suffered a serious fall in 2013, leading to multiple surgeries and a shoulder replacement. While Mark was still living with her, my mother was in a devastating car accident that fractured her spine.

29.    During this period of extreme vulnerability and dependency, Mark manipulated my mother into lending him $50,000 for his divorce settlement—money that he never repaid. (See Exhibit 39: 6-9-2015 $50,000 Check from Ann to Mark).

30.    Around this same time, Mark and Michael pressured my mother into gifting all her remaining shares of Valley View Winery to them, effectively stripping her of her ownership interest and causing her devastating financial harm.

31.    At some point around 2016, those 54,230 shares—the majority interest in Valley View Winery—were transferred to Mark and Mike Wisnovsky (Exhibit 51: Undated Transfer of 54,230 shares of VVW Stock). The sole signer in that transfer was allegedly Ann Wisnovsky. However, there is no date of transfer on the certificate, I did not sign the certificate, it was not executed in Huycke's office, and there is no accompanying notarized "Declaration of Gift." The dramatic difference between the minority stock transfer and the majority stock transfer calls into question whether the stock certificate was signed by Ann or whether undue influence was used to obtain her signature.

32.    As consideration for this alleged stock transfer, Attorney Patrick Huycke drafted the Agreement to Make Payments, designed to compensate her (and after her death, Robert and me) for the loss of her interest in the winery. (Exhibit 7: Agreement to Make Payments).

DECLARATION OF JOANNE COUVRETTE

33.    The execution of these documents is markedly different from other documents that Ann had executed, in Attorney Huycke's office, with witnesses and a notary. The series of emails between Huycke, Mark and Mike and Huycke's assistant Laurie demonstrate that by 2016, Huycke is drafting agreements, stock transfers and leases and transmitting them to Mark and Mike and the documents are being returned via email "signed" by Ann (Exhibit 59: Emails between Mark, Huycke and Laurie Miller):

- On February 15, 2016, Huycke emailed Mark and Mike and references the documents that he, Huycke, had prepared and sent to them in August of 2015, including a corporate resolution, and stock certificate. He specifically requests that Ann come into his office to execute the stock certificate. With the email, Huycke sends more documents including the leases and an Operating Agreement for Wisnovsky Land, LLC.

- On March 6, 2016, Mark sends an email and fax to Laurie Miller and Huycke. The executed "Agreement to Make Payments" allegedly signed by Ann on November 2, 2015, but faxed on March 4, 2016. Mark states:

  *"Attached is the signed "Agreement to Make Payments" we are finishing the review of the other documents and will be sending soon. My mother would like as much as possible to be done by the time she leaves for San Diego on March 22.*

  *Thanks, Mark"*

- Oddly, the leases are signed on March 24, 2016, after Ann left for San Diego, per Mark's email.

34.    The evidence that we have regarding Ann's transfer of the majority share of Valley View Winery, the Agreement to Make Payments, and the Leases indicate that if they were actually executed by Ann, they were not executed in her attorney's office, nor with an independent witness.

35.    The Agreement to Make Payments states:

- As a condition for their receipt of the gifts, VVW and Mark and Mike have agreed to make payments if certain conditions occur.

- Revenue over $750,000 from Valley View Winery was to be paid back to my Ann. This was a threshold number, that once reached, would have required all monies to accrue to Ann.

9

DECLARATION OF JOANNE COUVRETTE

- Payments were also triggered by the sale of VVW stock, or if VVW, Mark, or Michael **transferred assets outside of the normal course of business.**

36. Mark and Michael devised a scheme to avoid making any payments to my mother by creating an alter-ego company, Third Generation Farms LLC. This entity was formed two months before the Amended Agreement to Make Payments (Exhibit 7) and Second Addendum to the Vineyard Lease (Exhibit 3) were signed and served as an intermediary to divert profits away from Valley View Winery and directly into their own pockets. (Exhibit 38: Oregon Secretary of State Registration for Third Generation Farms).  These documents now form the set of documents Mark and Michael refer to as an "Inheritance Contract."

37. In Mark's Declaration, he admits that no payments were ever made under the Agreement to Make Payments. I concur, as there is no record of such payments having ever been made. Instead, Mark and Michael misled my mother into believing she would be compensated, while simultaneously structuring transactions to ensure she never received any return for decades of investment in VVW.  Even worse, she would never receive the return of her investment or the accrued rent that was owed to her, which seemed to have disappeared from the books completely.

38. The Agreement to Make Payments states that it is triggered if, within five years, VVW and Mark and Michael would pay Ann the proceeds of certain transactions over $750,000.

39. To get around this provision, in 2017, Mark and Michael made sure that VVW would not be the entity compensating them for the Cannabis grow, so they:

- Directed Attorney Huycke to draft two leases—the Vineyard Lease and the Winery Lease—covering 74 acres of land and VVW's production facilities. (Exhibits 1, 2: 2016 Vineyard and 2016 Winery Lease Agreements).

- Then they Amended the Vineyard Lease to allow subletting, enabling them to transfer the cannabis lease to Third Generation Farms, an entity they fully owned. (Exhibit 3: 2017 Second Addendum to Vineyard Lease).

10

DECLARATION OF JOANNE COUVRETTE

- Transferred this valuable lease to their alter-ego company, Third Generation Farms, without any record of payments being made to my mother or her trust.

- Obtained a valuable Cannabis license under the name Third Generation Farms, an entity to which Ann had no legal connection or control. Transferring a second asset from Valley View Winery, the lessee entitled to grow Cannabis.

40. The transfer of the lease and Cannabis license to an alter-ego company clearly qualified as an "asset transfer outside of normal business operations," which should have triggered immediate payments under the Agreement to Make Payments. Third Generation Farms then proceeded to pay Mark and Mike the lucrative proceeds from their Cannabis grow.

41. Pat Huycke's Deposition Testimony is very troubling to me regarding the advice or information he provided to my mom related to subleasing, which failed to identify any of the issues that were related to these complex, interconnected agreements. Not only because it failed to explain how the subletting would affect the Agreement to Make Payments, but because it failed to accurately describe the subletting clause itself:

Q. Did you give advice to Ann about the pros and cons of their subleasing on the vineyard property under this lease?
A. Well, I think I would have told her that they still had to comply with the terms of the main lease. I'm not sure I said much more than that.

42. Third Generation Farms had no written lease, no financial statements, and no accounting records. Third Generation Farms was used to funnel massive sums of money directly to Mark and Michael.

43. According to the 2018 and 2019 tax returns for Third Generation Farms LLC, Mark and Mike Wisnovsky were each allocated substantial pass-through income as reported on Line 14a (Net Earnings from Self-Employment) and Line 14b (Gross Farming Income) of the partnership's Form 1065, Schedule K-1.

- In 2018, Mark and Mike Wisnovsky were **each** allocated:

11

DECLARATION OF JOANNE COUVRETTE

- o $354,533 in self-employment taxable income (Box 14a)
- o $759,491 in gross income (Box 14b)
- In 2019, Mark and Mike Wisnovsky were **each** allocated:
  - o $70,763 in taxable self-employment income (Box 14a)
  - o $1,032,978 in gross income (Box 14b)

The total gross proceeds, each, to Mark and Mike in just those two years was $2,217,765 or a total of $4,435,530. As a pass-through entity, Third Generation Farms LLC does not pay corporate taxes, but instead allocates all taxable income directly to its partners, who are then responsible for reporting and paying taxes on these amounts on their individual tax returns. These figures reflect the income credited to Mark and Mike Wisnovsky, meaning that, for tax purposes, these amounts were considered their personal earnings by the IRS. (Exhibit 40 Third Generation Farms Partner K-1's).

44.    These gross earnings, transferred from Valley View Winery to Third Generation Farms to Mark and Mike Wisnovsky, trigger the Agreement to Make Payments, which states:

> If within five years following the Effective Date, in any transaction or series of transactions:
>
> a) **VVW sells or transfers assets, or any interests therein, out of the ordinary course of business;**
>
> b) Mike, Mark, and/or their successors in interest, sell stock of Valley View; and/or
>
> c) **Valley View makes payments to Mark, Mike,** and/or their successors in interest, that exceed the payments Mark and Mike would receive if they continued to receive their respective salaries at a level equal to the salaries paid to them immediately prior to the Effective Date; and if **the gross proceeds** of any such sales, transfers and payments, including the fair market value of any real or personal property received in such transactions, **exceeds the sum of $750,000**; then Valley View, Mark and Mike shall, jointly and severally, **be responsible to make payment to the Wisnovsky Trust of a dollar amount equal to the amount of such gross proceeds in excess of $750,000.** Payment shall be due within 30 days following the receipt of such gross proceeds in excess of $750,000.

45.    For the years of 2018 and 2019, Mark and Mike Wisnovsky were required to pay

12

DECLARATION OF JOANNE COUVRETTE

Ann $3,685,530 as consideration of her gift of all her shares in Valley View Winery. They did not.

46.     Suspiciously, some of Ann's rent payments came directly from Third Generation Farms instead of Valley View Winery, including the exact amount $1,583 under the original Winery and Vineyard Leases, which have never been mentioned as being sublet and per the winery lease, cannot be sublet.  This further highlights the "sublease" with no lease was just a structure to divert revenue to Third Generation, Mark and Mike didn't even continue the illusion that Third Generation Farms had an actual business relationship with VVW. Third Generation Farms seemed to me to just be a Valley View Winery "back pocket" that they put money in to keep it from Mom. (Exhibit 60: Rent Checks from Third Generation Farms to Wisnovsky Land).

47.     While we were unable to obtain complete financial records for Third Generation Farms, the bank records and tax filings that were produced reveal highly suspicious financial transactions, including:

48.     Western Union deposits into Valley View Winery's accounts, a technique frequently associated with money laundering. (Exhibit 41: Western Union Deposits into Valley View Winery).

49.     The Cannabis Business in these years was cash-based, making it impossible to verify the full extent of the hemp revenue. Huycke, acting as Ann's attorney, put no safeguard in place to assure that his other clients, Mark and Mike, did not take advantage of Ann.

**Parallels Between 2015 and 2008: A Pattern of Deception**

50.     The way Mark and Mike used Huycke to manipulate Ann is 2008 was repeated in 2015. The estate plan changes that Mark and Mike orchestrated are eerily like their actions in 2008.

13

DECLARATION OF JOANNE COUVRETTE

51.     In 2008, Mark and Mike emailed Attorney Huycke stating *Ann* wanted to change things, when she had no knowledge of their plan. In 2015, they repeated the process (Exhibit 33: 2008 Email from Mike to Huycke, Exhibit 12: 2015 Email from Mark to Huycke, Exhibit 13: Email from Mike to Huycke).

52.     In 2015, Mark wrote an estate proposal in Mark's voice and placed a scanned signature of Ann's at the bottom to make it look like she endorsed it. He did not even bother to pretend the words were Ann's, saying "my mom" instead of "I" (Exhibit 13: 2015 Estate Proposal Mark to Huycke).

53.     In 2008, Ann had obtained an independent review of their "Memorandum", which helped her identify the deception and stop their plan. (Exhibit: 36 2008 Review of Memorandum). By 2015, however, my mother was physically weakened from her accidents and surgeries, and no independent review of the plan was ever conducted. She was entirely reliant on Huycke, the same attorney who had prioritized Mark and Mike's interests in 2008. These were complicated transactions that deserved an independent review by counsel committed to Ann's interests, and Ann's interests alone. My mom thought she could trust her two sons, but she couldn't.

**The Redemption Agreement**

54.     My mother also signed a Redemption Agreement, drafted by Attorney Patrick Huycke at the direction of Mark and Michael. Under this revocable agreement, my mother's trust would be required to sell its interest in Wisnovsky Land, LLC (owner of all Ann's property) for between $200,000 and $280,000.   According to Hucke's deposition testimony the Redemption Agreement was revocable (Exhibit 5: Deposition of Pat Huycke)

55.     In 2017, Ann's Trust provided for Mark and Mike to inherit Wisnovsky Land, LLC.  Ann later amended her Trust, gifting Wisnovsky Land LLC to Robert and me.

DECLARATION OF JOANNE COUVRETTE

56.    At no point was an independent appraisal obtained (Exhibit 5: Deposition of Huycke), nor was my mother informed of the full market value of the property before signing the agreement. Unlike in 2008, when my mother sought an independent review of Mark and Michael's estate proposal, by 2015, she had weakened physically due to her accidents and surgeries and did not obtain a financial review before signing the Redemption Agreement or the other contracts that Defendants are retroactively construing as irrevocable inheritance contracts.

57.    The following valuations illustrate the drastic disparity between the price in the Redemption Agreement and the true market value of my mother's land:

- 2008 Memorandum: Mark and Michael's own estate planning proposal valued the land per the 2008 Tax Assessment valuation of $2,144,280. (Exhibit 35). The Redemption Agreement values half the interest of this asset at $200,000.

- Powell Banz Appraisal (2020): A professional appraisal valued the property at $4.48 million (without the lease) (Exhibit 9: Powell Banz Appraisal).

- 2025 Real Estate Agent Valuation: Real estate agent Lorrie Norman valued the assets—excluding Valley View Winery Corp—at $4.8 million. (Exhibit 42: 2025 Letter from Real Estate Agent Lorrie Norman

- Jackson County Tax Assessor (2024) Valuation of Lot 200 and Lot 1800, owned by Wisnovsky Land is $2,175,550 (Exhibit 48: 2024 Property Tax Statements)

- Date of Death Valuation (2023): At the time of Ann's death, March 16, 2023, we obtained a Real Market Valuation of her Wisnovsky Land, LLC property (Exhibit 45: Date of Death Valuation)

58.    These valuations provide clear and irrefutable evidence that my mother's property was worth millions more than the price dictated in the Redemption Agreement. She was never informed of these values, and she was not given the opportunity to seek competitive offers or fair market pricing before signing agreements that deprived her of the monies that she needed at the end of her life.

**The March 2017 Agreements: A Fabrication to Justify Unlawful Deductions**

59.    In their filings, Mark and Michael Wisnovsky refer to a set of documents as the

15

DECLARATION OF JOANNE COUVRETTE

"April Consent Documents", claiming that these documents justify their unauthorized deductions from Ann Wisnovsky's rent and their alleged right to make improvements to the property. However, these documents are both dated March 25, 2017, and there is no April agreement of any kind. More significantly, my mother was not in Oregon on March 25, 2017, and could not have signed them.

60.     Exhibit 26: 2017 Plane Tickets confirms that my mother was in California and Utah from February 24 to April 8, 2017. This means she was physically absent on the date the untitled document that allowed rent deductions and "Consent to Make Improvements" documents were allegedly signed. Despite this, Mark and Michael have repeatedly mischaracterized them as "April Agreements," to obscure the fact that Ann could not have executed them on March 25, 2017, the date on the actual documents. (Exhibit 15 Email from Campanella with Attachments). Both these documents turned up after Mark was sent an email telling him to stop making deductions from Ann's rent (Exhibit 14: 6-14-2019 Email from Joanne to Mark)

61.     The "Consent" document purports to authorize Mark and Michael to unilaterally deduct expenses from Ann's rental payments. It states:

> "I am giving my consent for Mark and/or Michael Wisnovsky to pay my personal bills and deduct the amounts from the monthly lease payments from either Winery lease, the Vineyard lease or the Hemp field lease.
>
> I am also consenting for them to make payments directly to US Bank on my home mortgage and deduct the amounts from the monthly lease payments either the Winery lease, the Vineyard lease or the Hemp Field lease."

62.     When I researched Ann's accounts, the dates of travel for Ann in 2017 and consulted with my attorney, I learned that:

- The **lease does not authorize** any such deductions.

- There is no independent verification that Ann approved of these deductions, which are Lease Addendums. Despite Ann being represented by counsel at the time they were signed, they were drafted by Mark and Mike and allegedly signed

16

DECLARATION OF JOANNE COUVRETTE

without counsel or notary.

- Defendants' own rent records (Exhibit 20: Rent Records) show that over $100,000 was deducted from Ann's rent based on this document.

63.    When confronted with proof that Ann was out of town, Mark and Michael began referring to the document as the 'April Agreement', despite its March date, further indicating that its authenticity is questionable.

64.    The "Notice of Improvements" document similarly lacks validity. Mark and Michael claim that Ann authorized them to make improvements to the leased property, without reference to the Winery Lease, Vineyard Lease and its terms regarding tenant improvements.

65.    Mark and Michael's attempt to rely on these fabricated agreements to support their "inheritance contract" is misleading. Their shifting terminology, the impossible timeline, and the lack of any actual improvements all point to a deliberate effort to retroactively justify their misconduct.  Both documents have been used as the basis for Counterclaims in this litigation.

**2019: Ann's Realization and Request for Help**

66.    In May 2019, while visiting me in San Diego, my mother, Ann Wisnovsky, expressed unease and uncertainty about the impact of the legal documents she had signed. She was particularly concerned about how these documents would affect Robert, especially considering that she credited Robert with saving Valley View Winery and wanted to ensure he was properly rewarded for his efforts upon her passing.

67.    My mother also disclosed that she had not received all her rent payments from Mark and Michael under the lease agreement. Concerned about her financial situation, she asked for my assistance in reviewing her financial records. As part of this effort, my mother contacted her attorney, Patrick Huycke, to request her legal file.

68.    After reviewing my mother's bank accounts, I confirmed that my Ann was correct, she had received **no rent payments** at all for the first year of the lease, 2016 and had

received just six rent checks in 2017 for total of $8,841.

69.     When we later received Mark and Mike's 2019 Rent Record (Exhibit 20: Rent Records), a document which itemized more than $100,000 that they had deducted from Ann's rent, I noticed a single entry of $23,500 paid to US Bank for Ann's Mortgage. No backup documents were provided for any of the deductions claimed from Ann's rent.  To validate the deductions, I investigated these transactions to verify them.

70.     I contacted US Bank regarding the alleged $23,500 payoff of the 1352 Upper Applegate Mortgage.  According to the transaction record provided to me by US Bank (Exhibit 46: 5-10-2018 Mortgage Payoff US Bank), the payment amount made to "pay off" the mortgage was on 5-10-2008 and was $4,886.84 paid in cash, with no record of who made the payment.

71.     However, per Ann's 2008 outside Review, we know that the $179,000 mortgage proceeds were due TO Ann, for her having loaned the proceeds of her mortgage to Valley View Winery, yet Mark and Mike claim to have made payments on her loan and then deducted the amounts from rent due to Ann.

72.     Additionally, the U.S. Bank and other cash transactions raise broader concerns regarding the availability of undocumented cash within Valley View Winery and its Cannabis operations. If Mark and Michael had access to large sums of cash for a mortgage payment, it raises questions regarding the total cash income from their business activities, how that income was tracked, and whether any safeguards existed to ensure compliance with the Second Addendum to the Vineyard Lease, which required a small percentage of revenue to be paid to Ann, and the Agreement to Make Payments, that required payment to Ann if certain revenue thresholds were met.

73.     I also discovered that Valley View Winery and Third Generation Farms were using the electric from Ann's house for their Cannabis drying and processing operations in the barn/shed.  They were then deducting their operational expense for electricity from Ann's rent.

18

DECLARATION OF JOANNE COUVRETTE

(Exhibit 20: Rent Records, Exhibit 47: Letter Thierolf to Brophy Schmor). They also deducted for expenses paid by Ann, such as her 2017 Property Tax Bill (Exhibit 49: 11-13-2017 Ann Wisnovsky's Check #1183 to Jackson County) and expenses that were in Mark's name (Exhibit 53: Mark Wisnovsky 1352 Upper Applegate Spectrum Bill).

74.    This lack of rental income was alarming given that she had relied on these payments to sustain herself.  On June 19, 2019, I sent an email to Mark instructing him not to deduct anything from rent. His attorney responded with the "Consent" document, allegedly allowing them to make deductions from rent and Rent Records (Exhibit 20: Rent Records), according to those records:

| Year | Rent Due | Payments Made | Deductions |
|------|----------|---------------|------------|
| 2016 | $12,943 | $0 | $12,943 |
| 2017 | $25,940 | $8,841 | $17,099 |
| 2018 | $49,620 | $42,126 | $7,494 |
| Jan-July 2019 | $70,550 | $4,463 | $66,087 |
| TOTAL | $159,053 | $55,430 | **$103,623** |

75.    Even if we believe the "consent agreement" to deduct personal expenses was signed by Ann, it would not be effective until the date signed, 3-24-2017, so no deductions would be authorized until that date, disallowing $25,370 in deductions (Exhibit 20)

| Disallowed Deductions | Amount |
|------------------------|--------|
| 2016 Unauthorized Deductions | $19,335 |
| 2017 Unauthorized Deductions (Jan-Mar) | $6,505 |
| Total Disallowed Deductions | **$25,370** |

76.    In addition, many of the deductions are false:

| Expense | Amount | Issue |
|---------|--------|-------|
| Chair Lift | $1,652 | Defendants purchased and installed a used Chair Lift that never worked (Declaration of Sophia Wisnovsky, Exhibit 44: Chair Lift Photo) |

19

DECLARATION OF JOANNE COUVRETTE

| Expense | Amount | Issue |
|---|---|---|
| Property Tax Payment | $2,550 | Defendants did not pay this bill. It was paid directly by Ann's personal check (Exhibit 49: 11-13-2017 Ann Wisnovsky's Check #1183 to Jackson County) |
| Attorney Fees (Huycke) | $4,343 | Huycke was VVW's attorney and was drafting documents at VVW's request. No documentation provided. |
| Blue Cross Payment | $14,156 | Ann's health insurance was covered by Humana auto-deductions from her personal account. |
| Mortgage Payment | $23,500 | Paid in cash to **US Bank** (Exhibit 46: 5-10-18 U.S. Bank Mortgage Payoff)<br><br>Mortgage of $179,000 was a VVW debt to Ann (Exhibit 36: Review of Memorandum) |
| Power Bill | $10,305 | Valley View Winery's use of Ann's power for Hemp drying, (Exhibit 47: Letter from Attorney Thierolf to Attorney Campanella) VVW was using Ann's house power for Cannabis drying and deducting the Bill from Ann's rent. |
| Spectrum Cable Bill | $6,257 | This was Mark Wisnovsky's personal bill for services he had installed when he lived at Ann's home (Exhibit 53: Mark Wisnovsky's Spectrum Bill) |

77.  Those few transactions represent deductions of $75,571 from Ann's rent from March 2017 through June 2019 that are easily refuted with documentary evidence. Notwithstanding the fact that Ann could not have signed the March 25, 2017, so-called "April Consent Agreements".

78.  At my mother's direct request, I helped her with a Fourth Trust Amendment. However, I firmly insisted that my mother retain a new attorney to represent her interests moving forward to ensure her legal matters were handled appropriately and impartially. She agreed and took immediate steps to secure independent legal representation.

79.  Upon her return to Oregon, my mother retained attorney Gary Turner to assist her in reviewing her legal affairs, while I retained attorney Richard Thierolf. I insisted on separate legal counsel to avoid any conflict of interest in Turner's representation of my mother.

80.  Ann provided Gary Turner with the complete legal file from Huycke, and they met to review her estate planning documents and discuss her intentions regarding her estate.

20

DECLARATION OF JOANNE COUVRETTE

This engagement was markedly different from her prior conflicted relationship with Huycke, Mark, and Mike, who had exerted significant influence over her legal and financial decisions.

81. My daughter, Anna Couvrette, was present during Ann's visit to San Diego and can attest to the circumstances surrounding her stay. Exhibit 27: Anna Couvrette's 1-28-25 Declaration supports the fact that Ann was in San Diego for Anna's graduation from the University of Southern California and that during this time, Ann showed no signs of incapacity or coercion. Anna also witnessed her grandmother's insistence on finalizing legal changes before returning to Oregon, including signing the Fourth Trust Amendment before a notary at Wells Fargo Bank.

82. The notarized Fourth, Fifth, and Sixth Trust Amendment (Exhibit 30: Ann's Trust with Amendments) and Revocation of Redemption Agreement (Exhibit 58: 7-2-2019 Revocation of Redemption Agreement) substantiate Ann's clear intent to reassess and rectify her estate planning. These actions, taken with the assistance of independent legal counsel, Gary Turner, underscore Ann's autonomy in making these decisions, free from undue influence or coercion.

**The Events of June 2019: Contrasting Reality with Mark's Narrative**

83. When I left Oregon in early June 2019 and returned to San Diego, I believed that my mother's concerns were addressed, her interests protected by her new attorney, and that she was physically safe. I had arranged for my niece, Sophia Wisnovsky, to stay with her Grandmother, Ann, for the summer, as I had noticed her developing mobility problems and was concerned about her managing the stairs in her house alone, until I could arrange for the Chair Lift and her stairs to be repaired for her use. Unfortunately, what later unfolded informed me that my mother was not safe in Oregon.

84. On June 19, 2019, my mother called me, shaken, and informed me that Mark had visited her home, woken her from a nap, and pressured her to sign legal documents. She refused and directed me to notify Mark that she had retained legal counsel and that any trust-related documents required both co-trustees' signatures. I immediately complied and sent an email to Mark confirming that Ann was represented by her new counsel, had amended her Trust, and that both of our signatures as Co-Trustees were required to sign any trust-related documents. (Exhibit

21

DECLARATION OF JOANNE COUVRETTE

14: June 19, 2019, Email Joanne to Mark).

85.    On June 20, 2019, ignoring this clear legal notification, Mark returned to Ann's home the very next day and had her sign a lease amendment that he later threatened to use as the basis for a $3.25 million lawsuit against her. (Exhibit 15: July 26, 2019, Email from Attorney Campanella with Attachment 6-20-19 "Notice of Improvement to Winery and Vineyard Lease" and "3-25-2017 Consent")

86.    On June 21, 2019, Mark staged a "proof of life" photo of Ann holding the June 21, 2019, Medford Mail Tribune, accompanied by a handwritten note asserting that she did not want changes to her estate plan—an act clearly designed to undermine her prior legal amendments. He sent the photo to Attorney Gary Turner. (Exhibit 31: Photos of Ann Wisnovsky with Note 6-23-2019).

**Ann's Voicemails – Context and Coercion**

87.    Mark and Mike selectively rely on June 20 voicemails left by Ann as evidence that she did not want changes to her estate. However, when viewed in the broader context of their coercion tactics, these voicemails reflect a cycle of manipulation and intimidation. The pattern is clear: Ann initially resisted signing documents, Mark applied pressure and threats, and ultimately Ann relented, leaving voicemails that reflect her distress rather than free will.

88.    On June 24, 2019, my niece, Sophia Wisnovsky, called me in distress, informing me that Mark was forcibly attempting to lift Ann into his truck to take her to an unscheduled doctor's appointment. Ann, a frail woman of just 4'8", was crying out in pain and unable to get into the vehicle. My niece attempted to intervene, but Mark insisted that the appointment had been changed and sped away with Ann. (Declaration of Sophia Wisnovsky, Exhibit 57: Ann's June and July Calendar)

89.    Mark took Ann to see Dr. Alan Binette, her personal physician of 40 years, without an appointment. This was highly unusual as patients usually have appointments for doctor visits. Dr. Binette performed an evaluation and found that Ann was "clinically quite collected and capable", passing a Mini Mental Status exam without difficulty. Dr. Binette documented that he did not observe any cognitive decline and that Ann herself did not feel that

DECLARATION OF JOANNE COUVRETTE

there was any issue with her memory. (Exhibit 29: July 1, 2019, FAX transmittal of Dr. Allan Binette's Medical Record)

90.    The Trust's incapacity provisions require that determination of incapacity be made by Ann's personal physician, rather than an independent medical examiner. Mark himself initiated this assessment, and the medical record reflects that Ann was deemed competent in 2019. This record is not being offered as an expert opinion but is referenced here to establish the facts of the events and to clarify that Ann was not found incapacitated during this period.

91.    Upon my return to Oregon, my mother and I visited her attorney, Gary Turner, on July 2, 2019. He showed us the disturbing staged "proof of life" photo that Mark had sent him. When I asked her why she had allowed that picture to be taken, Ann looked down in embarrassment and whispered, "They made me." However, after a moment of reflection, she lifted her head, smiled, and said, "Besides, it's too late—I already changed the estate." (Exhibit 31: Photos of Ann Wisnovsky with Note)

92.    Turner had reviewed Ann's file, consulted with Richard Thierolf, my attorney, and after meeting with her to review her estate plans, had drafted the 7-2-2019 Revocation of Redemption Agreement. and I signed it with Gary Turner, in his office, with a notary. (Exhibit 58: Revocation of Redemption Agreement)

93.    Shortly after this meeting, we arrived at Ann's home to find my nephews leaving her house. A chilling discovery followed: copies of a document titled "Things to Remember" had been placed in every drawer of her kitchen and dining room—some even laminated. (Exhibit 7: "Things to Remember"). We later realized her safe had been opened and was empty. Concerned for our safety, I called my brother Robert, who stayed with us until we left for San Diego. (Declaration of Sophia Wisnovsky)

94.    These events paint a deeply troubling picture of Mark and Mike's coercive tactics, which included threats, physical control, fabricated legal documents, and attempts to have Ann declared incompetent for their own financial gain. The selective use of Ann's voicemails ignores this broader reality of undue influence.

**Contrasting Mark's Narrative with the Facts**

23

DECLARATION OF JOANNE COUVRETTE

95.    Mark attempts to characterize June 2019 as a time of confusion for Ann, stating in his Declaration that Ann "did not know the name of her new attorney" and that she was unclear about her estate plans. This is demonstrably false.

96.    On June 19, 2019, Ann explicitly told me to notify Mark that she had hired an attorney, that she had amended her Trust, and that both of our signatures as Co-Trustees were required on Trust-related documents. This is proven by the email I sent to Mark that same day. (Exhibit 14: June 19 Email Joanne to Mark).

97.    Mark did not learn Ann's attorney's name from me—Ann provided it to him directly. He immediately contacted Attorney Gary Turner and, the very next day, returned to pressure Ann into signing the lease amendment. (Exhibit 15: July 26, 2019, Email with Lease Amendment and Consent Documents).

98.    The "Proof of Life" photo taken on June 21 was not a spontaneous moment—it was a staged attempt by Mark to create evidence against Ann's Trust amendments. This, along with coercive voicemails, an unauthorized doctor's visit, and the staged estate plan documents left in Ann's home, illustrates a calculated pattern of undue influence and elder abuse. (Exhibit 31: Photos of Ann with Note).

99.    By contrast, Ann's actions in May and June 2019 were deliberate and consistent. She sought legal counsel, executed notarized Trust Amendments (Exhibit 27: Declaration of Anna Maria Couvrette), and resisted Mark's pressure until he isolated her and forced her compliance.

100.    These events are not speculative; they are supported by emails, medical records, legal documents, and sworn testimony. Mark's Declaration omits key details and distorts the sequence of events to downplay his coercion and undue influence.

**Mark's History of Concealment and Unauthorized Actions**

101.    Since the Trust's inception in 2012, I served as Co-Trustee. As a Co-Trustee, I was named on all trust documents and assets. However, after rejecting proposed leases in 2015, I was systematically excluded from Trust-related matters.

DECLARATION OF JOANNE COUVRETTE

- I was never informed of the First, Second or Third Trust Amendments, which were executed while I was Co-Trustee.

- I was never informed when Ann allegedly transferred all her Valley View Winery stock, nor was I asked to sign the Stock Certificate listing me as an owner, which was allegedly executed while I was Co-Trustee.

- I was never notified of my alleged removal as Co-Trustee, as required by the Trust.

102. Alarmingly, real property with deeds titled in the name of the "Ann M. Wisnovsky Trust," and bearing my signature, was transferred to Wisnovsky Land, LLC without my signature or authorization. In fact, I discovered the signature line with my name was removed from the Deed and transferred.

103. These events paint a clear picture: Mark was not a passive bystander—he actively manipulated events, concealed critical information, and exerted undue influence over Ann to serve his financial interests.

**June 6, 2024, California Court Orders**

104. The San Diego Superior Court, Probate Division, issued a Final Order on June 6, 2024, in the matter of the Ann M. Wisnovsky Trust (Exhibit 28: June 6, 2024, California Superior Court Order). This order:

- Affirmed the Trust and its six amendments as valid and controlling.

- Found that the sole Qualified Beneficiaries of the Trust are Joanne Couvrette and Robert F. Wisnovsky.

- Established that the Principal Place of Administration of the Trust has always been San Diego County, California.

105. This Final Order is binding and not subject to appeal, rendering any claim that the Trust is invalid or that Mark and Michael Wisnovsky are beneficiaries legally baseless.

**Current Assets, Valuations, and Beneficiaries of the Trust**

106. **Section 3.3** of the Trust governs the **Final Distribution** of assets (Exhibit 30)

**Section 3.3 A** addresses Ann's **personal property** (household goods, photos, etc.). Ann **gifted these items to her children and grandchildren during her lifetime**, leaving **no personal property titled to the Trust at the time of her death**.

25

DECLARATION OF JOANNE COUVRETTE

**Section 3.3 B** states that the **Shares of Valley View Winery Stock** had already been **previously transferred** or **gifted to Mark A. Wisnovsky and Michael J. Wisnovsky**, meaning there were no remaining shares in the Trust at Ann's passing.

**Section 3.3 C** distributes the **rest, residue, and remainder of the Trust**:

*"The rest, residue and remainder of this Trust shall be divided into two (2) equal shares. One of such shares shall be distributed to Joanne Couvrette and one of such shares shall be distributed to Robert F. Wisnovsky."*

107.   Remaining Assets of the Trust:

- Membership interests in two Limited Liability Companies (LLCs):
    Wisnovsky Land LLC
    Upper Applegate LLC
- A contingent future interest in Elder Abuse Litigation

108.   In 2020, I obtained appraisals on Trust and LLC property, including the Wisnovsky Land, LLC property under lease to Valley View Winery.  I specifically requested an appraisal of the property subject to the lease, to determine whether it was viable for sale.  The Powell-Banz Appraisal, Exhibit 9, was obtained through the normal course of business and is submitted as a business record of Wisnovsky Land, LLC.

109.   Both LLCs are managed by a manager, and I am the manager of both in my individual capacity.

**Lis Pendens Lien & Lease Defaults**:

110.   Valley View Winery placed a Lis Pendens Lien on the Wisnovsky Land property, preventing its sale or use as collateral for a loan for my mother's care. (Exhibit 43: Lis Pendens Lien)

111.   Valley View Winery is currently in default on its lease for failing to pay 2022 and 2023 property taxes, and the leases have been terminated. (Exhibits 22 through 25 Default and Termination Letters)

- December 2023: VVW's property tax payment was returned NSF (non-sufficient funds). I personally paid the taxes to prevent delays in the 2-acre lot partition.

- January 2024: Wisnovsky Land terminated Valley View Winery's lease due to uncured defaults.

26

DECLARATION OF JOANNE COUVRETTE

- Since December 2023, VVW has refused to vacate the property or pay rent.

**Summary**

The evidence presented in this Declaration—including financial records, legal documents sworn testimony, and court orders—clearly establishes a pattern of elder abuse, financial mismanagement, and undue influence that deprived my mother of her rightful assets and financial security. On June 6, 2024, the California Superior Court, by its Order, confirmed the validity of the Trust and its amendments, as well as the true beneficiaries. Despite these findings, Mark and Michael Wisnovsky continue to assert baseless claims and obstruct the proper administration of the Trust, forcing unnecessary litigation over matters that have already been legally resolved.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

DATED this 27th day of March 2025.

By: _/s/ Joanne Couvrette_

27

DECLARATION OF JOANNE COUVRETTE