Plaintiff's Exhibit 1

# VINEYARD LEASE

**Effective Date:**    _March 24_, 2016

**Between:**    THE ANN M. WISNOVSKY TRUST,    ("Landlord")
UTD AUGUST 2, 2012
1352 Applegate Road
Jacksonville, OR 97530

**And:**    VALLEY VIEW WINERY, INC., an    ("Tenant")
Oregon corporation
1000 Upper Applegate Road
Jacksonville, OR 97530

Landlord leases to Tenant and Tenant leases from Landlord the following described property (the "Premises") on the terms and conditions stated below:

THAT PORTION OF THE REAL PROPERTY DESCRIBED IN **EXHIBIT A** PRESENTLY PLANTED AS A VINEYARD AND LYING FALLOW, BUT EXCLUDING THE SINGLE FAMILY RESIDENCE PRESENTLY OWNED BY THE ANN M. WISNOVSKY, TRUSTEEE OF THE ANN M. WISNOVSKY TRUST, UTD 8/2/12, AND THE TWO PARCELS THAT HAVE BEEN OR MAY BE CREATED UNDER OREGON MEASURE 37 (ORS 197.352). THE PREMISES ARE DEPICTED IN THE MAP ATTACHED AS **EXHIBIT B**.

The Tenant shall have the right of ingress and egress over and across the real property described in Exhibit A as reasonably necessary to access the Premises.

This lease supersedes all prior leases and tenancies for the Premises, which are of no further force or effect.

## Section 1.    Occupancy and Commencement Date

**1.1    Original Term.** The term of this lease shall commence on the date hereof and shall continue for 10 years, unless sooner terminated as hereinafter provided.

**1.2    Possession.** Tenant's right to possession and obligations under the lease shall commence on the commencement date described in paragraph 1.1 above.

**1.3    Renewal Option.** If the lease is not in default at the time each option is exercised or at the time the renewal term is to commence, Tenant shall have the option to renew this lease for 8 successive terms of 10 years, each, as follows:

1 – VINEYARD LEASE

PLAINTIFF'S
EXHIBIT
**251**

Exhibit 1 – Page 1 of 17

PDF Page 4                                    VALLEYVIEW_001382

(1)    Each of the renewal terms shall commence on the day following expiration of the preceding term.

(2)    The option will be automatically exercised unless written notice to Landlord is given for review not less than 180 days prior to the last day of the expiring term. The giving of such notice, not to renew, shall be sufficient to make the lease termination binding for the renewal term without further act of the parties.

(3)    The terms and conditions of the lease for each renewal term shall be identical with the original term except for rent. Rent for a renewal term shall be continued from the original term with escalation calculated in the same manner as during the original term.

## Section 2.    Rent

**2.1    Base Rent.** During the original term, Tenant shall pay to Landlord as monthly base rent the sum of $12.50 per acre of land that is being used for the production of agricultural crops. Presently there are 35 acres of land being used for the production of agricultural crops, so monthly base rent is $437.50. If any of such land that is now in production becomes fallow, no rent shall be paid on such land for a period of not more than 5 years; after a period of 5 years has expired, Tenant shall recommence paying rent for such land. Rent shall be payable on the first day of each month in advance at such place as may be designated by Landlord. If rent paid after the first day of the month, a five percent (5%) late fee will be due as additional rent.

**2.2    Additional Rent.** All taxes, insurance costs, utility charges that Tenant is required to pay by this lease, and any other sum that Tenant is required to pay to Landlord or third parties shall be additional rent.

## Section 3.    Escalation

Effective on the first day of the 61st month of the initial term of this lease and on the first day of each 61st month thereafter, monthly base rent shall be increased by an amount equal to 5% of the monthly base rent paid during the preceding 60 month period.

## Section 4.    Use of the Premises

**4.1    Permitted Use.** The Premises shall be used for the growing of grapes and other crops and for related uses. No other uses shall be made of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld.

**4.2    Costs of Farming.** Tenant will be responsible for and pay all the costs of materials, labor, equipment, utilities, and other expenses necessary to farm the Premises and raise crops from the Premises during the lease term.

2 – VINEYARD LEASE

Exhibit 1 – Page 2 of 17

PDF Page 5

VALLEYVIEW_001383

**4.3     Manner of Farming and Conservation Laws.** Tenant will farm, cultivate, maintain, and operate the Premises consistent with the best agricultural practices employed by the farming industry in the area where the Premises is located. Tenant will refrain from practices that will cause unusual erosion to the Premises. Tenant will maintain the Premises in compliance with all federal, state, and other governmental laws, regulations, and directives.

**4.4     Chemicals and Fertilizers.** The parties understand that chemicals and fertilizers may be necessary to produce the highest financial returns from the Premises. They also understand that chemicals and fertilizers can damage the Premises if applied incorrectly or on crops that are excluded on a chemical's or fertilizer's product label. Subject to the limitations in Section 4 above, chemicals and fertilizers will be used by Tenant, if necessary, to produce the highest financial returns from the Premises, subject to the condition that Tenant will not, without Landlord's prior written consent, use any of the fertilizers or chemicals that would adversely affect the condition of the Premises and the crops grown after termination of this lease.

**4.5     Irrigation.** Tenant will maintain the water rights on the Premises. Tenant will be responsible for all water costs. Landlord assumes no responsibility to Tenant for any water shortage, nor does Landlord warrant the quality or quantity of the water available to the Premises.

**4.6     Restrictions on Use.** In connection with the use of the Premises, Tenant shall:

(1)     Conform to all applicable laws and regulations of any public authority affecting the Premises and the use, and correct at Tenant's own expense any failure of compliance created through Tenant's fault or by reason of Tenant's use.

(2)     Refrain from any use that would be reasonably offensive to other tenants or owners or users of neighboring premises or that would tend to create a nuisance or damage the reputation of the Premises.

(3)     Tenant shall not cause or permit any Hazardous Substance to be spilled, leaked, disposed of, or otherwise released on or under the Premises. Tenant may use or otherwise handle on the Premises only those Hazardous Substances typically used or sold in the prudent and safe operation of the business specified in Section 4.1. Tenant may store such Hazardous Substances on the Premises only in quantities necessary to satisfy Tenant's reasonably anticipated needs. Tenant shall comply with all Environmental Laws and exercise the highest degree of care in the use, handling, and storage of Hazardous Substances and shall take all practicable measures to minimize the quantity and toxicity of Hazardous Substances used, handled, or stored on the Premises. Upon the expiration or termination of this Lease, Tenant shall remove all Hazardous Substances from the Premises. The term Environmental Law shall mean any federal, state, or local statute, regulation, ordinance or any judicial or other governmental order pertaining to the protection of health, safety or the environment. The term Hazardous

3 – VINEYARD LEASE

Exhibit 1 – Page 3 of 17

PDF Page 6                                                    VALLEYVIEW_001384

Substance shall mean any hazardous, toxic, infectious or radioactive substance, waste, and material as defined or listed by any Environmental Law and shall include, without limitation, petroleum oil and its fractions.

## Section 5.     Repairs and Maintenance

**5.1     Landlord's Obligations.** The Landlord shall have no responsibility of obligations for repairs and maintenance. The Tenant is responsible for all repairs and maintenance.

**5.2     Tenant's Obligations.** Tenant shall perform all maintenance and repairs to the Premises, including without limitation the following:

(1)     Any repairs necessitated by the negligence of Tenant, its agents, employees, and invitees.

(2)     Ordinary maintenance of the heating and air conditioning system and any repairs necessary because of improper maintenance.

(3)     Any repairs or alterations required under Tenant's obligation to comply with laws and regulations as set forth in Section 4.6 (1).

(4)     All other repairs necessary to maintain the Premises in good condition and repair.

**5.3     Reimbursement for Repairs Assumed.** If Tenant fails or refuses to make repairs that are required by this Section 5, Landlord may make the repairs and charge the actual costs of repairs to Tenant plus 10%, such expenditures by Landlord shall be reimbursed by Tenant on demand together with interest at the rate of 12% per annum from the date of expenditure by Landlord. Except in an emergency creating an immediate risk of personal injury or property damage, Landlord may not perform repairs which are the obligation of Tenant and charge Tenant for the resulting expense unless at least ten days before work is commenced, and Tenant is given notice in writing outlining with reasonable particularity the repairs required, and Tenant fails within that time to initiate such repairs in good faith.

**5.4     Inspection of Premises.** Landlord shall have the right to inspect the Premises at any reasonable time or times to determine the necessity of repair.

## Section 6.     Condition of Premises

**6.1     Alterations Prohibited.** Tenant will make no improvements or alterations on the Premises of any kind without first obtaining Landlord's written consent. All alterations will be made in a good and workmanlike manner, and in compliance with applicable laws and building codes.

4 – VINEYARD LEASE

Exhibit 1 – Page 4 of 17
PDF Page 7

VALLEYVIEW_001385

**6.2     Ownership and Removal of Alterations.** All improvements and alterations performed on the Premises by either Landlord or Tenant will be the property of Landlord when installed unless the applicable Landlord's consent or work sheet specifically provides otherwise. At Landlord's option, Tenant will remove its improvements and alterations and restore the Premises to its original condition, unless the applicable Landlord's consent or work sheet specifically provides otherwise.

**Section 7.     Insurance**

Tenant shall obtain and keep continuously in force during the term of this lease a comprehensive liability insurance policy naming Landlord as an additional named insured to protect against loss by reason of injury to persons or damage to property of third persons with personal injury limits of not less than $2,000,000.00 for each person, $2,000,000.00 for each occurrence, and $2,000,000.00 for property damage, and provide to Landlord certificates of such coverage.

**Section 8.     Taxes; Utilities**

**8.1     Property Taxes.** Tenant will do all that is reasonably necessary to maintain the special real property tax assessment that are presently available for the Premises. Tenant shall pay as due all taxes on its personal property located on the Premises. Tenant shall pay as due all real property taxes and special assessments levied against the Premises. As used herein, real property taxes include any fee or charge relating to the ownership, use, or rental of the Premises, other than taxes on the net income of Landlord or Tenant.

**8.2     Special Assessments.** If an assessment for a public improvement is made against the Premises, Landlord may elect to cause such assessment to be paid in installments, in which case all of the installments payable with respect to the lease term shall be treated the same as general real property taxes for purposes of Section 8.1.

**8.3     Contest of Taxes.** Tenant shall be permitted to contest the amount of any tax or assessment as long as such contest is conducted in a manner that does not cause any risk that Landlord's interest in the Premises will be foreclosed for nonpayment. Landlord shall cooperate in any reasonable manner with such contest by Tenant.

**8.4     Proration of Taxes.** Tenant's shall pay the taxes and assessments for the February and May installments of the current tax year that this lease is in effect.

**8.5     New Charges or Fees.** If a new charge or fee relating to the ownership or use of the Premises or the receipt of rental there from or in lieu of property taxes is assessed or imposed, then, to the extent permitted by law, Tenant shall pay such charge or fee. Tenant, however, shall have no obligation to pay any income, profits, or franchise tax levied on the net income derived by Landlord from this lease.

5 – VINEYARD LEASE

Exhibit 1 – Page 5 of 17

PDF Page 8

VALLEYVIEW_001386

**8.6     Payment of Utilities Charges.** Tenant shall pay when due all charges for services and utilities incurred in connection with the use, occupancy, operation, and maintenance of the Premises, including (but not limited to) charges for irrigation and electricity. If the charges are not separately metered or stated, Landlord shall apportion the charges on an equitable basis, and Tenant shall pay its apportioned share on demand.

**Section 9.     Eminent Domain**

**9.1     Partial Taking.** If a portion of the Premises is condemned and Section 9.2 does not apply, the lease shall continue on the following terms:

(1)     Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation.

(2)     Landlord shall proceed as soon as reasonably possible to make such repairs and alterations to the Premises as are necessary to restore the remaining Premises to a condition as comparable as reasonably practicable to that existing at the time of the condemnation.

(3)     After the date on which title vests in the condemning authority or an earlier date on which alterations or repairs are commenced by Landlord to restore the balance of the Premises in anticipation of taking, the rent shall be reduced in proportion to the reduction in value of the Premises as an economic unit on account of the partial taking. If the parties are unable to agree on the amount of the reduction of rent, the amount shall be determined by arbitration in the manner provided in Section 17.

(4)     If a portion of Landlord's property not included in the Premises is taken, and severance damages are awarded on account of the Premises, or an award is made for detriment to the Premises as a result of activity by a public body not involving a physical taking of any portion of the Premises, this shall be regarded as a partial condemnation to which Sections 9.1 (1) and 9.1 (3) apply, and the rent shall be reduced to the extent of reduction in rental value of the Premises as though a portion had been physically taken.

**9.2     Total Taking.** If a condemning authority takes all of the Premises or a portion sufficient to render the remaining Premises reasonable unsuitable for the use that Tenant was then making of the Premises, the lease shall terminate as of the date the title vests in the condemning authorities. Such termination shall have the same effect as a termination under Section 9.1 (1). Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation.

**9.3     Sale in Lieu of Condemnation.** Sale of all or part of the Premises to a purchaser with the power of eminent domain in the face of a threat of probability of the exercise of the power shall be treated for the purposes of this Section 9 as a taking by condemnation.

6 – VINEYARD LEASE

Exhibit 1 – Page 6 of 17

PDF Page 9
VALLEYVIEW_001387

## Section 10.    Liability and Indemnity

### 10.1    Liens

(1)    Except with respect to activities for which Landlord is responsible, Tenant shall pay as due all claims for work done on and for services rendered or material furnished to the Premises, and shall keep the Premises free from any liens. If Tenant fails to pay any such claims or discharge any lien, Landlord may do so and collect the cost as additional rent. Any amount so added shall bear interest at the rate of 12% per annum from the date expended by Landlord and shall be payable on demand. Such action by Landlord shall not constitute a waiver of any right or remedy, which Landlord may have on account of Tenant's default.

(2)    Tenant may withhold payment of any claim in connection with a good-faith dispute over the obligation to pay, as long as Landlord's property interests are not jeopardized. If a lien is filed as a result of nonpayment, Tenant shall, within ten days after knowledge of the filing, secure the discharge of the lien or deposit with Landlord cash or sufficient corporate surety bond or other surety satisfactory to Landlord in an amount sufficient to discharge the lien plus any costs, attorney fees, and other charges that could accrue as a result of a foreclosure or sale under the lien.

**10.2    Indemnification.** Tenant shall indemnify and defend Landlord from any claim, loss, or liability arising out of or related to any activity of Tenant on the Premises or any condition of the Premises in the possession or under the control of Tenant including any such claim, loss, or liability that may be caused or contributed to in whole or in part by Landlord's own negligence. Landlord shall have no liability to Tenant for any injury, loss, or damage caused by third parties, or by any condition of the Premises except to the extent caused by Landlord's gross negligence or willful breach of duty under this lease.

## Section 11.    Quiet Enjoyment; Mortgage Priority

**11.1    Landlord's Warranty.** Landlord warrants that it is the owner of the Premises and has the right to lease them. Landlord will defend Tenant's right to quiet enjoyment of the Premises from the lawful claims of all persons during the lease term.

**11.2    Mortgage Priority.** Any deed of trust, mortgage or other lien ("Mortgage") granted by Landlord which affects the Premises shall be and remain, as it may be modified or extended, at all times, a lien or charge on the Premises prior and superior to the lien or charge of this lease.

**11.3    Attornment.** In the event the holder of any Mortgage forecloses its lien, exercises any power of sale, or exercises any other remedy under any loan documents encumbering the Premises, or in the event of conveyance of title to the Premises by deed in lieu of foreclosure, Tenant agrees to accept and attorn to the purchaser of the Premises, and its successors and assigns as the new Landlord of the Premises, and, until terminated

7 -- VINEYARD LEASE

Exhibit 1 - Page 7 of 17

PDF Page 10                                                    VALLEYVIEW_001388

pursuant to its provisions, this lease shall continue in full force and effect as a direct lease between such purchaser and its successors and assigns and Tenant, with privity of contract and with the same force and effect as if this lease had initially been entered into between them.

**11.4    Estoppel Certificate.**  Either party will, within twenty days after notice from the other, execute and deliver to the other party a certificate stating whether or not this lease has been modified and is in full force and effect and specifying any modifications or alleged breaches by the other party.  The certificate shall also state the amount of monthly base rent, the dates to which rent has been paid in advance, and the amount of any security deposit or prepaid rent.  Failure to deliver the certificate within the specified time shall be conclusive upon the party from whom the certificate was requested that the lease is in full force and effect and has not been modified except as represented in the notice requesting the certificate.

## Section 12.    Assignment and Subletting

No part of the Premises may be assigned, mortgaged, or subleased, nor may a right of use of any portion of the property be conferred on any third person by any other means, without the prior written consent of Landlord.  This provision shall apply to all transfers by operation of law.  If Tenant is a corporation or partnership, this provision shall apply to any transfer of a majority voting interest in stock or partnership interest of Tenant.  No consent in one instance shall prevent the provision from applying to a subsequent instance.  Landlord may withhold or condition such consent in its sole and arbitrary discretion.  In determining whether to consent to assignment Landlord may consider the following factors: financial ability of assignee; business experience of assignee; and any other factor deemed relevant and reasonable by Landlord.

## Section 13.    Default

The following shall be events of default:

**13.1    Default in Rent.**  Failure of Tenant to pay any rent or other charge within ten days after notice to Tenant that it is due.

**13.2    Default in Other Covenants.**  Failure of Tenant to comply with any term or condition or fulfill any obligation of the lease (other than the payment of rent or other charges) within twenty days after written notice by Landlord specifying the nature of the default with reasonable particularity.  If the default is of such a nature that it cannot be completely remedied within the twenty-day period, this provision shall be complied with if Tenant begins correction of the default within the twenty-day period and thereafter proceeds with reasonable diligence and in good faith to effect the remedy as soon as practicable.

**13.3    Insolvency.**  Insolvency of Tenant; and assignment by Tenant for the benefit of creditors; the filing by Tenant of a voluntary petition in bankruptcy; and

8 – VINEYARD LEASE

Exhibit 1 – Page 8 of 17

PDF Page 11

VALLEYVIEW_001389

adjudication that Tenant is bankrupt or the appointment of a receiver of the properties of Tenant; the filing of any involuntary petition of bankruptcy and failure of Tenant to secure a dismissal of the petition within thirty days after filing; attachment of or the levying of execution on the leasehold interest and failure of Tenant to secure discharge of the attachment or release of the levy of execution within ten days shall constitute a default. If the lease has been assigned, the events of default so specified shall apply only with respect to the one then exercising the rights of Tenant under the lease.

**13.4    Abandonment.** Failure of Tenant for seven days or more to occupy the Premises for one or more of the purposes permitted under this lease, unless such failure is excused under other provisions of this lease.

## Section 14.    Remedies on Default

**14.1    Termination.** In the event of a default the lease may be terminated at the option of Landlord by written notice to Tenant. Whether or not the lease is terminated by the election of Landlord or otherwise, Landlord shall be entitled to recover damages from Tenant for the default, and Landlord may reenter, take possession of the Premises, and remove any persons or property by legal action or by self-help with the use of reasonable force and without liability for damages and without having accepted a surrender.

**14.2    Reletting.** Following reentry or abandonment, Landlord may relet the Premises and in that connection may make any suitable alterations or refurbish the Premises, or both, or change the character or use of the Premises, but Landlord shall not be required to relet for any use or purpose other than that specified in the lease or which Landlord may reasonably consider injurious to the Premises, or to any Tenant that Landlord may reasonably consider objectionable. Landlord may relet all or part of the Premises, alone or in conjunction with other properties, for a term longer or shorter than the term of this lease, upon any reasonable terms and conditions, including the granting of some rent-free occupancy or other rent concession.

**14.3    Damages.** In the event of the termination or retaking of possession following default, Landlord shall be entitled to recover immediately, without waiting until the due date of any future rent or until the date fixed for expiration of the lease term, the following amounts as damages:

(1)    The loss of rental from the date of default until a new Tenant is, or with the exercise of reasonable efforts could have been, secured and paying out.

(2)    The reasonable costs of reentry and reletting including without limitation the cost of and cleanup, refurbishing, removal of Tenant's property and fixtures, costs incurred under Section 14.5, or any other expense occasioned by Tenant's default including but not limited to, any repair costs, attorney fees, court costs, broker commissions, and advertising costs.

9 – VINEYARD LEASE

Exhibit 1 – Page 9 of 17
PDF Page 12

VALLEYVIEW_001390

(3)    Any excess of the value of the rent and all of Tenant's other obligations under this lease over the reasonable expected return from the Premises for the period commencing on the earlier continuing through the end of the term. The present value of future amounts will be computed using a discount rate equal to the prime loan rate of major Oregon banks in effect on the date of the written declaration of default by Landlord.

**14.4    Right to Sue More Than Once.**  Landlord may sue periodically to recover damages during the period corresponding to the remainder of the lease term, and no action for damages shall bar a later action for damages subsequently accruing.

**14.5    Landlord's Right to Cure Defaults.**  If Tenant fails to perform any obligation under this lease, Landlord shall have the option to do so after thirty days written notice to Tenant. All of Landlord's expenditures to correct the default shall be reimbursed by Tenant on demand with interest at the rate of 12 percent per annum from the date of expenditure by Landlord. Such action by landlord shall not waive any other remedies available to Landlord because of the default.

**14.6    Remedies Cumulative.**  The foregoing remedies shall be in addition to and shall not exclude any other remedy available to Landlord under applicable law.

**Section 15.    Surrender on Expiration**

**15.1    Condition of Premises.**  At the termination of this lease, with the exception of permitted alterations, the Premises will be returned to Landlord in the same condition as at the commencement of this lease, reasonable wear and tear excepted.

**15.2    Holdover**

(1)    If Tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a Tenant from month to month, subject to all provisions of this lease except the provisions for term and renewal and at a rental rate equal the rent last paid by Tenant during the original term, or to eject Tenant from the Premises and recover damages caused by wrongful holdover.

(2)    If a month-to-month tenancy results from a holdover by Tenant under this Section 15.2, the tenancy shall be terminable at the end of any monthly rental period on written notice from Landlord given not less than ten days prior to the termination date which shall be in the notice. Tenant waives any notice that would otherwise be provided by law with respect to a month-to-month tenancy.

**Section 16.    Miscellaneous**

**16.1    Non-waiver.**  Waiver by either party of strict performance of any provision of this lease shall not be a waiver of or prejudice the party's right to require strict performance of the same provision in the future or of any other provision.

10 – VINEYARD LEASE

Exhibit 1 – Page 10 of 17

PDF Page 13
VALLEYVIEW_001391

**16.2    Attorney Fees.**    If suit or action is institute in connection with any controversy arising out of this lease, the prevailing party shall be entitled to recover in addition to costs such sum as the court may adjudge reasonable as attorney fees at trial, on petition for review, and on appeal.

**16.3    Notices.**    Any notice required or permitted under this lease shall be given when actually delivered or 48 hours after deposited in United States mail as certified mail addressed to the address first given in this lease or to such other address as may be specified from time to time by either of the parties in writing.

**16.4    Succession.**    Subject to the above stated limitations on transfer of Tenant's interest, this lease shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

**16.5    Recordation.**    This lease shall not be recorded without the written consent of Landlord.

**16.6    Entry for Inspection.**    Landlord shall have the right to enter upon the Premises at any time to determine Tenant's compliance with this lease, to make necessary repairs to the building or to the Premises, or to show the Premises to any prospective tenant or purchaser, and in addition shall have the right, an any time during the last two months of the term of this lease, to place and maintain upon the Premises notices for leasing or selling of the Premises.

**16.7    Interest on Rent and Other Charges.**    Any rent or other payment required of Tenant by this lease shall, if not paid within ten days after it is due, bear interest at the rate of 12% per annum (but not in any event at a rate greater than the maximum rate of interest permitted by law) from the due date until paid. In addition, if Tenant fails to make any rent or other payment required by this lease to be paid to Landlord within five days after it is due, Landlord may elect to impose a late charge of five cents per dollar of the overdue payment or reimburse Landlord for the costs of collecting the overdue payment. Tenant shall pay the late charge upon demand by Landlord. Landlord may levy and collect a late charge in addition to all other remedies available for Tenant's default, and collection of a late charge shall not waive the breach caused by the late payment.

**16.8    Proration of Rent.**    In the event of commencement or termination of this lease at a time other than the beginning or end of one of the specified rental periods, then the rent shall be prorated as of the date of commencement or termination and in the event of termination for reasons other than default, all prepaid rent shall be refunded to Tenant or paid on its account.

**16.9    Time of Essence.**    Time is of the essence of the performance of each of Tenant's obligations under this lease.

11 – VINEYARD LEASE

Exhibit 1 – Page 11 of 17

PDF Page 14                                                        VALLEYVIEW_001392

## Section 17.    Arbitration

**17.1    Disputes to be Arbitrated.**   If any dispute arises between the parties as to a matter, which this lease says should be arbitrated, or as to any other question involving apportionment or valuation, either party may request arbitration and appoint as an arbitrator an independent real estate appraiser having knowledge of valuation of rental properties comparable to the Premises.  The other party shall also choose an arbitrator with such qualifications, and the two arbitrators shall choose a third.  If the choice of the second or third arbitrator is not made within ten days of the choosing of the prior arbitrator, then either party may apply to the presiding judge of the judicial district where the Premises are located to appoint the required arbitrator.

**17.2    Procedure for Arbitration.** The arbitrator shall proceed according to the Oregon statutes governing arbitration, and the award of the arbitrators shall have the effect therein provided.  The arbitration shall take place in the county where the leased premises are located.  Costs of the arbitration shall be shared equally by the parties, but each party shall pay its own attorney fees incurred in connection with the arbitration.


Landlord:                                              Tenant:

THE ANN M. WISNOVSKY TRUST,                VALLEY VIEW WINERY, INC.
UTD AUGUST 2, 2012

By:_____              By:_____
       Ann M. Wisnovsky, Trustee                    Mark A. Wisnovsky, President

                                                   By:_____
                                                          Michael J. Wisnovsky,
                                                          Vice President/Secretary


12 – VINEYARD LEASE

Exhibit 1 – Page 12 of 17

PDF Page 15
VALLEYVIEW_001393

represents and warrants that Tenant has inspected the Property, and that Tenant has made his or her own determination of the value and condition of the Property.

Landlord:                                          Tenant:

THE ANN M. WISNOVSKY TRUST,                        VALLEY VIEW WINERY, INC.
UTD AUGUST 2, 2012

By: _Ann M. Wisnovsky_                             By: _(signature)_
    Ann M. Wisnovsky, Trustee                          Mark A. Wisnovsky, President

         _(signature)_                             By: _(signature)_
         03/24/16                                      Michael J. Wisnovsky,
                                                       Vice President/Secretary

OFFICIAL STAMP
ELIJAH A. ROLLASON
NOTARY PUBLIC - OREGON
COMMISSION NO. 935543
MY COMMISSION EXPIRES JANUARY 19, 2019

12 - VINEYARD LEASE

Exhibit 1 – Page 13 of 17

PDF Page 16                                        VALLEYVIEW_001394

First American Title Company of Oregon

File No.: 7169-2290459
July 22, 2014

**Exhibit "A"**

Real property in the County of Jackson, State of Oregon, described as follows:

PARCEL I:
COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST 10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 89° 44' 41" WEST 1112.65 FEET TO A 1.5 INCH INSIDE DIAMETER IRON PIPE (RECORD 2 INCH PIPE), FROM WHICH THE CENTER OF A 48 INCH DIAMETER OAK TREE BEARS NORTH 47° EAST 21.4 FEET (RECORD 20.0 FEET), SAID PIPE MARKING THE SOUTHWEST CORNER OF SAID PARCEL DESCRIBED IN DOCUMENT NO. 78-08539; THENCE CONTINUING ALONG THE WESTERLY, NORTHERLY, AND EASTERLY BOUNDARY OF SAID DESCRIBED PARCEL THE FOLLOWING; NORTH 6° WEST 1574.0 FEET, MORE OR LESS, TO THE NORTH LINE OF LOT 4 OF SAID SECTION 33; THENCE EAST 1336 FEET, MORE OR LESS, TO THE SOUTHEAST CORNER OF LOT 4 OF SECTION 34, SAID TOWNSHIP AND RANGE; THENCE NORTH 608 FEET, MORE OR LESS, TO THE NORTHWEST CORNER OF LOT 3 OF SAID SECTION 34; THENCE EAST 736.8 FEET, MORE OR LESS, TO THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE, ALONG SAID RIGHT OF WAY BOUNDARY, SOUTH 7° 13' 10" WEST 1837.72 FEET TO A POINT OF CURVE; THENCE ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 3° 38' 17" WEST 242.34 FEET) A DISTANCE OF 242.50 FEET TO THE POINT OF BEGINNING.

PARCEL II:

*First American Title*

Exhibit __A__
Page __1__ of __2__

Exhibit 1 – Page 14 of 17
PDF Page 17

VALLEYVIEW_001395

Exhibit 1 – Page 15 of 17
PDF Page 18

VALLEYVIEW_001396

First American Title Company of Oregon

File No.: 7169-2290459
July 22, 2014

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST 10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 87° 33' 02" EAST 21.12 FEET TO A 5/8" IRON PIN; THENCE NORTH 88° 21' 48" EAST 109.22 FEET TO A 5/8" IRON PIN ; THENCE SOUTH 84° 56' 41" EAST 56.34 FEET TO A 5/8" IRON PIN ; THENCE ALONG THE ARC OF A 460.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS NORTH 81° 05' 40" EAST 221.96 FEET ) A DISTANCE OF 224.17 FEET TO A 5/8" IRON PIN; THENCE NORTH 67° 08' 01" EAST 137.72 FEET TO A 5/8" IRON PIN; THENCE NORTH 89° 17' 20" EAST 16.48 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH NORTH 00° 19' 38" WEST 26.00 FEET) A DISTANCE OF 26.00 FEET TO THE POINT OF BEGINNING.

NOTE: This Legal Description was created prior to January 01, 2008.

A
2 of 2

*First American Title*

Exhibit 1 – Page 16 of 17

PDF Page 19                                    VALLEYVIEW_001397

4/4/2016                                   1000 Upper Applegate Rd - Google Maps

## Google Maps    1000 Upper Applegate Rd



Imagery ©2016 Google, Map data ©2016 Google     200 ft



VINEYARD LEASE LANDS
EXCLUDE ALL PROPERTY
INCLUDED IN THE WINERY
LEASE.

Mark Wisnovsky
04/12/16

**1000 Upper Applegate Rd**
Jacksonville, OR 97530



Exhibit _B_
Page _1_ of _1_

https://www.google.com/maps/place/1000+Upper+Applegate+Rd,+Jacksonville,+OR+97530/@42.2219835,-123.0511662,865m/data=!3m1!1e3!4m2!3m1!1s0x5...     1/2

Exhibit 1 – Page 17 of 17

Plaintiff's Exhibit 2

## WINERY LEASE

**Effective Date:** *March 24,* 2016

**Between:**     THE ANN M. WISNOVSKY TRUST,         ("Landlord")
                UTD AUGUST 2, 2012
                1352 Applegate Road
                Jacksonville, OR 97530

**And:**         VALLEY VIEW WINERY, INC., an         ("Tenant")
                Oregon corporation
                1000 Upper Applegate Road
                Jacksonville, OR 97530

Landlord leases to Tenant and Tenant leases from Landlord the following described property (the "Premises") on the terms and conditions stated below:

> THE EVENT SITE, WINERY BUILDINGS AND WAREHOUSE, THE LAND UNDER AND IMMEDIATELY SURROUNDING SUCH BUILDINGS AND THE TASTING ROOM AND THE WINERY PARKING LOT.  THE PREMISES ARE LOCATED ON A PORTION OF THE REAL PROPERTY DESCRIBED IN **EXHIBIT A**. THE PREMISES ARE DEPICTED ON THE MAP ATTACHED AS **EXHIBIT B**.

The Tenant shall have the right of ingress and egress over and across the real property described in Exhibit A as reasonably necessary to access the Premises.

This lease supersedes all prior leases and tenancies for the Premises, which are of no further force or effect.

**Section 1.     Occupancy and Commencement Date**

    **1.1     Original Term.** The term of this lease shall commence on the date hereof and shall continue for 10 years, unless sooner terminated as hereinafter provided.

    **1.2     Possession.** Tenant's right to possession and obligations under the lease shall commence on the commencement date described in paragraph 1.1 above.

    **1.3     Renewal Option.** If the lease is not in default at the time each option is exercised or at the time the renewal term is to commence, Tenant shall have the option to renew this lease for 8 successive terms of 10 years, each, as follows:

        (1)     Each of the renewal terms shall commence on the day following expiration of the preceding term.

1 – WINERY LEASE

PLAINTIFF'S
EXHIBIT

**250**

Exhibit 2 – Page 1 of 17
PDF Page 22                                    VALLEYVIEW_000582

(2)    The option will be automatically exercised unless written notice to Landlord is given for review not less than 180 days prior to the last day of the expiring term.  The giving of such notice, not to renew, shall be sufficient to make the lease termination binding for the renewal term without further act of the parties.

(3)    The terms and conditions of the lease for each renewal term shall be identical with the original term except for rent.  Rent for a renewal term shall be continued from the original term with escalation calculated in the same manner as during the original term.

## Section 2.    Rent

**2.1    Base Rent.**  Subject to escalation as provided in Secton 3, during the original term, Tenant shall pay to Landlord as base rent the sum of $1,000.00 per month. Rent shall be payable on the first day of each month in advance at such place as may be designated by Landlord.  If rent paid after the first day of the month, a five percent (5%) late fee will be due as additional rent.

**2.2    Additional Rent.**  All taxes, insurance costs, utility charges that Tenant is required to pay by this lease, and any other sum that Tenant is required to pay to Landlord or third parties shall be additional rent.

## Section 3.    Escalation

Effective on the first day of the 61st month of the initial term of this lease and on the first day of each 61st month thereafter, monthly base rent shall be increased by an amount equal to ten percent (10%) of the monthly base rent paid during the preceding 60 month period.

## Section 4.    Use of the Premises

**4.1    Permitted Use.**  The Premises shall be used for the production, storage and sale of wine, as an event center and for related uses.  No other uses shall be made of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld.

**4.2    Restrictions on Use.**  In connection with the use of the Premises, Tenant shall:

(1)    Conform to all applicable laws and regulations of any public authority affecting the Premises and the use, and correct at Tenant's own expense any failure of compliance created through Tenant's fault or by reason of Tenant's use, but Tenant shall not be required to make any structural changes to effect such compliance unless such changes are required because of tenant's specific use.

(2)    Lessee will not allow any activity that would make it impossible to insure the Premises against casualty, would increase the insurance rate, or would prevent Landlord from taking advantage of any ruling of the Oregon Insurance Rating Bureau, or

2 – WINERY LEASE

Exhibit 2 – Page 2 of 17

PDF Page 23                                    VALLEYVIEW_000583

its successor. It is Tenant's responsibility to pay the additional cost of the insurance as provided in Section 7.

(3)    Refrain from any use that would be reasonably offensive to other tenants or owners or users of neighboring premises or that would tend to create a nuisance or damage the reputation of the Premises.

(4)    Refrain from loading the electrical system or floors beyond the point considered safe by a competent engineer or architect selected by Landlord.

(5)    Shall not make any marks on or attaching any sign, insignia, antenna, aerial, or other device to the exterior or interior walls, windows, or roof of the Premises without the written consent of Landlord.

(6)    Tenant shall not cause or permit any Hazardous Substance to be spilled, leaked, disposed of, or otherwise released on or under the Premises. Tenant may use or otherwise handle on the Premises only those Hazardous Substances typically used or sold in the prudent and safe operation of the business specified in Section 4.1. Tenant may store such Hazardous Substances on the Premises only in quantities necessary to satisfy Tenant's reasonably anticipated needs. Tenant shall comply with all Environmental Laws and exercise the highest degree of care in the use, handling, and storage of Hazardous Substances and shall take all practicable measures to minimize the quantity and toxicity of Hazardous Substances used, handled, or stored on the Premises. Upon the expiration or termination of this Lease, Tenant shall remove all Hazardous Substances from the Premises. The term Environmental Law shall mean any federal, state, or local statute, regulation, ordinance or any judicial or other governmental order pertaining to the protection of health, safety or the environment. The term Hazardous Substance shall mean any hazardous, toxic, infectious or radioactive substance, waste, and material as defined or listed by any Environmental Law and shall include, without limitation, petroleum oil and its fractions.

## Section 5.    Repairs and Maintenance

**5.1    Landlord's Obligations.** The Landlord shall have no responsibility or obligations for repairs and maintenance. The Tenant is responsible for all repairs and maintenance.

**5.2    Tenant's Obligations.** Tenant shall perform all maintenance and repairs to the Premises, including without limitation the following:

(1)    Repairs and maintenance of the roof and gutters, exterior walls (including painting), bearing walls, structural members, floor slabs, and foundation.

(2)    Repair and maintenance of exterior water, sewage, gas, and electrical services up to the point of entry to the leased Premises.

3 – WINERY LEASE

Exhibit 2 – Page 3 of 17

PDF Page 24

VALLEYVIEW_000584

(3)     Repair of interior walls, ceilings, doors, windows, and related hardware, light fixtures, switches, and wiring and plumbing from the point of entry to the Premises.

(4)     Any repairs necessitated by the negligence of Tenant, its agents, employees, and invitees, except as provided in Section 7.2 dealing with waiver of subrogation.

(5)     Ordinary maintenance of the heating and air conditioning system and any repairs necessary because of improper maintenance.

(6)     Ordinary maintenance of exterior grounds including landscaping, parking lot maintenance, and striping.

(7)     Any repairs or alterations required under Tenant's obligation to comply with laws and regulations as set forth in Section 4.2 (1).

(8)     All other repairs necessary to maintain the Premises in good condition and repair.

**5.3     Reimbursement for Repairs Assumed.**  If Tenant fails or refuses to make repairs that are required by this Section 5, Landlord may make the repairs and charge the actual costs of repairs to Tenant plus 10%, such expenditures by Landlord shall be reimbursed by Tenant on demand together with interest at the rate of 12% per annum from the date of expenditure by Landlord.  Except in an emergency creating an immediate risk of personal injury or property damage, Landlord may not perform repairs which are the obligation of Tenant and charge Tenant for the resulting expense unless at least ten days before work is commenced, and Tenant is given notice in writing outlining with reasonable particularity the repairs required, and Tenant fails within that time to initiate such repairs in good faith.

**5.4     Inspection of Premises.**  Landlord shall have the right to inspect the Premises at any reasonable time or times to determine the necessity of repair.

**Section 6.     Alterations**

**6.1     Alterations Prohibited.**  Tenant shall make no improvements or alterations on the Premises of any kind without first obtaining Landlord's written consent, which shall not be unreasonably withheld.  All alterations shall be made in a good and workmanlike manner, and in compliance with applicable laws and building codes.  As used herein, "alterations" includes the installation of computer and telecommunications wiring, cables, and conduit.

**6.2     Ownership and Removal of Alterations.**  All improvements and alterations performed on the Premises by either Landlord or Tenant shall be the property of Landlord when installed unless the applicable Landlord's consent or work sheet specifically provides otherwise.  Improvements and alterations installed by tenant shall,

4 – WINERY LEASE

Exhibit 2 – Page 4 of 17
PDF Page 25

VALLEYVIEW_000585

at Landlord's option, be removed by Tenant and the Premises restored unless the applicable Landlord's consent or work sheet specifically provides otherwise.

**Section 7.    Insurance**

**7.1    Insurance Required.** Tenant shall keep Premises insured at Tenant's expense against fire and other risks covered by a standard fire insurance policy with an endorsement for extended coverage, for full replacement value, with the Landlord named as the loss payee thereon. Tenant shall bear the expense of any insurance insuring the property of Tenant on the Premises against such risks but shall not be required to insure.

**7.2    Waiver of Subrogation.** Neither party shall be liable to the other (or to the other's successors or assigns) for any loss or damage caused by fire or any of the risks enumerated in a standard fire insurance policy with an extended coverage endorsement, and in the event of insured loss, neither party's insurance company shall have a subrogated claim against the other. This waiver shall be valid only if the insurance policy in question expressly permits waiver of subrogation or if the insurance company agrees in writing that such a waiver will not affect coverage under the policies. Each party agrees to use best efforts to obtain such an agreement from its insurer if the policy does not expressly permit a waiver of subrogation.

**7.3    Liability Insurance.** Tenant shall obtain and keep continuously in force during the term of this lease a comprehensive liability insurance policy naming Landlord as an additional named insured to protect against loss by reason of injury to persons or damage to property of third persons with personal injury limits of not less than $2,000,000.00 for each person, $2,000,000.00 for each occurrence, and $2,000,000.00 for property damage, and provide to Landlord certificates of such coverage. Such insurance shall cover losses and claims due to operations that include the sale or serving of alcoholic beverages.

**Section 8.    Taxes; Utilities**

**8.1    Property Taxes.** Tenant shall pay as due all taxes on its personal property located on the Premises. Tenant shall pay as due all real property taxes and special assessments levied against the Premises. As used herein, real property taxes include any fee or charge relating to the ownership, use, or rental of the Premises, other than taxes on the net income of Landlord or Tenant.

**8.2    Special Assessments.** If an assessment for a public improvement is made against the Premises, Landlord may elect to cause such assessment to be paid in installments, in which case all of the installments payable with respect to the lease term shall be treated the same as general real property taxes for purposes of Section 8.1.

**8.3    Contest of Taxes.** Tenant shall be permitted to contest the amount of any tax or assessment as long as such contest is conducted in a manner that does not cause any risk that Landlord's interest in the Premises will be foreclosed for nonpayment. Landlord shall cooperate in any reasonable manner with such contest by Tenant.

5 – WINERY LEASE

Exhibit 2 – Page 5 of 17

PDF Page 26                                VALLEYVIEW_000586

**8.4    Proration of Taxes.** Tenant's shall pay the taxes and assessments for the February and May installments of the current tax year that this lease is in effect.

**8.5    New Charges or fees.** If a new charge or fee relating to the ownership or use of the Premises or the receipt of rental there from or in lieu of property taxes is assessed or imposed, then, to the extent permitted by law, Tenant shall pay such charge or fee. Tenant, however, shall have no obligation to pay any income, profits, or franchise tax levied on the net income derived by Landlord from this lease.

**8.6    Payment of Utilities Charges.** Tenant shall pay when due all charges for services and utilities incurred in connection with the use, occupancy, operation, and maintenance of the Premises, including (but not limited to) charges for fuel, water, gas, electricity, sewage disposal, power, refrigeration, air conditioning, telephone, refuse removal and janitorial services. If any utility services are provided by or through Landlord, charges to Tenant shall be comparable with prevailing rates for comparable services. If the charges are not separately metered or stated, Landlord shall apportion the charges on an equitable basis, and Tenant shall pay its apportioned share on demand.

**Section 9.    Damage and Destruction**

**9.1    Partial Damage.** If the Premises are partly damaged, and Section 9.2 does not apply, the Premises shall be repaired by Landlord at Landlord's expense. Repairs shall be accomplished with all reasonable dispatch subject to interruptions and delays from labor disputes and matters beyond the control of Landlord.

**9.2    Destruction.** If any structure on the Premises is destroyed or damaged such that the cost of repair exceeds one-third of the value of structure before the damage, either party may elect to terminate the lease as of the date of the damage or destruction by notice given to the other in writing not more than 45 days following the date of damage. In such event all rights and obligations of the parties shall cease as of the date of termination, and Tenant shall be entitled to the reimbursement of any prepaid amounts paid by Tenant and attributable to the anticipated term. If neither party elects to terminate, Landlord shall proceed to restore the Premises to substantially the same form as prior to the damage or destruction. Work shall be commenced as soon as reasonably possible and thereafter shall proceed without interruption except for work stoppages on account of labor disputes and matters beyond Landlord's reasonable control.

**9.3    Rent Abatement.** Rent shall be abated during the repair of any damage to the extent the Premises are untenantable, except that there shall be no rent abatement where the damage occurred as the result of the fault of Tenant.

**9.4    Damage Late in Term.** If damage or destruction to which Section 9.2 would apply occurs within one year before the end of the then-current lease term, Tenant may elect to terminate the lease by written notice to Landlord given within 30 days after the date of the damage. Such termination shall have the same effect as termination by Landlord under Section 10.1 (1).

6 – WINERY LEASE

Exhibit 2 – Page 6 of 17
PDF Page 27                                                                    VALLEYVIEW_000587

## Section 10.    Eminent Domain

**10.1    Partial Taking.** If a portion of the Premises is condemned and Section 10.2 does not apply, the lease shall continue on the following terms:

(1)    Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation.

(2)    Landlord shall proceed as soon as reasonably possible to make such repairs and alterations to the Premises as are necessary to restore the remaining Premises to a condition as comparable as reasonably practicable to that existing at the time of the condemnation.

(3)    After the date on which title vests in the condemning authority or an earlier date on which alterations or repairs are commenced by Landlord to restore the balance of the Premises in anticipation of taking, the rent shall be reduced in proportion to the reduction in value of the Premises as an economic unit on account of the partial taking. If the parties are unable to agree on the amount of the reduction of rent, the amount shall be determined by arbitration in the manner provided in Section 18.

(4)    If a portion of Landlord's property not included in the Premises is taken, and severance damages are awarded on account of the Premises, or an award is made for detriment to the Premises as a result of activity by a public body not involving a physical taking of any portion of the Premises, this shall be regarded as a partial condemnation to which Sections 10.1 (1) and 10.1 (3) apply, and the rent shall be reduced to the extent of reduction in rental value of the Premises as though a portion had been physically taken.

**10.2    Total Taking.** If a condemning authority takes all of the Premises or a portion sufficient to render the remaining Premises reasonable unsuitable for the use that Tenant was then making of the Premises, the lease shall terminate as of the date the title vests in the condemning authorities. Such termination shall have the same effect as a termination under Section 10.1 (1). Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation.

**10.3    Sale in Lieu of Condemnation.** Sale of all or part of the Premises to a purchaser with the power of eminent domain in the face of a threat of probability of the exercise of the power shall be treated for the purposes of this Section 10 as a taking by condemnation.

## Section 11.    Liability and Indemnity

**11.1    Liens**

(1)    Except with respect to activities for which Landlord is responsible, Tenant shall pay as due all claims for work done on and for services rendered or material furnished to the Premises, and shall keep the Premises free from any liens. If Tenant fails

7 – WINERY LEASE

Exhibit 2 – Page 7 of 17

PDF Page 28

VALLEYVIEW_000588

to pay any such claims or discharge any lien, Landlord may do so and collect the cost as additional rent. Any amount so added shall bear interest at the rate of 12% per annum from the date expended by Landlord and shall be payable on demand. Such action by Landlord shall not constitute a waiver of any right or remedy, which Landlord may have on account of Tenant's default.

(2)     Tenant may withhold payment of any claim in connection with a good-faith dispute over the obligation to pay, as long as Landlord's property interests are not jeopardized. If a lien is filed as a result of nonpayment, Tenant shall, within ten days after knowledge of the filing, secure the discharge of the lien or deposit with Landlord cash or sufficient corporate surety bond or other surety satisfactory to Landlord in an amount sufficient to discharge the lien plus any costs, attorney fees, and other charges that could accrue as a result of a foreclosure or sale under the lien.

**11.2     Indemnification.** Tenant shall indemnify and defend Landlord from any claim, loss, or liability arising out of or related to any activity of Tenant on the Premises or any condition of the Premises in the possession or under the control of Tenant including any such claim, loss, or liability that may be caused or contributed to in whole or in part by Landlord's own negligence. Landlord shall have no liability to Tenant for any injury, loss, or damage caused by third parties, or by any condition of the Premises except to the extent caused by Landlord's gross negligence or willful breach of duty under this lease.

## Section 12.     Quiet Enjoyment; Mortgage Priority

**12.1     Landlord's Warranty.** Landlord warrants that it is the owner of the Premises and has the right to lease them. Landlord will defend Tenant's right to quiet enjoyment of the Premises from the lawful claims of all persons during the lease term.

**12.2     Mortgage Priority.** Any deed of trust, mortgage or other lien ("Mortgage") granted by Landlord which affects the Premises shall be and remain, as it may be modified or extended, at all times, a lien or charge on the Premises prior and superior to the lien or charge of this lease.

**12.3     Attornment.** In the event the holder of any Mortgage forecloses its lien, exercises any power of sale, or exercises any other remedy under any loan documents encumbering the Premises, or in the event of conveyance of title to the Premises by deed in lieu of foreclosure, Tenant agrees to accept and attorn to the purchaser of the Premises, and its successors and assigns as the new Landlord of the Premises, and, until terminated pursuant to its provisions, this lease shall continue in full force and effect as a direct lease between such purchaser and its successors and assigns and Tenant, with privity of contract and with the same force and effect as if this lease had initially been entered into between them.

**12.4     Estoppel Certificate.** Either party will, within twenty days after notice from the other, execute and deliver to the other party a certificate stating whether or not this lease has been modified and is in full force and effect and specifying any modifications or alleged breaches by the other party. The certificate shall also state the

8 – WINERY LEASE

Exhibit 2 – Page 8 of 17

PDF Page 29                                                    VALLEYVIEW_000589

amount of monthly base rent, the dates to which rent has been paid in advance, and the amount of any security deposit or prepaid rent. Failure to deliver the certificate within the specified time shall be conclusive upon the party from whom the certificated was requested that the lease is in full force and effect and has not been modified except as represented in the notice requesting the certificate.

**Section 13.    Assignment and Subletting**

No part of the Premises may be assigned, mortgaged, or subleased, nor may a right of use of any portion of the property be conferred on any third person by any other means, without the prior written consent of Landlord. This provision shall apply to all transfers by operation of law. If Tenant is a corporation or partnership, this provision shall apply to any transfer of a majority voting interest in stock or partnership interest of Tenant. No consent in one instance shall prevent the provision from applying to a subsequent instance. Landlord may withhold or condition such consent in its sole and arbitrary discretion. In determining whether to consent to assignment Landlord may consider the following factors: financial ability of assignee; business experience of assignee; and any other factor deemed relevant and reasonable by Landlord.

**Section 14.    Default**

The following shall be events of default:

**14.1    Default in Rent.** Failure of Tenant to pay any rent or other charge within ten days after notice to Tenant that it is due.

**14.2    Default in Other Covenants.** Failure of Tenant to comply with any term or condition or fulfill any obligation of the lease (other than the payment of rent or other charges) within twenty days after written notice by Landlord specifying the nature of the default with reasonable particularity. If the default is of such a nature that it cannot be completely remedied within the twenty-day period, this provision shall be complied with if Tenant begins correction of the default within the twenty-day period and thereafter proceeds with reasonable diligence and in good faith to effect the remedy as soon as practicable.

**14.3    Insolvency.** Insolvency of Tenant; and assignment by Tenant for the benefit of creditors; the filing by Tenant of a voluntary petition in bankruptcy; and adjudication that Tenant is bankrupt or the appointment of a receiver of the properties of Tenant; the filing of any involuntary petition of bankruptcy and failure of Tenant to secure a dismissal of the petition within thirty days after filing; attachment of or the levying of execution on the leasehold interest and failure of Tenant to secure discharge of the attachment or release of the levy of execution within ten days shall constitute a default. If the lease has been assigned, the events of default so specified shall apply only with respect to the one then exercising the rights of Tenant under the lease.

**14.4    Abandonment.** Failure of Tenant for seven days or more to occupy the Premises for one or more of the purposes permitted under this lease, unless such failure is excused under other provisions of this lease.

9 – WINERY LEASE

Exhibit 2 – Page 9 of 17

PDF Page 30

VALLEYVIEW_000590

**Section 15.    Remedies on Default**

**15.1    Termination.** In the event of a default the lease may be terminated at the option of Landlord by written notice to Tenant. Whether or not the lease is terminated by the election of Landlord or otherwise, Landlord shall be entitled to recover damages from Tenant for the default, and Landlord may reenter, take possession of the Premises, and remove any persons or property by legal action or by self-help with the use of reasonable force and without liability for damages and without having accepted a surrender.

**15.2    Reletting.** Following reentry or abandonment, Landlord may relet the Premises and in that connection may make any suitable alterations or refurbish the Premises, or both, or change the character or use of the Premises, but Landlord shall not be required to relet for any use or purpose other than that specified in the lease or which Landlord may reasonably consider injurious to the Premises, or to any Tenant that Landlord may reasonably consider objectionable. Landlord may relet all or part of the Premises, alone or in conjunction with other properties, for a term longer or shorter than the term of this lease, upon any reasonable terms and conditions, including the granting of some rent-free occupancy or other rent concession.

**15.3    Damages.** In the event of the termination or retaking of possession following default, Landlord shall be entitled to recover immediately, without waiting until the due date of any future rent or until the date fixed for expiration of the lease term, the following amounts as damages:

(1)    The loss of rental from the date of default until a new Tenant is, or with the exercise of reasonable efforts could have been, secured and paying out.

(2)    The reasonable costs of reentry and reletting including without limitation the cost of and cleanup, refurbishing, removal of Tenant's property and fixtures, costs incurred under Section 15.5, or any other expense occasioned by Tenant's default including but not limited to, any remodeling or repair costs, attorney fees, court costs, broker commissions, and advertising costs.

(3)    Any excess of the value of the rent and all of Tenant's other obligations under this lease over the reasonable expected return from the Premises for the period commencing on the earlier continuing through the end of the term. The present value of future amounts will be computed using a discount rate equal to the prime loan rate of major Oregon banks in effect on the date of the written declaration of default by Landlord.

**15.4    Right to Sue More Than Once.** Landlord may sue periodically to recover damages during the period corresponding to the remainder of the lease term, and no action for damages shall bar a later action for damages subsequently accruing.

**15.5    Landlord's Right to Cure Defaults.** If Tenant fails to perform any obligation under this lease, Landlord shall have the option to do so after thirty days written notice to Tenant. All of Landlord's expenditures to correct the default shall be reimbursed by Tenant on demand with interest at the rate of 12% annum from the date of

10 – WINERY LEASE

Exhibit 2 – Page 10 of 17

PDF Page 31

VALLEYVIEW_000591

expenditure by Landlord.  Such action by landlord shall not waive any other remedies available to Landlord because of the default.

**15.6    Remedies Cumulative.** The foregoing remedies shall be in addition to and shall not exclude any other remedy available to Landlord under applicable law.

**Section 16.    Surrender on Expiration**

**16.1    Condition of Premises.** Upon expiration of the lease term or earlier termination on account of default, Tenant shall deliver all keys to landlord and surrender the Premises in good condition and repair, reasonable wear and tear excepted. Alterations constructed by Tenant with permission from Landlord shall not be removed or restored to the original condition unless the terms of permission for the alteration so require. Depreciation and wear from ordinary use for the purpose for which Tenant is responsible shall be completed to the latest practical date prior to such surrender.  Tenant's obligations under this section shall be subordinate to the provisions of Section 9 relating to destruction.

**16.1    Fixtures**

(1)    All fixtures placed upon the Premises, prior to and during the term, shall, at Landlord's option, become the property of Landlord.  If Landlord so elects, Tenant shall remove any or all fixtures that would otherwise remain the property of Landlord, and shall repair any physical damage resulting from the removal.  If Tenant fails to remove such fixtures, Landlord may do so and charge the cost to Tenant with interest at the legal rate from the date of expenditure.

(2)    Prior to expiration or other termination of the lease term Tenant shall remove all furnishings and furniture that remain its property.  If Tenant fails to do so, this shall be an abandonment of the property, and Landlord may retain the property and all rights of Tenant with respect to it shall cease or, by notice in writing given to Tenant within twenty days after removal was required, Landlord may elect to hold Tenant to its obligation of removal.  If Landlord elects to require Tenant to remove, Landlord may effect a removal and place the property in public storage for Tenant's account. Tenant shall be liable to Landlord for the cost of removal, transportation to storage, and storage, with interest at the legal rate on all such expenses from the date of expenditure by Landlord.

**16.2    Holdover**

(1)    If Tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a Tenant from month to month, subject to all provisions of this lease except the provisions for term and renewal and at a rental rate equal the rent last paid by Tenant during the original term, or to eject Tenant from the Premises and recover damages caused by wrongful holdover.  Failure of Tenant to remove fixtures, furniture, furnishings, or trade fixtures that Tenant is required to remove under this lease shall constitute a failure to vacate to which this section shall apply if the property not removed will substantially interfere with occupancy of the Premises by

11 – WINERY LEASE

Exhibit 2 – Page 11 of 17

PDF Page 32

VALLEYVIEW_000592

another tenant or with occupancy by Landlord for any purpose including preparation for a new tenant.

(2)    If a month-to-month tenancy results from a holdover by Tenant under this Section 16.2, the tenancy shall be terminable at the end of any monthly rental period on written notice from Landlord given not less than ten days prior to the termination date which shall be in the notice.  Tenant waives any notice that would otherwise be provided by law with respect to a month-to-month tenancy.

## Section 17.    Miscellaneous

**17.1    Non-waiver.**  Waiver by either party of strict performance of any provision of this lease shall not be a waiver of or prejudice the party's right to require strict performance of the same provision in the future or of any other provision.

**17.2    Attorney Fees.**  If suit or action is institute in connection with any controversy arising out of this lease, the prevailing party shall be entitled to recover in addition to costs such sum as the court may adjudge reasonable as attorney fees at trial, on petition for review, and on appeal.

**17.3    Notices.**  Any notice required or permitted under this lease shall be given when actually delivered or 48 hours after deposited in United States mail as certified mail addressed to the address first given in this lease or to such other address as may be specified from time to time by either of the parties in writing.

**17.4    Succession.**  Subject to the above stated limitations on transfer of Tenant's interest, this lease shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

**17.5    Recordation.**  This lease shall not be recorded without the written consent of Landlord.

**17.6    Entry for Inspection.**  Landlord shall have the right to enter upon the Premises at any time to determine Tenant's compliance with this lease, to make necessary repairs to the building or to the Premises, or to show the Premises to any prospective tenant or purchaser, and in addition shall have the right, an any time during the last two months of the term of this lease, to place and maintain upon the Premises notices for leasing or selling of the Premises.

**17.7    Interest on Rent and Other Charges.**  Any rent or other payment required of Tenant by this lease shall, if not paid within ten days after it is due, bear interest at the rate of 12% per annum (but not in any event at a rate greater than the maximum rate of interest permitted by law) from the due date until paid.  In addition, if Tenant fails to make any rent or other payment required by this lease to be paid to Landlord within five days after it is due, Landlord may elect to impose a late charge of five cents per dollar of the overdue payment or reimburse Landlord for the costs of collecting the overdue payment. Tenant shall pay the late charge upon demand by Landlord.  Landlord may levy and collect a late charge in addition to all other remedies

12 – WINERY LEASE

Exhibit 2 – Page 12 of 17
PDF Page 33

VALLEYVIEW_000593

available for Tenant's default, and collection of a late charge shall not waive the breach caused by the late payment.

**17.8    Proration of Rent.** In the event of commencement or termination of this lease at a time other than the beginning or end of one of the specified rental periods, then the rent shall be prorated as of the date of commencement or termination and in the event of termination for reasons other than default, all prepaid rent shall be refunded to Tenant or paid on its account.

**17.9    Time of Essence.** Time is of the essence of the performance of each of Tenant's obligations under this lease.

**Section 18.    Arbitration**

**18.1    Disputes to be Arbitrated.** If any dispute arises between the parties as to a matter, which this lease says should be arbitrated, or as to any other question involving apportionment or valuation, either party may request arbitration and appoint as an arbitrator an independent real estate appraiser having knowledge of valuation of rental properties comparable to the Premises. The other party shall also choose an arbitrator with such qualifications, and the two arbitrators shall choose a third. If the choice of the second or third arbitrator is not made within ten days of the choosing of the prior arbitrator, then either party may apply to the presiding judge of the judicial district where the Premises are located to appoint the required arbitrator.

**18.2    Procedure for Arbitration.** The arbitrator shall proceed according to the Oregon statutes governing arbitration, and the award of the arbitrators shall have the effect therein provided. The arbitration shall take place in the county where the leased premises are located. Costs of the arbitration shall be shared equally by the parties, but each party shall pay its own attorney fees incurred in connection with the arbitration.

Landlord:                                          Tenant:

THE ANN M. WISNOVSKY TRUST,                        VALLEY VIEW WINERY, INC.
UTD AUGUST 2, 2012

                                                   By:_____
By:_____                           Mark A. Wisnovsky, President
    Ann M. Wisnovsky, Trustee
                                                   By:_____
                                                       Michael J. Wisnovsky,
                                                       Vice President/Secretary

13 – WINERY LEASE

Exhibit 2 – Page 13 of 17

PDF Page 34                                        VALLEYVIEW_000594

available for Tenant's default, and collection of a late charge shall not waive the breach caused by the late payment.

**17.8    Proration of Rent.** In the event of commencement or termination of this lease at a time other than the beginning or end of one of the specified rental periods, then the rent shall be prorated as of the date of commencement or termination and in the event of termination for reasons other than default, all prepaid rent shall be refunded to Tenant or paid on its account.

**17.9    Time of Essence.** Time is of the essence of the performance of each of Tenant's obligations under this lease.

**Section 18.    Arbitration**

**18.1    Disputes to be Arbitrated.** If any dispute arises between the parties as to a matter, which this lease says should be arbitrated, or as to any other question involving apportionment or valuation, either party may request arbitration and appoint as an arbitrator an independent real estate appraiser having knowledge of valuation of rental properties comparable to the Premises. The other party shall also choose an arbitrator with such qualifications, and the two arbitrators shall choose a third. If the choice of the second or third arbitrator is not made within ten days of the choosing of the prior arbitrator, then either party may apply to the presiding judge of the judicial district where the Premises are located to appoint the required arbitrator.

**18.2    Procedure for Arbitration.** The arbitrator shall proceed according to the Oregon statutes governing arbitration, and the award of the arbitrators shall have the effect therein provided. The arbitration shall take place in the county where the leased premises are located. Costs of the arbitration shall be shared equally by the parties, but each party shall pay its own attorney fees incurred in connection with the arbitration.

Landlord:                                              Tenant:

THE ANN M. WISNOVSKY TRUST,                VALLEY VIEW WINERY, INC.
UTD AUGUST 2, 2012

By: _Ann M. Wisnovsky_                          By: _____
    Ann M. Wisnovsky, Trustee                       Mark A. Wisnovsky, President

                                                    By: _____
                                                        Michael J. Wisnovsky,
                                                        Vice President/Secretary

_03/24/16_

OFFICIAL STAMP
ELIJAH A. ROLLASON
NOTARY PUBLIC - OREGON
COMMISSION NO. 935543
MY COMMISSION EXPIRES JANUARY 19, 2019

13 – WINERY LEASE

Exhibit 2 – Page 14 of 17

PDF Page 35                                              VALLEYVIEW_000595

First American Title Company of Oregon

File No.: 7169-2290459
July 22, 2014

**Exhibit "A"**

Real property in the County of Jackson, State of Oregon, described as follows:

PARCEL I:
COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST 10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 89° 44' 41" WEST 1112.65 FEET TO A 1.5 INCH INSIDE DIAMETER IRON PIPE (RECORD 2 INCH PIPE), FROM WHICH THE CENTER OF A 48 INCH DIAMETER OAK TREE BEARS NORTH 47° EAST 21.4 FEET (RECORD 20.0 FEET), SAID PIPE MARKING THE SOUTHWEST CORNER OF SAID PARCEL DESCRIBED IN DOCUMENT NO. 78-08539; THENCE CONTINUING ALONG THE WESTERLY, NORTHERLY, AND EASTERLY BOUNDARY OF SAID DESCRIBED PARCEL THE FOLLOWING; NORTH 6° WEST 1574.0 FEET, MORE OR LESS, TO THE NORTH LINE OF LOT 4 OF SAID SECTION 33; THENCE EAST 1336 FEET, MORE OR LESS, TO THE SOUTHEAST CORNER OF LOT 4 OF SECTION 34, SAID TOWNSHIP AND RANGE; THENCE NORTH 608 FEET, MORE OR LESS, TO THE NORTHWEST CORNER OF LOT 3 OF SAID SECTION 34; THENCE EAST 736.8 FEET, MORE OR LESS, TO THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE, ALONG SAID RIGHT OF WAY BOUNDARY, SOUTH 7° 13' 10" WEST 1837.72 FEET TO A POINT OF CURVE; THENCE ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 3° 38' 17" WEST 242.34 FEET) A DISTANCE OF 242.50 FEET TO THE POINT OF BEGINNING.

PARCEL II:

**Exhibit A**
**Page 1 of 2**

*First American Title*

Exhibit 2 – Page 15 of 17

PDF Page 36

VALLEYVIEW_000596

First American Title Company of Oregon

File No.: 7169-2290459
July 22, 2014

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST 10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 87° 33' 02" EAST 21.12 FEET TO A 5/8" IRON PIN; THENCE NORTH 88° 21' 48" EAST 109.22 FEET TO A 5/8" IRON PIN ; THENCE SOUTH 84° 56' 41" EAST 56.34 FEET TO A 5/8" IRON PIN ; THENCE ALONG THE ARC OF A 460.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS NORTH 81° 05' 40" EAST 221.96 FEET ) A DISTANCE OF 224.17 FEET TO A 5/8" IRON PIN; THENCE NORTH 67° 08' 01" EAST 137.72 FEET TO A 5/8" IRON PIN; THENCE NORTH 89° 17' 20" EAST 16.48 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH NORTH 00° 19' 38" WEST 26.00 FEET) A DISTANCE OF 26.00 FEET TO THE POINT OF BEGINNING.

NOTE: This Legal Description was created prior to January 01, 2008.

Exhibit___A_____
Page__2__of__2__

*First American Title*

Exhibit 2 – Page 16 of 17

PDF Page 37                                                           VALLEYVIEW_000597

3/24/2016                                              1000 Upper Applegate Rd - Google Maps

 Maps     1000 Upper Applegate Rd     WINERY LEASE ✓



Imagery ©2016 Google, Map data ©2016 Google     50 ft



## 1000 Upper Applegate Rd
Jacksonville, OR 97530



Exhibit __B__
Page __/__ of __/__

https://www.google.com/maps/place/1000+Upper+Applegate+Rd,+Jacksonville,+OR+97530/@42.2248726,-123.0488483,211m/data=!3m1!1e3!4m2!3m1!1s0x5...     1/2

Exhibit 2 – Page 17 of 17

PDF Page 38

VALLEYVIEW_000598

Plaintiff's Exhibit 3

## SECOND ADDENDUM TO
## VINEYARD LEASE

**Effective Date:**    February 23, 2017

**Between:**    WISNOVSKY LAND, LLC, an           ("Landlord")
Oregon limited liability company
1352 Applegate Road
Jacksonville, OR 97530

**And:**    VALLEY VIEW WINERY, INC., an           ("Tenant")
Oregon corporation
1000 Upper Applegate Road
Jacksonville, OR 97530

**Recitals:**

A.    The Ann M. Wisnovsky Trust, UTD August 2, 2012, and Tenant are parties to a lease dated effective March 24, 2016, ("Lease").

B.    The original landlord's interest in the lease and the original landlord's title to the real property that is subject to the Lease has been assigned to Landlord.

C.    Landlord and Tenant desire to modify some of the terms and conditions of the Lease.

**Agreements:**

1.    **Base Rent.** Section 2.1 of the Lease is revised to read as follows:

"Prior to March 1, 2017, Tenant has paid as "Monthly Base Rent" the sum of $12.50 per acre of land that was being used for the production of agricultural crops. Commencing March 1, 2017, Tenant shall pay to Landlord:
(1) Monthly Base Rent equal to the sum of $16.67 per acre of land that is presently being used for the production of agricultural crops ("Current Production Land"). Presently the Current Production Land consists of 35 acres, so Monthly Base Rent is $583.45;
(2) Monthly Base Rent equal to the sum of $16.67 per acre of land that is hereafter used for the production of agricultural crops, excluding hemp and cannabis agricultural crops, over and above the Current Production Land ("Future Production Land");
(3) Monthly Base Rent equal to the sum of $83.33 per acre of land that is hereafter used for the production of hemp and cannabis agricultural crops over and above the Current Production Land ("Future Production Hemp Land"); and

1 - SECOND ADDENDUM TO VINEYARD LEASE



PLAINTIFF'S
EXHIBIT

**272**

VALLEYVIEW_000566

Exhibit 3 – Page 1 of 3
PDF Page 40

(4) "Annual Base Rent" equal to the lesser of: (a) $1,000.00 per acre of Future Production Hemp Land; or (b) annual percentage rent equal to 5% of the gross sale proceeds realized upon the sale of the agricultural crops grown on the Future Production Hemp Land ("Percentage Rent").

Monthly Base Rent shall be paid on or before the first day of each calendar month. Annual Base Rent shall be paid on a calendar year basis and shall be prorated for partial years. Annual Base Rent shall be paid on or before February 1 of the year following the end of the calendar year for which the Annual Base Rent is due. Percentage Rent shall be calculated as of the last day of each calendar year, commencing December 31, 2017, and the calculation shall be completed by January 31 of the following year. Payment of Annual Base Rent shall be accompanied by a statement of the gross sales for the prior year. Tenant shall maintain or cause to be maintained complete and accurate records showing gross sales of agricultural crops grown on the Future Production Hemp Land, and Tenant retain or cause to be retained such records until the expiration of 3 years following the termination of this Lease. Tenant shall take action necessary to ensure that Landlord has the right to inspect and audit such records.

Tenant shall use good farming practices and diligently work to grow crops on land that, at any time, becomes Future Production Land and Future Production Hemp Land. If any Current Production Land, Future Production Land or Future Production Hemp Land becomes fallow following the date hereof, no rent shall be paid on such land for a period of not more than a total of 5 years; after the 5 years have expired, Tenant shall recommence paying rent for such land. Annual Base Rent that is due for Future Production Hemp Land that is fallow or not farmed diligently with good farming practices shall be equal to $1,000.00 per acre. Monthly Base Rent shall be payable on the first day of each month in advance at such place as may be designated by Landlord.  If rent is unpaid for a period of 10 days or more, Tenant shall pay, as additional rent a late charge equal to 5% of the amount due."

2.     **Restrictions on Use.** Section 4.6(1) is revised to read as follows:

"Conform to all applicable laws and regulations of any state authority affecting the Premises and the use, and correct at Tenant's own expense any failure of compliance created through Tenant's fault or by reason of Tenant's use."

3.     **Subletting.** Landlord agrees that Tenant may sublet all or any part of the Future Production Land to Mark A. Wisnovsky and/or Michael J. Wisnovsky and/or to a limited liability company wholly owned by Mark A. Wisnovsky and/or Michael J. Wisnovsky and/or any of their lineal descendants.

//

//

//

2 - SECOND ADDENDUM TO VINEYARD LEASE

VALLEYVIEW_000567

Exhibit 3 – Page 2 of 3

PDF Page 41

IN WITNESS, the parties have executed this agreement to be effective on the date set forth above.

Landlord:                                    Tenant:

WISNOVSKY LAND, LLC                           VALLEY VIEW WINERY, INC.

By: THE ANN M. WISNOVSKY TRUST                By: _____
    UTD AUGUST 2, 2012                            Mark A. Wisnovsky, President

By: _____
    Ann M. Wisnovsky, Trustee                 By: _____
                                                  Michael J. Wisnovsky,
                                                  Vice President/Secretary

3 - SECOND ADDENDUM TO VINEYARD LEASE

VALLEYVIEW_000568

Exhibit 3 – Page 3 of 3
PDF Page 42

Plaintiff's Exhibit 4



# VALLEY VIEW VINEYARD

**RECEIVED**

LEASE AGREEMENT

MAR 1 3 2000

The following agreement between Valley View Winery, Inc. and Ann Wisnovsky is to be effective as of January 1, 1989 and will remain in effect until written notification by either entity.

1) Valley View Winery, Inc. agrees to lease the winery and all the winery equipment and the 26-acre vineyard and all the vineyard equipment from Ann Wisnovsky for $5000 per month.

2) Valley View Winery, Inc. will pay all utility and operation costs associated with the winery business.

3) Any additional equipment or vineyard improvements will be made by Valley View Winery, Inc.

Ann Wisnovsky

Date: 1/1/89

Valley View Winery, Inc.
Mark Wisnovsky

Date: 1/1/89

**PLAINTIFF'S EXHIBIT**

**202**

1000 Upper Applegate Road    *    Jacksonville, Oregon 97530  USA    *    (503) 899-8468

Exhibit 4 – Page 3 of 4

PDF Page 44

WINOKUR_000842
CONFIDENTIAL

Plaintiff's Exhibit 5

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
Medford Division

JOANNE COUVRETTE, as trustee )
of the Ann M. Wisnovsky )
Trust; and WISNOVSKY LAND, )  Case No.
LLC, )  1:21-CV00157-CL
)
    Plaintiffs, )
)
  vs )
)
MARK A. WISNOVSKY, an )
individual; MICHAEL J. )
WISNOVSKY, an individual; )
PATRICK HUYCKE, an )
individual; VALLEY VIEW )
WINERY, INC., an Oregon )
corporation; JARVIS, DREYER, )
GLATTE & LARSEN, LLP, an )
Oregon partnership, fka )
Huycke O'Connor Jarvis, LLP, )
)
    Defendants. )

DEPOSITION VIA VIDEOCONFERENCE OF
PATRICK G. HUYCKE, ESQ.
Taken in behalf of the Plaintiff

December 13, 2022

## Page 2

BE IT REMEMBERED THAT the deposition of PATRICK G. HUYCKE, ESQ. was taken before Chris Villano Iba, Registered Professional Reporter and Certified Shorthand Reporter of the State of Oregon, on Tuesday, December 13, 2022, commencing at the hour of 10:00 a.m.  All participants appearing via remote videoconference.
-:-

APPEARANCES:

ATTORNEY FOR THE PLAINTIFF:

Bonnie Richardson
Marissa Korbel
Richardson Wang
805 SW Broadway
Suite 470
Portland, Oregon  97205
503 517-8200
Bonnie@richardsonwang.com
Marissa@richardsonwang.com

ATTORNEY FOR THE DEFENDANTS WISNOVSKY AND VALLEY VIEW WINERY:

Brooks M. Foster
Chenoweth Law Group
510 SW Fifth Avenue
4th Floor
Portland, Oregon  97204
503 221-7958
Bfoster@chenowethlaw.com

## Page 3

ATTORNEY FOR THE DEFENDANT HUYCKE:

Bernard S. Moore
Frohnmayer Deatherage
2592 E. Barnett Road
Medford, Oregon  97504
541 779-2333
Moore@fdfirm.com

ATTORNEY FOR THE DEFENDANT JARVIS, DREYER, GLATTE & LARSEN:

Gregory T. Lusby
Arnold Gallagher
800 Willamette Street, Suit 800
PO BOX 1758
Eugene, Oregon  97440
541 484-0188
Glusby@arnoldgallgher.com

Also present:  Mark Wisnovsky, Joanne Couvrette, Sarah Troutt; Amy Hoven; Ryan Kidder-Discovery Media Productions

## Page 4

I N D E X

Examinations                          Page
EXAMINATION BY MS. RICHARDSON:                    11

Exhibits

| No. | Description | Page | Line |
|-----|-------------|------|------|
| 200 | Letter, April 20, 1999, VALLEYVIEW_001297 | 39 | 25 |
| 201 | Letter, June 7, 1999, VALLEYVIEW_001298 | 50 | 25 |
| 202 | Lease Agreement, HUYCKE_000842 | 52 | 16 |
| 203 | Letter, December 16, 2002, HUYCKE_000515-521 | 65 | 19 |
| 204 | Email, 1/24/2005, HUYCKE_000658_000659 | 89 | 11 |
| 206 | The Last Will of Ann M. Wisnovsky, JCOUVRETTE000507-527 | 92 | 16 |
| 207 | Memo, May 2005, VALLEYVIEW_003696-697 | 94 | 25 |
| 208 | Email exchange, 8/25/2005, JCOUVRETTE002377-378 | 97 | 16 |

PATRICK G. HUYCKE, 12/12/22       COUVRETTE V WISNOVSKY, ET AL

5

| No. | Description | Page | Line |
|---|---|---|---|
| 209 | Email exchange, 9/8/2009, HYUCKE_000803 | 98 | 13 |
| 210 | Email, 12/18/2006, HUYKE_000783 | 103 | 17 |
| 211 | Email, 12/17/2008, HUYCKE_000787-788 | 105 | 8 |
| 212 | Declaration of Gift, HUYCKE_000771, 761, 764, 758, 755, 757, 770, 767, 763, 754, 760, 748 | 117 | 15 |
| 213 | First Codicil to Last Will of Ann M. Wisnovsky, JCOUVRETTE000495-497 | 121 | 16 |
| 214 | Letter, December 10, 2007, HUYCKE_000474-477 | 124 | 22 |
| 282 | Email, 12/10/2017, HUYCKE_000426 | 127 | 6 |
| 215 | Handwritten notes, HUYCKE_000478 | 134 | 4 |
| 216 | Second Codicil to Last Will of Ann M. Wisnovsky, JCOUVRETTE002504-506 | 135 | 16 |
| 217 | Email, 1/14/2008, HUYCKE_000655-656 | 136 | 1 |
| 218 | Email, 2/13/2008, | 138 | 20 |

6

| No. | Description | Page | Line |
|---|---|---|---|
|  | HUYCKE_000665 | | |
| 220 | Memorandum, February 13, 2008, HUYCKE_000421-424 | 139 | 10 |
| 219 | Review of Memorandum Regarding Purchase of Valley View Winery, JCOUVRETTE006234-236 | 149 | 9 |
| 221 | Letter, March 14, 2008, HUYCKE_000470 | 170 | 3 |
| 222 | Letter, April 10, 2008, HUYCKE_000450-468 | 171 | 18 |
| 223 | Third Codicil to Last Will of Ann M. Wisnovsky, JCOUVRETTE000455-457 | 173 | 23 |
| 224 | Inter Vivos Revocable Trust, The Ann M. Wisnovsky Trust, JCOUVRETTE005258-280 | 174 | 7 |
| 225 | Last Will of Ann M. Wisnovsky, JCOUVRETTE002507-510 | 174 | 17 |
| 226 | Email, 1/13/2014, HUYCKE_000653-654, 679 | 178 | 22 |
| 227 | Email, 2/14/2014, JCOUVRETTE000429 | 182 | 1 |
| 228 | Email, 2/24/2015, HUYCKE_00677 | 183 | 4 |
| 284 | Letter, October 1, 2010 | 184 | 14 |
| 285 | Letter, October 1, 2010 | | |

7

| No. | Description | Page | Line |
|---|---|---|---|
| 229 | Email, 2/24/2015, HUYCKE_000678, JCOUVRETTE0002546 | 188 | 4 |
| 230 | "Hello Ann" letter, JCOUVRETTE002547-548 | 188 | 17 |
| 243 | Statement-Office, 3/10/2008, JCOUVRETTE000542-544, 33 pages | 192 | 8 |
| 231 | Email, 4/6/2015, HUYCKE_000718 | 196 | 6 |
| 232 | Email, 1/6/2018, HUUCKE_000651-652 | 197 | 6 |
| 233 | Estate Proposal, JCOUVRETTE003247-248 | 198 | 25 |
| 234 | Email, 8/25/2015, HUYCKE_000744-745 | 199 | 6 |
| 235 | Email, 8/26/2015, HUYCKE_000746-748 | 202 | 22 |
| 236 | Email exchange, 01 Dec 2015, VALLEYVIEW_002067-069 | 210 | 17 |
| 237 | Letter, October 26, 2015, HUYCKE_000302-303 | 211 | 20 |
| 283 | Stock certificate, HUYCKE_000923-924 | 212 | 2 |
| 239 | Email exchange, February 17, 2016, VALLEYVIEW_001898-899 | 213 | 12 |
| 241 | First Amendment to Inter Vivos | 216 | 16 |

8

| No. | Description | Page | Line |
|---|---|---|---|
|  | Revocable Trust The Ann M. Wisnovsky Trust, JCOUVRETTE000122-123 | | |
| 242 | Consent to Action Without Meeting by Shareholders and Directors of Valley View Winery, Inc., Valleyview_001344 | 217 | 22 |
| 244 | Handwritten notes, Pages 1-26 | 219 | 10 |
| 263 | Typed notes, 11/2/2016, VALLEYVIEW_000475-480 | 220 | 15 |
| 246 | Agreement to Make Payments, VALLEYVIEW_001412-414 | 234 | 19 |
| 247 | Email exchange, 3/22/2016, HUYCKE_000684-686 | 235 | 7 |
| 270 | Redemption Agreement, VALLEYVIEW_002274-282 | 238 | 3 |
| 249 | Email exchange, 3/24/21016, HUYCKE_000692-694 | 245 | 17 |
| 250 | Winery Lease, March 24, 2016, VALLEYVIEW_000582-598 | 247 | 7 |
| 251 | Vineyard Lease, March 24, 2016, VALLEYVIEW_001382-398 | 247 | 12 |
| 253 | Letter, March 31, 2016, VALLEYVIEW_001828-829 | 248 | 12 |

9

255  Email, 4/4/2016, HUYCKE_000708249  13
257  Email exchange, 4/5/2016,        250  15
     HUYCKE_000710-712
258  Email exchange, 8/30/2016,       251  16
     HUYCKE_000760-762
259  Email exchange, 8/30/2016,       252  21
     HUYCKE_000753-756
260  Email exchange, 8/20/2016,       254  5
     HUYCKE_000763-766
261  Letter, September 6, 2016,       256  1
     HUYCKE_000248
262  Memorandum, September 6, 2016, 256  13
     HUYCKE_000249-260
265  Email exchange, 11/11/2016,      261  19
     HUYCKE_000771-772
266  Letter, January 11, 2017,        263  7
     HUYCKE_000195-198
267  Letter, Feb 20, 2017,            267  9
     JCOUVRETTE000182
269  Letter, February 22, 2017,       271  18
     VALLEYVIEW_002540-268
268  Email, 23 Feb 2017,              271  25
     VALLEYVIEW_002253
271  First Amendment to and           273  10

     Restatement of Agreement to

10

     Make Payments, February 23,
     2017, VALLEYVIEW_001415-418
272  Second Addendum to Vineyard      274  1
     Lease, February 23, 2017,
     VALLEYVIEW_000566-568
279  Third Amendment to Inter Vivos   278  7
     Revocable Trust The Ann M.
     Wisnovsky Trust,
     JCOUVRETTE001897-901
274  Email, 5/7/2019, HUYCKE_000723280  15
276  Letter, May 22, 2019,            282  20
     JCOUVRETTE000764
277  Email exchange, 5/28/2019,       284  1
     HUYCKE_000726-727
278  Message exchange, 8/13/16,       286  16
     VALLEYVIEW_001663-669

Requested Information          Page  Line


Instruction By Counsel         Page  Line

11

PATRICK G. HUYCKE, ESQ.
was thereupon produced as a witness in behalf of
the Plaintiff and, having been first duly sworn on
oath, was examined and testified as follows:


EXAMINATION
BY MS. RICHARDSON:
   Q. Hello, Mr. Huycke.  It's nice to meet you
virtually here.  And I want to just go ahead and
get started because we've got a lot of material to
cover, all right?
   A. Okay.
   Q. Okay.  So I'm not going to go over the rules
of the deposition with you, but I do want to know
have you ever had your deposition taken before?
   A. Yes.
   Q. When was that?
   A. I don't know.  20 years ago, 25 years ago.
I don't know.
   Q. Sometime in the '90s?
   A. Yeah, I think so.
   Q. What was the case?
   A. It involved a failed savings and loan.
   Q. Was that in Oregon or in another state?
   A. That was in Oregon.

12

   Q. Which court?
   A. I think it was Jackson County, but I'm not
sure.  I can't really remember.
   Q. And were you a party in that case?
   A. Yes.
   Q. Was your -- what law firm were you with at
the time?
   A. Well, it might have been Robertson Hilts &
Huycke.
   Q. Do you remember who the plaintiff was?
   A. I think it was the SAIF?  Is that what it
was?  No, not SAIF.  I can't remember what the
savings and loan -- you know, it was after a
failed savings and loan, and I can't remember who
the plaintiff was, whether it was -- you know, the
insurance company, like the FDIC, but they had a
separate one for the savings and loans?
   Q. I don't remember back then.  But if it was
in the '90s, that's when your deposition was
taken, approximately?
   A. I think it was FSLIC.  FSLIC.  Federal
Savings & Loan Insurance Corporation, yeah.
   Q. Okay.  Was there just one case or more than
one case?
   A. Just one case.

49

Q. Did you know at that time, in 1999, whether Mark or Mike were officers of the board of directors for the corporation?

A. I don't think they were.

Q. Was that something that was part of your practice to ask at the time when you were doing a reorganization of a corporation?

A. Yeah, I probably would have gotten the details of it, but --

Q. Do you remember what type of corporation it was?

A. You mean C corp or S corp? Is that what you're saying, or what?

Q. I think so, yes.

A. I don't recall.

Q. Would that have been something important for you to know for reorganization, the type of corporation, whether it be a C corp or an S corp?

A. It probably would come out, you know, come out at some point or time -- some point in time, depending on what we were doing.

Q. Were you ever involved in the formation of that corporation?

A. No. I don't think so.

Q. And then here it says "If any transaction

50

structured with Mike or Mark, I cannot represent them," in the last paragraph.

A. Right. I saw that.

Q. Why did you write that?

A. Well, because I felt it would be a conflict.

Q. What do you mean by it would be a conflict?

MR. MOORE: Object to the form.

A. I felt like possibly they might have conflicting interests.

Q. Who is "they"?

A. Ann and Mark and Mike.

Q. Was this part of your practice to write something like this if you felt that there was a conflicting interest?

A. Well, if they were all coming into my office and talking to me and asking me questions, I'd probably want to clarify who I'm representing.

Q. And when you wrote "If any transaction is structured with Mike and Mark, I cannot represent them," are you referring to Mark and Mike individually?

A. Yes.

Q. All right. I just want to turn to the next page, which is Exhibit 201.

[EXB. 201 identified]

51

Q. And this is a letter that you sent to Ann at the Valley View Nursery. Do you see that, where you're --

A. Yeah.

Q. -- asking the value? Do you recall discussions with Ann about calculating the value of her business?

A. Could you, I'm sorry, ask that again?

Q. Yes. In around 1999, do you recall talking to Ann about calculating the value of the business?

A. No more than that's in these letters.

Q. Do you know why you were asking for a calculation of the value of the business?

A. I believe it was because of her -- mostly because of her estate planning, and she was going to be -- I don't know. You know, I -- no, I really -- other than that, I don't know.

Q. Why is calculations for the value of the business important for estate planning?

MR. MOORE: Object to the form.

A. Well --

Q. Well, is it important for the estate planning?

MR. MOORE: I'm still objecting to the

52

form.

A. If she's the owner of the corporation it is because it's her estate. I want -- need to know how big is her estate, what's it consist of.

Q. Would the value of the business also be important for gifts --

A. Yes.

Q. -- of stock?

A. We're talking over each other again.

Q. Sorry. That was my fault.

A. It was kind of me too. You kind of pause your questions a little bit, I think you're done and so I answer. It's fine.

Q. All right. I'll try not to do that as much.

All right. So turning to Exhibit 202.

[EXB. 202 identified]

Q. This came out of your file, and it is -- it's stamped received March 13, 2000. I'm wondering if you recognize that stamp, whether or not it was a stamp made by your office, if you know.

A. I -- I think it was a stamp from our office. Seems like it.

Q. And this appears to be a lease agreement that was signed in 1989. And do you -- you were

53

not the one that created this lease agreement; is that correct?

A. Right.

Q. And do you recall why you were receiving this lease agreement in 2000?

A. No.

Q. Would a prior lease agreement have been important for your work on the Valley View Winery reorganization?

A. Not necessarily.

Q. Would it have been important for estate planning?

A. Not necessarily.

Q. Do you know why you were receiving this lease agreement in 2000?

A. No.

Q. Do you recall anything about what Mark or Mike or Ann told you with respect to this 1989 lease agreement?

A. No, other than I remember them mentioning sometimes that there's -- there's some lease from a long time ago, and maybe this was it, you know, like later on when we were talking. You know, I might have forgotten that I received this lease, and -- I think they referenced, oh, yeah, I think,

54

you know, that there's some very short lease agreement.

Q. What else do you remember Mark and Mike saying about this 1989 lease agreement?

A. Ever?

Q. Ever.

A. I remember one time having a little conversation about, well, are you paying the rent, is the rent being paid. And I can't remember -- I can't remember what their answer was. But I kind of remember having some discussion about that.

Q. And that discussion was with Mark and Mike; is that correct?

A. Oh, well, I -- I would -- I'd be guessing. But I think, if it occurred, I think it occurred with -- it could have occurred with all three of them.

Q. And if you remember, that's okay, and just let me know if you don't. But do you recall having that conversation with Ann about the 1989 lease agreement and whether or not rents were being paid?

A. Well, I think I just said if I had any discussions about this lease, I think it would have been with -- with Ann, and possibly the two

55

of them, the boys.

Q. But what I want to know is do you recall talking with Ann about the payments, whether they were making payments in 1989?

A. I remember having a discussion with them about whether or not payments were being made, and that's it.

Q. That's all you remember.

A. Yeah.

Q. You don't remember whether or not they told you that they had or had not been making payments.

A. I can't -- I can't remember specifically, no.

Q. Generally do you remember?

A. Well, I seem to have some vague recollection that maybe they haven't been making payments, but they haven't been accounting for payments correctly. I mean, I kind of recall something where they said, well, we pay a lot of mom's expenses.

Now, wait, you're kind of -- there's a thing here. I don't know -- there's a --

Q. Yes.

A. I don't know what -- no, I didn't.

Q. That was a chat. Just ignore that. That

56

was --

A. Okay. Now I've got something over here. Let me see if I can -- if I do that. I don't know. I just got a margin over here, but I can still see the three of you.

MR. MOORE: He's asking the host to let Sarah Trout in.

Q. Yeah. Sorry, it just pops up and kind of interferes there with your --

A. Yeah, well, it hid your face, so I couldn't see you.

Q. Okay. Yeah.

A. Now it's fine.

Q. I didn't do that, just so you know.

A. Okay.

Q. All right. So I want to just go back and make sure that we have the question, that you can answer the question that was asked since that was interrupted.

And the court reporter's on there, and I hope I asked the question in a good way. Can you read back that last question?

(Reporter read as requested:

Q. You don't remember whether or not they told you that they had or had

237

Ann never really worked on it, you know, didn't really participate. She knew about it but she didn't really participate in any of the, maybe the legwork kind of stuff that had to be done relative to that. So that's why I was writing Mike about it --

Q. So --

A. -- if that's your question.

Q. Why -- why would you want to increase the number of lots on the land?

A. Because it makes it more valuable.

Q. And at this time, who owned the land?

A. And the agreement to make payments -- no. The redemption agreement, although I don't know what the dates of everything are, but the redemption agreement call for different amounts to be paid based on the number of lots. I recall that. But generally, just to make the land more -- more valuable.

Q. Okay. Well, is it -- since you talked about the redemption agreement, can we go to that? Are you going to be able to hold your place here while we now skip ahead?

A. Yeah.

Q. All right. So this email is dated 2016.

238

And the redemption agreement I have is Exhibit 270, and it's dated February 23rd, 2017.

[EXB. 270 identified]

A. Can you give me a Bates stamp number?

Q. Well, it's Exhibit 270.

A. Yeah, I know, but when I go through everything, some of the -- oh, here, I've got 273. Let me go back.

Q. I see. Yeah, that makes it difficult.

A. 272.

Q. It's Valley View 02274.

A. Yeah, I'm -- I'm kind of there almost, I think. Okay. I'm almost there. Well, okay, now I'm on 269.

Q. Almost there. 270.

A. Okay. Now I'm there.

Q. So you mentioned the redemption agreement.

A. Right.

Q. And I believe this is the redemption agreement. It's dated February 23rd, 2017.

A. Yeah.

Q. I believe it is signed by Ann Wisnovsky. Did you draft this redemption agreement?

A. Yes.

Q. Why -- what was the purpose of this

239

agreement?

A. The purpose of the agreement was to provide a mechanism after Ann's death for Mark and Mike to end up with total ownership of Wisnovsky Land, and Bob and Joanne to receive some benefit, you know, some money.

Q. And is that how you explained it to Ann?

A. Well, Ann wanted to make sure -- my recollection is that Ann in 2017 wanted to make absolutely sure that Mark and -- no, Robert and Joanne couldn't mess with the winery. And so I came up with this thought of the redemption agreement that would, you know, basically -- because they just -- well, I think I discussed with Ann, you know, the difficulty of having a partner or a member of an LLC, even if it's a minority interest member, who was very adverse.

And, you know, she had come in saying she wanted to make sure they didn't have the ability to mess with Mark and Mike and the winery. And so I suggested this buyout as an option.

Q. When you say buyout, are you referring to the redemption agreement?

A. Yeah.

Q. So this redemption agreement is what Ann

240

wanted in 2017; is that correct?

A. Yes.

Q. And if she changed her mind about this redemption agreement, would Ann be able to revoke it?

A. Well, she could amend her trust, because the redemption agreement was part of an amendment to her trust.

Q. When -- explain -- did this redemption agreement have a different -- another name that you called it?

A. No. I don't know. I don't recall.

Q. Okay. I mean, I just -- the agreement to make payments I think you referred to as the windfall agreement. I didn't know if you had another name for the redemption agreement.

A. I don't think so. I don't recall.

Q. So per the redemption agreement --

Somebody coughing?

MR. MOORE: That's me.

MS. RICHARDSON: Hope you're okay, Bernie.

MR. MOORE: I'm allergic to the dark. We've been here so long it's dark.

MS. RICHARDSON: Okay. Well, we have a

241

little ways to go here. Let's keep going.

BY MS. RICHARDSON:

Q. Okay. So referring again to the redemption agreement, Exhibit 270. In it you have set a price for the purchase of the land; is that correct?

A. I think it's a -- I think it's a purchase of the membership interest in the agreement, in the LLC, I think.

Q. And the LLC would own the land; is that correct?

A. Yeah.

Q. Okay. And so when you set this price -- well, first of all, the price is set at 200,000; is that correct?

A. Well, it's 200 or 240 or 280.

Q. And that would depend on whether or not the land was further divided into lots; is that correct?

A. Right. Separate legal parcels.

Q. And so if it was divided up into separate legal parcels, then the price would be higher; is that correct?

A. Yes.

Q. Okay. And when I look at this, I'm

242

wondering how did you determine what price to put here in redemption agreement for the membership interests that held the land?

A. Well, I didn't determine that. I was given that by I think Ann and Mark and Mike.

Q. And do you know how they determined what that price would be?

A. No.

Q. Do you know if there was ever an appraisal of the land at any point?

A. I don't believe so.

Q. Did you ever discuss with Ann what she would need to do if she needed money from -- if she needed money while she was still living in the house, before her death, obviously? Did you ever discuss with her about being able to use the land to obtain more money?

A. I didn't discuss that with her.

Q. Now, on the attachment to this redemption agreement are -- is a promissory note. There's a trust deed as well. What instructions did you provide with respect to this Exhibit A, promissory note and trust deed?

A. Well, I think -- those were exhibits to the redemption agreement. And I think, you know, the

243

purchase price was going to be paid by the execution and delivery of a promissory note secured by a trust deed. So I was just putting forth the note and the trust deed.

Q. And that would happen after her death; is that correct?

A. Yes.

Q. All right. So, sorry to do this, but we're going to go back to where we left off. Hopefully you marked it.

A. Okay. Just a second.

MR. MOORE: Which exhibit was that, Bonnie?

A. Am I on 247?

Q. We were on 247, yes.

A. Okay.

Q. I'm going to go now to 248.

MS. RICHARDSON: But before I do that, let's just pause for a minute and -- I can't remember when we had our last break.

MR. MOORE: It's been about an hour.

MS. RICHARDSON: Okay. Maybe let's take one more break here. Is that okay?

THE WITNESS: Okay.

MS. RICHARDSON: Let's go -- let go

244

ahead and take a break and then we can go off the record and talk.

(RECESS: 5:03-5:11)

BY MS. RICHARDSON:

Q. Okay. Mr. Huycke, turning your attention to Exhibit 283, which is, looks like a share -- shares of common stock -- common stock, excuse me. I want to turn your attention to the second page of Exhibit 283, which is the back of the certificate, I suppose.

A. Yeah.

Q. And I believe you earlier testified that you had prepared this.

A. Right.

Q. And I wanted to ask you why it was not notarized.

A. Because it's not normal to do so.

Q. Because it's not normal to do so in a stock certificate?

A. Yeah. I've never -- never seen a notarized stock certificate.

Q. Okay. It's also not dated on the back, it just says 2015. Why wasn't it dated?

A. I don't know.

Q. Well, why wasn't there a signature of

277

use on this other land.  I can't remember.  I'm sure we talked about marijuana and hemp, and I remember that being an issue for Ann.

Q.  And I'll direct you.  I don't mean to interrupt you too much here.  But if you look at the second page of Exhibit 272, at the bottom it does say subletting.

A.  Yeah.

Q.  So that appears to be a change.  So at this time, did you know that Mark and Mike were going to be subleasing through a different entity?

A.  I knew that was what was contemplated.  I didn't know if they were going to do it or whether it was just thought or whatever.

Q.  Did you give advice to Ann about the pros and cons of their subleasing on the vineyard property under this lease?

A.  Well, I think I would have told her that they still had to comply with the terms of the main lease.  I'm not sure I said much more than that.

MS. RICHARDSON:  Okay.  So I'm just going to just take a little break here, not to -- just pause, go off the record.  I'm going to ask the videographer how much time.

278

(RECESS:  6:04-6:09)

BY MS. RICHARDSON:

Q.  Okay.  I'm going to refer you to Exhibit 279.  It's a little out of order.  It's the third amendment to the trust.  It is dated July 28, 2017.

[EXB. 279 identified]

A.  Okay.  Okay.  Just a second.  Okay.

Q.  And my question to you on this third amendment to the trust, do you remember whether or not Ann Wisnovsky signed this in your office?

A.  Well, I don't know.  I'd have to look at my billing records.

Q.  Your billing record are Exhibit 243.

A.  I don't know that I'm going to be able to -- I mean, I've been kind of --

Q.  Okay.  Well, let's just --

A.  It's quite a stack.  Oh, here.  Okay, I have that.  Are they in chronological -- are they in chronological order?

MR. MOORE:  I think they are.

Q.  We try to be, but the billing records are a little bit different.  Maybe --

Let me ask this of you, Mr. Huycke, so we can save some time.

279

A.  Okay.

Q.  If your billing records -- would you have noted in your billing records that you met with Ann or that Ann came in to sign?  Would that be on your billing records if she did in fact come in to sign in two-thousand --

A.  Yeah, I mean, normally it would be unless -- you know.  I mean, do I ever forget to put time down?  Yeah.

So normally it would be.  It would be very unusual for her not to have signed this in my office, I mean, because it's not -- you know, it's not exactly a simple document, and I probably -- I would have wanted to go over it with her.

Q.  But you don't recall going over it with her in your office before she signed it?

A.  I don't recall that specifically, no.  I recall kind of the back and forth about what we were trying to do more than the actual signing of this document.

Q.  And what I want to get at is, I mean, we did look at other documents that she did not sign in your office that were estate-planning documents, right?

A.  Right.

280

Q.  And so I just wanted to know whether or not you remember if she signed this in your office.  And if you don't, that's okay.  And then you probably -- if you don't remember, if you remember having a conversation with her while she's signing this document in July 2017.

A.  I don't recall a specific conversation.  I just know that -- that it would be unusual if she didn't sign this kind of document, as opposed to a fairly simple will or codicil to a will, it would be unusual for her to sign this kind of document outside my office and not have me kind of go over it with her.

Q.  Okay.  Let's go to Exhibit 274.

[EXB. 274 identified]

Q.  While you're getting to it, it's a May 7, 2019, email from you to Mike, with a cc to his brother Mark.  Do you remember writing this email to them?

A.  Well, kind of -- kind of.  I remember the issue of this lot legality stuff coming up.  And I remember having a meeting with Mark -- well, I can't remember if it was Mark and Mike or one or the other and Dan and me.

Q.  And then in here you talk about how you need

289

Q. Did you talk -- let me ask this, have you ever talked to Ann Wisnovsky after the year 2019?

A. No.

Q. Okay. So in the year 2019, you were receiving some messages from Mark Wisnovsky. Did you ever have any conversations with Mark Wisnovsky in 2019 after the May 2019 letter you got from Ann Wisnovsky?

A. There may have been a conversation with Mark or Mike, I don't know, where they just told me just all hell's breaking loose, and -- you know. I think they were -- you know, made it -- seemed to me like they were going to file some lawsuits and things like that.

Q. Was that in 2019?

A. Well, it was -- it was -- it was 2019 or later.

Q. Any other conversations you've had with Mark and Mike since 2019 that you can recall?

A. Not that I recall.

Q. Did anyone in 2019 ever discuss with you Ann Wisnovsky's mental capacity?

A. I don't believe so.

Q. Did anybody ever discuss with you Ann Wisnovsky's mental capacity after the year 2019,

290

in 2020?

A. Well, I think I recall somebody telling me, but I don't know -- it could have been Mark or Mike, that maybe a guardian had been appointed, a conservator.

Q. Did you ever have any discussions in 2019 or after with Gary Turner?

A. No.

MS. RICHARDSON: Okay. So I think my time is up, so I'm done.

MR. MOORE: Okay. Thank you everybody.

(DEPOSITION CONCLUDED: 6:30 p.m.)

(The witness at the time of their deposition did not request the right to review)

291

C E R T I F I C A T E

I, Chris Villano Iba, a Certified Shorthand Reporter of the State of Oregon, do hereby certify that PATRICK G. HUYCKE, ESQ., appeared before me via videoconference at the time and place mentioned in the caption herein; that the witness was first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to print; and that the foregoing transcript, Pages 1 to 291, inclusive, constitutes a full, true and accurate record of said examination of and testimony by said witness, and of all other oral proceedings had during the taking of said proceedings, and of the whole thereof.

Witness my hand and seal as Certified Shorthand Reporter at Portland, Oregon, this 22nd day of June, 2023.

Chris Villano Iba
Certified Shorthand Reporter
Certificate No. 90-0062
Expires September 30, 2024

Case 1:21-cv-00157-CL    Document 169    Filed 05/02/25    Page 53 of 234

Plaintiff's Exhibit 6

PDF Page 55

**Brooks M. Foster, OSB No. 042873**
E-mail: bfoster@chenowethlaw.com
Chenoweth Law Group, PC
510 SW Fifth Avenue, Fourth Floor
Portland, OR 97204
Telephone: (503) 221-7958
Facsimile: (503) 221-2182

**James R. Dole, OSB No. 892272**
Email: jdole@wlrlaw.com
Watkinson Laird Rubinstein, P.C.
1246 NE Seventh Street, Suite B
Grants Pass, OR 97526
PO Box 10567
Eugene, OR 97440
Telephone: (541) 484-2277
Facsimile: (541) 484-2282

Attorneys for Defendants Mark A. Wisnovsky,

Michael J. Wisnovsky, and Valley View Winery, LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| JOANNE COUVRETTE, a trustee of the Ann M. Wisnovsky Trust,<br><br>                              Plaintiff,<br><br>               vs.<br><br>MARK A. WISNOVSKY, an individual; MICHAEL J. WISNOVSKY, an individual; PATRICK HUYCKE, an individual; VALLEY VIEW WINERY, INC., an Oregon corporation; JARVIS, DREYER, GLATTE & LARSEN, LLP, an Oregon partnership, fka Huycke O'Connor Jarvis, LLP,<br><br>                              Defendants. | Case No. 1:21–cv–00157–CL<br><br><br>DEFENDANT MICHAEL J. WISNOVSKY'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT MICHAEL J. WISNOVSKY |

Page 1 - DEFENDANT MICHAEL J. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT
MICHAEL J. WISNOVSKY

Exhibit 6 – Page 1 of 5

PDF Page 56

statements, income statements, property tax records, and federal and state tax returns.

**RESPONSE:** Mr. Wisnovsky objects that this request is overly broad and unduly burdensome, it is directed at an entity not party to this lawsuit, it does not seek documents relevant to this lawsuit, it is not limited to any particular time period, it is not proportional to the needs of the case, it requests disclosure of privileged information, it requests disclosure of sensitive and confidential business financial information, and the terms "financial records," "Third Generation Farms, LLC," "annual reports, balance sheets, profit and loss statements, income statements, property tax records, and federal and state tax returns" are vague, ambiguous, and/or undefined.

**REQUEST FOR PRODUCTION NO. 17:** All leases, subleases, or assignments for land or buildings subject to the Vineyard Lease or the Winery Lease.

**RESPONSE:** Mr. Wisnovsky objects that this request is overly broad and unduly burdensome, it is not limited to subjects relevant to this lawsuit, it is not limited to any particular time period, it is not proportional to the needs of the case, it seeks documents already in Plaintiff's possession, custody, or control, and the term "leases, subleases, or assignments" is vague, ambiguous, and/or undefined.

Subject to and without waiving any of the foregoing objections, after conducting a reasonable search, Mr. Wisnovsky is not aware of any responsive documents.

**REQUEST FOR PRODUCTION NO. 18:** All documents and communications relating to rent payments for the Vineyard Lease and/or Winery Lease, including payments for subleases or assignments of land or buildings subject to the Vineyard Lease or the Winery Lease.

**RESPONSE:** Mr. Wisnovsky objects that this request is overly broad and unduly burdensome, it is not limited to subjects relevant to this lawsuit, it is not limited to any particular

Page 10 - DEFENDANT MICHAEL J. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT
MICHAEL J. WISNOVSKY

Exhibit 6 – Page 2 of 5
PDF Page 57

and transportation (i.e. car purchase or lease, gas, rentals, etc.).

**RESPONSE:** Mr. Wisnovsky objects that this request is overly broad and unduly burdensome, it does not seek documents relevant to this lawsuit, it is not proportional to the needs of the case, and the term "expenses of Michael Wisnovsky, the children of Michael Wisnovsky, and/or any current or former spouse of Michael Wisnovsky" is vague, ambiguous, and/or undefined.

DATED this 10th day of November 2021

CHENOWETH LAW GROUP PC

By: /s/ Brooks M. Foster
Brooks M. Foster, OSB No. 042873
bfoster@chenowethlaw.com
James R. Dole, OSB No. 892272
jdole@wlrlaw.com

Attorneys for Defendant Michael J.
Wisnovsky

Trial Attorney: James R. Dole

Exhibit 6 – Page 3 of 5
PDF Page 58

Page 18 - DEFENDANT MICHAEL J. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT
MICHAEL J. WISNOVSKY

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2021, I caused to be served a copy of the foregoing **DEFENDANT MICHAEL J. WISNOVSKY'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT MICHAEL J. WISNOVSKY** on the following person in the manner indicated below:

Ms. Bonnie Richardson, OSB No. 983331
Mr. Zachariah Allen, OSB No. 122729
Ms. Elizabeth Graves, OSB No. 193644
Richardson Wright, LLP
805 SW Broadway, Ste. 470
Portland, OR 97205
bonnie@richardsonwright.com
zach@richardsonwright.com
elizabeth@richardsonwright.com
*Of Attorneys for Plaintiff/Counter-Defendant Joanne Couvrette*

Mr. Gregory T. Lusby, OSB No. 933490
Arnold Gallagher, PC
800 Willamette St. Ste. 800
PO Box 1758
Eugene, OR 97440
glusby@arnoldgallagher.com
*Attorney for Defendant Jarvis, Dreyer, Glatte& Larsen, LLP*

Bernard S. Moore
Frohnmayer Deatherage
2592 E. Barnett Rd.
Medford, OR 97504
moore@fdfirm.com
*Attorney for Defendant Patrick Huycke*

by the following method(s):

xx      by **e-service / emailing** a full, true and correct copy thereof to the parties at the email addresses shown above, which are the last-known email addresses of the parties, on the date set forth below.

        by **mailing** a full, true and correct copy thereof in a sealed, first-class, postage pre-paid envelope, addressed to the last-known address of the parties as shown above, and deposited with the United States Postal Service at Portland, Oregon, on the date set forth below.

        by **hand delivering** a full, true and correct copy thereof to the parties at the last known business address of the parties above.

/ / /

/ / /

Exhibit 6 – Page 4 of 5
PDF Page 59

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it may be used as evidence in court and is subject to penalty for perjury.

By: /s/ Bradley T. Crittenden
    Bradley T. Crittenden
    bcrittenden@chenowethlaw.com
    Attorney

Exhibit 6 – Page 5 of 5
PDF Page 60

Plaintiff's Exhibit 7

Case 1:21-cv-00157-CL Document 169 Filed 05/02/25 Page 60 of 234

## AGREEMENT TO MAKE PAYMENTS

**Effective Date:** *NOVEMBER 2*, 2015

**Parties:**

VALLEY VIEW WINERY, INC., an Oregon ("Valley View")
corporation

ANN M. WISNOVSKY, TRUSTEE OF THE ("Wisnovsky Trust")
ANN M. WISNOVSKY TRUST, UTD 8/2/12

MARK A. WISNOVSKY ("Mark")

MICHAEL J. WISNOVSKY ("Mike")

### Recitals:

A. Ann M. Wisnovsky is the mother of Mark and Mike. Ann M. Wisnovsky is also the mother of Joanne Couvrette ("Joanne") and Robert F. Wisnovsky ("Robert").

B. The Wisnovsky Trust, Mark and Mike are shareholders of Valley View. Contemporaneously with the execution of this Agreement, Ann M. Wisnovsky, through the Wisnovsky Trust has gifted the trust's shares of common stock Valley View to Mark and Mike, in equal shares.

C. As a condition to their receipt of the gifts, Valley View and Mark and Mike have agreed to make payments to Joanne and Robert upon the happening of the events specified herein.

### Agreements:

1. **Payments.** If within five years following the Effective Date, in any transaction or series of transactions:

   a) Valley View sells or transfers assets, or any interests therein, out of the ordinary course of business;

   b) Mike, Mark, and/or their successors in interest, sell stock of Valley View; and/or

   c) Valley View makes payments to Mark, Mike, and/or their successors in interest, that exceed the payments Mark and Mike would receive if they continued to receive their respective salaries at a level equal to the salaries paid to them immediately prior to the Effective Date; and

Exhibit 7 – Page 1 of 8

PDF Page 62

if the gross proceeds of any such sales, transfers and payments, including the fair market value of any real or personal property received in such transactions, exceeds the sum of $750,000; then Valley View, Mark and Mike shall, jointly and severally, be responsible to make payment to the Wisnovsky Trust of a dollar amount equal to the amount of such gross proceeds in excess of $750,000. Payment shall be due within 30 days following the receipt of such gross proceeds in excess of $750,000. If Ann M. Wisnovsky is deceased at the time payment is due, in lieu of payment to her, payment shall be made to the residuary beneficiaries of the Wisnovsky Trust in the manner provided in such trust.

2. **Third-Party Beneficiaries.** The parties intend that Joanne and Robert are third party beneficiaries of this Agreement. Upon any default hereunder, such individuals shall be entitled to enforce the payment obligations created hereunder and shall have all rights and remedies available to them under this Agreement and Oregon law.

3. **Miscellaneous.**

3.1. **Binding Effect.** This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, successors, and assigns.

3.2. **Attorney Fees.** If any suit or action is filed by any party to enforce this Agreement or otherwise with respect to the subject matter of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees incurred in preparation or in prosecution or defense of such suit or action as fixed by the trial court, and if any appeal is taken from the decision of the trial court, reasonable attorney fees as fixed by the appellate court.

3.3. **Amendments.** This Agreement may be amended only by an instrument in writing executed by all the parties.

3.4. **Waiver.** A provision of this Agreement may be waived only by a written instrument executed by the party waiving compliance. No waiver of any provision of this Agreement shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. Failure to enforce any provision of this Agreement shall not operate as a waiver of such provision or any other provision.

3.5. **Time of Essence.** Time is of the essence for each and every provision of this Agreement.

Exhibit 7 – Page 2 of 8

PDF Page 63

**3.6. Governing Law; Venue; Jurisdiction.** This Agreement has been made entirely within the state of Oregon. This Agreement shall be governed by and construed in accordance with the laws of the state of Oregon. If any suit or action is filed by any party to enforce this Agreement or otherwise with respect to the subject matter of this Agreement, exclusive venue and jurisdiction shall be in the state courts in Jackson County, Oregon.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective on the date set forth above.

VALLEY VIEW WINERY, INC.

By: _____
    Mark A. Wisnovsky, President

By: _____
    Michael J. Wisnovsky, Secretary

_____
ANN M. WISNOVSKY

_____
MARK A. WISNOVSKY

_____
MICHAEL J. WISNOVSKY

Exhibit 7 – Page 3 of 8

PDF Page 64

## FIRST AMENDMENT TO AND RESTATEMENT
## OF AGREEMENT TO MAKE PAYMENTS

**Effective Date:**    February 23, 2017

**Parties:**    VALLEY VIEW WINERY, INC.,
an Oregon corporation    ("Valley View")

ANN M. WISNOVSKY, TRUSTEE OF
THE ANN M. WISNOVSKY TRUST,
UTD 8/2/12    ("Wisnovsky Trust")

MARK A. WISNOVSKY    ("Mark")

MICHAEL J. WISNOVSKY    ("Mike")

### Recitals:

A.    Ann M. Wisnovsky is the mother of Mark and Mike. Ann M. Wisnovsky is also the mother of Joanne Couvrette ("Joanne") and Robert F. Wisnovsky ("Robert").

B.    On November 2, 2015, the parties executed an Agreement to Make Payments, which is amended and restated by this Agreement. At that time, the Wisnovsky Trust, Mark and Mike were shareholders of Valley View.  Contemporaneously with the execution of the Agreement to Make Payments, Ann M. Wisnovsky, through the Wisnovsky Trust gifted the trust's shares of common stock of Valley View to Mark and Mike in equal shares.

C.    Ann M. Wisnovsky has determined to amend the Wisnovsky Trust and Valley View and Wisnovsky Land, LLC, which is controlled by Ann M. Wisnovsky, have agreed to amend a Vineyard Lease that exists between them. Ann M. Wisnovsky's agreement to make such changes is conditioned upon the execution of this Agreement.

D. The Agreement to Make Payments is amended and restated as follows:

### Agreements:

1.    Payments for Event within Five Years.  If within five years following the Effective Date, in any transaction or series of transactions:

1 - FIRST AMENDMENT TO AND RESTATEMENT OF AGREEMENT TO MAKE PAYMENTS

Exhibit 7 – Page 4 of
PDF Page 65

PLAINTIFF'S
EXHIBIT
**271**

VALLEYVIEW_001415

a)    Valley View sells or transfers assets, or any interests therein, out of the ordinary course of business;

b)    Mike, Mark, and/or their successors in interest, sell stock of Valley View; and/or

c)    Valley View makes payments to Mark, Mike, and/or their successors in interest, that exceed the payments Mark and Mike would receive if they continued to receive their respective salaries at a level equal to the salaries paid to them immediately prior to the Effective Date; and if the gross proceeds of any such sales, transfers and payments, including the fair market value of any real or personal property received in such transactions, exceeds the sum of $750,000; then Valley View, Mark and Mike shall, jointly and severally, be responsible to make payment to the Wisnovsky Trust of a dollar amount equal to the amount of such gross proceeds in excess of $750,000. Payment shall be due within 30 days following the receipt of such gross proceeds in excess of $750,000. If Ann M. Wisnovsky is deceased at the time payment is due, in lieu of payment to her, payment shall be made to the residuary beneficiaries of the Wisnovsky Trust in the manner provided in such trust.

2.    Payments for Event between Five Years and Ten Years. If after five years following the Effective Date but before ten years following the Effective Date, in any transaction or series of transactions:

a)    Valley View sells or transfers assets, or any interests therein, out of the ordinary course of business;

b)    Mike, Mark, and/or their successors in interest, sell stock of Valley View; and/or

c)    Valley View makes payments to Mark, Mike, and/or their successors in interest, that exceed the payments Mark and Mike would receive if they continued to receive their respective salaries at a level equal to the salaries paid to them immediately prior to the Effective Date; and if the gross proceeds of any such sales, transfers and payments, including the fair market value of any real or personal property received in such transactions, exceeds the sum of $1,500,000; then Valley View, Mark and Mike shall, jointly and severally, be responsible to make payment to the Wisnovsky Trust of a dollar amount equal to 25% of the amount of such gross proceeds in excess of $1,500,000. Payment shall be due within 30 days following the receipt of such gross proceeds in excess of $1,500,000. If Ann

2 - FIRST AMENDMENT TO AND RESTATEMENT OF AGREEMENT TO MAKE PAYMENTS

Exhibit 7 – Page 5 of 8
PDF Page 66

VALLEYVIEW_001416

M. Wisnovsky is deceased at the time payment is due, in lieu of payment to her, payment shall be made to the residuary beneficiaries of the Wisnovsky Trust in the manner provided in such trust.

    3.    Third-Party Beneficiaries.  The parties intend that Joanne and Robert are third party beneficiaries of this Agreement.  Upon any default hereunder, such individuals shall be entitled to enforce the payment obligations created hereunder and shall have all rights and remedies available to them under this Agreement and Oregon law.

    4.    Miscellaneous.

    4.1. Binding Effect.  This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, successors, and assigns.

    4.2. Attorney Fees.  If any suit or action is filed by any party to enforce this Agreement or otherwise with respect to the subject matter of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees incurred in preparation or in prosecution or defense of such suit or action as fixed by the trial court, and if any appeal is taken from the decision of the trial court, reasonable attorney fees as fixed by the appellate court.

    4.3. Amendments.  This Agreement may be amended only by an instrument in writing executed by all the parties.

    4.4. Waiver.  A provision of this Agreement may be waived only by a written instrument executed by the party waiving compliance.  No waiver of any provision of this Agreement shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. Failure to enforce any provision of this Agreement shall not operate as a waiver of such provision or any other provision.

    4.5. Time of Essence.  Time is of the essence for each and every provision of this Agreement.

    4.6. Governing Law; Venue; Jurisdiction.  This Agreement has been made entirely within the state of Oregon. This Agreement shall be governed by and construed in accordance with the laws of the state of Oregon.  If any suit or action is filed by any party to enforce this Agreement or otherwise with respect to the subject matter of this Agreement, exclusive venue

3 - FIRST AMENDMENT TO AND RESTATEMENT OF AGREEMENT TO MAKE PAYMENTS

Exhibit 7 – Page 6 of 8

PDF Page 67

VALLEYVIEW_001417

and jurisdiction shall be in the state courts in Jackson County, Oregon.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective on the date set forth above.

VALLEY VIEW WINERY, INC.

By: _____
      Mark A. Wisnovsky,
      President

By: _____
      Michael J. Wisnovsky
      Vice President/Secretary

THE ANN M. WISNOVSKY TRUST,
UTD 8/2/12

By: _____
      Ann M. Wisnovsky

_____
MARK A. WISNOVSKY

_____
MICHAEL J. WISNOVSKY

4 - FIRST AMENDMENT TO AND RESTATEMENT OF AGREEMENT TO MAKE PAYMENTS

Exhibit 7 – Page 7 of 8

PDF Page 68

VALLEYVIEW_001418

Plaintiff's Exhibit 8

Exhibit 7 – Page 8 of 8

PDF Page 69

Plaintiff's Exhibit 9



**VALUATION SERVICES**
Real Estate Appraisal
Consulting
Litigation
Estate Planning
Feasibility Analysis
Rent Surveys

**PROPERTY TYPES**
Land
Subdivisions
Multi-Family
Single-Family
Industrial
Office
Medical
Retail
Public
Religious
Parks / Open Space
Farms / Agricultural
Specialty

**SERVING**
Oregon
Washington
Idaho
Northern California

**Powell Banz Valuation, LLC**
201 Ferry Street SE, Suite 300
Salem, Oregon 97301
(503) 371-2403 voice
(503) 371-2613 fax
www.powellbanz.com

# A REAL ESTATE APPRAISAL REPORT



(Photos taken August 4, 2020, #12575-143, 194)

## ANN M. WISNOVSKY TRUST
1140 and 1352 Upper Applegate Road
Jacksonville, Oregon 97350

### PREPARED FOR
Joanne Couvrette, Trustee
Ann M. Wisnovsky Trust
13274 Jacarte Court
San Diego, California 92130

### PREPARED BY
London R. Fergus
Katherine Powell Banz, MAI
PBV File Number: P201356

### EFFECTIVE DATE OF VALUE
Date of Value: November 4, 2020

POWELL BANZ VALUATION, LLC

Exhibit 9 – Page 1 of 17



December 17, 2020


Joanne Couvrette, Trustee
Ann M. Wisnovsky Trust
13274 Jacarte Court
San Diego, California 92130


**RE:    ANN M. WISNOVSKY TRUST**
         1140 and 1352 Upper Applegate Road
         Jacksonville, Oregon 97530


Dear Ms. Couvrette:

As requested, the captioned property has been valued using generally accepted appraisal principles and practices. This appraisal report is intended to comply with the development and report requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) and the Appraisal Institute. A copy of your professional service agreement is included in the Addenda.

The subject is identified as **Valley View Winery**, a 75.41 AC vineyard property located in rural Jackson County, Oregon near Jacksonville, Oregon.   It is improved with a 2,269 SF tasting room built in 2003, a 3,300 SF winery building, a 3,750 SF warehouse, a 36 AC vineyard planting, and a 1,447 SF residence. There is an additional 32.31 AC of tillable farmland currently, most of which is planted in hemp and/or cannabis. The property is zoned EFU (Exclusive Farm Use), and there is one Measure 49 approval.

We have performed no services as appraisers or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this agreement. However, one report was previously issued as part of the current scope of work.  The contributory value of the residence and homesite have been included herein.

Joanne Couvrette, Trustee                                          December 17, 2020
Ann M. Wisnovsky Trust                                                      Page 2

Per the scope of work for this appraisal, the following value scenarios are reported:

1. "As Is" Market Value of the fee simple interest in the subject property, <u>excluding</u> a barn, pumphouse, and temporary structure under the ownership of the tenant;

2. "As Is" market value of the leased fee interest in the subject property, <u>excluding</u> a barn, pumphouse, and temporary structure under the ownership of the tenant;

3. Based upon our investigation and analysis of available information, the concluded values, under the requested scenarios, as of November 4, 2020, were:

| MARKET VALUE SCENARIOS | DATE | VALUE |
|---|---|---|
| "As Is" Market Value – Fee Simple | November 4, 2020 | $4,480,000 |
| "As Is" Value – Leased Fee | November 4, 2020 | No Value |
| Estimated Exposure Time | | 12 to 18 months |
| Estimated Marketing Time | | 18 to 24 months |

**This appraisal is based on the following extraordinary assumptions:**

- **The vineyard planting reflects good overall health, as indicated by the property representatives, and that the vines and improvements will be well managed and maintained over the lease term.**

- **The interior of the improvements reflect similar condition and quality as the exterior.**

**If either assumption is determined to be false, the value conclusions herein will need to be revisited.**

This appraisal is subject to the conditions and comments presented in this report. If any questions arise concerning this report, please contact the undersigned.

Sincerely,

**POWELL BANZ VALUATION, LLC**

London R. Fergus
OR State Certified General Appraiser
No. C001335
Expiration Date: April 30, 2021

Katherine Powell Banz, MAI
OR State Certified General Appraiser
No. C000897
Expiration Date: August 31, 2022

KJB: lrf
Appraisal Report
P201356

# TABLE OF CONTENTS

Transmittal Letter

**INTRODUCTION**
Executive Summary ...........................................................................................................1
Preliminary Appraisal Information ....................................................................................2
Assumptions and Limiting Conditions ..............................................................................8

**DESCRIPTION**
Subject Maps ...................................................................................................................11
Description .......................................................................................................................15
Subject Photographs ........................................................................................................28
Building Diagram .............................................................................................................36

**MARKET ANALYSIS/HIGHEST & BEST USE**
Market Analysis/Highest & Best Use ..............................................................................37

**VALUATION METHODS**
Valuation Methods ..........................................................................................................58

**COST APPROACH**
Site Valuation .................................................................................................................60
  Land Sales Tabulation Chart and Adjustment Grid .....................................................71
  Land Sales Maps ..........................................................................................................72
Cost Approach ...............................................................................................................73
  Discounted Cash Flow Analysis ..................................................................................81
  Cost Approach Summation Table .................................................................................83

**INCOME APPROACH**
Income Approach ...........................................................................................................84
  Lease Tabulation Chart ................................................................................................88
  Land Sales Maps ..........................................................................................................89

**SALES COMPARISON APPROACH**
Sales Comparison Approach ...........................................................................................90
Improved Sales Tabulation Chart and Adjustment Grid .................................................98
Improved Sales Maps ......................................................................................................99
Improved Sales Tabulation Chart and Adjustment Grids ..............................................103
Improved Sales Maps ....................................................................................................104

**ANALYSIS OF VALUE CONCLUSIONS**
Analysis of Value Conclusions .....................................................................................105
  Discounted Cash Flow Analysis – Entire Life of Lease .............................................108

**CERTIFICATION OF APPRAISAL**
Certification of Appraisal ..............................................................................................109

**ADDENDA**
Professional Service Agreement
Taxes, Assessment Data, Deed & Legal Description
Water Right Documentation
Regional Description
Appraiser Qualifications
Appraiser Certifications

# EXECUTIVE SUMMARY

## PROPERTY INFORMATION

| | |
|---|---|
| **Property Name:** | **Ann M. Wisnovsky Trust** |
| Address: | 1140 and 1352 Upper Applegate Road Jacksonville, Oregon 97350 |
| Tax Account Number: | 1-056361-0; 1-047680-4 |
| Map/Tax Lot: | 383W34B 1800; 383W34C 200 |
| Property Type: | Agricultural |
| Current Use: | Vineyard and winery |
| Proposed Use: | N/A |
| Owner of Record: | Wisnovsky Land LLC |

## BUILDING CHARACTERISTICS

| | |
|---|---|
| Number of Buildings: | 4 |
| Number of Tenants: | 2 |
| Gross Living Area: | 1,447 SF |
| Gross Building Area: | 11,342 SF |
| Percent Occupied: | 100.00% |
| Year Built: | Tasting Room-2003, Unknown for winery and warehouse buildings, Residence - 1973 |
| Condition: | Assumed Fair To Good |
| Substantial Deferred Maintenance: | None |

## SITE CHARACTERISTICS

| | |
|---|---|
| Land Area: | 75.41 AC |
| Zoning Designation: | EFU (Exclusive Farm Use) |
| Conforming Use: | Yes |

## HIGHEST AND BEST USE

| | |
|---|---|
| As if Vacant: | Agricultural use |
| As Improved: | Existing winery improvements and vineyard planting |
| Excess / Surplus Land: | None |

## VALUATION INFORMATION

| | |
|---|---|
| Site Valuation: | $1,975,000 |
| Cost Approach: | $4,130,000 |
| Income Approach: | $4,485,000 |
| Sales Comparison Approach: | $4,470,000 |
| Reconciled Fee Simple Value: | $4,480,000 |

## VALUE CONCLUSION

| | Effective Date of Value | Value Conclusion |
|---|---|---|
| **"As Is" Market Value – Fee Simple:** | **November 4, 2020** | **$4,480,000** |
| **"As Is" Market Value – Leased Fee :** | **November 4, 2020** | **No Value** |
| Allocation for Furniture, Fixtures and Equipment: | | None |

# INCOME APPROACH

In this section, the subject's market value is based on the direct capitalization method. The subject's income generating potential is estimated, vacancy and expenses deducted, and capitalized based on the subject's investment risk level.

## POTENTIAL INCOME

**Actual Leasing Activity -** The subject property is encumbered by two long term, related party leases that are at below market rents.

The **vineyard and tillable land area** are rented for $12.50 per AC per month. This is equivalent to (12 mo. x $12.50/mo) **$150 per AC** annually. Rent increases 5% every five years.

The **winery improvements** are leased for $1,000 per month, or **$0.11 per SF**. Rent increases 10% every five years.

The leases commenced March 24, 2016 with an initial 10-year term. Both leases include eight, 10-year renewal options.

The expense structures are triple net with the tenant paying all expenses.

The residence is rented to a tenant at a current rent of **$1,483 per month** with the tenant responsible for utilities.

The actual rents for the farmland with vineyard  are far below market. Therefore, market rents and market participant interviews are used to conclude market rent for the subject's vineyard and land component, as well for the improvements.

An attempt was made to locate market leases of winery properties similar to the subject located in Southern Oregon; however, data was minimal. The search was expanded throughout Oregon and includes food/beverage service space, industrial space, and food/beverage processing space.

**Winery Improvements -** The comparable leases indicate an adjusted triple net rental range from **$0.60 to $2.35 per SF per month**.  Each lease comparable is outlined in the tabulation chart  at the end of this section.

## INCOME APPROACH (continued)

The comparables are arrayed below, illustrating the subject's competitive position:

| Lease Comparable Array | | |
|---|---|---|
| Comparable | Adjusted Rent/SF | Type |
| 1 | $2.35 | Retail |
| 3 | $1.30 | Brewery/Taproom |
| 2 | $1.25 | Restaurant |
| SUBJECT - Tasting Room - $1.00 | | |
| 7 | $1.00 | Winery w/ TR |
| 8 | $0.94 | Warehouse |
| 4 | $0.92 | Brewery/Taproom |
| SUBJECT - Warehouse - $0.80 | | |
| 9 | $0.78 | Warehouse |
| SUBJECT - Winery - $0.65 | | |
| 6 | $0.64 | Winery Space |
| 5 | $0.60 | Food Processing |

The subject's tasting room reflects good quality retail space; however, it is rurally located. A market rent of **$1.00 per SF per month** is concluded.

A lower end rent is reasonable for the winery and warehouse buildings. A market rent of **$0.80 per square foot per month** is considered appropriate for the warehouse. And, a market rent of **$0.65 per SF per month** is concluded for the winery building.

**Residence –** The residence has three bedrooms and two bathrooms. It is sited on a 0.50 AC homesite, built in 1973, reflecting average condition and quality.

| Property Location | Rentable SF | Bedroom/ Bathroom | Monthly Rent | Rent/SF | Notes |
|---|---|---|---|---|---|
| Applegate, OR | 2,200 | 3/2.5 | $2,795 | $1.27 | Rural, two story, average, River Front |
| Rural Jackson County | N/A | 4/2.5 | $2,200 | | Rural, MFH |
| Jacksonville, OR | 1,316 | 3/1.5 | $1,900 | $1.44 | In town, one story, average |
| Medford, OR | 1,470 | 2/2 | $1,725 | $1.17 | In town, newer, average |
| Subject - 1,447 SF | | | | | |
| Medford, OR | 1,000 | 3/1 | $1,475 | $1.48 | In town, two story, average, updates |
| High | 2,200 | | $2,795 | $1.48 | |
| Low | 1,000 | | $1,475 | $1.17 | |
| Average | 1,497 | | $2,019 | $1.34 | |

The subject's actual rent rate **of $1,483 per month** is well bracketed by the rent comparables. The rural location, condition, and quality warrant a market rent near the low end of the range. Therefore, the actual rent is concluded to be at market and is used herein.

**Tillable Land –** Land rent data for farmland in the area was not readily available. Therefore, market participants were interviewed and suggested rental rates between $1,000 per AC for non-hemp or cannabis crops, up to $20,000 per AC for fully licensed recreational cannabis land. For hemp, one market participant suggested a market rent of $5,000 per AC.

One market based lease was provided. The 16 AC site is located near Eugene, is not irrigated, and is leased for $3,000 per AC annually.

## INCOME APPROACH (continued)

Based on this information, and noting successful hemp and/or cannabis cultivation, yet acknowledging that lower rent would be required for a non-hemp or cannabis user, a market rent of **$4,000 per AC per year** is reasonable for the subject's irrigated, tillable land.

**Vineyard -** The subject's vineyard planting was described in the Improvement Description.

An effort was made to locate in-place lease rates for established vineyard plantings; however, lease information is typically considered propriety and is not readily available to the public. Only, one market lease was available, and is a confidential lease retained in the appraisers' workfile. Additionally, market participants were interviewed.

The lease comparable reflects a pinot noir, pinot Gris, and pinot blanc vineyard located near Philomath, within the Willamette Valley AVA. The lease rate is **$1,000/AC annually**.

A local vineyard owner, in 2019, suggested his pinot noir vineyard within the Van Duzer AVA could rent for **$2,500 per AC**.

Discussions with other market particpants suggest that triple net lease rates for established vineyards range from **$1,000 to $3,500** with the upper range reflecting leases to large label producers.

The following chart outlines the various market rent indications for the subject's vineyard planting.

| Source | Location | Type | Indication/AC |
|---|---|---|---|
| Lease Comparable | Philomath, OR / Willamette Valley AVA | Pinot Gris, Blanc, and Noir | $1,000 |
| Estimated Lease Comparable | Pinot Noir, Chard, various others / Van Duzer AVA | Multi-varietal | $2,500 |
| Market Participants | | | $1,000 - $3,500 |
| **Market Rent Conclusion** | | | **$2,000** |

The concluded market rent for the subject vineyard, on a **triple net** basis, is **$2,000 per AC per year**.

**Potential gross income** is calculated as follows:

| Potential Gross Income | Size | Market Rent/Revenue | | Annual Income |
|---|---|---|---|---|
| Tasting Room | 2,269 SF | $1.00 /SF | 12 mo | $27,228 |
| Winery | 3,300 SF | $0.65 /SF | 12 mo | $25,740 |
| Warehouse | 3,750 SF | $0.80 /SF | 12 mo | $36,000 |
| Residence (GBA) with Homesite | 2,023 SF | $1,483 /mo | 12 mo | $17,796 |
| **Blended Lease Rate** | **11,342** | **$0.78** | **12 mo** | **$106,764** |
| | | | | |
| Vineyard | 36.00 AC | $2,000 /AC | | $72,000 |
| Tillable Land | 32.31 AC | $4,000 /AC | | $129,240 |
| **Blended Lease Rate Annual** | **68.31 AC** | **$2,946 /AC** | | **$201,240** |
| **Potential Gross Income** | | | | **$308,004** |

## VACANCY & CREDIT LOSS

A vacancy factor of **5%** is used noting the long-term nature of agricultural leases, yet acknowledging a potential vacancy of the improvements may be prolonged due to their specialty nature and rural location. Vacancy is equal to **$15,400.**

**Effective gross income** is equal to **$292,604.**

## INCOME APPROACH (continued)

### OPERATING EXPENSES

Applicable operating expenses include insurance and reserves.

**Management** is estimated at **4% of the EGI or $11,704**

Reserves for repair and replacement is estimated at **4% of the EGI or $11,704.**

Estimated operating expenses total **$23,408**.

### NET OPERATING INCOME

Deducting the total operating expenses from the EGI results in a net operating income of **$296,196**.

### NET OPERATING INCOME

Capitalization rates were derived from the market for agricultural and industrial properties. Capitalization rates for agricultural properties typically range from 1% to 5% depending on land uses and type of improvements. Rates for improved properties are typically higher, upwards of 5 to 8%. Considering the specialized nature of the subject improvements, along with the vineyard planting, a **capitalization rate of 6.00%,** above the typical range for agricultural properties, is reasonable considering the site, location, irrigation, permanent plantings, supporting industrial improvements, and ample upside potential.

### CONCLUSION

Applying the to the concluded capitalization rate to the NOI equates to a value of **$4,485,000**, rounded.

The following table summarizes the Income Approach:

| Potential Gross Income | Size | Market Rent/Revenue | | Annual Income |
|---|---|---|---|---|
| Tasting Room | 2,269 SF | $1.00 /SF | 12 mo | $27,228 |
| Winery | 3,300 SF | $0.65 /SF | 12 mo | $25,740 |
| Warehouse | 3,750 SF | $0.80 /SF | 12 mo | $36,000 |
| Residence (GBA) with Homesite | 2,023 SF | $1,483 /mo | 12 mo | $17,796 |
| **Blended Lease Rate** | **11,342** | **$0.78** | **12 mo** | **$106,764** |
| | | | | |
| Vineyard | 36.00 AC | $2,000 /AC | | $72,000 |
| Tillable Land | 32.31 AC | $4,000 /AC | | $129,240 |
| **Blended Lease Rate Annual** | **68.31 AC** | **$2,946 /AC** | | **$201,240** |
| **Potential Gross Income** | | | | **$308,004** |
| Less Vacancy | | - 5.00% | | -$15,400 |
| **Effective Gross Income** | | | | **$292,604** |
| Management | | - 4.00% | | $11,704 |
| Reserves for Replacement | | - 4.00% | | $11,704 |
| **Total Operating Expenses** | | | | **-$23,408** |
| **Net Operating Income** | | | | **$269,196** |
| **Capitalization Rate** | | | | 6.00% |
| **"As Is" Market Value Conclusion** | | | | **$4,486,600** |
| **Rounded** | | | | **$4,485,000** |
| **per AC** | | | | **$59,872** |

Exhibit 2 - Page 9

## ANALYSIS OF VALUE CONCLUSIONS (continued)

### "AS IS" MARKET VALUE – LEASED FEE INTEREST

The previous value conclusion assumes the subject is operating at market level lease rates; however, the subject's **winery and vineyard acutal lease rates are below market with eight, 10-year renewal options**.

Therefore, the resulting rent loss is over the entire life of the lease, assuming every renewal option is exercised, will be deducted from the fee simple value conclusion. Based on the advantageous lease rates and non-market terms, it is reasonable to assume the lease renewals will be exercised.

The actual lease rates and terms are compared to the previously concluded market rents.  Market rent appreciation has been tempered to reflect actual market behavior, with consideration given to age and remaining life of the improvements and vines, as well as market trends, rather than following the actual lease terms.

Market rent for the vineyard & tillable land increases 3% per renewal period while market rent for the winery related improvements is increased 3% at the beginning of the first and second renewal periods and remains level thereafter.  Appreciating the market rent further would be too speculative given typical fluctuations in the market.

A high discount rate is warranted due to the length of the lease and uncertainty regarding future real estate trends projecting this far out into the future (80+ years).

The discounted rent loss is presented below and far exceeds the concluded market value of the property. In this analysis, the subject property **has no value**. All value has been eroded, as a buyer would not purchase a property with limited to no return on investment.

Because the actual lease term, with full renewals exercised, is so long and the future is uncertain, the resulting value – or lack thereof – is not considered to be market value. Rather, the following is an illustration of the impact the current lease has on the subject property's value.

| Total | Rent Loss | Rounded |
|---|---|---|
| Undiscounted | $32,884,732 | $32,885,000 |
| | | |
| **Discount Rate** | **NPV** | **Rounded** |
| 10% | $9,253,583 | $9,255,000 |
| **11%** | **$8,521,778** | **$8,520,000** |
| 12% | $7,889,561 | $7,890,000 |
| 10% Contingency | | $852,000 |
| Total | | $9,372,000 |
| Rounded | | $9,370,000 |

| Leased Fee Calculation Assuming Entire Lease Term | |
|---|---|
| **Stabilized Value - Fee Simple** | **$4,480,000** |
| Rent Loss | -$8,520,000 |
| Profit / Contingency of 10% | -$852,000 |
| Total Rent Loss and Absorption Costs | -$9,372,000 |
| **Total Rent Loss ROUNDED** | **-$9,370,000** |
| **Leased Fee Calculation Assuming Entire Lease Term** | **-$4,890,000** |

# CERTIFICATION OF APPRAISAL

We certify that, to the best of our knowledge and belief:

■ The statements of fact contained in this report are true and correct.

■ We have performed no services as appraisers or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this agreement. However, one report was previously issued as part of the current scope of work. The contributory value of the residence and homesite have been included herein.

■ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions.

■ We have no present or prospective personal interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

■ We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

■ Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

■ Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

■ Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

■ I, Katherine Powell Banz, MAI, have made a personal exterior inspection of the property that is the subject of this report. I have also inspected the exterior of all comparable data referenced in this report in person or via photographs.

■ I, London R. Fergus, have made a personal exterior inspection of the property that is the subject of this report. I have also inspected the exterior of all comparable data referenced in this report in person or via photographs.

■ No one provided significant professional assistance to the persons signing this report.

■ The reported analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

■ The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

■ As of the date of this report, I, London R. Fergus, have completed the Standards and Ethics Education Requirements for Practicing Affiliates of the Appraisal Institute.

■ As of the date of this report, I, Katherine Powell Banz, MAI, have completed the continuing education program for Designated Members of the Appraisal Institute.

_____        December 17, 2020
London R. Fergus                                                      Date
OR Certified General Real Estate Appraiser
License No. C001335
Expiration Date: April 30, 2021

_____        December 17, 2020
Katherine Powell Banz, MAI                                       Date
OR Certified General Real Estate Appraiser
License No. C000897
Expiration Date: August 31, 2022



September 18, 2020                                                  **Bid Number: B3861**

Joanne Couvrette, Trustee
Ann M. Wisnovsky Trust
13274 Jacarte Court
San Diego, CA 92130
jcouvrette@sbcglobal.net

Dear Ms. Couvrette:

Thank you for considering Powell Banz Valuation, LLC for the appraisal assignment identified in the attached Professional Service Agreement. Please sign one copy of the agreement and return it via fax or e-mail, thereby indicating your authorization for us to proceed with this assignment.

The following is a list of information we will need to begin our analysis. Please forward with the agreement as soon as possible.

- Signed Professional Service Agreement
- Retainer
- Property contact for site inspection
- Building plans (if available)
- Vine stock information (varieties planted, # of acres, year planted, and age of each variety)
- Historical grape production for the prior three years
- Date of value in 2016

Our ability to honor the terms of this agreement will require your response by September 22, 2020. If you have questions regarding the enclosed, please feel free to contact me. We look forward to working with you.

Respectfully,

**POWELL BANZ VALUATION, LLC**

Katherine Powell Banz, MAI
Principal
+1 (503) 371-2403
kbanz@powellbanz.com

201 Ferry Street SE, Suite 300 • Salem, Oregon 97301
Phone (503) 371-2403 • Fax (503) 371-2613 • email: kbanz@powellbanz.com
Exhibit 9 – Page 12 of 17
www.powellbanz.com
PDF Page 82



**Professional Service Agreement   Bid Number:     B3861**

| | | | |
|---|---|---|---|
| **Property:** | Ann M. Wisnovsky Trust | **Location:** | 1140 & 1352 Upper Applegate Rd Jacksonville, OR 97530 |
| **Client:** | Ann M. Wisnovsky Trust | **Contact:** | Joanne  Couvrette |

*Scope of Work:*

An Appraisal Report prepared in accordance with the Appraisal Institute and Uniform Standards of Professional Appraisal Practice. The report will present two value scenarios:

**Phase 1:**

1. "As-Is" Market Value of the **fee simple** interest as of 2016, reflecting the highest and best use of the property,  excluding any leases in place as of the date of value. The analysis would consider the Measure 49 claim.
2. "As-Is" Market Value of the **leased fee** estate as of 2016 based on the leases in place as of the date of value.
   - Vineyard lease & Addendums
   - Winery lease & Addendums

   The analysis would also consider the impact of the leases on the Measure 49 claim.

**Phase 2:** Includes the previous value scenarios, but with a current 2020 date of value.

*Copies:*

One (1) Electronic Final Appraisal in PDF format.

Two (2) hard copies (upon request). Additional copies will be billed at a rate of $75 each.

*Professional Fee:*

**Phase 1:** $10,900.00 (expert witness testimony – including prep and travel time – is billed at an additional $250/hour)

**Phase 2:** $4,900.00

*Retainer:*

$10,900.00

*Terms:*

Commencement of the appraisal process will begin upon receipt of the signed Professional Service Agreement, retainer, and any requested materials. The fee for the appraisal is due upon delivery of the report. Past due accounts will accrue a late payment charge of 1.5% per month, compounded monthly. In the event that either party commences any legal action relating to the provisions of the Agreement, including collection, the prevailing party shall be entitled to its actual attorney's fees and costs, including those incurred upon appeal. This agreement shall be governed by and construed in accordance with the laws of the State of Oregon, and the venue of any action arising from this agreement shall be in Marion County, Oregon.

*Delivery:*

**Phase 1:** November 16, 2020

**Phase 2:** At least two additional weeks to complete the 2020 research and analysis.

*Modification or Cancellation:*

*Changes in the Scope of Work, pre-trial conferences, trial preparation and testimony will be billed separately at the stated hourly rates below.*

If the assignment is cancelled prior to completion, for any reason, the client will be billed at a minimum $500 or for all time expended prior to cancellation. Billing rates are $150 per hour for associate time, $200 per hour for senior associate time, and $250 per hour for principal time. If the client delays completion of the assignment beyond 90 days, the fee will be renegotiated.

201 Ferry Street SE, Suite 300 • Salem, Oregon 97301
Phone (503) 371-2403 • Fax (503) 371-2613 • email: kbanz@powellbanz.com
Exhibit 9 – Page 13 of 17
www.powellbanz.com
PDF Page 83



| **Professional Service Agreement** | **Bid Number:** | **B3861** |
|---|---|---|
| **Property:** Ann M. Wisnovsky Trust | **Location:** | 1140 & 1352 Upper Applegate Rd Jacksonville, OR 97530 |
| **Client:** Ann M. Wisnovsky Trust | **Contact:** | Joanne Couvrette |

**Hazardous Waste Disclaimer:** Powell Banz Valuation, LLC does not assume any duty to analyze or examine the property or adjacent property for the possible presence of toxic or hazardous substances or materials and accepts no liability regarding the issue. This appraisal report will contain a comprehensive disclaimer to this effect.

**Liability:** Powell Banz Valuation, LLC's responsibilities are rendered and limited to the client. Liability is limited to the fee actually received for the services requested herein.

I, Katherine Powell Banz, MAI, Principal of Powell Banz Valuation, LLC, agree to the above terms, assuming the Professional Service Agreement and retainer are returned by September 22, 2020.

I, Joanne Couvrette, on behalf of Ann M. Wisnovsky Trust, agree to the above stated terms and authorize Powell Banz Valuation, LLC to prepare the above referenced appraisal.

| | |
|---|---|
| September 18, 2020 | 9-22-20 |
| Katherine Powell Banz, MAI     Date | Joanne Couvrette     Date |

201 Ferry Street SE, Suite 300 • Salem, Oregon 97301
Phone (503) 371-2403 • Fax (503) 371-2613 • email: kbanz@powellbanz.com
Exhibit 9 - Page 14 of 17
www.powellbanz.com
PDF Page 84

*APPRAISER CERTIFICATIONS*



# Appraiser Certification and Licensure Board

## State Certified General Appraiser

*28 hours of continuing education required*

License No.: C001335

Issue Date: May 01, 2019

Expiration Date: April 30, 2021

LONDON R FERGUS
POWELL BANZ VALUATION, LLC
201 FERRY ST SE STE 300
SALEM, OR 97302

**Gae Lynne Cooper, Administrator**

Exhibi



# Appraiser Certification and Licensure Board
## State Certified General Appraiser
*28 hours of continuing education required*

License No.: C000897

Issue Date: September 01, 2020

Expiration Date: August 31, 2022

KATHERINE J BANZ
POWELL BANZ VALUATION, LLC
201 FERRY ST SE STE 300
SALEM, OR 97301



Chad Koch, Administrator

Plaintiff's Exhibit 10

Stephen Brigandi
Law Office of Stephen Brigandi
3624 Caminito Cielo Del Mar
San Diego, CA 92130
Email: sbrigandi@san.rr.com

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF OREGON MEDFORD DIVISION

| | |
|---|---|
| **MICHELLE SULLIVAN, as Personal Representative of the Estate of ANN M. WISNOVSKY, and WISNOVSKY LAND, LLC,**<br>**Plaintiffs,**<br><br>**v.**<br>**MARK A. WISNOVSKY, MICHAEL J. WISNOVSKY, and VALLEY VIEW WINERY, INC.,**<br>**Defendants.** | **DECLARATION OF JOANNE COUVRETTE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS; MOTION FOR SUMMARY JUDGMENT TO DISMISS COUNTERCLAIMS; AND MOTION TO DISMISS MOOT AND PRECLUDED CLAIMS** |

**DECLARATION OF JOANNE COUVRETTE
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Joanne Couvrette, declare as follows:

1. **Introduction and Background**

   o I am over the age of 18, and I have personal knowledge of the matters set forth herein.

   o I am the daughter of Ann M. Wisnovsky ("Ann"), who is the Trustor of the Ann M. Wisnovsky Trust (the "Trust").

2. **Relationship with Ann M. Wisnovsky**

   o Ann was my mother. I assisted her with estate planning matters at her request and always acted in her best interests.

   o At no time did I exert undue influence over my mother.

Exhibit 10 – Page 1 of 4
PDF Page 89

3. **Timeframe of Key Events**

- o In 2017, Ann drove to San Diego on February 24, 2017 with Robert and Sophia Wisnovsky, after attending the 90th birthday celebration of our cousin, Helen Hoog in Marin County. During her visit, we traveled together from San Diego to Salt Lake City from March 14 to March 19, and Ann stayed with me until her return to Medford on April 8, 2017. (See Ex. 26 Plane Tickets)

  - ▪ During her time in California in 2017, Ann did not sign any documents of any kind related to her leases or estate planning. She did not have access to a computer, and I did not receive any documents on her behalf.

- o In May 2019, Ann returned to California to attend my daughter's graduation from the University of Southern California. During this visit, Ann was very competent, animated, and engaged in current events. She cooked amazing Italian dinners, assisted with planning my daughter's graduation events, and actively participated in family activities.

  - ▪ During this time, I worked full-time on weekdays and did not influence her decisions regarding her estate. Ann requested my assistance in updating her estate plan, and at her direction, I helped her find an attorney in Oregon, Gary Turner, to handle her estate planning needs.

- o I retained separate counsel for myself and Wisnovsky Land LLC. Dick Thierolf represented me and Wisnovsky Land, LLC.

- o On July 2, 2019, after returning to my Mom's house from a trip, I discovered the document "Things to Remember" in many of the kitchen and dining room drawers. Some copies were laminated and bigger drawers had more than one copy. I counted 24 separate copies of the document distributed throughout my Mom's house. These were placed in the drawers between the time we had left in the morning and returned in the early afternoon. A copy was produced in Valley View Winery's Document Production (See Ex. 18)

4. **Authentication of Exhibits as Business Records**

- o I am familiar with the documents included in the following exhibits, which are attached to the Motion for Summary Judgment:

  - ▪ **Exhibit 9**: November 4, 2020 Powell Banz Appraisal for the Ann M. Wisnovsky Trust.

  - ▪ **Exhibit 14**: June 19, 2019 Email from Joanne Couvrette to Mark Wisnovsky.

Exhibit 10 – Page 2 of 4

PDF Page 90

- **Exhibit 15**: July 26, 2019 Email from Attorney Campanella with Attachment 6-20-19 "Notice of Improvement to Winery and Vineyard Lease" and "3-25-2017 Consent."

- **Exhibit 16**: July 30, 2019 Email from Defendants' Attorney Campanella to Attorneys Thierolf and Turner.

- **Exhibit 17**: Letter from Attorney Dick Thierolf to Campanella and Mark Weaver on July 31, 2019.

- **Exhibit 22**: November 29, 2023 Winery Lease Default Letter.

- **Exhibit 23**: November 29, 2023 Vineyard Lease Default Letter.

- **Exhibit 24**: January 25, 2024 Winery Lease Termination Letter.

- **Exhibit 25**: January 25, 2024 Vineyard Lease Termination Letter.

- **Exhibit 26**: April 8, 2017 Los Angeles to Medford.

- **Exhibit 28**: June 6, 2024 California Superior Court of California, County of San Diego Case 24PT 000875C Order in The Matter of the Trust Administration of the Ann M. Wisnovsky Trust, dated August 2, 2012.

- **Exhibit 29**: July 1, 2019 FAX transmittal of Dr. Allan Binette's Medical Record of Ann Wisnovsky; Chart Note 6-24-2019.

o   These exhibits were prepared, maintained, and kept in the regular course of business or activities conducted by the Trust, Wisnovsky Land LLC, or other relevant entities. They were created at or near the time of the events described within each document by individuals with knowledge of the events or transactions.

5. **Prefabricated Ag Building**

In my role as Co-Trustee of the Ann M. Wisnovsky Trust, I did not deny Valley View Winery, Inc. the approval to add a building. I asked attorney Dick Thierolf to negotiate lease addendum terms that protected the interest of Wisnovsky Land, LLC and the Trust and I relied upon his legal advice as to those terms.

6. **Rent Payments**

Neither Wisnovsky Land, LLC, the Ann M. Wisnovsky Trust, nor its beneficiaries have received any payments related to any Agreement to Make Payments contract. As noted in Ex. 20, $1.3M was earned by Mark and Mike in 2019 on their hemp crop in a single year with no consideration ever paid for the controlling share of Valley View Winery.

Wisnovsky Land, LLC has never received any payments under the Second Addendum to the Vineyard Lease for Annual Rent for unplanted/fallow acreage.  Since the signing of

Exhibit 10 – Page 3 of 4

the Second Addendum, a significant portion of the 35 acres added to the Vineyard lease has been controlled by Valley View Winery with no consideration.

Wisnovsky Land, LLC has not received any payments subject to the Vineyard Lease or Winery Lease, either as monthly rent or payment of property tax, since December 2023. Although the lease was terminated in early 2024, the tenants, Valley View Winery, Inc., have continued to occupy the leased property with no consideration being paid pursuant to any lease terms.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 27th day of January, 2025, in San Diego, California

Joanne Couvrette

Exhibit 10 – Page 4 of 4

PDF Page 92

Plaintiff's Exhibit 11

THIRD AMENDMENT
TO
INTER VIVOS REVOCABLE TRUST
THE ANN M. WISNOVSKY TRUST

I, ANN M. WISNOVSKY, am the Grantor and Trustee under that certain Inter Vivos Revocable Trust, dated August 2, 2012, establishing THE ANN M. WISNOVSKY TRUST. On March 14, 2016, I executed a First Amendment to said trust. On February 23, 2017, I executed a Second Amendment to said trust. This Third Amendment supercedes the First Amendment and the Second Amendment, which shall be of no further force or effect. I hereby amend the said trust as follows:

The provisions of Section 3.3B are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"B. The Trustee shall make the following additional specific distributions:

i) The trust estate includes a 100% membership interest in Wisnovsky Land, LLC, an Oregon limited liability company ("Wisnovsky Land"). Grantor and Wisnovsky Land, LLC, have entered into a Redemption Agreement that creates a binding commitment for the redemption of one-half of the trust's membership interest in Wisnovsky Land. The purchase price for the redemption of such membership interest shall be paid pursuant to a promissory note in the amount of $200,000.00, $240,000.00 or $280,000.00, depending on the number of legal parcels in the real property owned by Wisnovsky Land on the date of closing of the redemption. The promissory note will be secured by a trust deed that will encumber the real property owned by Wisnovsky Land. The Trustee is directed to consummate the transaction described in the Redemption Agreement. The trust's remaining membership interest in Wisnovsky Land shall be divided into shares as follows: fifty percent (50%) for MARK A. WISNOVSKY; and fifty percent (50%) for MICHAEL J. WISNOVSKY. The shares as so established shall be distributed to the respective beneficiaries for which the shares are created. The Trustee shall distribute to each of JOANNE COUVRETTE and ROBERT F. WISNOVSKY an undivided one-half interest in



PLAINTIFF'S
EXHIBIT

279

Exhibit 11 – Page 1 of 14
PDF Page 94

JCOUVRETTE001897

the promissory note and trust deed described in this Section 3.3B, which are to be executed and delivered pursuant to the Redemption Agreement.

ii) If the trust estate includes the following described real property (the "Home"), the Trustee shall have the Home appraised by an appraiser in Medford, Oregon, who shall be selected by the Trustee. Following receipt of the appraisal, the Trustee shall mail a copy thereof to ROBERT F. WISNOVSKY, and he shall have the sole and exclusive option ("Option") to purchase an undivided one-half interest in the Home in the manner and for the price stated herein. The "Term" of the Option shall commence on the date the Trustee mails a copy of the appraisal to ROBERT W. WISNOVSKY and shall expire 120 days thereafter. The Option shall be exercised, if at all, by written notice (the "Exercise Notice") given by ROBERT W. WISNOVSKY to the Trustee at any time during the Term. The "Purchase Price" shall be the 95% of one-half of the appraised value of the Home, as determined by the appraiser. The purchase price for the Home shall be paid in cash. Closing of the sale and purchase (the "Closing") shall occur on a date (the "Closing Date") selected by ROBERT W. WISNOVSKY, but in all events the Closing shall occur within 90 days after the date that the Exercise Notice is given. The Trustee and ROBERT W. WISNOVSKY shall each pay one-half of the escrow fee of the title company with respect to the Closing. The Trustee shall pay the premium for an owner's title insurance policy that the Trustee shall cause to be provided to ROBERT W. WISNOVSKY. ROBERT W. WISNOVSKY shall pay the fee for recording the deed described below. One-half of the real property taxes and assessments payable with respect to the tax year in which Closing occurs shall be prorated between the Trustee and ROBERT W. WISNOVSKY as of the Closing Date. At the Closing, the Trustee shall execute, acknowledge, and deliver to ROBERT W. WISNOVSKY a Statutory Warranty Deed conveying the undivided one-half interest in the Home to ROBERT W. WISNOVSKY, subject only to taxes for the current tax year and easements and restrictions not materially affecting title. If ROBERT W. WISNOVSKY purchases the undivided one-half interest in the Home, the Trustee shall distribute to him the remaining undivided one-half interest in the Home, subject to real property taxes and assessments payable with respect to the tax year in which Closing occurs, and no other monetary liens, and the Trustee shall distribute to JOANNE COUVRETTE all of the net proceeds of the sale of the undivided one-half interest in the Home. If ROBERT

2 - Third Amendment to Inter Vivos Revocable Trust

Exhibit 11 – Page 2 of 14

PDF Page 95

JCOUVRETTE001898

W. WISNOVSKY does not purchase the undivided one-half interest in the Home, the Home shall be distributed to JOANNE COUVRETTE and ROBERT F. WISNOVSKY, in equal shares.

Real property commonly known as 1352 Applegate Road, in the County of Jackson, State of Oregon, described as follows:

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST  127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST

3  - Third Amendment to Inter Vivos Revocable Trust

Exhibit 11 – Page 3 of 14

PDF Page 96

JCOUVRETTE001899

10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 87° 33' 02" EAST 21.12 FEET TO A 5/8" IRON PIN; THENCE NORTH 88° 21' 48" EAST 109.22 FEET TO A 5/8" IRON PIN ; THENCE SOUTH 84° 56' 41" EAST 56.34 FEET TO A 5/8" IRON PIN ; THENCE ALONG THE ARC OF A 460.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS NORTH 81° 05' 40" EAST 221.96 FEET ) A DISTANCE OF 224.17 FEET TO A 5/8" IRON PIN; THENCE NORTH 67° 08' 01" EAST 137.72 FEET TO A 5/8" IRON PIN; THENCE NORTH 89° 17' 20" EAST 16.48 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH NORTH 00° 19' 38" WEST 26.00 FEET) A DISTANCE OF 26.00 FEET TO THE POINT OF BEGINNING.

TAX LOTS: 200, 201 AND 1800.

NOTE: This Legal Description was created prior to January 01, 2008."

The provisions of Section 3.3C are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"C.  If the trust estate includes the Home at the time of Grantor's death, the rest, residue and remainder of this trust shall be divided into shares as follows: twenty-five percent (25%) for JOANNE COUVRETTE; twenty-five percent (25%) for ROBERT F. WISNOVSKY; twenty-five percent (25%) for MARK A. WISNOVSKY; and twenty-five percent (25%) for MICHAEL J. WISNOVSKY. If the trust estate does not include the Home at the time of Grantor's death, the rest, residue and remainder of this trust shall be divided into shares as follows:  thirty-five percent (35%) for JOANNE COUVRETTE; thirty-five percent (35%) for ROBERT F. WISNOVSKY; fifteen percent (15%) for MARK A. WISNOVSKY; and fifteen percent (15%) for MICHAEL J. WISNOVSKY.  The shares as so established shall be distributed to the respective beneficiaries for which the shares are created."

4  - Third Amendment to Inter Vivos Revocable Trust

Exhibit 11 – Page 4 of 14

PDF Page 97

JCOUVRETTE001900

JOANNE COUVRETTE is removed as a Co-Trustee of the Trust. Grantor shall continue to serve as the sole Trustee of the Trust.

The provisions of Section 9.1 are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"9.1  Successor Trustee.  In the event ANN M. WISNOVSKY shall die, resign, or become incapacitated, or cease to act as Trustee for any reason whatsoever, GEORGE WISNOVSKY is appointed as Trustee with full powers of the Trustee. In the event GEORGE WISNOVSKY shall die, resign, or become incapacitated, or cease to act as Trustee for any reason whatsoever, STEPHEN WISNOVSKY is appointed as Trustee with full powers of the Trustee. In the event STEPHEN WISNOVSKY shall die, resign, or become incapacitated, or cease to act as Trustee for any reason whatsoever, U.S. BANK, N.A., is appointed as Trustee with full powers of the Trustee."

As amended by this Third Amendment to Inter Vivos Revocable Trust, I hereby ratify and affirm the Inter Vivos Revocable Trust, dated August 2, 2012.

IN WITNESS WHEREOF, this Third Amendment to Inter Vivos Revocable Trust is executed on the 28 day of July, 2017.

_____
ANN M. WISNOVSKY
                        "Grantor"

_____
ANN M. WISNOVSKY
                        "Trustee"

5  - Third Amendment to Inter Vivos Revocable Trust

Exhibit 11 – Page 5 of 14
PDF Page 98

JCOUVRETTE001901

## REDEMPTION AGREEMENT

THIS REDEMPTION AGREEMENT is entered into and shall be effective as of February 23, 2017, the "Effective Date", by and among WISNOVSKY LAND, LLC, an Oregon limited liability company (the "Company"), and ANN M. WISNOVSKY, TRUSTEE OF THE ANN M. WISNOVSKY TRUST, UTD 8/2/12 ("Member").

### Recitals:

A.   Member is the owner of a 100% Ownership Interest in the Company.

B.   Member and the Company desire to agree on a partial redemption of Member's Ownership Interest.

### Agreements:

1.   **Partial Redemption.** Following the date of death of Ann M. Wisnovsky, the Company shall purchase from Member and Member shall sell to the Company one-half of Member's Ownership Interest in the Company. Closing of the redemption shall occur not later than sixty (60) days following such date of death ("Closing Date").

2.   **Purchase Price and Security for Payment.** The "Purchase Price" which the Company agrees to pay to Member is the following: (a) if, on the Closing Date, the real property owned by the Company consists of one legal parcel, the Purchase Price shall be the sum of $200,000.00; (b) if, on the Closing Date, the real property owned by the Company consists of two legal parcels, the Purchase Price shall be the sum of $240,000.00; (c) if, on the Closing Date, the real property owned by the Company consists of three legal parcels, the Purchase Price shall be the sum of $280,000.00 . The Purchase Price shall be paid by the Company's execution and delivery to Member of a promissory note ("Note") in the form of the Note attached hereto, marked Exhibit "A". Payment of the Note shall be secured by a "Trust Deed" in the form of the Trust Deed attached hereto, marked Exhibit "B". The Trust Deed shall encumber the real property owned by the Company on the Closing Date, and it shall be executed by Company and recorded in the Official Records of Jackson County, Oregon.

3.   **Miscellaneous.**

3.1   Binding Effect. This Agreement is binding on and inures to the benefit of the parties and their respective heirs, personal representatives, successors, and assigns.



PLAINTIFF'S EXHIBIT

270

Exhibit 11 – Page 6 of 14

PDF Page 99   VALLEYVIEW_002274

3.2   Amendments. This Agreement may be amended only by an instrument in writing executed by all the parties, which writing must refer to this Agreement.

3.3   Further Assurances. Each party agrees to execute and deliver such other documents and to do and perform such other acts and things as any other party may reasonably request to carry out the intent and accomplish the purposes of this Agreement.

3.4   Time of Essence. Time is of the essence with respect to all dates and time periods set forth or referred to in this Agreement.

3.5   Waiver. Any provision or condition of this Agreement may be waived at any time, in writing, by the party entitled to the benefit of such provision or condition. Waiver of any breach of any provision will not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.

3.6   Governing Law. This Agreement will be governed by and construed in accordance with the laws of the state of Oregon, without regard to conflict-of-laws principles.

3.7   Attorney Fees. If any arbitration, suit, or action is instituted to interpret or enforce the provisions of this Agreement, to rescind this Agreement, or otherwise with respect to the subject matter of this Agreement, the party prevailing on an issue will be entitled to recover with respect to such issue, in addition to costs, reasonable attorney fees incurred in the preparation, prosecution, or defense of such arbitration, suit, or action as determined by the arbitrator or trial court, and, if any appeal is taken from such decision, reasonable attorney fees as determined on appeal.

3.8   Injunctive and Other Equitable Relief. The parties agree that the remedy at law for any breach or threatened breach by a party may, by its nature, be inadequate, and that in addition to damages, the other parties will be entitled to a restraining order, temporary and permanent injunctive relief, specific performance, and other appropriate equitable relief, without showing or proving that any monetary damage has been sustained.

2 - REDEMPTION AGREEMENT

Exhibit 11 – Page 7 of 14

PDF Page 100   VALLEYVIEW_002275

IN WITNESS WHEREOF, the parties have hereunto executed this Redemption Agreement to be effective on the date hereinabove set forth.

"Company"

WISNOVSKY LAND, LLC
By: ANN M. WISNOVSKY TRUST, UTD
    8/2/12, its Member

By: _Ann M. Wisnovsky_
    ANN M. WISNOVSKY, Trustee

"Member"

THE ANN M. WISNOVSKY TRUST,
UTD 8/2/12

By: _Ann M. Wisnovsky_
    ANN M. WISNOVSKY, Trustee

3 - REDEMPTION AGREEMENT

Exhibit 11 – Page 8 of 14

PDF Page 101  VALLEYVIEW_002276

**Exhibit A**

**PROMISSORY NOTE**

$_____　　　　　_____, 20___, Medford, Oregon

1.　Obligation; Loan Amount.

　　　　FOR VALUE RECEIVED, the undersigned ("Borrower") promises to pay to _____, Trustee of THE ANN M. WISNOVSKY TRUST, UTD 8/2/12, or order ("Noteholder"), the principal sum of _____ _____and NO/100 DOLLARS ($_____) with interest on the unpaid principal balance from the date of this note until paid at the rate specified in Section 3 below. Principal and interest shall be payable at such place as Noteholder shall designate.

2.　Loan Term.

　　　　All indebtedness owing to Noteholder pursuant to this promissory note shall be due and payable on or before the expiration of 10 years following the date hereof. This date shall be the "Date of Maturity" of the obligations evidenced by this promissory note.

3.　Interest Rate.

　　　　The interest rate applicable to the principal balance of this note is _____%, which is the Applicable Federal Rate for this promissory note established by the Internal Revenue Service during the month in which this note is executed. Interest shall be calculated on the basis of a 365-day year.

4.　Payments.

　　　　No payments are required of Borrower. Payments, if any, shall be applied first to interest and then to principal.

5.　Time of Essence; Attorney's Fees.

　　　　Time is of the essence hereof. Borrower shall pay all of Noteholder's reasonable collection costs, including attorney's fees, even though no civil action is commenced. If suit or action is brought to collect this note, the Noteholder shall be entitled to collect all reasonable costs and expenses of such suit or action, including, but not limited to, reasonable attorney's fees at trial and on appeal.

Exhibit 11 – Page 9 of 14

PDF Page 102　VALLEYVIEW_002277

6.  <u>Maximum Limit</u>.

In no event shall any payment of interest or any other sum payable exceed the maximum amount permitted by applicable law.  If it is established that any payment exceeding lawful limits has been received, the Noteholder will credit the excess amount to principal, or, at its option, refund the same.

7.  <u>Joint and Several Obligation</u>.

Presentment, notice of dishonor and protest are hereby waived by all makers, sureties, guarantors and endorsers hereof.  This note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers and shall be binding upon them and their successors and assigns.

8.  <u>Waiver; Cumulative Rights</u>.

No delay or forbearance on the part of the Noteholder in the exercise of any power or right under this note or under any other instrument executed pursuant hereto shall operate as a waiver thereof, nor shall a single or partial exercise of any other power or right.  Enforcement by the Noteholder of any security for the payment hereof shall not constitute any election of remedies so as to preclude the exercise of any other remedy available.

9.  <u>Governing Law, Venue and Jurisdiction</u>.

This note has been executed and delivered in the State of Oregon and the laws of such state shall govern the validity, construction, enforcement and interpretation of this note.  Exclusive venue and jurisdiction for any dispute concerning this agreement shall be in Jackson County, Oregon.

10.  <u>Headings</u>.

The headings of the sections of this note are inserted for convenience only and shall not be deemed to constitute a part hereof.

WISNOVSKY LAND, LLC
By: ANN M. WISNOVSKY TRUST, UTD
    8/2/12, its Member

By:_____
    _____, Trustee

Exhibit 11 – Page 10 of 14

PDF Page 103  VALLEYVIEW_002278

**AFTER RECORDING RETURN TO:**

_____

**Grantor:**
**WISNOVSKY LAND, LLC, an Oregon limited
liability company**

**Beneficiary:**
_____, **TRUSTEE OF THE ANN
M. WISNOVSKY TRUST, UTD 8/2/12**

---

## TRUST DEED

THIS TRUST DEED, made on _____, 20___, between **WISNOVSKY LAND, LLC** an Oregon limited liability company, as Grantor, **FIRST AMERICAN TITLE COMPANY OF OREGON**, as Trustee, and _____,
**TRUSTEE OF THE ANN M. WISNOVSKY TRUST, UTD 8/2/12**,

### WITNESSETH:

Grantor irrevocably grants, bargains, sells and conveys to trustee in trust, with power of sale, the property in **JACKSON COUNTY**, Oregon, described as:

SEE EXHIBIT "A", ATTACHED HERETO

together with all and singular the tenements, hereditaments and appurtenances and all other rights thereunto belonging or in anywise now or hereafter appertaining, and the rents, issues and profits thereof and all fixtures now or hereafter attached to or used in connection with the property.

FOR THE PURPOSE OF SECURING PERFORMANCE of each agreement of grantor herein contained and payment of: A) the sum of _____ ($_____), with interest thereon according to the terms of a promissory note of even date herewith, payable to beneficiary or order and made payable by grantor, the final payment of principal and interest hereof, if not sooner paid, to be due and payable ten (10) years following the date hereof.

Any sale, gift, conveyance, contract for conveyance, transfer, assignment, encumbrance, pledge, or grant of a security interest in all or any part of the property, or any interest therein, either voluntarily, involuntarily, or by the operation of law (a "Transfer"), without Beneficiary's prior written consent, shall constitute an event of default. For the purpose of clarification, and without limiting the generality of the foregoing, the occurrence at any time of any sale, conveyance, assignment, or other transfer of, or the grant of a pledge of or security interest in, any membership/ownership interest of Grantor shall be deemed to be a Transfer in violation of this paragraph. The provisions of this paragraph shall apply to each and every Transfer, regardless of whether or not Beneficiary has consented or waived its rights in connection with any previous Transfer. Beneficiary may attach such conditions to its consent as Beneficiary may determine in its sole discretion, including without limitation an increase in the interest rate or the payment of transfer or assumption fees, and the payment of administrative and legal fees and costs incurred by Beneficiary.

**To protect the security of this trust deed, grantor agrees:**

1. To protect, preserve and maintain said property in good condition and repair; not to remove or demolish any building or improvement thereon; not to commit or permit any waste of said property.
2. To complete or restore promptly and in good workmanlike manner any building or improvement which may be constructed, damaged or destroyed thereon, and pay when due all costs incurred therefore.
3. To comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the property; if the beneficiary so requests, to join in executing such financing statements pursuant to the Uniform Commercial Code as the beneficiary may require and to pay for filing same in the proper public office or offices, as well as the cost of all lien searches made by filing officers or searching agencies as may be deemed desirable by the beneficiary.
4. To provide and continuously maintain insurance on the buildings now or hereafter erected on said premises against loss or damage by fire and such other hazards, as the beneficiary may from time to time require, in an amount not less than the $ **full replacement value,** written by one or more companies acceptable to the beneficiary, with loss payable to the latter. All policies of insurance shall be delivered to the beneficiary as soon as insured. If grantor shall fail for any reason to procure any such insurance and to deliver said policies to the beneficiary at least fifteen (15) days prior to the expiration of any policy of insurance now or hereafter placed on said buildings, the beneficiary may procure same at grantor's expense. The amount collected under any fire or other insurance policy may be applied by beneficiary upon any indebtedness secured hereby and in such order as beneficiary may determine, or at option of beneficiary the entire amount so collected, or any part thereof, may be released to grantor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.
5. To keep said premises free from construction liens and to pay all taxes, assessments and other charges that may be levied or assessed upon or against said property before any part of such taxes, assessments and other charges become past due or delinquent and promptly deliver receipts therefore to beneficiary; should the grantor fail to make payment of any taxes, assessments, insurance premiums, liens or other charges payable by grantor, either by direct payment or by providing beneficiary with funds with which to make such payment, beneficiary may, at its option, make payment thereof, and the

--------------------------------------------------------------------------------

Exhibit 11 – Page 11 of 14

PDF Page 104   VALLEYVIEW_002279

amount so paid, with interest at the rate set forth in the note secured hereby, together with obligations described in paragraphs 6 and 7 of this trust deed, shall be added to and become a part of the debt secured by this trust deed, without waiver of any rights arising from breach of any of the covenants hereof and for such payments, with interest as aforesaid, the property hereinbefore described, as well as the grantor, shall be bound to the same extent that they are bound for the payment of the obligation herein described, and all such payments shall be immediately due and payable without notice, and the nonpayment thereof shall, at the option of the beneficiary, render all sums secured by this trust deed immediately due and payable and constitute a breach of this trust deed.

6. To pay all costs, fees and expenses of this trust deed including the cost of title search as well as the other costs and expenses of the trustee incurred in connection with or in enforcing this obligation and trustee's and attorney's fees actually incurred.

7. To appear in and defend any action or proceeding purporting to affect the security rights or powers of beneficiary or trustee; and in any suit, action or proceeding in which the beneficiary or trustee may appear, including any suit for the foreclosure of this deed, to pay all costs and expenses, including evidence of title and the beneficiary's or trustee's attorney's fees; the amount of attorney's fees mentioned in this paragraph 7. in all cases shall be fixed by the trial court and in the event of an appeal from any judgment or decrees of the trial court, grantor further agrees to pay such sum as the appellate court shall adjudge reasonable as the beneficiary's or trustee's attorney's fees on such appeal.

**It is mutually agreed that:**

8. In the event that any portion or all of said property shall be taken under the right of eminent domain or condemnation, beneficiary shall have the right, if it so elects, to require that all or any portion of the monies payable as compensation for such taking, which are in excess of the amount required to pay all reasonable costs, expenses and attorney's fees necessarily paid or incurred by grantor in such proceedings, shall be paid to beneficiary and applied by it first upon any such reasonable costs and expenses and attorney's fees, both in the trial and appellate courts, necessarily paid or incurred by beneficiary in such proceedings, and the balance applied upon the indebtedness secured hereby; and grantor agrees, at its own expense, to take such actions and execute such instruments as shall be necessary in obtaining such compensation, promptly upon beneficiary's request.

9. At any time and from time to time upon written request of beneficiary, payment of its fees and presentation of this deed and the note for endorsement (in case of full reconveyances, for cancellation), without affecting the liability of any person for the payment of the indebtedness, trustee may (a) consent to the making of any map or plat of said property; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this deed or the lien or charge thereof; (d) reconvey, without warranty, all or any part of the property. The grantee in any reconveyance may be described as the "person or persons legally entitled thereto," and the recitals therein of any matters or facts shall be conclusive proof of the truthfulness thereof. Trustee's fees for any of the services mentioned in this paragraph shall be not less than $5.

10. Upon any default by grantor hereunder, beneficiary may at any time without notice, either in person, by agent or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in its own name sue or otherwise collect the rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees upon any indebtedness secured hereby, and in such order as beneficiary may determine.

11. The entering upon and taking possession of said property, the collection of such rents, issues and profits, or the proceeds of fire and other insurance policies or compensation or awards for any taking or damage of the property, and the application or release thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

12. Upon default by grantor in payment of any indebtedness secured hereby or in his performance of any agreement hereunder, time being of the essence with respect to such payment and/or performance, the beneficiary may declare all sums secured hereby immediately due and payable. In such an event the beneficiary at his election may proceed to foreclose this trust deed in equity as a mortgage or direct the trustee to foreclose this trust deed by advertisement and sale, or may direct the trustee to pursue any other right or remedy, either at law or in equity, which the beneficiary may have. In the event the beneficiary elects to foreclose by advertisement and sale, the beneficiary or the trustee shall execute and cause to be recorded his written notice of default and his election to sell the said described real property to satisfy the obligation secured hereby whereupon the trustee shall fix the time and place of sale, give notice thereof as then required by law and proceed to foreclose this trust deed in the manner provided in ORS 86.735 to 86.795.

13. After the trustee has commenced foreclosure by advertisement and sale, and at any time prior to 5 days before the date the trustee conducts the sale, the grantor or any other person so privileged by ORS 86.753, may cure the default or defaults. If the default consists of a failure to pay, when due, sums secured by the trust deed, the default may be cured by paying the entire amount due at the time of the cure other than such portion as would not then be due had no default occurred. Any other default that is capable of being cured may be cured by tendering the performance required under the obligation or trust deed. In any case, in addition to curing the default or defaults, the person effecting the cure shall pay to the beneficiary all costs and expenses actually incurred in enforcing the obligation of the trust deed together with trustee's and attorney's fees not exceeding the amounts provided by law.

14. Otherwise, the sale shall be held on the date and at the time and place designated in the notice of sale or the time to which said sale may be postponed as provided by law. The trustee may sell said property either in one parcel or in separate parcels and shall sell the parcel or parcels at auction to the highest bidder for cash, payable at the time of sale. Trustee shall deliver to the purchaser its deed in form as required by law conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in the deed of any matters of fact shall be conclusive proof of the truthfulness thereof. Any person, excluding the trustee, but including the grantor and beneficiary, may purchase at the sale.

15. When trustee sells pursuant to the powers provided herein, trustee shall apply the proceeds of sale to payment of (1) the expenses of sale, including the compensation of the trustee and a reasonable charge by trustee's attorney, (2) to the obligation secured by the trust deed, (3) to all persons having recorded liens subsequent to the interest of the trustee in the trust deed as their interests may appear in the order of their priority and (4) the surplus, if any, to the grantor or to his successor in interest entitled to such surplus.

16. Beneficiary may from time to time appoint a successor or successors to any trustee named herein or to any successor trustee appointed hereunder. Upon such appointment, and without conveyance to the successor trustee, the latter shall be vested with all title, powers and duties conferred upon any trustee herein named or appointed hereunder. Each such appointment and substitution shall be made by written instrument executed by beneficiary, which, when recorded in the mortgage records of the county or counties in which the property is situated, shall be conclusive proof of proper appointment of the successor trustee.

17. Trustee accepts this trust when this deed, duly executed and acknowledged is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which grantor, beneficiary or trustee shall be a party unless such action or proceeding is brought by trustee. The grantor covenants and agrees to and with the beneficiary and the beneficiary's successor in interest that the grantor is lawfully seized

Exhibit 11 – Page 12 of 14

PDF Page 105   VALLEYVIEW_002280

in fee simple of the real property and has a valid, unencumbered title thereto and that the grantor will warrant and forever defend the same against all persons whomsoever.

**WARNING: Unless grantor provides beneficiary with evidence of insurance coverage as required by the contract or loan agreement between them, beneficiary may purchase insurance at grantor's expense to protect beneficiary's interest. This insurance may, but need not, also protect grantor's interest. If the collateral becomes damaged, the coverage purchased by beneficiary may not pay any claim made by or against grantor. Grantor may later cancel the coverage by providing evidence that grantor has obtained property coverage elsewhere. Grantor is responsible for the cost of any insurance coverage purchased by beneficiary, which cost may be added to grantor's contract or loan balance. If it is so added, the interest rate on the underlying contract or loan will apply to it. The effective date of coverage may be the date grantor's prior coverage lapsed or the date grantor failed to provide proof of coverage. The coverage beneficiary purchases may be considerably more expensive than insurance grantor might otherwise obtain alone and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.**

The grantor warrants that the proceeds of the loan represented by the above described note and this trust deed are primarily for grantor's:

__ personal, family, or household purposes.
    Initial: _____    _____
OR

X organization, or (even if grantor is a natural person) are for business or commercial purposes.
    Initial: _____    _____

This deed applies to, inures to the benefit of and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, personal representatives, successors, and assigns. The term beneficiary shall mean the holder and owner, including pledgee, of the contract secured hereby, whether or not named as a beneficiary herein.

In construing this trust deed, it is understood that the grantor, trustee and/or beneficiary may be more than one person; that if the context so requires, the singular shall be taken to mean and include the plural and that generally all grammatical changes shall be made, assumed and implied to make the provisions hereof apply equally to corporations and to individuals.

The terms and conditions of the attached Addendum to All-Inclusive Trust Deed are incorporated herein.

**IN WITNESS WHEREOF, said grantor has hereunto set his/her hand the day and year first above written.**

Grantor:
        WISNOVSKY LAND, LLC
        By: _____, Trustee of the
            Ann M. Wisnovsky Trust, UTD 8/2/12

        By: _____
            _____, Trustee


STATE OF _____ )
                     ) ss.
COUNTY OF _____ )              _____, 20___

On this ___ day of _____, 20___, before me, the undersigned Notary Public in and for said State, personally appeared _____, Trustee of the Ann M. Wisnovsky Trust UTD 8/2/12, Member of WISNOVSKY LAND, LLC, an Oregon limited liability Company, known or identified to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that said instrument was signed and sealed on behalf of said company by authority of its Member, and he/she acknowledged said instrument to be its voluntary act and deed.

Before me:

            _____
            Notary Public for Oregon


Exhibit 11 – Page 13 of 14
PDF Page 106   VALLEYVIEW_002281

**REQUEST FOR FULL RECONVEYANCE**
(To be used only when obligations have been paid)

TO: _____, Trustee

The undersigned is the legal owner and holder of all indebtedness secured by the foregoing trust deed. All sums secured by the trust deed have been fully paid and satisfied. You hereby are directed, on payment to you of any sums owing to you under the terms of the trust deed or pursuant to statute, to cancel all evidences of indebtedness secured by the trust deed (which are delivered to you herewith together with the trust deed) and to reconvey, without warranty, to the parties designated by the terms of the trust deed the estate now held by you under the same.

Mail reconveyance and documents to: _____

DATED: _____, _____.

                                                        _____

                                                        _____
                                                        Beneficiary

**Do not lose or destroy this Trust Deed or the Note which it secures.**
**Both must be delivered to the Trustee for cancellation before reconveyance will be made.**

Exhibit 11 – Page 14 of 14

Plaintiff's Exhibit 12

Hi Pat,

My mom is visiting our sister in San Diego for the about 6 weeks. She is leaving on Friday and would like to have the LLC changes done before she leaves. We will then work on the other parts of the January 11th letter concerning her estate.

1. Wisnovsky Lands LLC will increase the rent to $200/acre per year to start in March, 2017.
2. At the time of her death, Wisnovsky Lands LLC will be distributed equally to Mark and Michael. Mark and Michael will pay Robert and Joanne $100,000 each at the federally required minimum interest rate, due within ten years of her death. In addition Mark and Michael will pay $40,000 each to Robert and Joanne for the existing lot and any lot that is created by the measure 49 claim that is not sold at the time of her death at the same federally required minimum interest rate, due within ten years of her death.
3. We will also like to amend the lease to allow Mark and Michael to lease the remaining farm land not currently used for vineayrdsfor $1,000/acre per year. In addition Mark and Michael will pay Wisnovsky Lands LLC 5% on the net proceeds of any agricultural activity on those lands up to an additional $1000/acre per year.
4. Extend the period of the Agreements to Make Payments from 5 years to 10 years. From year 5 to year 10 25% of all proceeds over $1.5 million would go to the trust.

Ann Wisnovsky

PLAINTIFF'S EXHIBIT 267

Exhibit 12 – Page 1 of 1
PDF Page 109

JCOUVRETTE000182

Plaintiff's Exhibit 13

CONFIDENTIAL

| Filters Used: | # Email Report | Date Printed: **8/17/2022** |
|---|---|---|
| **1 Tagged   Record** | Form Format | Time Printed: **3:41PM** |
| | | Printed By:  **WNT** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Date | **1/06/2015** | Time | **10:54AM** | **10:54AM** | Duration | **0.00** (hours)   Code |
| Subject | **Valley View Winery** | | | | | Staff   **Pat G Huycke** |
| Client | **Wisnovsky, Mike** | | MatRef | **Wisnovsky, Ann - Estate Planning** | MatNo | **6364H** |
| From | mike@valleyviewwinery.com | | | | | |
| To | **Pat Huycke** | | | | | |
| CC To | | | | | | |
| Bcc To | | | | | | |
| Reminders | | (days before) Follow | **N**  Done  **N**  Notify  **N**  Hide  **N**  Trigger  **N**  Private  **N** Status | | | |

| | | |
|---|---|---|
| User1 | | User3 |
| User2 | | User4 |

**Hi Pat,**

**My mom wants to change the trust** for the ownership of the corporation. She would like for Mark and I to have 50% each of the shares. As you know this has been a long time coming and it would seem at least for the corporation part of her estate relatively straightforward. We have not talked about a timeline as we would leave that up to you as to the benefits of when the shares would transfer.

As for the rest of her estate it would of course be of great interest to the corporation that it acquires the land and the grapes that are currently growing on the land. This will be a bit more complicated and with the addition of a measure 37 claim that we would like to pursue this could get quite involved.

We would like to discuss the options with you for both the corporation shares and the vineyard.


**Cheers,**

**Michael Wisnovsky**

**Valley View Winery**
**Jacksonville Oregon**
**1.800.781.9463**
 **(Image)**
**Check us out on the web at www.valleyviewwinery.com**

1

**PLAINTIFF'S EXHIBIT**

**232**

HUYCKE_000651

Exhibit 13 — Page 1 of 4
PDF Page 111

CONFIDENTIAL

CONFIDENTIAL

Filters Used:

**1 Tagged   Record**

# Email Report

Form Format

Date Printed: **8/17/2022**
Time Printed: **3:41PM**
Printed By:  **WNT**

| | | | | | | |
|---|---|---|---|---|---|---|
| Date | **1/09/2015** | Time | **10:35AM** | **10:35AM** | Duration | **0.00** (hours)   Code |
| Subject | **Valley View Winery** | | | | | Staff  **Pat G Huycke** |
| Client | **Wisnovsky, Mike** | | MatRef | **Wisnovsky, Ann - Estate Planning** | MatNo | **6364H** |
| From | mike@valleyviewwinery.com | | | | | |
| To | **Pat Huycke** | | | | | |
| CC To | | | | | | |
| Bcc To | | | | | | |

Reminders                    (days before) Follow  **N**  Done  **N**  Notify  **N**  Hide  **N**  Trigger  **N**  Private  **N**  Status

User1                                        User3
User2                                        User4

**Hi Pat,**

**I just thought of something and see if I am correct. Mark had to get a winery valuation done for his divorce. It came it at $500,000 which is of course more than when we had it valued back when my mom gifted the first series of shares to us. Could we or would we want to use that valuation if she were to gift us shares. Also if we did that I think it is 14k for 2015 could we do 3 for my family myself Kim and Gabi and Mark Quinn and Collin and then have them sign it back to us?**

**And lastly could we do a retroactive gift for 2014.**

**Cheers,**

**Michael Wisnovsky**

**Valley View Winery**
**Jacksonville Oregon**
**1.800.781.9463**
 **(Image)**
**Check us out on the web at www.valleyviewwinery.com**

1

Exhibit 13 – Page 2 of 4
PDF Page 112

CONFIDENTIAL

HUYCKE_000652

Estate Proposal


Eventual Winery goal:

To have Valley View Winery, Inc. ownership to be by Mark and Michael Wisnovsky and heirs.

Logistics:

Distribute remaining shares of Ann Wisnovsky to Mark and Michael so that each owns 50%. Have the LLC and the Winery enter into a long term lease/contract for the land under and immediately surrounding the Tasting Room, event site, winery, parking lot and warehouse as well as an easement for all roads. Applicable buildings will also be either leased or purchased.

Stock can be transferred either immediately using the lifetime gift allowance and the recent appraisal or at time of death.

Windfall Issue:

Within five years of completed stock transfer any financial windfall as a result of the sale of any stock cumulatively exceeding $750,000 will be shared evenly with Ann and/or her estate.


Eventual Vineyard goal:

To have all vineyard and surrounding land to be owned collectively by Joanne, Robert, Mark and Michael Wisnovsky in an LLC.

Logistics:

The LLC and Valley View Winery, Inc. will negotiate the following contracts:

Land Lease: LLC and Winery will enter into a long term lease/contract for the land under and immediately surrounding the Tasting Room, event site, winery, parking lot and warehouse as well as an easement for all roads. Applicable buildings will also be either leased or purchased. Proposed initial term will be 10 years with renewals every ten years.

Vineyard Lease: LLC and winery will negotiate a five to ten year lease to manage all aspects of vineyard lands, included in the lease are use and maintenance of the associated buildings and all equipment. Winery will have right of first refusal on any vineyard lease.


Remaining Estate:

PLAINTIFF'S
EXHIBIT

**233**

Exhibit 13 – Page 3 of 4

PDF Page 113

JCOUVRETTE003247

All remaining assets of Ann, including house, cash and investment accounts, etc. shall be distributed to Joanne, Robert, Mark and Michael Wisnovsky and heirs as Ann desires.


Measure 37 claim: to be decided later

Exhibit 13 – Page 4 of 4

PDF Page 114

JCOUVRETTE003248

Plaintiff's Exhibit 14

## Mother's Finances Etc.

From:  Joanne Couvrette (jcouvrette@sbcglobal.net)

To:      mark@valleyviewwinery.com

Bcc:    rwisnovsky@aol.com

Date:  Wednesday, June 19, 2019 at 03:28 PM PDT

Dear Mark,

Mom has asked me to let you know that she has already engaged an attorney.

She has also executed amendments to her trust which requires the signatures of both Co-Trustees to bind the trust.

Going forward, I will handle her bills.  She has already provided me with most of that information.  Her lease payments should be paid in full beginning on July 1st, with no deductions.

Feel free to communicate with me via this email.

Joanne Couvrette
Co-Trustee of the Ann Wisnovsky Trust

858-350-0253 Ext. 4005

Home:
13274 Jacarte Court
San Diego, CA  92130
619-750-8509

Statement of Confidentiality:  The contents of this e-mail message and any attachments are intended solely for the addressee. The information may also be confidential and/or legally privileged.  This transmission is sent for the sole purpose of delivery to the intended recipient.  If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited.  If you are not the intended recipient, please immediately notify the sender by reply e-mail and delete this message and its attachments, if any.  E-mail is covered by the Electronic Communications Privacy Act, 18 USC SS 2510-2521 and is legally privileged.



Exhibit 14 – Page 1 of 1

PDF Page 116

Plaintiff's Exhibit 15

AT&T Yahoo Mail - Fwr Wisnovsky Lands LLC and Valley View Winery, Inc./ANN COUVEN.

**From:** Dominic Campanella
**Sent:** Friday, July 26, 2019 1:02 PM
**To:** 'gturner@davishearn.com' <gturner@davishearn.com>; 'rthierolf@jtdlegal.com' <rthierolf@jtdlegal.com>
**Cc:** Mark Weaver <MWeaver@brophylegal.com>
**Subject:** Wisnovsky Lands LLC and Valley View Winery, Inc.

Dear Dick and Gary,

We have been retained to represent Valley View Winery, Inc. and Mark and Mike Wisnovsky. This will follow up my telephone conference with Dick this morning. I understand Dick represents Joanne Couvrette, and Gary represents Ann Wisnovsky and (possibly) Wisnovsky Land, LLC.

There are a number of fairly complicated and significant issues between our clients that will need to be resolved. However, the purpose of this email is to address the most immediate issue from our clients' perspective – the construction of a farm building on the vineyard property.

In June 2019, Valley View Winery decided to purchase and construct a building for farm and winery use. Attached to this email is a June 20, 2019 notice regarding the building, which was signed by Ann, Mark, Mike, and Bruce Gieg as a witness. The notice served as the landlord's consent to allow Valley View Winery to construct a steel building approximately 4800 square feet for general farm and winery activities. Attached to the notice is an aerial photo showing the location of the building near the winery.

The building will be used for winery storage in the long term.  It will also be used to dry the hemp crop which is in the ground. The hemp harvest is scheduled for the first week of September 2019, so it is imperative that construction be completed before that time.

Relying on Ann's consent, Valley View purchased a building and hired Batzer Construction to build it. Batzer is prepared to break ground on Monday. Valley View's employees are lined up to harvest the hemp and move it into the building.

This morning, our clients discovered the county is now unwilling to issue a permit, apparently because of an objection lodged by one of your clients. The purpose of this email is to request that your clients contact the county to confirm this project can proceed. This is a win-win for everyone involved because the building becomes part of the real estate and ultimately both of your clients will benefit.

If your clients are unwilling to contact the county as requested, we will file suit on Monday to seek an injunction and damages for the loss of the hemp crop which is expected to be over $3 million, plus $250,000 which is the cost of the building.

Please let me know your clients' position.

Thank you,

Dom

**Dominic M. Campanella** | Partner

Exhibit 15 – Page 1 of 5
PDF Page 118

201 West Main, 5th Floor | P.O. Box 128 | Medford, OR 97501 | 541.772.7123 | 541.772.7249 (fax)

**From:** Dominic Campanella [mailto:DCampanella@brophylegal.com]
**Sent:** Monday, July 29, 2019 5:02 PM
**To:** Gary Turner; 'rthierolf@jtdlegal.com'
**Cc:** Mark Weaver
**Subject:** RE: Wisnovsky Lands LLC and Valley View Winery, Inc.


Dick and Gary,


Thank you for your telephone calls with me today. I understand the Batzer folks need to have the county permit in hand by Thursday Aug. 1 in order to finish the building in time for the hemp harvest. So, we're on a very tight timetable. However, I have authorization from my clients to hold off on filing the complaint until 3:00 tomorrow afternoon, in the hopes the three of us can meet and discuss a mutually agreeable resolution. I have flexibility tomorrow morning to meet at your convenience. We can meet in my office if you like.


Attached are the signed Vineyard and Winery Leases, as we discussed. Also, my clients are working on an accounting showing they are fully paid up on rent. Also attached is a document from Ann confirming that her personal bills and mortgage be paid in lieu of lease payments. I understand this arrangement was at Ann's direction for tax purposes.


I look forward to meeting tomorrow,

Dom


**Dominic M. Campanella** | Partner


201 West Main, 5th Floor | P.O. Box 128 | Medford, OR 97501 | 541.772.7123 | 541.772.7249 (fax)

 image00.jpg
2.8kB

 image001.jpg
2.8kB

 Ann Wisnovsky consent 3-25-17.pdf
52.7kB

 Vineyard Lease.pdf
1.5MB

 Winery Lease.pdf
1.9MB

**In accordance with ORCP 9 G, Brophy Schmor LLP does not accept service of legal documents by email, absent a case specific agreement to the contrary. This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the stated recipient of this message, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you, delete this email from your system, and return any printed copies to the address above. Thank you for your cooperation.**

Exhibit 15 – Page 2 of 5

PDF Page 119

I am giving my consent for Mark and/or Michael Wisnovsky to pay my personal bills and deduct the amounts from the monthly lease payments from either the Winery lease, the Vineyard lease or the Hemp Field lease.

I am also consenting for them to make payments directly to US Bank on my home mortgage and deduct the amounts from the monthly lease payments from either the Winery lease, the Vineyard lease or the Hemp Field lease.

_Ann Wisnovsky_

Ann Wisnovsky

3/25/17

Date

Exhibit 15 – Page 3 of 5

PDF Page 120

## Notice of Improvement to Winery & Vineyard Lease

This letter is to inform Ann Wisnovsky and Wisnovsky Lands, LLC that Valley View Winery Inc., Mark and Michael Wisnovsky and any LLC they may own that they will be constructing a steel building approximately 4800 square feet in the location attached.

The purpose of the building is for general farm and winery activities.

All costs for the building and maintenance will be the responsibility of Valley View Winery, Inc. Mark and Michael Wisnovsky and any LLC they may own. Wisnovsky Lands, LLC will have no obligations for the new building.

_____       _____6/20/19_____
Ann Wisnovsky                                              Date

_____       _____6/20/2019_____
Mark Wisnovsky                                             Date

_____       _____6/28/2019_____
Michael Wisnovsky                                        Date

_____       _____6-20-19_____
Bruce Gieg (witness)                                     Date

Exhibit 15 – Page 4 of 5



Exhibit 15 – Page 5 of 5

PDF Page 122

Plaintiff's Exhibit 16

# Wisnovsky Lands LLC and Valley View Winery, Inc.

From: Dick Thierolf (rthierolf@jtdlegal.com)

To: jcouvrette@sbcglobal.net

Date: Tuesday, July 30, 2019 at 03:28 PM PDT

Joanne:

Forwarded below is the e-mail we received this afternoon from Dominic Campanella.

Yours truly,

Richard B. Thierolf, Jr.
**JACOBSON THIEROLF & DICKEY, P.C.**
Two N. Oakdale Ave.
Medford, OR 97501
Telephone: (541) 773-2727
Fax: (541) 734-7269

**From:** Dominic Campanella [mailto:DCampanella@brophylegal.com]
**Sent:** Tuesday, July 30, 2019 2:30 PM
**To:** 'gturner@davishearn.com'; Dick Thierolf
**Cc:** Mark Weaver
**Subject:** RE: Wisnovsky Lands LLC and Valley View Winery, Inc.

Dick and Gary,

Mike and Mark have authorized us to hold off on filing the complaint today, in anticipation of a proposal from your clients along the lines we have discussed. The construction of the building would proceed. Our clients would agree that the use as a hemp-drying facility for this season would not set any precedent for future use. Landlord reserves any claims under the lease. Our clients would reaffirm their obligation to indemnify the landlord for any damages arising from the hemp operation. There will be no hemp extraction on site.

I want to reiterate that our clients would very much like to avoid a lawsuit and would prefer to negotiate a mutually workable solution. However, their damages are already starting to accrue. Today, due to the delay and uncertainty about this project, Batzer removed its equipment from the site and has moved onto another job. It's unclear when or if Batzer can get back to work at Valley View. It's unlikely our clients can find another off-site option for air-drying this hemp harvest. If your clients are willing to make a proposal, please do so by tomorrow morning.

Thank you,
Dom

**Dominic M. Campanella** | Partner



201 West Main, 5th Floor | P.O. Box 128 | Medford, OR 97501 | 541.772.7123 | 541.772.7249 (fax)
dcampanella@brophylegal.com | www.brophylegal.com

**In accordance with ORCP 9 G, Brophy Schmor LLP does not accept service of legal documents by email, absent a case specific agreement to the contrary. This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the stated recipient of this message, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you, delete this email from your system, and return any printed copies to the address above. Thank you for your cooperation.**

**From:** Dominic Campanella
**Sent:** Monday, July 29, 2019 5:02 PM
**To:** 'gturner@davishearn.com' <gturner@davishearn.com>; 'rthierolf@jtdlegal.com' <rthierolf@jtdlegal.com>
**Cc:** Mark Weaver <MWeaver@brophylegal.com>
**Subject:** RE: Wisnovsky Lands LLC and Valley View Winery, Inc.

Dick and Gary,

Thank you for your telephone calls with me today. I understand the Batzer folks need to have the county permit in hand by Thursday Aug. 1 in order to finish the building in time for the hemp harvest. So, we're on a very tight timetable. However, I have authorization from my clients to hold off on filing the complaint until 3:00 tomorrow afternoon, in the hopes the three of us can meet and discuss a mutually agreeable resolution. I have flexibility tomorrow morning to meet at your convenience. We can meet in my office if you like.

Attached are the signed Vineyard and Winery Leases, as we discussed. Also, my clients are working on an accounting showing they are fully paid up on rent. Also attached is a document from Ann confirming that her personal bills and mortgage be paid in lieu of lease payments. I understand this arrangement was at Ann's direction for tax purposes.

I look forward to meeting tomorrow,
Dom

**Dominic M. Campanella** | Partner



**BROPHY SCHMOR**LLP
ATTORNEYS AT LAW

201 West Main, 5th Floor | P.O. Box 128 | Medford, OR 97501 | 541.772.7123 | 541.772.7249 (fax)
dcampanella@brophylegal.com | www.brophylegal.com

**In accordance with ORCP 9 G, Brophy Schmor LLP does not accept service of legal documents by email, absent a case specific agreement to the contrary. This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the stated recipient of this message, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you, delete this email from your system, and return any printed copies to the address above. Thank you for your cooperation.**

Plaintiff's Exhibit 17

JERRY A. JACOBSON*
RICHARD B. THIEROLF, JR.
*Admitted in Oregon & California

ROBERT R. DICKEY (Retired)

**JACOBSON, THIEROLF & DICKEY, P.C.**
ATTORNEYS AT LAW
POST OFFICE BOX 4687
TWO NORTH OAKDALE AVENUE
MEDFORD, OREGON 97501

TELEPHONE:     (541) 773-2727
FACSIMILE :     (541) 734-7269

July 31, 2019

**REGULAR MAIL AND E-MAIL: mweaver@brophylegal.com/
dcampanella@brophylegal.com**

Dominic M. Campanella
Mark R. Weaver
Attorneys at Law
Brophy Schmor, LLP
P O Box 128
Medford, OR 97501

Re:     "Ag-exempt" barn/shed at 1140 Upper Applegate Road/
Valley View Winery, Inc./Wisnovsky Land, LLC

Gentlemen:

The purpose for this term sheet is to resolve our present dispute concerning whether Valley View Winery, Inc., Mark Wisnovsky, and Mike Wisnovsky may erect a 4,800 square-foot barn/shed on land leased from Wisnovsky Land, LLC. I am writing on behalf of Wisnovsky Land, LLC, with authority from the trustees of the Ann M. Wisnovsky Trust under trust agreement dated August 2, 2012, as amended, subject to Gary Turner's confirmation of approval. If Valley View Winery, Inc., and Mark and Mike Wisnovsky agree to the following, and thus sign this term sheet, then my client, as landlord, permits the erection of the barn/shed, and will comply with Jackson County requirements for a so-called "ag-exemption" from permitting requirements. If your clients state their approval of these terms by signing this term sheet, my client will take the steps required by Jackson County for obtaining the exemption from permit requirements that enable Mark and Mike Wisnovsky and Valley View Winery, Inc., to have JB Steel begin construction as soon as possible. The terms are:

1. Valley View Winery, Inc., Mark Wisnovsky, and Mike Wisnovsky will forthwith sign a third addendum to the March 24, 2016, *Vineyard Lease*.

     a)     The building will be subject to the *Vineyard Lease*, not the *Winery Lease*. This is necessary, because the legal descriptions attached to both leases are identical, covering approximately 75 acres. My understanding is that all the land subject to the *Vineyard Lease* is presently under cultivation, but we do not want there to be any question about which lease applies to the barn/shed.

     b)     The lease addendum must identify the person in charge of the barn/shed. In other words, Section 3 (subletting) of the *Second Addendum to Vineyard Lease* says that Valley View Winery, Inc., may sublet "Future Production Land." Regardless of whether the barn/shed will be located on such land, my client wants to know whether, say, Third Generation, LLC, or some other person or entity will actually be in charge of the barn/shed.

     c)     Rent just for the barn/shed will be $8,000 per month, effective August 1,

Exhibit 17 – Page 1 of 3
PDF Page 127

Dominic M. Campanella
Mark R. Weaver
July 31, 2019
Page 2

2019, and continuing for the duration of the lease term. This will not change the present requirements in the lease for rent; it will be in addition to the current rent.

d)      Section 7 of the *Vineyard Lease* requires Valley View Winery to "obtain and keep continuously in force...a comprehensive liability insurance policy naming Landlord as an additional named insured..." Within 20 days from the date of this letter, plus 48 hours, Valley View Winery must provide Wisnovsky Land with a certificate showing that this required coverage is in effect, with Wisnovsky Land, LLC, as an additional named insured. Moreover, in addition to this, Valley View Winery, Inc., must, within the same time period, obtain and furnish proof of coverage to Wisnovsky Land of:

i)      Fire and casualty insurance for the barn/shed and also for the other structure already existing on the leased premises (my understanding is that this is a barn) with coverage for the full insurable value; and

ii)     Workers' compensation coverage for any employees for whom such coverage is required. This includes employees of the person or entity in charge of the building/shed, but it also includes, in general, the employees of the Valley View Winery, Inc., who will be working on the property subject to the *Vineyard Lease* from now on. Of course, if such employees already have workers' comp coverage, we just want proof of that coverage, together with a promise that coverage won't lapse in the future.

e)      The lease addendum will reiterate Sections 4.3, 6.2, and 10.2 of the *Vineyard Lease*, to the effect that Valley View Winery will comply with all laws, regulations, and directives; Wisnovsky Land will own the barn/shed when installed and at the end of the lease term; and Valley View Winery will indemnify Wisnovsky Land. Additionally, Valley View Winery will indemnity Ann Wisnovsky and Joanne Couvrette in connection with matters described in Section 10.2 of the lease.

f)      Although the initial installation of the barn/shed will be pursuant to an exemption from permitting requirements ("ag-exempt building"), Valley View Winery will, within one year from installation, obtain building permits and have the structure fully inspected for compliance with applicable codes. My understanding is that this is not difficult to accomplish, and that JB Steel can help in the effort to obtain the permit(s).

Although it will not be included in the lease addendum, the following are also conditions for Wisnovsky Land's permission for Valley View Winery to erect the barn/shed pursuant to Section 6.1 of the *Vineyard Lease*:

A)      Valley View Winery will pay Wisnovsky Land $5,000 for attorney fees in connection with this matter. This will be paid forthwith, following signing of the term sheet.

Exhibit 17 – Page 2 of 3    PDF Page 128

B)      Mark and Mike Wisnovsky, on behalf of Valley View Winery, Inc., and any and all other entities they control, will promise to not file a civil action against Ann Wisnovsky, Joanne Couvrette, or Wisnovsky Land, LLC, for any claim relating to the dispute about whether or not Mark, Mike or Valley View Winery was entitled to install the barn/shed on the leased premises.

C)      Wisnovsky Land's permission for installation of the barn/shed cannot be interpreted or construed as a waiver, estoppel, or any other bar to its assertion of claims concerning Valley View Winery's compliance with the *Winery Lease* or *Vineyard Lease*, or how these leases should be interpreted, applied, or construed.

Gary Turner has not yet reviewed this letter. He reserves the right to comment, to add to, or change the foregoing. If you have questions about his position, you should contact him directly. This said, I will be away from the office after 3:30 this afternoon, so any further communication about this letter should be directed to Gary Turner. We look forward to resolving this matter.

Yours truly,

JACOBSON, THIEROLF & DICKEY, P.C.

Richard B. Thierolf, Jr.

RBT/gml
cc:     Garrison F. Turner, Esq.
        Joanne Couvrette

Valley View Winery, Inc., an Oregon Corporation consents to the foregoing.

DATED: _____, 2019

_____
Mark Anthony Wisnovsky, President
Valley View Winery, Inc.

We, Mark Anthony Wisnovsky and Michael Wisnovsky, as individuals, consent to the terms set forth above.

DATED: _____, 2019

_____
Mark Anthony Wisnovsky

DATED: _____, 2019

_____
Michael Wisnovsky

Exhibit 17 – Page 3 of 3
PDF Page 129

Plainti's Exhibit 18

# Things to Remember

## Personal

All my bills are paid by Mark & Mike and deducted from the lease payments they give me for the winery lease, the vineyard lease and the hemp field lease.

There is no more mortgage on my house and the two acres of land is on a separate tax lot so it can be sold. Mark & Mike paid off my mortgage of about $24,000 with the lease money they owed me from the hemp field. The current value of my house and land is about $550-600,000.

In June 2018 I had about $117,000 in my US Bank account, as of June 2019 I have about $156,000.

## Winery

Around 2005 **I decided** to give Mark & Mike 23% each of the winery stock. Around 2014 **I decided** to give Mark & Mike the remaining 54% to be equally split between them. At the same time, I entered into a long-term lease agreement with Mark & Mike to lease both the winery buildings, the land underneath the buildings and the land the winery needs.

## Land

At the same time of the stock transfers, I entered into another long-term lease agreement to lease the rest of the land not covered by the winery lease to Mark & Mike. This does not include my house.

## Estate

For the past twenty years I have wanted to finalize my estate plan, I have talked to Jerry Burns, my CPA at the time, and Pat Huycke, my lawyer for many years, and gradually worked out a plan.

**What I did was the result of over twenty years of planning and it was my decision and it is all done.**

Exhibit 18 – Page 1 of 1
PDF Page 131

VALLEYVIEW_001340

Plaintiff's Exhibit 19

**Brooks M. Foster, OSB No. 042873**
E-mail: bfoster@chenowethlaw.com
Chenoweth Law Group, PC
510 SW Fifth Avenue, Fourth Floor
Portland, OR 97204
Telephone: (503) 221-7958
Facsimile: (503) 221-2182

**James R. Dole, OSB No. 892272**
Email: jdole@wlrlaw.com
Watkinson Laird Rubinstein, P.C.
1246 NE Seventh Street, Suite B
Grants Pass, OR 97526
PO Box 10567
Eugene, OR 97440
Telephone: (541) 484-2277
Facsimile: (541) 484-2282

Attorneys for Defendants Mark A. Wisnovsky,

Michael J. Wisnovsky, and Valley View Winery, LLC

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| JOANNE COUVRETTE, a trustee of the Ann M. Wisnovsky Trust,<br><br>                      Plaintiff,<br><br>      vs.<br><br>MARK A. WISNOVSKY, an individual; MICHAEL J. WISNOVSKY, an individual; PATRICK HUYCKE, an individual; VALLEY VIEW WINERY, INC., an Oregon corporation; JARVIS, DREYER, GLATTE & LARSEN, LLP, an Oregon partnership, fka Huycke O'Connor Jarvis, LLP,<br><br>                    Defendants. | Case No. 1:21–cv–00157–CL<br><br><br>DEFENDANT VIEW WINERY, INC.'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT VALLEY VIEW WINERY, INC. |

Page 1 - DEFENDANT VALLEY VIEW WINERY INC.'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT VALLEY VIEW WINERY, INC.

Exhibit 19 – Page 1 of 5

PDF Page 133

Case 1:21-cv-00157-CL    Document 169    Filed 05/02/25    Page 132 of 234

Exhibit 19 – Page 2 of 5
PDF Page 134

Subject to and without waiving any of the foregoing objections, Valley View stored industrial hemp on property subject to the Winery Lease at various times between 2018 and 2021. Valley View never stored industrial hemp in any structures subject to the Winery Lease and never processed hemp on property subject to the Winery Lease. Sales of industrial hemp occurred on property subject to the Winery Lease between 2018 and 2021, but Valley View is unaware of any specific dates when those sales occurred.

**INTERROGATORY NO. 7:**    State the real property, structures, fixtures, and personal property that you consider to be subject to the Winery Lease.

**RESPONSE:** Valley View objects that this interrogatory is overly broad and unduly burdensome, fails to identify or limit the time period to which it pertains, is not limited to subjects relevant to this lawsuit, the terms "real property, structures, fixtures, and personal property" and "subject to the Winery Lease" are vague, ambiguous, and/or undefined, and the interrogatory contains multiple sub-parts.

Subject to and without waiving the foregoing objections, Wisnovsky Land, LLC leases the event site, winery buildings, warehouse, the land under and immediately surrounding those buildings, the tasting room, and the winery parking lot to Valley View pursuant to the Winery Lease.

**INTERROGATORY NO. 8:**    State the real property, structures, fixtures, and personal property that you consider to be subject to the Vineyard Lease.

**RESPONSE:** Valley View objects that this interrogatory is overly broad and unduly burdensome, fails to identify or limit the time period to which it pertains, is not limited to subjects relevant to this lawsuit, the terms "real property, structures, fixtures, and personal property" and "subject to the Vineyard Lease" are vague, ambiguous, and/or undefined, and the

Page 12 - DEFENDANT VALLEY VIEW WINERY, INC.'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
VALLEY VIEW WINERY, INC.

interrogatory contains multiple sub-parts.

Subject to and without waiving the foregoing objections, Wisnovsky Land, LLC leases approximately 77 acres of land as described in the Vineyard Lease, excluding the land subject to the Winery Lease, to Valley View pursuant to the Vineyard Lease.

DATED this 10th day of November 2021.

CHENOWETH LAW GROUP, PC

By: /s/ Brooks M. Foster
　　Brooks M. Foster, OSB No. 042873
　　bfoster@chenowethlaw.com
　　James R. Dole, OSB No. 892272
　　jdole@wlrlaw.com

Attorneys for Defendant Mark A. Wisnovsky

Trial Attorney: James R. Dole

Exhibit 19 – Page 3 of 5
PDF Page 135

Page 13 - DEFENDANT VALLEY VIEW WINERY, INC.'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
VALLEY VIEW WINERY, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2021, I caused to be served a copy of the foregoing **DEFENDANT VALLEY VIEW WINERY INC.'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT VALLEY VIEW WINERY, INC.** on the following person in the manner indicated below at the following address:

Exhibit 19 – Page 4 of 5
PDF Page 136

| | |
|---|---|
| Ms. Bonnie Richardson, OSB No. 983331<br>Mr. Zachariah Allen, OSB No. 122729<br>Ms. Elizabeth Graves, OSB No. 193644<br>Richardson Wright, LLP<br>805 SW Broadway, Ste. 470<br>Portland, OR 97205<br>bonnie@richardsonwright.com<br>zach@richardsonwright.com<br>elizabeth@richardsonwright.com<br>*Of Attorneys for Plaintiff/Counter-Defendant*<br>*Joanne Couvrette* | Mr. Gregory T. Lusby, OSB No. 933490<br>Arnold Gallagher, PC<br>800 Willamette St. Ste. 800<br>PO Box 1758<br>Eugene, OR 97440<br>glusby@arnoldgallagher.com<br>*Attorney for Defendant Jarvis, Dreyer,*<br>*Glatte& Larsen, LLP* |
| Bernard S. Moore<br>Frohnmayer Deatherage<br>2592 E. Barnett Rd.<br>Medford, OR 97504<br>moore@fdfirm.com<br>*Attorney for Defendant Patrick Huycke* | |

by the following method(s):

xx      by **e-service / emailing** a full, true and correct copy thereof to the parties at the email addresses shown above, which are the last-known email addresses of the parties, on the date set forth below.

_____      by **mailing** a full, true and correct copy thereof in a sealed, first-class, postage pre-paid envelope, addressed to the last-known address of the parties as shown above, and deposited with the United States Postal Service at Portland, Oregon, on the date set forth below.

_____      by **hand delivering** a full, true and correct copy thereof to the parties at the last known business address of the parties above.

/ / /

Page 14 - DEFENDANT VALLEY VIEW WINERY, INC.'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT VALLEY VIEW WINERY, INC.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it may be used as evidence in court and is subject to penalty for perjury.

By: /s/ *Bradley T. Crittenden*
Bradley T. Crittenden
bcrittenden@chenowethlaw.com
Attorney

Exhibit 19 – Page 5 of 5
PDF Page 137

Page 15 - DEFENDANT VALLEY VIEW WINERY, INC.'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
VALLEY VIEW WINERY, INC.

Plaintiff's Exhibit 20

## 2016 Lease Payments

**04/01/2016 to 12/31/2016**

Vineyard Lease:

| | |
|---|---|
| 35 acres of vineyard | $3,937 |

Winery Lease $9,000

total payments due: $12,937

| Date | | Amount | Description |
|---|---|---|---|
| 4/1/2016 | $ | 1,191.00 | Car Insurance |
| 4/4/2016 | $ | 1,050.00 | Rental House sewer check #9305 |
| 4/7/2016 | $ | 1,589.00 | Mom's Home insurance |
| 4/5/2016 | $ | 2,898.00 | Blue Cross/Medicare |
| 4/15/2016 | $ | 320.00 | 2016 Cell Phone |
| 5/1/2016 | $ | 831.00 | 2016 Car Insurance |
| 6/17/2016 | $ | 2,142.50 | CC Huycke Moms Attoney |
| 8/2/2016 | $ | 1,437.50 | Check 5873 |
| 11/8/2016 | $ | 2,429.60 | Property tax Check 5951 |
| 12/31/2016 | $ | 1,647.00 | Charter internet/Phone/TV |
| 12/31/2016 | $ | 2,313.00 | Power |
| 12/31/2016 | $ | 1,487.00 | Credit Card |

Total Payments for 2016 $ 19,335.60

overpayment: $ 6,398.60

Exhibit 20 – Page 1 of 7

PDF Page 139

VALLEYVIEW_000524

## 2017 Lease Payments

**01/01/2017 to 12/31/2017**

Vineyard Lease:

|  |  |
|---|---|
| 35 acres of vineyard | $6,562 |

| Winery Lease |  | $12,000 |
|---|---|---|

| Hemp Lease |  | $0 |
|---|---|---|
| Farmed 9.6 acres | | $7,378 |

| total payments due: | $25,940 |
|---|---|

| Date | | Amount | Description |
|---|---|---|---|
| 1/1/17 | $ | 6,398.60 | carryover from 2016 payments |
| 1/1/2017 | $ | 480.00 | cell phone |
| 1/1/2017 | $ | 1,130.00 | Car Insurance |
| 1/1/2017 | $ | 4,056.00 | Blue Cross medicare premiums |
| 1/3/2017 | $ | 390.00 | Huycke O'Connor estate bill, CC |
| 1/9/2017 | $ | 2,875.00 | check 5996 |
| 2/13/2017 | $ | 1,437.50 | check 6016 |
| 3/27/2017 | $ | 1,652.00 | chair lift |
| 6/20/2017 | $ | 1,583.33 | check 6105 |
| 8/17/2017 | $ | 1,363.75 | check 1229 |
| 11/2/2017 | $ | 1,583.33 | check 6214 |
| 12/31/2017 | $ | 2,603.00 | home power for 2017 |
| 11/15/2017 | $ | 2,550.00 | property tax for 1352 home |
| 12/31/2017 | $ | 2,340.00 | Spectrum TV, internet and cable |
| 12/31/2017 | $ | 566.00 | Mom's credit card charges |

| Total Payments for 2016 | $ | 31,008.51 |
|---|---|---|
| over payment | $ | 5,068.51 |

Exhibit 20 – Page 2 of 7

PDF Page 140

VALLEYVIEW_000525

## 2018 Lease Payments

**01/01/2018 to 12/31/2018**

Vineyard Lease:

|  |  |  |
|---|---|---|
| 35 acres of vineyard | $7,000 |
| Winery Lease | $12,000 |
| Hemp Lease | $0 |
| farmed 14.6 acres | $17,520 |
| Hemp bonus, 14.6 acres | $14,600 |
| total payments due: | $51,120 |

|  |  |  |  |
|---|---|---|---|
| 1/1/18 | $ | 5,068.51 | carryover from 2016 payments |
| 1/1/2018 | $ | 480.00 | cell phone |
| 1/1/2018 | $ | 1,172.00 | Car Insurance |
| 1/1/2018 | $ | 4,284.00 | Blue Cross medicare premiums, year |
| 2/20/2018 | $ | 3,166.66 | cash |
| 4/1/2018 | $ | 23,500.00 | mortgage payments/US Bank |
| 4/5/2018 | $ | 218.00 | Mail Tribune subscription, year |
| 5/1/2018 | $ | 3,433.00 | check 9763 |
| 6/5/2018 | $ | 10,000.00 | check 1057 |
| 6/13/2018 | $ | 3,000.00 | cash |
| 7/13/2018 | $ | 3,000.00 | check 1063 |
| 7/13/2018 | $ | 12,230.00 | check 1064 |
| 7/25/2018 | $ | 224.00 | check 9821 |
| 8/9/2018 | $ | 6,333.32 | check 1066 |
| 8/13/2018 | $ | 420.00 | check 9837 |
| 8/16/2018 | $ | 1,583.33 | check 1069 |
| 8/16/2018 | $ | 1,000.00 | check 1070 |

Exhibit 20 – Page 3 of 7

PDF Page 141

VALLEYVIEW_000526

**2019 Lease Payments**
**01/01/2019 to 8/1/2019**

Vineyard Lease:

| | | |
|---|---|---|
| 35 acres of vineyard | $7,000 | |
| Winery Lease | $12,000 | |
| Hemp Lease | | |
| farmed 19.2 acres | $23,040 | |
| Hemp bonus, 19.2 acres, due 12/31/19 | $19,200 | |
| | | |
| total payments due: | $61,240 | |

| | | | |
|---|---|---:|---|
| 1/1/19 | $ | 52,520.51 | carryover from 2018 payments |
| 1/1/2019 | $ | 2,968.00 | Blue Cross medicare premiums |
| 1/1/2019 | $ | 860.00 | Car Insurance to 6/25/2019 |
| 1/14/2019 | $ | 1,880.00 | Check 9904 |
| 2/1/2019 | $ | 2,583.33 | check 1006 |
| 2/15/2019 | $ | 312.00 | CC Mail Tribune |
| 3/1/2019 | $ | 4,000.00 | Cash |
| 4/1/2019 | $ | 4,000.00 | Cash |
| 4/1/2019 | $ | 1,259.00 | Huycke O'Connor estate bill, CC |
| 5/1/2019 | $ | 1,000.00 | Cash |
| 5/24/2019 | $ | 2,383.33 | Check 6591 |
| 6/25/2019 | $ | 9,533.00 | Check 6611 |
| 6/26/2019 | $ | 216.00 | Car Insurance until 12/26/19 |
| 7/1/2019 | $ | 2,356.00 | Credit Card |
| 7/1/2019 | $ | 1,238.98 | Spectrum TV, internet and cable YTD |
| 8/1/2019 | $ | 3,503.33 | Check 6649 |
| 8/1/2019 | $ | 2,055.00 | mom home power |

| | | |
|---|---|---:|
| Total Payments for 2016 | $ | 92,668.48 |
| Current amount of overpayment: | $ | 31,428.48 |

Exhibit 20 – Page 4 of 7

PDF Page 142

VALLEYVIEW_000529

## 2019 Lease Payments
**01/01/2019 to 8/1/2019**

Vineyard Lease:

| | | |
|---|---|---|
| 35 acres of vineyard | $7,000 |
| Winery Lease | | $12,000 |
| Hemp Lease | | |
| farmed 19.2 acres | $23,040 |
| Hemp bonus, 19.2 acres, due 12/31/19 | $19,200 |
| | | |
| total payments due: | $61,240 |

| | | | |
|---|---|---:|---|
| 1/1/19 | $ | 52,520.51 | carryover from 2018 payments |
| 1/1/2019 | $ | 2,968.00 | Blue Cross medicare premiums |
| 1/1/2019 | $ | 860.00 | Car Insurance to 6/25/2019 |
| 1/14/2019 | $ | 1,880.00 | Check 9904 |
| 2/1/2019 | $ | 2,583.33 | check 1006 |
| 2/15/2019 | $ | 312.00 | CC Mail Tribune |
| 3/1/2019 | $ | 4,000.00 | Cash |
| 4/1/2019 | $ | 4,000.00 | Cash |
| 4/1/2019 | $ | 1,259.00 | Huycke O'Connor estate bill, CC |
| 5/1/2019 | $ | 1,000.00 | Cash |
| 5/24/2019 | $ | 2,383.33 | Check 6591 |
| 6/25/2019 | $ | 9,533.00 | Check 6611 |
| 6/26/2019 | $ | 216.00 | Car Insurance until 12/26/19 |
| 7/1/2019 | $ | 2,356.00 | Credit Card |
| 7/1/2019 | $ | 1,238.98 | Spectrum TV, internet and cable YTD |
| 8/1/2019 | $ | 3,503.33 | Check 6649 |
| 8/1/2019 | $ | 2,055.00 | mom home power |

| | | |
|---|---|---:|
| Total Payments for 2016 | $ | 92,668.48 |
| Current amount of overpayment: | $ | 31,428.48 |

Exhibit 20 – Page 5 of 7

PDF Page 143

VALLEYVIEW_000529

| | | |
|---|---:|---|
| 8/23/2018 | $ 500.87 | check 6405 |
| 9/25/2018 | $ 2,550.00 | cash |
| 10/1/2018 | $ 1,219.00 | credit card, mom's expenses |
| 10/1/2018 | $ 2,588.33 | check 1073 |
| 11/2/2018 | $ 399.00 | check 9877 |
| 11/15/2018 | $ 2,589.00 | property taxes |
| 11/14/2018 | $ 2,583.33 | check 1090 |
| 12/28/2018 | $ 5,166.66 | check 1030 |
| 12/21/2018 | $ 552.50 | Huycke O'Connor estate bill, CC |
| 12/21/2018 | $ 3,064.00 | Power for year |
| 12/31/2018 | $ 842.00 | credit card, mom's expenses |
| 12/31/2018 | $ 2,473.00 | Charter internet/phone/TV |

Total Payments for 2018                    $ 103,640.51

over payment applied to 2019               $ 52,520.51

Exhibit 20 – Page 6 of 7

PDF Page 144

VALLEYVIEW_000527

January 30, 2020

## Annual Report for Hemp Production Lands: 2019

## Leased Property: 1000 Upper Applegate Road, Jacksonville, Oregon 97530

Acreage of hemp increased in June of 2019 to 24.3 acres, gross sales of hemp grown on the above leased property in 2019 totaled $1,356,000. Gross sales for both 2019 and 2020 are substantially reduced due to the inability to construct the already purchased and approved building as a result of actions taken by Ms. Couvrette.

Due to continual increased harassment by Ms. Couvrette and her agent, acreage in hemp will decrease in 2020 to seven acres with 17.3 acres devoted to other crops as we move more hemp growing to other locations. Upon planting in June, 2020 a more accurate total of acreage will be known due to germination rates, plant mortality, and spacing.

Exhibit 20 – Page 7 of 7
PDF Page 145

VALLEYVIEW_000528

Plaintiff's Exhibit 21

**Brooks M. Foster, OSB No. 042873**
E-mail: bfoster@chenowethlaw.com
Chenoweth Law Group, PC
510 SW Fifth Avenue, Fourth Floor
Portland, OR  97204
Telephone: (503) 221-7958
Facsimile: (503) 221-2182

**James R. Dole, OSB No. 892272**
Email: jdole@wlrlaw.com
Watkinson Laird Rubinstein, P.C.
1246 NE Seventh Street, Suite B
Grants Pass, OR 97526
PO Box 10567
Eugene, OR 97440
Telephone: (541) 484-2277
Facsimile: (541) 484-2282

Attorneys for Defendants Mark A. Wisnovsky,

Michael J. Wisnovsky, and Valley View Winery, LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

Exhibit 21 – Page 1 of 11
PDF Page 147

| | |
|---|---|
| JOANNE COUVRETTE, a trustee of the Ann M. Wisnovsky Trust,<br><br>Plaintiff,<br><br>vs.<br><br>MARK A. WISNOVSKY, an individual; MICHAEL J. WISNOVSKY, an individual; PATRICK HUYCKE, an individual; VALLEY VIEW WINERY, INC., an Oregon corporation; JARVIS, DREYER, GLATTE & LARSEN, LLP, an Oregon partnership, fka Huycke O'Connor Jarvis, LLP,<br><br>Defendants. | Case No. 1:21–cv–00157–CL<br><br>DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT MARK A. WISNOVSKY |

Page 1 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

the payments, the time of the payments, and the amount of the payments.

**RESPONSE:** Mr. Wisnovsky objects that this interrogatory is overly broad and unduly burdensome, not limited to any particular time period, not limited to subjects relevant to this lawsuit, it requests disclosure of privileged information, including attorney-client privileged communications, the terms "provided compensation," "facilitated the payment of compensation," "Jarvis Firm," "purpose of the payments," "time of the payments," and "amount of the payments" are vague, ambiguous, an/or undefined, and the interrogatory contains multiple sub-parts.

Subject to and without waiving any of the foregoing objections: Mr. Wisnovsky has never paid any of his own money to Mr. Huycke or Jarvis, Dreyer, Glatte & Larsen, LLP fka Huycke O'Connor Jarvis, LLP ("Jarvis Firm"). Mr. Wisnovsky has never caused a payment to be made by anyone to Mr. Huycke. Mr. Wisnovsky recalls that he caused Valley View to pay the following amounts to the Jarvis Firm on or about the following dates to pay invoices for legal services provided to Ann Wisnovsky by the Jarvis Firm:

- 6/17/2016    $2,142.50
- 1/3/2017     $390.00
- 12/21/2018   $552.50
- 4/17/2019    $1,259.00

**INTERROGATORY NO. 4:**    For each rent payment made pursuant to the Vineyard Lease, state the time of the payment, the amount of the payment, how many acres of land subject to the lease were in use at the time of such payment, and an explanation of how you calculated the amount due.

**RESPONSE:** Mr. Wisnovsky objects that this interrogatory is overly broad and unduly burdensome, not limited to any particular time period, not limited to subjects relevant to this lawsuit, the terms "time of the payment," "amount of the payment," "in use at the time of such

Page 5 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

Exhibit 21 – Page 2 of 11
PDF Page 148

payment," and "explanation of how you calculated the amount due" are vague, ambiguous, and/or undefined, and the interrogatory contains multiple sub-parts.

Subject to and without waiving any of the foregoing objections, Mr. Wisnovsky recalls that rent payments made pursuant to the Vineyard Lease were calculated according to the terms of the Vineyard Lease as stated below and paid on the following dates and in the following amounts:

- In 2016, over a period of nine months, Valley View used 35 acres of land subject to the Vineyard Lease for the production of agricultural crops. The monthly base rent was $437.50 during this period. Pursuant to an agreement with Ann Wisnovsky whereby Valley View would pay her expenses and credit those payments as rent payments under the Vineyard Lease and Winery Lease, Valley View paid the following amounts of money on the following dates in 2016 for Ann Wisnovsky's expenses and Valley View's rent:

  o 4/1/2016      $1,191.00

  o 4/4/2016      $1,050.00

  o 4/5/2016      $2,898.00

  o 5/1/2016      $831.00

  o 4/15/2016     $320.00

  o 6/17/2016     $2,142.50

  o 8/2/2016      $1,437.50

  o 11/8/2016     $2,429.60

  o 12/31/2016    $2,473.00

  o 12/31/2016    $2,314.00

Exhibit 21 – Page 3 of 11
PDF Page 149

Page 6 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

- o    12/31/2016    $1,487.00

- Throughout 2017, Valley View used 35 acres of land subject to the Vineyard Lease for the production of agricultural crops other than hemp and cannabis agricultural crops. The monthly base rent for that use was $437.50 for January and February 2017. The monthly base rent was $583.45 for the remaining ten months of 2017. Also in 2017, for a period of eight months, Valley View used 9.6 acres of land subject to the Vineyard Lease for the production of hemp and cannabis crops. The monthly base rent for that use was $799.97 during that time period. Pursuant to an agreement with Ann Wisnovsky whereby Valley View would pay for her expenses as credit toward rent payments under the Vineyard Lease and Winery Lease, the following amounts of money were paid on the following dates in 2017 for Ann Wisnovsky's expenses and Valley View's rent:

  - o    1/1/2017    $5,636.00

  - o    1/1/2017    $480.00

  - o    1/1/2017    $4,056.00

  - o    1/1/2017    $1,130.00

  - o    1/3/2017    $390.00

  - o    1/9/2017    $2,875.00

  - o    2/13/2017    $1,437.50

  - o    3/27/2017    $1,652.00

  - o    6/20/2017    $1,583.33

  - o    8/17/2017    $1,363.75

  - o    11/2/2017    $1,583.33

  - o    12/31/2017    $1,583.34

Page 7 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

Exhibit 21 – Page 4 of 11
PDF Page 150

- o  11/15/2017    $2,550.00
- o  12/31/2017    $2,603.00
- o  12/31/2017    $2,473.00
- o  12/31/2017    $566.00

- Throughout 2018, Valley View used 35 acres of land subject to the Vineyard Lease for the production of agricultural crops other than hemp and cannabis agricultural crops. The monthly base rent for that use was $583.45 during that time period. Also throughout 2018, Valley View used 9.6 acres of land subject to the Vineyard Lease for the production of hemp and cannabis crops. The monthly base rent for that use was $799.97 during that time period. For a period of seven months in 2018, Valley View used an additional five acres of land subject to the Vineyard Lease for the production of hemp and cannabis crops. The monthly base rent for that use was $416.65. In addition to the monthly base rent, there was annual base rent for the use of 14.6 acres of land for production of hemp and cannabis crops in 2018, in the amount of $14,600. Pursuant to an agreement with Ann Wisnovsky whereby Valley View would pay for her expenses as credit toward rent payments under the Vineyard Lease and Winery Lease, the following amounts of money were paid on the following dates in 2018 for Ann Wisnovsky's expenses and Valley View's rent:

  - o  1/1/18       $6,853.01
  - o  1/1/2018     $480.00
  - o  1/1/2018     $1,172.00
  - o  1/1/2018     $4,284.00
  - o  2/20/2018    $3,166.66

Page 8 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

Exhibit 21 – Page 5 of 11
PDF Page 151

- o 4/1/2018    $23,500.00
- o 4/5/2018    $218.00
- o 5/1/2018    $3,433.00
- o 6/5/2018    $10,000.00
- o 6/13/2018   $3,000.00
- o 7/13/2018   $3,000.00
- o 7/13/2018   $12,230.00
- o 7/25/2018   $224.00
- o 8/9/2018    $6,333.32
- o 8/13/2018   $420.00
- o 8/16/2018   $1,583.33
- o 8/16/2018   $1,000.00
- o 8/23/2018   $500.87
- o 9/25/2018   $2,550.00
- o 10/1/2018   $1,219.00
- o 10/1/2018   $2,588.33
- o 11/2/2018   $399.00
- o 11/15/2018  $2,589.00
- o 11/14/2018  $2,583.33
- o 12/28/2018  $5,166.66
- o 12/21/2018  $552.50
- o 12/21/2018  $3,064.00
- o 12/31/2018  $842.00

Exhibit 21 – Page 6 of 11

PDF Page 152

Page 9 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

- o 12/31/2018    $2,473.00

- Throughout 2019, Valley View used 35 acres of land subject to the Vineyard Lease for the production of agricultural crops other than hemp and cannabis agricultural crops. The monthly base rent for that use was $583.45. Also throughout 2019, Valley View used 14.6 acres of land subject to the Vineyard Lease for the production of hemp and cannabis crops. The monthly base rent for that use was $1,216.62. For a period of eight months in 2019, Valley View used an additional 9.7 acres of land subject to the Vineyard Lease for the production of hemp and cannabis crops. The monthly base rent for that production was $808.30. In addition to the monthly base rent, there was annual base rent for the use of 24.3 acres of land for production of hemp and cannabis crops in 2019, in the amount of $24,300. Pursuant to an agreement with Ann Wisnovsky whereby Valley View would pay for her expenses as credit toward rent payments under the Vineyard Lease and Winery Lease, the following amounts of money were paid on the following dates in 2019 for Ann Wisnovsky's expenses and Valley View's rent:

  - o 1/1/2019      $2,597.00
  - o 1/1/2019      $860.00
  - o 1/14/2019     $1,880.00
  - o 2/15/2019     $312.00
  - o 3/1/2019      $4,000.00
  - o 4/1/2019      $4,000.00
  - o 4/17/2019     $1,259.00
  - o 5/1/2019      $1,000.00
  - o 5/1/2019      $1,538.33

Exhibit 21 – Page 7 of 11
PDF Page 153

Page 10 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

- 5/25/2019    $2,383.33
- 6/25/2019    $9,533.32
- 6/26/2019    $216.00
- 7/1/2019    $2,356.00
- 8/1/2019    $3,503.33
- 9/1/2019    $4,013.00
- 10/1/2019    $4,013.00
- 11/1/2019    $4,013.00
- 12/1/2019    $4,013.00
- 2/1/2020    $24,300.00

**INTERROGATORY NO. 5:**    State the dates you have stored, processed, or sold hemp on property subject to the Winery Lease?

**RESPONSE:** Mr. Wisnovsky objects that this interrogatory is overly broad and unduly burdensome, not limited to any particular time period, not limited to subjects relevant to this lawsuit, the term "stored, processed, or sold hemp" is vague, ambiguous, and/or undefined, the interrogatory contains multiple sub-parts, and the interrogatory ends with a question mark even though it is stated as a command and not a question.

Subject to and without waiving any of the foregoing objections, while acting on behalf of Valley View Winery, Inc., Mr. Wisnovsky stored industrial hemp on property subject to the Winery Lease at various times between 2018 and 2021. Mr. Wisnovsky never processed industrial hemp on property subject to the Winery Lease. Sales of industrial hemp occurred on property subject to the Winery Lease between 2018 and 2021, but Mr. Wisnovsky is unaware of any specific dates when those sales occurred.

Page 11 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

Exhibit 21 – Page 8 of 11
PDF Page 154

with Ann Wisnovsky in person many times over the past ten years about the need for more building space. Those communications led to the plan to construct the PreFab Building, to which Ann Wisnovsky consented in writing.

DATED this 10th day of November 2021.

CHENOWETH LAW GROUP, PC

By: /s/ *Brooks M. Foster*

Brooks M. Foster, OSB No. 042873
bfoster@chenowethlaw.com
James R. Dole, OSB No. 892272
jdole@wlrlaw.com

Attorneys for Defendant Mark A. Wisnovsky

Trial Attorney: James R. Dole

Exhibit 21 – Page 9 of 11

PDF Page 155

Page 16 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2021, I caused to be served a copy of the foregoing **DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT MARK A. WISNOVSKY** on the following person in the manner indicated below at the following address:

| | |
|---|---|
| Ms. Bonnie Richardson, OSB No. 983331<br>Mr. Zachariah Allen, OSB No. 122729<br>Ms. Elizabeth Graves, OSB No. 193644<br>Richardson Wright, LLP<br>805 SW Broadway, Ste. 470<br>Portland, OR 97205<br>bonnie@richardsonwright.com<br>zach@richardsonwright.com<br>elizabeth@richardsonwright.com<br>*Of Attorneys for Plaintiff/Counter-Defendant Joanne Couvrette* | Mr. Gregory T. Lusby, OSB No. 933490<br>Arnold Gallagher, PC<br>800 Willamette St. Ste. 800<br>PO Box 1758<br>Eugene, OR 97440<br>glusby@arnoldgallagher.com<br>*Attorney for Defendant Jarvis, Dreyer, Glatte & Larsen, LLP* |
| Bernard S. Moore<br>Frohnmayer Deatherage<br>2592 E. Barnett Rd.<br>Medford, OR 97504<br>moore@fdfirm.com<br>*Attorney for Defendant Patrick Huycke* | |

by the following method(s):

xx\_\_\_\_\_ by **e-service / emailing** a full, true and correct copy thereof to the parties at the email addresses shown above, which are the last-known email addresses of the parties, on the date set forth below.

\_\_\_\_\_ by **mailing** a full, true and correct copy thereof in a sealed, first-class, postage pre-paid envelope, addressed to the last-known address of the parties as shown above, and deposited with the United States Postal Service at Portland, Oregon, on the date set forth below.

\_\_\_\_\_ by **hand delivering** a full, true and correct copy thereof to the parties at the last known business address of the parties above.

/ / /

/ / /

Exhibit 21 – Page 10 of 11
PDF Page 156

Page 17 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it may be used as evidence in court and is subject to penalty for perjury.

By: /s/ *Bradley T. Crittenden*_____
Bradley T. Crittenden
bcrittenden@chenowethlaw.com
Attorney

Exhibit 21 – Page 11 of 11

PDF Page 157

Page 18 - DEFENDANT MARK A. WISNOVSKY'S RESPONSES TO
PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT
MARK A. WISNOVSKY

Plaintiff's Exhibit 22

November 29, 2023

**First-class mail and certified mail return receipt requested, and electronic mail to *jdole@wlrlaw.com***

James R. Dole
Attorney at law
Watkinson Laird Rubenstein PC
1203 Willamette, Suite 200
Eugene, Oregon 97401
*jdole@wlrlaw.com*

Valley View Winery, Inc.
c/o Registered Agent Mark Wisnovsky
All Other Occupants
1000 Upper Applegate Road
Jacksonville, Oregon 97530

**Re:  <mark>NOTICE OF DEFAULT</mark>**

Dear Mr. Dole, Valley View Winery, Inc., an Oregon corporation, their agents, officers, owners, and All Other Occupants:

### Introduction

This letter is in regard to Wisnovsky Land, LLC, the landlord of the real property commonly known as 1000 Upper Applegate Road, Jacksonville, Jackson County, Oregon 97350, the event site, winery buildings and warehouse, the land under the immediately surrounding such buildings, tasting room and the winery parking lot, which were allegedly leased to Valley View Winery, Inc., by a Commercial Lease Agreement dated on or about March 24, 2016, and amended by Addendum to and Assignment by Landlord, dated on or about November 2, 2016 (the "Lease").  This our

### 10-DAY NOTICE OF DEFAULT

of your alleged tenancy of the said premises because failure to pay property taxes and additional rent due under the Lease of the said premises.  Property taxes in the total sum of $6840.54 are presently owing for tax year 2023 and all of which are past due at this time, and demand is hereby made for payment of that sum.

Exhibit 22 – Page 1 of 2

PDF Page 159

This amount does not include other charges which may also be due and payable, including interest, penalties, and additional taxes or rent and other charges pursuant to Section 17.7 of the Lease.

To correct this default and avoid termination of your alleged tenancy you must pay the sum of $6,840.54 to Jackson County Oregon or to Wisnovsky Land on or before **11:59 p.m. December 11, 2023** (which includes at least an additional 48 hours because this notice is served by U.S. mail, certified or registered mail, postage prepaid). If the said sums are not paid by **11:59 p.m., December 11, 2023**, then we will consider the alleged tenancy to be terminated. If you fail to remedy the default as set for above, the Lease provides the Landlord the right to re-enter the premises, remove all persons and property, and retake possession.

If you fail to remedy the defaults as set for above, the alleged Lease provides the Landlord the right to re-enter the premises, remove all persons and property, and retake possession. These notices are supplemental to all prior notices with respect to this alleged Lease and the dates stated herein shall be in addition to the effective dates in connection with any termination or eviction by the landlord pursuant to any prior notice. If you have questions about your rights, you should seek your own counsel.

Regards,

*Joanne Couvrette*

Joanne Couvrette
Manager, Wisnovsky Land LLC
Trustee of the Ann M. Wisnovsky Trust

13274 Jacarte Court
San Diego, CA  92130

---

## VETERANS DISCLOSURE

Oregon law requires that we also provide the following disclosure. If you are a Veteran, of the armed forces assistance may be available from a county veteran's service officer, a community action agency, by dialing 2-1-1 or from the following:
 • County veteran's service officer for the county where Tenant lives 1000 E Main St, Ste 3, Medford, Oregon 97504 (541)774-8214
 • Community action agency for the area where Tenant lives: ACCESS, 3630 Aviation Way, Medford, Oregon 97504 (541)494-1210

Exhibit 22 – Page 2 of 2

PDF Page 160

Plaintiff's Exhibit 23

November 29, 2023

**First-class mail and certified mail return receipt requested, and electronic mail to *jdole@wlrlaw.com***

James R. Dole
Attorney at law
Watkinson Laird Rubenstein PC
1203 Willamette, Suite 200
Eugene, Oregon 97401
*jdole@wlrlaw.com*

Valley View Winery, Inc.
c/o Registered Agent Mark Wisnovsky
All Other Occupants
1000 Upper Applegate Road
Jacksonville, Oregon 97530

Re:  <mark>**NOTICE OF DEFAULT**</mark>

Dear Mr. Dole, Valley View Winery, Inc., an Oregon corporation, their agents, officers, owners, and All Other Occupants:

### Introduction

This letter is in regard to Wisnovsky Land, LLC the landlord of the real property commonly known as 1140 and 1352 Upper Applegate Road, Jacksonville, Jackson County, Oregon 97350, that portion of the real property described as having been previously planted as a vineyard, but excluding the single family residence, and more specifically described on the attached exhibits A and B (the "premises"), which were allegedly leased to Valley View Winery, Inc., by a Commercial Lease Agreement dated on or about March 24, 2016, amended by Addendum to and Assignment by Landlord, dated on or about November 2, 2016, and second addendum to vineyard lease, dated February 23, 2017 (the "Lease"). This our

### 10-DAY NOTICE OF DEFAULT

of your alleged tenancy of the said premises because failure to pay property taxes and additional rent due under the Lease of the said premises.  Property taxes in the total sum of $473.62 are presently owing for tax year 2023, all of which are

Exhibit 23 – Page 1 of 2

PDF Page 162

past due at this time, and demand is hereby made for payment of that sum.  This amount does not include other charges which may also be due and payable, including interest, penalties, and additional taxes or rent and other charges pursuant to Section 16.7 of the Lease.

To correct this default and avoid termination of your alleged tenancy you must pay the sum of $473.62 on or before **11:59 p.m., December 11, 2023** (which includes at least an additional 48 hours because this notice is served by U.S. mail, certified or registered mail, postage prepaid).  If the said sums are not paid by **11:59 p.m., December 11, 2023**, then we will consider the alleged tenancy to be terminated.  If you fail to remedy the default as set for above, the Lease provides the Landlord the right to re-enter the premises, remove all persons and property, and retake possession.

If you fail to remedy the defaults as set for above, the alleged Lease provides the Landlord the right to re-enter the premises, remove all persons and property, and retake possession.  These notices are supplemental to all prior notices with respect to this alleged Lease and the dates stated herein shall be in addition to the effective dates in connection with any termination or eviction by the landlord pursuant to any prior notice.  If you have questions about your rights, you should seek your own counsel.

Regards,

*Joanne Couvrette*

Joanne Couvrette
Manager, Wisnovsky Land LLC
Trustee of the Ann M. Wisnovsky Trust

13274 Jacarte Court
San Diego, CA  92130

---

## VETERANS DISCLOSURE

Oregon law requires that we also provide the following disclosure. If you are a Veteran, of the armed forces assistance may be available from a county veteran's service officer, a community action agency, by dialing 2-1-1 or from the following:
 • County veteran's service officer for the county where Tenant lives 1000 E Main St, Ste 3, Medford, Oregon 97504 (541)774-8214
 • Community action agency for the area where Tenant lives ACCESS, 3630 Aviation Way, Medford, Oregon 97504 (541)494-1210

Exhibit 23 – Page 2 of 2

PDF Page 163

Plaintiff's Exhibit 24

# Murphy Law Group P.C.

333 NE Russell St., Ste. 200                    Phone: 503 550 4894
Portland, OR  97212                             Fax:  503 296 2633


Tim@oregonlandlord.net                          www.oregonlandlord.net

---

**Sent via certified mail**

January 23, 2024

Valley View Winery, Inc.
c/o Registered Agent Mark Wisnovsky
1000 Upper Applegate Rd.
Jacksonville, OR 97530

James R. Dole
Attorney at Law
Watkinson Laird Rubenstein PC
1203 Willamette St., Ste. 200
Eugene, OR 97401

RE:    Termination of tenancy of Valley View Winery, Inc.

Dear Mr. Wisnovsky and Mr. Dole:

This office represents Joanne Couvrette, who is the trustee of The Ann M. Wisnovsky Trust and managing member of Wisnovsky Land, LLC.

Wisnovsky Land, LLC is the current landlord to the lease dated March 24, 2016 entered into between The Ann M. Wisnovsky Trust and Valley View Winery, Inc.  The property (hereinafter "Winery") described in that lease is:

> THE EVENT SITE, WINERY BUILDINGS AND WAREHOUSE, THE
> LAND UNDER AND IMMEDIATELY SURROUNDING SUCH
> BUILDINGS AND THE TASTING ROOM AND THE WINERY
> PARKING LOT. THE PREMISES ARE LOCATED ON A PORTION
> OF THE REAL PROPERTY DESCRIBED IN EXHIBIT A. THE
> PREMISES ARE DEPICTED ON THE MAP ATTACHED AS EXHIBIT B.

See Exhibits A and B to the Winery lease dated March 24, 2016 entered into between The Ann M. Wisnovsky Trust and Valley View Winery, Inc.

You are hereby notified that the Winery lease dated March 24, 2016 between The Ann M. Wisnovsky Trust and Valley View Winery, Inc., including the first and any other addenda, (hereinafter "Winery Lease") is terminated immediately.  Pursuant to an addendum dated

Exhibit 24 – Page 1 of 5

PDF Page 165

November 2, 2016 to the original March 24, 2016 lease, The Ann M. Wisnovsky Trust assigned its interest in the Winery Lease to Wisnovsky Land, LLC.

On November 29, 2023, you were issued a 10-Day Notice of Default for failure to pay property taxes required by the Winery Lease. You subsequently remitted payment to Jackson County via personal check; however, the check was later returned for insufficient funds.

Winery Lease includes a section regarding termination, which reads:

> **15.1 Termination**. In the event of a default the lease may be terminated at the option of Landlord by written notice to Tenant. Whether or not the lease is terminated by the election of Landlord or otherwise, Landlord shall be entitled to recover damages from Tenant for the default, and Landlord may reenter, take possession of the Premises, and remove any persons or property by legal action or by self-help with the use of reasonable force and without liability for damages and without having accepted a surrender.

This letter serves as written notice of your landlord's termination of the Winery Lease. Please contact the undersigned attorney with any questions. If you fail to vacate the rental premises pursuant to this termination notice by 12:01 am on January 26, 2024, an FED will be filed against you.

Thank you.

Signed,
Landlord's Agent:
Timothy L Murphy
Murphy Law Group, P.C.
333 NE Russell St., Ste. 200
Portland, OR 97212
Telephone: (503) 550-4894
Facsimile: (503) 296-2633

Exhibit 24 – Page 2 of 5

PDF Page 166

First American Title Company of Oregon

File No.:  7169-2290459
July 22, 2014

**Exhibit "A"**

Real property in the  County of Jackson, State of Oregon, described as follows:

PARCEL I:
COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST 10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 89° 44' 41" WEST 1112.65 FEET TO A 1.5 INCH INSIDE DIAMETER IRON PIPE (RECORD 2 INCH PIPE), FROM WHICH THE CENTER OF A 48 INCH DIAMETER OAK TREE BEARS NORTH 47° EAST 21.4 FEET (RECORD 20.0 FEET), SAID PIPE MARKING THE SOUTHWEST CORNER OF SAID PARCEL DESCRIBED IN DOCUMENT NO. 78-08539; THENCE CONTINUING ALONG THE WESTERLY, NORTHERLY, AND EASTERLY BOUNDARY OF SAID DESCRIBED PARCEL THE FOLLOWING; NORTH 6° WEST 1574.0 FEET, MORE OR LESS, TO THE NORTH LINE OF LOT 4 OF SAID SECTION 33; THENCE EAST 1336 FEET, MORE OR LESS, TO THE SOUTHEAST CORNER OF LOT 4 OF SECTION 34, SAID TOWNSHIP AND RANGE; THENCE NORTH 608 FEET, MORE OR LESS, TO THE NORTHWEST CORNER OF LOT 3 OF SAID SECTION 34; THENCE EAST 736.8 FEET, MORE OR LESS, TO THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE, ALONG SAID RIGHT OF WAY BOUNDARY, SOUTH 7° 13' 10" WEST 1837.72 FEET TO A POINT OF CURVE; THENCE ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 3° 38' 17" WEST 242.34 FEET) A DISTANCE OF 242.50 FEET TO THE POINT OF BEGINNING.

PARCEL II:

Exhibit _A_
Page _1_ of _2_

*First American Title*

Exhibit 24 – Page 3 of 5

PDF Page 167

First American Title Company of Oregon

File No.: 7169-2290459
July 22, 2014

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST 10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 87° 33' 02" EAST 21.12 FEET TO A 5/8" IRON PIN; THENCE NORTH 88° 21' 48" EAST 109.22 FEET TO A 5/8" IRON PIN ; THENCE SOUTH 84° 56' 41" EAST 56.34 FEET TO A 5/8" IRON PIN ; THENCE ALONG THE ARC OF A 460.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS NORTH 81° 05' 40" EAST 221.96 FEET ) A DISTANCE OF 224.17 FEET TO A 5/8" IRON PIN; THENCE NORTH 67° 08' 01" EAST 137.72 FEET TO A 5/8" IRON PIN; THENCE NORTH 89° 17' 20" EAST 16.48 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH NORTH 00° 19' 38" WEST 26.00 FEET) A DISTANCE OF 26.00 FEET TO THE POINT OF BEGINNING.

NOTE: This Legal Description was created prior to January 01, 2008.

Exhibit _A_
Page _2_ of _2_

*First American Title*

Exhibit 24 – Page 4 of 5

PDF Page 168

3/24/2016                                    1000 Upper Applegate Rd - Google Maps

# Google Maps    1000 Upper Applegate Rd    *WINERY LEASE* ↓





Imagery ©2016 Google, Map data ©2016 Google     50 ft



## 1000 Upper Applegate Rd
Jacksonville, OR 97530



Exhibit  _B_

Page _/_ of _/_

https://www.google.com/maps/place/1000+Upper+Applegate+Rd,+Jacksonville,+OR+97530/@42.2248726,-123.0488483,211m/data=!3m1!1e3!4m2!3m1!1s0x5...     1/2

Exhibit 24 – Page 5 of 5

PDF Page 169

Plaintiff's Exhibit 25

# Murphy Law Group P.C.

333 NE Russell St., Ste. 200                           Phone: 503 550 4894
Portland, OR  97212                                    Fax:  503 296 2633

Tim@oregonlandlord.net                                 www.oregonlandlord.net

---

**Sent via certified mail**

January 23, 2024

Valley View Winery, Inc.
c/o Registered Agent Mark Wisnovsky
1000 Upper Applegate Rd.
Jacksonville, OR 97530

James R. Dole
Attorney at Law
Watkinson Laird Rubenstein PC
1203 Willamette St., Ste. 200
Eugene, OR 97401

> RE:     Termination of tenancy of Valley View Winery, Inc.

Dear Mr. Wisnovsky and Mr. Dole:

This office represents Joanne Couvrette, who is the trustee of The Ann M. Wisnovsky Trust and managing member of Wisnovsky Land, LLC.

Wisnovsky Land, LLC is the current landlord to the lease dated March 24, 2016 entered into between The Ann M. Wisnovsky Trust and Valley View Winery, Inc.  The property (hereinafter "Vineyard") described in that lease is:

> THAT PORTION OF THE REAL PROPERTY DESCRIBED IN EXHIBIT A PRESENTLY PLANTED AS A VINEYARD AND LYING FALLOW, BUT EXCLUDING THE SINGLE FAMILY RESIDENCE PRESENTLY OWNED BY THE ANN M. WISNOVSKY, TRUSTEEE OF THE ANN M. WISNOVSKY TRUST, UTD 8/2/12, AND THE TWO PARCELS THAT HAVE BEEN OR MAY BE CREATED UNDER OREGON MEASURE 37 (ORS 197.352). THE PREMISES ARE DEPICTED IN THE MAP ATTACHED AS EXHIBIT B.

See Exhibits A and B to the lease dated March 24, 2016 entered into between The Ann M. Wisnovsky Trust and Valley View Winery, Inc.

Exhibit 25 – Page 1 of 5
PDF Page 171

You are hereby notified that the Vineyard lease dated March 24, 2016 between The Ann M. Wisnovsky Trust and Valley View Winery, Inc., including the first and second and any other addenda, (hereinafter "Vineyard Lease") is terminated immediately. Pursuant to an addendum dated November 2, 2016 to the original March 24, 2016 lease, The Ann M. Wisnovsky Trust assigned its interest in the Vineyard Lease to Wisnovsky Land, LLC.

On November 29, 2023, you were issued a 10-Day Notice of Default for failure to pay the property taxes required pursuant to the Vineyard Lease. You subsequently remitted payment to Jackson County via personal check; however, the check was later returned for insufficient funds.

The Vineyard Lease includes a section regarding termination, which reads:

> **14.1 Termination**. In the event of a default the lease may be terminated at the option of Landlord by written notice to Tenant. Whether or not the lease is terminated by the election of Landlord or otherwise, Landlord shall be entitled to recover damages from Tenant for the default, and Landlord may reenter, take possession of the Premises, and remove any persons or property by legal action or by self-help with the use of reasonable force and without liability for damages and without having accepted a surrender.

This letter serves as written notice of your landlord's termination of the Vineyard Lease. Please contact the undersigned attorney with any questions. If you fail to vacate the rental premises pursuant to this termination notice by 12:01 am on January 26, 2024, an FED will be filed against you.

Thank you.

Signed,
Landlord's Agent:
Timothy L Murphy
Murphy Law Group, P.C.
333 NE Russell St., Ste. 200
Portland, OR 97212
Telephone: (503) 550-4894
Facsimile: (503) 296-2633

Exhibit 25 – Page 2 of 5

PDF Page 172

First American Title Company of Oregon

File No.: 7169-2290459
July 22, 2014

## Exhibit "A"

Real property in the County of Jackson, State of Oregon, described as follows:

PARCEL I:
COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST 10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 89° 44' 41" WEST 1112.65 FEET TO A 1.5 INCH INSIDE DIAMETER IRON PIPE (RECORD 2 INCH PIPE), FROM WHICH THE CENTER OF A 48 INCH DIAMETER OAK TREE BEARS NORTH 47° EAST 21.4 FEET (RECORD 20.0 FEET), SAID PIPE MARKING THE SOUTHWEST CORNER OF SAID PARCEL DESCRIBED IN DOCUMENT NO. 78-08539; THENCE CONTINUING ALONG THE WESTERLY, NORTHERLY, AND EASTERLY BOUNDARY OF SAID DESCRIBED PARCEL THE FOLLOWING; NORTH 6° WEST 1574.0 FEET, MORE OR LESS, TO THE NORTH LINE OF LOT 4 OF SAID SECTION 33; THENCE EAST 1336 FEET, MORE OR LESS, TO THE SOUTHEAST CORNER OF LOT 4 OF SECTION 34, SAID TOWNSHIP AND RANGE; THENCE NORTH 608 FEET, MORE OR LESS, TO THE NORTHWEST CORNER OF LOT 3 OF SAID SECTION 34; THENCE EAST 736.8 FEET, MORE OR LESS, TO THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE, ALONG SAID RIGHT OF WAY BOUNDARY, SOUTH 7° 13' 10" WEST 1837.72 FEET TO A POINT OF CURVE; THENCE ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 3° 38' 17" WEST 242.34 FEET) A DISTANCE OF 242.50 FEET TO THE POINT OF BEGINNING.

PARCEL II:

Exhibit ___A___
Page ___1___ of ___2___

First American Title Company of Oregon

File No.: 7169-2290459
July 22, 2014

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST 10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 87° 33' 02" EAST 21.12 FEET TO A 5/8" IRON PIN; THENCE NORTH 88° 21' 48" EAST 109.22 FEET TO A 5/8" IRON PIN ; THENCE SOUTH 84° 56' 41" EAST 56.34 FEET TO A 5/8" IRON PIN ; THENCE ALONG THE ARC OF A 460.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS NORTH 81° 05' 40" EAST 221.96 FEET ) A DISTANCE OF 224.17 FEET TO A 5/8" IRON PIN; THENCE NORTH 67° 08' 01" EAST 137.72 FEET TO A 5/8" IRON PIN; THENCE NORTH 89° 17' 20" EAST 16.48 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH NORTH 00° 19' 38" WEST 26.00 FEET) A DISTANCE OF 26.00 FEET TO THE POINT OF BEGINNING.

NOTE: This Legal Description was created prior to January 01, 2008.

Exhibit _A_
Page _2_ of _2_

4/4/2016    1000 Upper Applegate Rd - Google Maps

# Google Maps    1000 Upper Applegate Rd



Imagery ©2016 Google, Map data ©2016 Google    200 ft



## 1000 Upper Applegate Rd
Jacksonville, OR 97530

VINEYARD LEASE LANDS EXCLUDE ALL PROPERTY INCLUDED IN THE WINERY LEASE.

Mark Wisnovsky
04/12/16



Exhibit __B__
Page __/__ of __/__

https://www.google.com/maps/place/1000+Upper+Applegate+Rd,+Jacksonville,+OR+97530/@42.2219835,-123.0511662,865m/data=!3m1!1e3!4m2!3m1!1s0x5...    1/2

Exhibit 25 – Page 5 of 5

PDF Page 175

Plaintiff's Exhibit 26

**From:** Mark Wisnovsky <markawisnovsky@gmail.com>
**Sent:** Fri, 03 Mar 2017 16:47:47 -0800
**To:** Joanne Couvrette <jcouvrette@sbcglobal.net>
**Subject:** Fwd: Travel details for ANN MARIE WISNOVSKY on Mar 14, 2017

---

---------- Forwarded message ----------
From: "Chase Ultimate Rewards Travel" <mark@valleyviewwinery.com>
Date: Mar 3, 2017 4:46 PM
Subject: Travel details for ANN MARIE WISNOVSKY on Mar 14, 2017
To: <markawisnovsky@gmail.com>
Cc:



if you have any questions, please call:
**1-866-951-6592**

### Tuesday, Mar 14, 2017

Departing Flight
**1 ticket**

> **Please note:** It's always best to check with your airline for last-minute flight information and seat assignment changes.

 **Delta Air Lines**
**DL 106**
BOEING 737-800 | Economy

| San Diego | | Salt Lake City |
|---|---|---|
| 1:05 PM | 1hr 56min | 4:01 PM |
| SAN | → | SLC |
| Tue, Mar 14 | Non-stop | Tue, Mar 14 |

Additional **Baggage Fees** may apply.

Exhibit 26 – Page 1 of 5

PDF Page 177                                    VALLEYVIEW_001341

## Passenger Information

| Passenger | Flight | Requested Seat |
|---|---|---|
| ANN MARIE WISNOVSKY | Delta Air Lines 106 | |
| | Delta Air Lines 2295 | |

## Rules and Policies

Cancellation:

- If your reservation was made more than 7 days prior to your travel date: Cancellation is allowed in most cases before 9pm Mountain Time the day after you book your ticket for a full refund of the base fare and taxes, with no airline-imposed cancellation fee. A few airlines, such as Spirit, Frontier, Allegiant and Southwest Airlines, may have different timelines for cancellations. Call us for details at 1-866-951-6592.
- If your reservation was made 7 days or less prior to your travel date: Only certain airlines permit free cancellation and a refund of the base fare and taxes, with no airline-imposed cancellation fee, until 9pm Mountain Time the day after your ticket is booked. A few airlines, such as Spirit, Frontier, Allegiant and Southwest Airlines, may have different timelines for cancellations. Airline Fare Rules can be viewed online on your Trip Details page.
- For changes or cancellations outside of the free cancellation period see the Refunds section below.

Refunds:

- This ticket is non-refundable.
- Some non-refundable tickets do not allow any changes. Some non-refundable tickets can be applied (for a limited time) toward future travel, but all changes to your itinerary may result in a fare adjustment and will incur a per ticket airline change fee. Airline Fare Rules can be viewed online on your Trip Details page. Changes or cancellations must be made by calling us at 1-866-951-6592.

General:

- All tickets are non-transferable.
- Carry-on baggage restrictions will apply. Your selected airline's baggage fees will apply. Airlines may charge additional fees for miscellaneous services such as advance seat selection, food and beverage. Fees vary by airline so you must contact

Exhibit 26 – Page 2 of 5

PDF Page 178

VALLEYVIEW_001342

the airline directly or check their website for up to date information and pricing details.

- A small number of air carriers may require us to confirm flight availability when booking. If there is any issue with availability, a travel representative will contact you within 24 hours to make alternate flight arrangements at no additional cost.
- Government-issued photo identification is required at check-in and must match the name on the reservation. If this is an international flight, this reservation requires a passport and may require a visa and satisfaction of health requirements. Please contact the consulate of the destination country for current visa/passport and other entry requirements.
- Please refer to the **Travel Disclosures** for more information.

## Sunday, Mar 19, 2017

### Returning Flight
**1 ticket**

**Please note:** It's always best to check with your airline for last-minute flight information and seat assignment changes.

**Delta Air Lines**
**DL 2295**
AIRBUS INDUSTRIE A319 | Economy

| Salt Lake City | 2hr | San Diego |
|---|---|---|
| 8:35 AM | Non-stop | 9:35 AM |
| SLC | | SAN |
| Sun, Mar 19 | | Sun, Mar 19 |

Additional **Baggage Fees** may apply.

©2017 JP Morgan Chase & Co.                    Privacy

Exhibit 26 – Page 3 of 5
PDF Page 179

VALLEYVIEW_001343

AT&T Yahoo Mail - RE: Confirmation Letter - TUEZRE 04/08/17 - from Alaska Airlines

# RE: Confirmation Letter - TUEZRE 04/08/17 - from Alaska Airlines

From: **Alaska Airlines** <Alaska.IT@alaskaair.com>
Date: Sat, Apr 1, 2017 at 5:15 PM
Subject: Confirmation Letter - TUEZRE 04/08/17 - from Alaska Airlines
To: <JOANNE.COUVRETTE@sduhsd.net>

Confirmation code: TUEZRE

Exhibit 26 – Page 4 of 5
PDF Page 180

You're all set. Thank you for booking with Alaska and we look forward to seeing you on board.

Need to change your flight? Visit us in advance, online at https://www.alaskaair.com/booking/reservation-lookup?eml=WHA_TR_CL_MANAGERESERVATION||EG||&TR_20170401&utm_campaign=20170401&utm_medium=Email&utm_source=Transactional or through reservations at http://www.alaskaair.com/content/about-us/online-help.aspx?eml=WHA_TR_CL_RESERVATIONS||EG||&TR_20170401&utm_campaign=20170401&utm_medium=Email&utm_source=Transactional

Travelers

Ann Wisnovsky

Flight information

Flight: Alaska 2420
Operated By Horizon Air as Alaska Airlines. Check in with Alaska Airlines.
Equipment: Bombardier Q400
Departs: Los Angeles, CA (LAX) on Sat, Apr 8 at 8:20 pm
Arrives: Medford (MFR) on Sat, Apr 8 at 10:34 pm
Class: Y(Coach)
Seats: *

For seat assignments, contact the operating airline using the operating airline's confirmation code.

Prohibited hazardous materials

The Federal Government has specific restrictions about hazardous materials in carry-on and checked baggage. Failure to declare hazardous materials may result in civil and criminal penalties, for more information, visit: http://www.faa.gov/about/initiatives/hazmat_safety

Summary of airfare charges

Traveler: Ann Wisnovsky
Enter your mileage plan number at https://www.alaskaair.com/booking/reservation-lookup?LNAME=WISNOVSKY&RECLOC=TUEZRE&Source=ConfirmationLetter&eml=WHA_TR_CL_ENTERMILEAGEPLANNUMBER||EG||&TR_20170401&utm_campaign=20170401&utm_medium=Email&utm_source=Transactional&TR_20170401&utm_campaign=20170401&utm_medium=Email&utm_source=Transactional
Ticket: 0272137470268
Base Fare and Surcharges: $320.93
Taxes and Other Fees: $38.27
Traveler total:

Total fare: USD  $359.20

View all taxes, fees and charges at https://www.alaskaair.com/booking/reservation-lookup?LNAME=WISNOVSKY&RECLOC=TUEZRE&Action=PriceDetails&Source=ConfirmationLetter&eml=WHA_TR_CL_VIEWTAX||EG||&TR_20170401&utm_campaign=20170401&utm_medium=Email&utm_source=Transactional&TR_20170401&utm_campaign=20170401&utm_medium=Email&utm_source=Transactional

Exhibit 26 – Page 5 of 5

Plaintiff's Exhibit 27

Stephen Brigandi
Law Office of Stephen Brigandi
3624 Caminito Cielo Del Mar
San Diego, CA 92130
Email: sbrigandi@san.rr.com

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF OREGON MEDFORD DIVISION

| | |
|---|---|
| **MICHELLE SULLIVAN, as Personal Representative of the Estate of ANN M. WISNOVSKY, and WISNOVSKY LAND, LLC,** <br> **Plaintiffs,** <br><br> **v.** <br> **MARK A. WISNOVSKY, MICHAEL J. WISNOVSKY, and VALLEY VIEW WINERY, INC.,** <br> **Defendants.** | **DECLARATION OF ANNA MARIA COUVRETTE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS; MOTION FOR SUMMARY JUDGMENT TO DISMISS COUNTERCLAIMS; AND MOTION TO DISMISS MOOT AND PRECLUDED CLAIMS** |

**DECLARATION OF ANNA MARIA COUVRETTE IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

I, Anna Maria Couvrette, declare as follows:

1. **Introduction and Background**

   o I am over the age of 18, and I have personal knowledge of the matters set forth herein.

   o I am the granddaughter of Ann M. Wisnovsky ("Ann"), who is the Trustor of the Ann M. Wisnovsky Trust (the "Trust").

   o I am also the current Co-Trustee of the Ann M. Wisnovsky Trust.

2. **Observations of Ann M. Wisnovsky in 2019**

   o In May 2019, my grandmother visited California to attend my graduation from the University of Southern California. We spent a few days together in Los Angeles and then

Exhibit 27 – Page 1 of 3

PDF Page 183

headed down to San Diego for a graduation party. During this time, I had the opportunity to spend significant time with her and observe her behavior.

o Grandma was active, talkative, and engaged in conversations. She loved to discuss politics, my love life, and my career as an auctioneer. She was sharp and witty. She participated fully in family activities and gatherings.

o While staying at my mother's home, Grandma often cooked, she assisted with planning my graduation celebration, and was social with family and friends who visited during that time.

o Not long after arriving in San Diego, Grandma started asking about making changes to her estate. She stressed that she wanted to ensure that her estate was divided equally and she wanted to change her trust so that changes made to the estate would require two signatures, hers and my mother's. Grandma occasionally expressed impatience with my mother, Joanne, for not immediately addressing matters related to her estate. My mother was busy with work at the time and unable to act as quickly as Grandma wanted.

3. **Lack of Undue Influence or Impairment**

o During the two weeks Grandma stayed with us in California in May 2019, my mother, Joanne Couvrette, was working full-time on weekdays and had limited time to spend with Grandma during the day.

o Grandma was independent in her actions and opinions, often initiating conversations about her own desires to make changes to the estate.

4. **Estate Planning Discussions and Witnessing of Fourth Amendment**

o Grandma mentioned wanting to update her estate plan during her visit before she got on an airplane. I did not see my mother make any legal or financial decisions on Grandma's behalf.

o I personally witnessed Grandma sign the Fourth Amendment to her Trust in the presence of a notary at Wells Fargo Bank. She was clear and deliberate in her decision to execute the amendment.

5. **Care for Ann During Her Time in San Diego**

Exhibit 27 – Page 2 of 3
PDF Page 184

- o During the time Grandma lived in San Diego from July 2019, during the COVID-19 pandemic, and until her death, I observed my mother, Joanne, take excellent care of her. My mother worked closely with UCSD to obtain expensive and complex medical care for Grandma, who had been diagnosed with a rare form of acquired hemophilia.

- o My mother was highly involved in coordinating Grandma's treatment and ensuring she received the best possible care. After an extended stay in the hospital, Grandma lost her ability to walk.

- o My mother worked diligently with physical therapists to learn how to transfer Grandma from her bed or chair to a wheelchair and into the car. She consistently ensured that Grandma's needs were met and provided her with compassionate care.

- o My mother frequently visited Grandma at her assisted living facility and often took her on outings to ensure she remained active and engaged.

6. **Engagement and Intent**

- o Grandma's conversations and actions demonstrated her engagement and enthusiasm for life. She was vocal about her plans and her desire to ensure her wishes were carried out as intended.

- o She remained enthusiastic to discuss politics, my love life, and my career as an auctioneer up until the week she died. Her humor and sharp observations were a constant presence during her time with us.

7. **Conclusion**

- o I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 27th day of January, 2025, in Carlsbad, California.

*s/Anna Maria Couvrette*

_____
Anna Maria Couvrette

Exhibit 27 – Page 3 of 3
PDF Page 185

Plaintiff's Exhibit 28

Joanne Couvrette
13274 Jacarte Court
San Diego, CA  92130
Pro Se

**F I L E D**
Clerk of the Superior Court

JUN 0 6 2024

By: A. Calderón

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

| | |
|---|---|
| In the Matter of the Trust Administration of | Case No.: 24PT000875C |
| THE ANN M. WISNOVSKY TRUST dated August 2, 2012 | ~~PROPOSED~~ ORDERS IN RE: |
| Petitioner: Joanne Couvrette, Trustee | **EX PARTE PETITION FOR AN ORDER ALLOWING RESIGNATION OF TRUSTEE JOANNE COUVRETTE FOR MEDICAL REASONS WITHOUT 30 DAYS NOTICE, WITH SUCCESSOR TRUSTEE ANNA COUVRETTE TO SERVE**<br>**ORS 130.050 UTC 201** |

Hearing held on 6-6-24 at 3:15 pm in San Diego Superior Court, Department 504.  Judge Deniel Belsky presiding.

**ORDERS OF THE COURT**

**FINDINGS:**

1) The San Diego Superior Court has jurisdiction over the Ann M. Wisnovsky Trust, whose Principal Place of Administration is and has been San Diego County.
2) Pursuant to her Doctor's letter, Joanne Couvrette will be unable to do any work during her recovery from surgery and rehabilitation.
3) Pursuant to the Trust as Amended, the current Qualified (Principal and Interest) beneficiaries of the Ann M. Wisnovsky Trust are Joanne Couvrette and Robert Wisnovsky.
4) Section 9.1 of the Ann M. Wisnovsky Trust allows Joanne Couvrette to resign and appoint a Successor Trustee or Co-Trustee.
5) The Court has jurisdiction to make this Order pursuant to:
   **Section 130.620 - UTC 705. Resignation of trustee**
   (1) A trustee may resign:

Exhibit 28 – Page 1 of 2
PDF Page 187

(a) After at least 30 days' notice to the qualified beneficiaries, the settlor, if living, and all cotrustees; or

(b) At any time with the approval of a court.

(2) If a court approves a resignation, the court may issue orders and impose conditions reasonably necessary for the protection of the trust property.

(3) Any liability of a resigning trustee or of any sureties on the trustee's bond for acts or omissions of the trustee is not discharged or affected by the trustee's resignation.

**ORDER:**

1) The Court approves the Resignation of Co-Trustee Joanne Couvrette without 30 days' notice, should it become necessary for medical reasons.

2) Anna Couvrette has consented to be Successor Trustee and will serve as Successor Trustee to Joanne Couvrette, should Joanne choose to resign due to medical reasons.

IT IS SO ORDERED.

Dated: _____6/6/24_____

_____
Judge of the Superior Court

**DANIEL S. BELSKY**

Joanne Couvrette

Exhibit 28 – Page 2 of 2

PDF Page 188

Plaintiff's Exhibit 29

# *Women's*
## *Health, Inc.*

Alan Binetie, M.D.

DBA: *Women's Specialty Group*

FAX: (541) 773-3093

| | |
|---|---|
| Date: | 7/1/19 |
| From: | |
| Business Phone: | |

**SEND TO:**

| | |
|---|---|
| Company: | |
| Attention: | Joanne |
| City/State: | |
| Business Phone: | |
| Fax Phone: | 541-488-4455 |

**COMMENTS:**

| |
|---|
| |
| |
| |
| |

**NUMBER OF PAGES INCLUDING THIS COVER: 2**

The data contained in this facsimile message is privileged and confidential information intended for the use of the addressee listed above. If you are neither the intended recipient or the employee/agent responsible for delivering this information to the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking of any action in reliance on the content of this tele-copied information is strictly prohibited. If you have received this copy in error, please immediately notify us by telephone to arrange for return of the original documents to us. If these documents are part of a medical record, they may not be further disclosed to anyone without the specific written authorization of the person involved. (ORS 433.045 and OAR 333-12-270 )

Exhibit 29 – Page 1 of 2

PDF Page 190

**ANN M. WISNOVSKY**                          **06/24/19**

She is an 86-year-old, gravida 5, para 4, AB 1, white female, who is brought in her by son, Mark. He feels that she has had several months of fairly pronounced decline in mental acuity. The patient does not feel that that is the case. She is scrappy nearly 87-year-old, who has been the matriarch of the Wisnovsky family since the inception and is to me clinically quite collected and capable. A Mini Mental Status exam is performed and passed without difficulty. Her son is concerned about her memory loss.

**PLAN:** I will refer her for a CT scan of the head, in addition to a high sensitivity C-reactive protein, sed rate, $B_{12}$, folic acid, hemoglobin A1c, ferritin, VDRL, ANA, vitamin $D_3$, Chem-14, TSH, free $T_4$ and lipid panel. I will see her back for further evaluation upon conclusion of these studies. The patient seems quite capable to me and I cannot help but feel that there may be an unspoken agenda on the part of her son.
All of her questions were answered.
Alan Binette, M.D./bas

**LABS: TSH**_____, **free $T_4$**_____, **$B_{12}$**_____, **vitamin $D_3$**_____,
**high sensitivity C-reactive protein**_____, **sed rate**_____, **folic acid**_____,
**hemoglobin A1c**_____, **ferritin**_____, **VDRL**_____, **ANA**_____,
**lipid panel**_____,
**Chem-14**_____.
**********************************************************************************************************

Exhibit 29 – Page 2 of 2

PDF Page 191

Plaintiff's Exhibit 30



## INTER VIVOS REVOCABLE TRUST
## THE ANN M. WISNOVSKY TRUST

THIS AGREEMENT, made this 2nd day of August, 2012, by and between ANN M. WISNOVSKY, hereinafter called the "Grantor", and ANN M. WISNOVSKY and JOANNE COUVRETTE, hereinafter called the "Trustee".

The parties agree as follows:

Section 1.  PROPERTY OF THE TRUST.

1.1  Initial Property.  The Grantor has simultaneously with the execution of this agreement executed and delivered to the Trustee documents for transferring and conveying to the trust title to certain real and/or personal property, which Trustee agrees to hold on the terms and conditions and for the purposes set forth herein, which trust shall be known as "THE ANN M. WISNOVSKY TRUST".

1.2  Additional Property.  The Grantor and any other person shall have the right at any time to make additions to the corpus of this trust.  All such additions shall be held, controlled and distributed by the Trustee in accordance with the terms and conditions of this agreement.

Section 2.  OPERATION OF THE TRUST DURING GRANTOR'S LIFETIME.

2.1  Restriction of Investment.  During the Grantor's lifetime, while not incapacitated to the extent that Grantor is

1 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust



PLAINTIFF'S EXHIBIT

224

Exhibit 30 – Page 1 of 44

PDF Page 193

JCOUVRETTE005258

unable to manage Grantor's business affairs, and in the absence of written instructions to the contrary delivered by the Grantor to the Trustee, the Trustee shall refrain from making any investments or changes of investments except those which the Grantor, on terms specified by Grantor, in writing, may direct. Except for such incapacity to act, Trustee shall exercise all power granted to Trustee herein and at all times shall hold, manage, invest and reinvest the property and shall collect and receive the income therefrom, and after deducting all necessary expenses incident to the administration of the trust, shall dispose of the trust assets as set forth herein.

2.2  Payment to Grantor.  The Trustee shall pay to the Grantor or to Grantor's order the net income and principal of the trust estate in such amount and at such times as Grantor shall request in writing delivered to the Trustee.

2.3  Upon Grantor's Incapacity.  In addition to the payments from income and principal as above provided, Trustee shall, in the event that Grantor shall become incapacitated by reason of illness, accident, or other emergency, during the period of such incapacity, pay to or apply directly for the benefit of Grantor such sums from either income or principal as the Trustee, in the reasonable exercise of Trustee's discretion, shall deem necessary or advisable to provide proper care,

2 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 2 of 44

PDF Page 194

JCOUVRETTE005259

support, and maintenance of the Grantor without regard to other means available for such purposes.

2.4   Accounting.   During the lifetime of Grantor, the Trustee shall render an account of receipts and disbursements to the Grantor whenever requested.   Following the death of Grantor, the Trustee shall render to the beneficiaries of the trust an account of receipts and disbursements not less often than annually.   Grantor's or the Beneficiaries' written approval of said account, or failure to object to said account within 120 days after the rendering of the account, shall, as to all matters and transactions disclosed by said account, be binding upon all who are then or who may thereafter become entitled to the income or principal.

Section 3.   DIVISION AND DISTRIBUTION UPON DEATH OF GRANTOR.

3.1   Expenses of Last Illness, Funeral, Burial.   Upon the death of Grantor, Trustee may apply such sums from the assets of the trust estate as are needed to pay the expenses of Grantor's last illness, funeral and burial, all income and property taxes properly chargeable against the estate, and any expenses incurred for the purpose of disposing of or distributing this trust estate.

3.2   Death Taxes.   The Trustee may pay all inheritance, estate or other death taxes which may be assessed by reason of

3 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 3 of 44
PDF Page 195

JCOUVRETTE005260

Grantor's death on any property or interest therein which is included in Grantor's gross estate for tax purposes irrespective of whether or not such property, or interest therein, is properly subject to probate or passes under the Trust Agreement or otherwise. Any such tax payment shall be made from the trust estate as a whole and shall not be charged against the respective beneficiaries' shares in the trust estate, and the Trustee shall not seek reimbursement from anyone therefor.

3.3 Final Distribution. After full payment of the expenses above set forth, all of the rest, residue and remainder of this trust shall be distributed as follows:

A. All household goods, books, apparel, tools, art objects, jewelry, personal effects, and other like contents of Grantor's residence and any vacation property which Grantor or the trust owns or in which Grantor resides at the time of Grantor's death, and all unexpired insurance policies on such property, shall be distributed to JOANNE COUVRETTE, ROBERT F. WISNOVSKY, MARK A. WISNOVSKY and MICHAEL J. WISNOVSKY to be divided among them by the Trustee as the Trustee, in the Trustee's discretion, feels is most equitable and practicable. If any of said individuals predecease Grantor, said individual's share of such personal property may be distributed to said individual's surviving lineal descendants, by right of representation. The Trustee, in making such decision, shall take

4 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 4 of 44

PDF Page 196

JCOUVRETTE005261

into consideration a letter written by Grantor stating Grantor's desires with regard to the division of such personal property. A copy of this letter has been kept with the original of this Trust Agreement. The Trustee, in making such decision, shall further take into consideration the personal preferences of the individuals who are to receive such personal property. All reasonable expenses of packing, insuring and delivering any of such items to a beneficiary shall be paid by the Trustee as an expense of the trust.

B.    If, at or after the time of Grantor's death, the Trust owns or receives stock of VALLEY VIEW WINERY, INC., an Oregon corporation, all of such stock shall be distributed as follows: JOANNE COUVRETTE, 20,000 shares; ROBERT F. WISNOVSKY, 20,000 shares; MARK A. WISNOVSKY, 7,115 shares; and MICHAEL J. WISNOVSKY, 7,115 shares.

C.    The rest, residue and remainder of this trust shall be divided into four (4) equal shares. One of such shares shall be distributed to JOANNE COUVRETTE; one of such shares shall be distributed to ROBERT F. WISNOVSKY; one of such shares shall be distributed to MARK A. WISNOVSKY; and one of such shares shall be distributed to MICHAEL J. WISNOVSKY.

D.    If any beneficiary under this trust shall die prior to receiving distribution of his or her share of the rest, residue and remainder of this trust, the distribution to said

5 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 5 of 44

PDF Page 197

JCOUVRETTE005262

beneficiary shall lapse and the rest, such share of the residue and remainder of this trust shall be distributed to said beneficiary's lineal descendants, by right of representation. Except as provided in Subsection 3.3 B, above, if any beneficiary under this trust shall die prior to receiving distribution of his or her share of the rest, residue and remainder of this trust, leaving no lineal descendants surviving, the distribution to said beneficiary shall lapse, and such share of the rest, residue and remainder of this trust shall be distributed in equal shares to the surviving lineal descendants or Grantor by right of representation.

E.   Notwithstanding the foregoing, if any beneficiary (hereafter, "Beneficiary") of this trust is not "Of Age", as defined below, at the time distribution to the Beneficiary is to occur, such Beneficiary's share of the this trust shall be held in further trust and shall be administered and distributed as provided herein:

i)   During the time that the Beneficiary is under the age of eighteen (18) years, the Trustees shall pay to or apply for the benefit of the Beneficiary, from his or her share of the trust estate, such portions of the income and principal as the Trustee may determine to be necessary or advisable for the health, education, support and maintenance of the Beneficiary.

6 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 6 of 44

PDF Page 198

JCOUVRETTE005263

ii)   At such time as the Beneficiary attains the age of eighteen (18) years, the payments and applications of funds to or for such Beneficiary, as provided for above, shall cease, provided, however, that the Trustee may pay to or apply for the benefit of the Beneficiary, such portions of the income and principal of his or her share of the trust estate as are, in the Trustee's sole discretion, reasonably required to meet any serious illness, medical emergency or other emergency affecting the Beneficiary or as are reasonably necessary for so long as the Beneficiary is a student regularly attending school, community college, college or university, or regularly attending a course of vocational or technical training designed to fit him or her for gainful employment.

iii) At such time as the Beneficiary becomes Of Age, his or her share of the trust estate shall be distributed to the Beneficiary.

iv)   As used herein, "Of Age" shall mean the age of thirty (30) years.

Section 4.   FAILURE OF BENEFICIARY.

If under any contingency not herein provided for there remains property for which there is no named or described beneficiary either as to principal or income, such property shall be distributed forthwith to those persons then living who would be entitled to receive Grantor's intestate personal property as

7 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 7 of 44
PDF Page 199

JCOUVRETTE005264

determined by the laws of the state of Grantor's domicile in force at the time of Grantor's death.

Section 5.  BENEFICIARY PROTECTION.

No beneficiary shall have any assignable interest in any trust created under this instrument or in the income therefrom.  Neither the principal nor the income shall be liable for the debts of any beneficiary.  No beneficiary shall have any power to sell, assign, transfer, encumber or in any other manner to anticipate or dispose of his or her interest in the trust or the income produced thereby prior to its actual distribution by the Trustee to the beneficiary, or to another for the benefit of the beneficiary, in a manner authorized by this instrument.

Section 6.  TERMINATION OF TRUST.

Unless sooner terminated or vested in accordance with other provisions of this instrument, all interests not otherwise vested, including, but not limited to, all trusts and powers of appointment created hereunder shall terminate 90 years following the date hereof.  At the end of that time, distribution of all those interests shall be made to the persons then entitled to distributions of income and in the manner and proportions herein stated, or, if not stated, equally, irrespective of their ages.

Section 7.  UNDISTRIBUTED INCOME.

Unless otherwise provided herein, income accrued, accumulated or undistributed upon the termination of any estate

8 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 8 of 44

PDF Page 200

JCOUVRETTE005265

or interest under any trust, shall go to the recipient entitled to the next eventual interest.  Any income which is not distributable or which is not distributed pursuant to the terms of any trust shall be accumulated, added to and thereafter administered as part of the principal of the trust.

Section 8.  SURVIVORSHIP.

If any beneficiary under this trust dies within ninety (90) days after Grantor's death, all of the provisions in this trust for the benefit of such person shall lapse and this trust shall be construed as if such person predeceased Grantor.

Section 9.  SUCCESSIVE TRUSTEES.

9.1  Successor Trustee.  In the event that either of the Co-Trustees appointed pursuant to this Trust Agreement shall die, resign, or become incapacitated, or cease to act as Trustee for any reason whatsoever, the other of such Co-Trustees shall continue to serve as Trustee with full powers of the Trustee. Grantor or JOANNE COUVRETTE may, at any time, by written declaration appoint a Co-Trustee and/or Successor Trustee, and, in the event both Co-Trustees appointed pursuant to this Trust Agreement shall die, resign, or become incapacitated, or cease to act as Trustee for any reason whatsoever, such appointed Co-Trustee or Successor Trustee shall serve as Trustee hereunder, with full powers of the Trustee.

9 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 9 of 44
PDF Page 201

JCOUVRETTE005266

9.2  <u>Trustee Compensation</u>.  The Trustee shall be entitled to reasonable compensation for its services (if a corporate trustee, pursuant to its current schedule of fees from time to time in effect) and to reimbursement for any expenses reasonably incurred in the management, custody and preservation of the trust property; such fees and charges shall constitute a lien on the trust property.  Further, the Trustee shall be entitled to employ custodians, investment managers and sub-investment managers, as well as attorneys, accountants and other agents to assist Trustee in the administration of the Trust.  Reasonable compensation for all services performed by these agents shall be paid as specifically provided herein, or if not, out of income or principal, as Trustee in Trustee's discretion shall determine, and unless agreed to in writing by Grantor and Trustee, shall not decrease the compensation to which Trustee is entitled hereunder.

9.3  <u>Trustee Resignation</u>.  Any Trustee shall have the right to resign at any time during the life of a Grantor by giving notice in writing to Grantor, and, at any time after Grantor's death by giving notice in writing to the then income beneficiary(ies) of the trust.

9.4  <u>Trustee Removal</u>.  Any Trustee may be removed before the death of the Grantor by a written notice of such removal signed by Grantor, in which event the Successor Trustee

10 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 10 of 44

PDF Page 202

JCOUVRETTE005267

named herein shall assume the duties of Trustee unless Grantor has selected a different Successor Trustee. After the Grantor's death or incapacity, any corporate Trustee may be removed as Trustee and replaced by another corporate Trustee as a majority of the trust income beneficiaries may determine. When a majority of the income beneficiaries of any trust or share established hereunder shall exercise the power of removal pursuant to this paragraph, such power shall be exercised by written notice specifying the date of removal.

9.5 <u>Alternate Trustee for Special Property</u>. In the event the Trustee is unwilling or unable to act with respect to any trust property, the Trustee shall have the power to designate in writing an individual, bank trust department or trust company to act as an alternate Trustee with respect to any specified trust property. The alternate Trustee shall have all of the Trustee Powers with respect to the specified property provided for by this trust agreement unless otherwise limited in writing by the delegating Trustee. Any alternate Trustee may resign at any time by delivery of an instrument in writing to the delegating Trustee, and the delegating Trustee may at any time remove the alternate Trustee.

9.6 <u>Delegation of Investment Discretion</u>. The Trustee is hereby authorized to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms,

11 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 11 of 44

PDF Page 203

JCOUVRETTE005268

distribution requirements and other circumstances of the trust. The Trustee is specifically authorized to employ agents, brokers, custodians, investment counsel and attorneys, and to delegate to them the discretionary authority to make purchases and sales of investments otherwise authorized for the Trustee, and the Trustee shall not be liable for any loss or damage which may result from such investments.

9.7 Corporate Trustee. If any corporate Trustee is merged or voluntarily liquidated into or consolidated with another entity having the required fiduciary powers, the successor shall have all powers granted to the original corporate Trustee.

9.8 Beneficiary or Court Appointment. If, at any time, there shall not be a Trustee of any trust provided for herein, a majority in interest of those beneficiaries of such trust to whom income may then be paid may appoint a Successor Trustee or Trustees. Those beneficiaries not of legal age or capacity shall be represented by their guardians, if any. Appointments shall be made by an instrument in writing acknowledged by each person executing the same and shall specify whether the successor Trustee(s) shall serve with or without bond. If a majority in interest of such beneficiaries is unable to determine the appointment of a successor Trustee or Trustees, any of such beneficiaries may apply to a court of competent

12 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 12 of 44
PDF Page 204

JCOUVRETTE005269

jurisdiction for the appointment of a successor Trustee or Trustees by Court order.

9.9  <u>Transfer to and Responsibility of Successor Trustee</u>.  All rights, title and interest in the property of the Trust shall immediately vest in the successor Trustee(s) at the time of appointment.  The prior Trustee shall, without warranty, transfer to the successor Trustee(s) the existing trust property. No successor Trustee shall be under any duty to examine, verify, question or audit the books, records, accounts or transactions of any preceding Trustee; and no successor Trustee shall be liable or responsible for any acts or defaults of any predecessor Trustee, nor for any loss or expense from or occasioned by anything done or neglected to be done by any predecessor Trustee. A successor Trustee shall be liable only for its own acts and defaults.

Section 10.  TRUSTEE'S POWERS.

10.1  <u>Powers</u>.  With respect to any trust created under this instrument, the Trustee is empowered to do all things appropriate for the orderly administration of the trust estate subject to the Trustee's power and control unless otherwise specifically provided herein.  Co-Trustees serving hereunder shall each have the full powers of the Trustee, which powers may be exercised independently by each Co-Trustee, without the knowledge or consent of the other Co-Trustee.  Without limiting

13 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 13 of 44
PDF Page 205

JCOUVRETTE005270

this general power and without limitation of other powers by Grantor or otherwise possessed by Trustee, including those specified in the Uniform Trustee's Powers Act in effect in Oregon as may be amended from time to time, the Trustee shall have the following powers and discretion, which the Trustee shall exercise in such manner and upon such terms and conditions as the Trustee shall deem necessary, desirable or convenient.

A.  To retain any property for such period as the Trustee may deem desirable, whether or not such property is productive of any income and independent of any requirement of diversification.

B.  To receive additions to the assets of the estate from any source.

C.  To continue or participate in the operation of any business or other enterprises, including as a sole proprietor or as a partner in any manner, or as a shareholder, and to effect any form of incorporation, dissolution, liquidation, reorganization or other change in the form of the organization of the business or enterprise, or to contribute capital or to loan money to a business or enterprise.

D.  To invest and reinvest in any assets without limitation by any law applicable to investments by fiduciaries, in securities, including common or preferred stock, mortgages, notes, subordinate debentures and warrants of any corporation,

14 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 14 of 44
PDF Page 206

JCOUVRETTE005271

any common trust fund now or hereafter administered by any Trustee or other property, real or personal, including but not limited to savings accounts and deposits, interests in mutual or money market funds or investment trusts, annuities and insurance (which may be owned by the insured or by the estate of any other person), without being restricted to statutory investments and whether or not such investments are unsecured or of a wasting nature.

E.    To acquire, grant or dispose of property, including puts, calls and options, including options on stock owned by the estate, for cash or on credit, including maintaining margin accounts with brokers, at public or private sale, upon such terms and conditions as the Trustee may deem advisable, and to manage, develop, improve, exchange, partition, change the character of, abandon property or any interest therein, or otherwise deal with property.

F.    To borrow, guarantee or indemnify in the name of the estate and to secure any such loan or obligation by mortgage, encumbrance, pledge, or other security interest, and to renew, modify, extend or amend any such obligation, for a term with or extending beyond the term of the estate.    No lender shall be bound to see to or be liable for the application of the proceeds of any obligation, and no Trustee shall be personally liable for any obligation.

15 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 15 of 44

PDF Page 207

JCOUVRETTE005272

G.    To enter for any purpose into a lease as lessor or lessee with or without option to purchase or renew for a term within or extending beyond the term of the estate.

H.    To enter into a lease, pooling or unitization agreement, or other arrangement for exploration, development, operation, conservation and removal of minerals or other natural resources.

I.    To vote a security, in person or by general or limited proxy, to participate in or consent to any voting trust, and to deposit securities with and transfer title to a protective or other committee.

J.    To hold a security or other property in the name of a nominee (including "street name" of a broker) or in other form without disclosure of the fiduciary relationship so that title may pass by delivery, but the Trustee is liable for any act of the nominee in connection with the assets so held.

K.    To insure the estate against any risk, and the Trustee against liability with respect to third persons.

L.    To compromise, release and adjust any debt, claim or controversy, and to submit any matter to arbitration.

M.    To pay any taxes, assessments, reasonable compensation of the Trustee, and other expenditures (including legal and accounting fees) incurred in the collection, management, care, protection and conservation of the estate.

16 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 16 of 44
PDF Page 208

JCOUVRETTE005273

N.   To allocate items of income or expenditure to either income or principal and to create reserves out of the income, all as provided by law and to the extent not so provided to allocate or create reserves as the Trustee, in its discretion, deems appropriate, and the Trustee's decision made in good faith with respect thereto shall be binding and conclusive upon all persons.

O.   To pay any sum or distribute any property distributable to a beneficiary who is a minor, incompetent, under legal disability, or a person whom the Trustee deems to be unable wisely or properly to handle property if paid to him directly, in any one or more of the following ways, without liability to the Trustee:

1.   Directly to the beneficiary;

2.   To the natural guardian, legal guardian, conservator, or custodian under the appropriate Uniform Gifts to Minors law or any other fiduciary for the beneficiary;

3.   To any person or organization furnishing health care, support, maintenance or education of the beneficiary;

4.   By making expenditures directly for the health care, support, maintenance or education of the beneficiary;

17 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 17 of 44

PDF Page 209

JCOUVRETTE005274

P.    To make distributions in cash or in specific property, real or personal, or an undivided interest therein, or partly in cash and partly in such property, and to make pro rata or non pro rata distributions of cash or property, or any combination thereof, among the beneficiaries without regard to any difference in tax basis of the assets.

Q.    To engage persons, including attorneys, auditors, investment advisors, custodians (including stock clearing corporations or depositories) or agents to advise or assist the Trustee, and to delegate to them Trustee's powers.

R.    To prosecute, defend, contest or otherwise litigate actions, suits, claims or proceedings for the protection or benefit of the estate and the Trustee.

S.    Except as otherwise provided herein, the Trustee in the exercise of its duties is authorized to do all acts that might legally be done by an individual in absolute ownership and control of property.

T.    With regard to record keeping for investment transactions, the Trustee need not provide confirmations or alternate reports, except that evidence or a report of security transactions should be set forth in any periodic accountings by the Trustee.

18 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 18 of 44

PDF Page 210

JCOUVRETTE005275

U.    To make ordinary or extraordinary repairs or alterations in buildings or other structures, to demolish any improvements, to raze existing or erect new party walls or buildings, and to use as much of the income and principal of the estate as necessary to establish a reserve for payment of taxes, insurance premiums, assessments, debts, claims, maintenance, repairs, management fees and related costs with respect to property of the estate.

V.    To serve as director, trustee, receiver, officer or employee of any corporation or company, the stock, bonds, or securities of which are held by the estate, and to receive such compensation for such services as would be proper were the services performed by an individual not a Trustee.

W.    Except as otherwise provided herein, if there shall be more than one Trustee acting, and if they are unable to agree on any matter, power, duty or exercise of discretion in connection with the estate, the decision of a majority of the acting Trustees shall prevail.

10.2  Additional Trustee's Powers.  The Trustee is authorized, in his discretion:

A.    To claim deductions available to Grantor's estate on inheritance or estate tax returns or on state and federal income tax returns.

19 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 19 of 44

PDF Page 211

JCOUVRETTE005276

B.     To use date of death values or alternate valuation date values for estate tax purposes.

C.     To make any other election or decision available under any federal or state tax laws, including but not limited to:

1.     Filing income tax returns for the year in which Grantor's death occurred and for any previous year for which a return has not been filed prior to Grantor's death.

2.     Paying in full any debt of Grantor, any tax shown on any income tax return or gift tax return filed by Grantor, Grantor's personal representative or the Trustee, and any additional tax and interest that may be assessed as a result of the audit of any such return.

10.3    Restrictions During Lifetime of Grantor.  During Grantor's lifetime, while not incapacitated to the extent that Grantor is unable to manage Grantor's business affairs, the Trustee shall exercise the powers above granted only in accordance with the written direction of the Grantor.  Such direction shall be followed by the Trustee, who shall not be liable for depreciation or loss incurred by reason of sales, exchanges, purchases, or other action taken pursuant to such direction, or by reason of inaction on the part of the Trustee should the Grantor fail to give such direction.

20 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 20 of 44

PDF Page 212

JCOUVRETTE005277

Section 11. AMENDMENT AND REVOCATION.

Grantor reserves the right at any time or times to amend or revoke this instrument, in whole or in part, by an instrument or instruments in writing signed by Grantor and delivered to any acting Trustee. If this instrument is revoked in its entirety, the revocation shall take effect upon the delivery of the required writing to the Trustee and thereupon the Trustee shall deliver to Grantor, as the Grantor may direct in the instrument of revocation, all the trust property, and shall execute any conveyances or other documents of transfer necessary for such purpose.

Section 12. MISCELLANEOUS PROVISIONS.

12.1 Use of Term "Trustee". References in this instrument to "Trustee" shall include not only the original Trustee named herein, but also any additional or successor Trustee(s). Unless otherwise provided herein, the survivor(s) of Co-Trustees shall continue to serve as Trustee upon the death of one of the Co-Trustees.

12.2 Incapacity. For purposes of this trust, incapacity shall be determined by the opinion, to be evidenced and given in writing, of the primary physician of the incapacitated person.

21 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 21 of 44
PDF Page 213

JCOUVRETTE005278

12.3  <u>Child, Children and Descendants</u>.  References in this instrument to "child" or "children" mean lawful adopted or blood descendants in the first degree of the parent designated and shall further include any other child or children born after the execution of this agreement.  "Descendants" shall mean all lineal descendants except lineal descendants of living parents.

12.4  <u>Right of Representation</u>.  Distribution by "right of representation" shall be by distribution of the share of any deceased beneficiary who left descendants surviving among such descendants of the same degree of kindred, but in the event of unequal degrees of kindred, the share of any deceased descendant leaving descendants surviving shall be distributed among such surviving descendants.

12.5  <u>Certified Copies</u>.  To obtain the effect as if it were the original, anyone may rely upon a copy certified by a notary public to be a true copy of this instrument and of the writings, if any, endorsed thereon or attached thereto.  Anyone may rely on any statement of fact certified by anyone who appears from the original document or certified copy thereof to be a Trustee hereunder.

12.6  <u>Applicable Law</u>.  Except as otherwise provided in this agreement, the construction of this agreement shall be determined in accordance with Oregon law.  For purposes of determining the distribution of any of the trust estate and the

22 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 22 of 44

PDF Page 214

JCOUVRETTE005279

rights of beneficiaries, Oregon law regarding wills existing at the date of this agreement shall be applied as if Grantor was a testator and the beneficiaries were devisees.

IN WITNESS WHEREOF, ANN M. WISNOVSKY, as Grantor, and ANN M. WISNOVSKY and JOANNE COUVRETTE, as Trustee, have signed and acknowledged this agreement the day and year first above written.

_____
ANN M. WISNOVSKY

"Grantor"

_____
ANN M. WISNOVSKY

_____
JOANNE COUVRETTE

"Trustee"

23 - Inter Vivos Revocable Trust - The Ann M. Wisnovsky Trust

Exhibit 30 – Page 23 of 44

PDF Page 215

JCOUVRETTE005280

**FIRST AMENDMENT**
**TO**
**INTER VIVOS REVOCABLE TRUST**
**THE ANN M. WISNOVSKY TRUST**

I, ANN M. WISNOVSKY, am the Grantor and Trustee under that certain Inter Vivos Revocable Trust, dated August 2, 2012, establishing THE ANN M. WISNOVSKY TRUST. I hereby amend the said trust as follows:

The provisions of Section 3.3B are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"B. All of the interest of the trust estate in Wisnovsky Land, LLC, an Oregon limited liability company, shall be divided into shares as follows: twenty-five percent (25%) for JOANNE COUVRETTE; twenty-five percent (25%) for ROBERT F. WISNOVSKY; twenty-five percent (25%) for MARK A. WISNOVSKY; and twenty-five percent (25%) for MICHAEL J. WISNOVSKY. The shares as so established shall be distributed to the respective beneficiaries for which the shares are created."

The provisions of Section 3.3C are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"C. The rest, residue and remainder of this trust shall be divided into shares as follows: thirty-five percent (35%) for JOANNE COUVRETTE; thirty-five percent (35%) for ROBERT F. WISNOVSKY; fifteen percent (15%) for MARK A. WISNOVSKY; and fifteen percent (15%) for MICHAEL J. WISNOVSKY. The shares as so established shall be distributed to the respective beneficiaries for which the shares are created."

As amended by this First Amendment to Inter Vivos Revocable Trust, I hereby ratify and affirm the Inter Vivos Revocable Trust, dated August 2, 2012.

Exhibit 30 – Page 24 of 44
PDF Page 216

IN WITNESS WHEREOF, this First Amendment to Inter Vivos Revocable Trust is executed on the 14th day of March, 2016.

_____
ANN M. WISNOVSKY
                                    "Grantor"

_____
ANN M. WISNOVSKY
                                    "Trustee"

Exhibit 30 – Page 25 of 44
PDF Page 217

2   - Second Amendment to Inter
      Vivos Revocable Trust



## SECOND AMENDMENT
## TO
## INTER VIVOS REVOCABLE TRUST
## THE ANN M. WISNOVSKY TRUST

I, ANN M. WISNOVSKY, am the Grantor and Trustee under that certain Inter Vivos Revocable Trust, dated August 2, 2012, establishing THE ANN M. WISNOVSKY TRUST. On March 14, 2016, I executed a First Amendment to said trust. This Second Amendment supercedes the First Amendment, which shall be of no further force or effect. I hereby amend the said trust as follows:

The provisions of Section 3.3B are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"B.    The trust estate includes a 100% membership interest in Wisnovsky Land, LLC, an Oregon limited liability company ("Wisnovsky Land"). Grantor and Wisnovsky Land, LLC, have entered into a Redemption Agreement that creates a binding commitment for the redemption of one-half of the trust's membership interest in Wisnovsky Land. The purchase price for the redemption of such membership interest shall be paid pursuant to a promissory note in the amount of $200,000.00, $240,000.00 or $280,000.00, depending on the number of legal parcels in the real property owned by Wisnovsky Land on the date of closing of the redemption. The promissory note will be secured by a trust deed that will encumber the real property owned by Wisnovsky Land. The Trustee is directed to consummate the transaction described in the Redemption Agreement. The trust's remaining membership interest in Wisnovsky Land shall be divided into shares as follows: fifty percent (50%) for MARK A. WISNOVSKY; and fifty percent (50%) for MICHAEL J. WISNOVSKY. The shares as so established shall be distributed to the respective beneficiaries for which the shares are created. The Trustee shall distributed to each of JOANNE COUVRETTE and ROBERT F. WISNOVSKY an undivided one-half interest in the promissory note and trust deed described in this Section 3.3B, which are to be executed and delivered pursuant to the Redemption Agreement."

Exhibit 30 – Page 26 of 44
PDF Page 218

The provisions of Section 3.3C are revoked in their entirety, and in lieu thereof, the following provisions shall be substitut

      "C.   The rest, residue and remainder of this trust shall be divided into shares as follows:  thirty-five percent (35%) for JOANNE COUVRETTE; thirty-five percent (35%) for ROBERT F. WISNOVSKY; fifteen percent (15%) for MARK A. WISNOVSKY; and fifteen percent (15%) for MICHAEL J. WISNOVSKY.  The shares as so established shall be distributed to the respective beneficiaries for which the shares are created."

As amended by this Second Amendment to Inter Vivos Revocable Trust, I hereby ratify and affirm the Inter Vivos Revocable Trust, dated August 2, 2012.

IN WITNESS WHEREOF, this Second Amendment to Inter Vivos Revocable Trust is executed on the 23rd day of February, 2017.

_____
ANN M. WISNOVSKY
              "Grantor"

_____
ANN M. WISNOVSKY
              "Trustee"

Exhibit 30 – Page 27 of 44
PDF Page 219

2   - Second Amendment to Inter
      Vivos Revocable Trust

the promissory note and trust deed described in this Section 3.3B, which are to be executed and delivered pursuant to the Redemption Agreement.

ii) If the trust estate includes the following described real property (the "Home"), the Trustee shall have the Home appraised by an appraiser in Medford, Oregon, who shall be selected by the Trustee. Following receipt of the appraisal, the Trustee shall mail a copy thereof to ROBERT F. WISNOVSKY, and he shall have the sole and exclusive option ("Option") to purchase an undivided one-half interest in the Home in the manner and for the price stated herein. The "Term" of the Option shall commence on the date the Trustee mails a copy of the appraisal to ROBERT W. WISNOVSKY and shall expire 120 days thereafter. The Option shall be exercised, if at all, by written notice (the "Exercise Notice") given by ROBERT W. WISNOVSKY to the Trustee at any time during the Term. The "Purchase Price" shall be the 95% of one-half of the appraised value of the Home, as determined by the appraiser. The purchase price for the Home shall be paid in cash. Closing of the sale and purchase (the "Closing") shall occur on a date (the "Closing Date") selected by ROBERT W. WISNOVSKY, but in all events the Closing shall occur within 90 days after the date that the Exercise Notice is given. The Trustee and ROBERT W. WISNOVSKY shall each pay one-half of the escrow fee of the title company with respect to the Closing. The Trustee shall pay the premium for an owner's title insurance policy that the Trustee shall cause to be provided to ROBERT W. WISNOVSKY. ROBERT W. WISNOVSKY shall pay the fee for recording the deed described below. One-half of the real property taxes and assessments payable with respect to the tax year in which Closing occurs shall be prorated between the Trustee and ROBERT W. WISNOVSKY as of the Closing Date. At the Closing, the Trustee shall execute, acknowledge, and deliver to ROBERT W. WISNOVSKY a Statutory Warranty Deed conveying the undivided one-half interest in the Home to ROBERT W. WISNOVSKY, subject only to taxes for the current tax year and easements and restrictions not materially affecting title. If ROBERT W. WISNOVSKY purchases the undivided one-half interest in the Home, the Trustee shall distribute to him the remaining undivided one-half interest in the Home, subject to real property taxes and assessments payable with respect to the tax year in which Closing occurs, and no other monetary liens, and the Trustee shall distribute to JOANNE COUVRETTE all of the net proceeds of the sale of the undivided one-half interest in the Home. If ROBERT

2  - Third Amendment to Inter Vivos Revocable Trust

Exhibit 30 – Page 28 of 44
PDF Page 220

Exhibit 30 – Page 29 of 44
PDF Page 221

W. WISNOVSKY does not purchase the undivided one-half interest in the Home, the Home shall be distributed to JOANNE COUVRETTE and ROBERT F. WISNOVSKY, in equal shares.

Real property commonly known as 1352 Applegate Road, in the County of Jackson, State of Oregon, described as follows:

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 33, TOWNSHIP 38 SOUTH, RANGE 3 WEST OF THE WILLAMETTE MERIDIAN, JACKSON COUNTY, OREGON; THENCE NORTH 39° 48' 33" EAST 2122.16 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD, SAID PIN BEING 30.00 FEET RIGHT OF ENGINEER'S CENTERLINE STATION PT 69+35.8; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS NORTH 3° 51' 13" WEST 264.58 FEET) A DISTANCE OF 264.79 FEET TO A 5/8" IRON PIN, FOR THE TRUE POINT OF BEGINNING.; THENCE, LEAVING SAID RIGHT OF WAY BOUNDARY, SOUTH 89° 43' 32" WEST 83.26 FEET TO A 5/8" IRON PIN; THENCE NORTH 75° 39' 31" WEST 110.87 FEET TO A 5/8" IRON PIN; THENCE NORTH 65° 12' 52" WEST 77.57 FEET TO A 5/8" IRON PIN; THENCE NORTH 5° 34' 09" WEST 80.64 FEET TO A 5/8" IRON PIN; THENCE NORTH 86° 01' 00" WEST 127.25 FEET TO A 5/8" IRON PIN; THENCE NORTH 3° 00' 09" WEST 37.24 FEET TO A 5/8" IRON PIN; THENCE NORTH 34° 08' 21" WEST 87.37 FEET TO A 5/8" IRON PIN; THENCE SOUTH 87° 40' 11" WEST 71.86 FEET TO A 5/8" IRON PIN; THENCE SOUTH 2° 30' 32" EAST 129.86 FEET TO A 5/8" IRON PIN WITNESS MONUMENT; THENCE CONTINUING SOUTH 2° 30' 32" EAST 10.73 FEET TO THE CENTERLINE OF THE FARMER'S DITCH (IRRIGATION); THENCE ALONG THE CENTERLINE OF SAID IRRIGATION DITCH, ALONG THE ARC OF A 70.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 59° 03' 39" WEST 11.40 FEET) A DISTANCE OF 11.41 FEET; THENCE SOUTH 63° 43' 55" WEST 1.04 FEET; THENCE ALONG THE ARC OF A 20.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 38° 32' 36" WEST 17.02 FEET) A DISTANCE OF 17.59 FEET; THENCE SOUTH 13° 21' 18" WEST 31.90 FEET; THENCE ALONG THE ARC OF A 60.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 18° 29' 32" EAST 63.32 FEET) A DISTANCE OF 66.70 FEET; THENCE SOUTH 50° 20' 23" EAST 51.96 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH BEARS SOUTH 2° 59' 16" WEST 35.29 FEET) A DISTANCE OF 40.95 FEET; THENCE SOUTH 56° 18' 55" WEST 70.70 FEET; THENCE ALONG THE ARC OF A 22.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS SOUTH 42° 24' 35" WEST

3 - Third Amendment to Inter Vivos Revocable Trust

10.57 FEET) A DISTANCE OF 10.68 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THAT LANE REFERRED TO AS THE SOUTH BOUNDARY OF THAT PARCEL DESCRIBED IN DOCUMENT NO. 78-08539 OFFICIAL RECORDS OF JACKSON COUNTY, OREGON; THENCE, LEAVING SAID IRRIGATION DITCH CENTERLINE FOLLOWING ALONG THE NORTHERLY BOUNDARY OF SAID LANE, SOUTH 87° 33' 02" EAST 21.12 FEET TO A 5/8" IRON PIN; THENCE NORTH 88° 21' 48" EAST 109.22 FEET TO A 5/8" IRON PIN ; THENCE SOUTH 84° 56' 41" EAST 56.34 FEET TO A 5/8" IRON PIN ; THENCE ALONG THE ARC OF A 460.00 FOOT RADIUS CURVE TO THE LEFT (THE LONG CHORD TO WHICH BEARS NORTH 81° 05' 40" EAST 221.96 FEET ) A DISTANCE OF 224.17 FEET TO A 5/8" IRON PIN; THENCE NORTH 67° 08' 01" EAST 137.72 FEET TO A 5/8" IRON PIN; THENCE NORTH 89° 17' 20" EAST 16.48 FEET TO A 5/8" IRON PIN ON THE WESTERLY RIGHT OF WAY BOUNDARY OF APPLEGATE ROAD; THENCE ALONG SAID WESTERLY RIGHT OF WAY BOUNDARY, ALONG THE ARC OF A 1939.86 FOOT RADIUS CURVE TO THE RIGHT (THE LONG CHORD TO WHICH NORTH 00° 19' 38" WEST 26.00 FEET) A DISTANCE OF 26.00 FEET TO THE POINT OF BEGINNING.

TAX LOTS: 200, 201 AND 1800.

NOTE: This Legal Description was created prior to January 01, 2008."

The provisions of Section 3.3C are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"C.   If the trust estate includes the Home at the time of Grantor's death, the rest, residue and remainder of this trust shall be divided into shares as follows: twenty-five percent (25%) for JOANNE COUVRETTE; twenty-five percent (25%) for ROBERT F. WISNOVSKY; twenty-five percent (25%) for MARK A. WISNOVSKY; and twenty-five percent (25%) for MICHAEL J. WISNOVSKY. If the trust estate does not include the Home at the time of Grantor's death, the rest, residue and remainder of this trust shall be divided into shares as follows:  thirty-five percent (35%) for JOANNE COUVRETTE; thirty-five percent (35%) for ROBERT F. WISNOVSKY; fifteen percent (15%) for MARK A. WISNOVSKY; and fifteen percent (15%) for MICHAEL J. WISNOVSKY.  The shares as so established shall be distributed to the respective beneficiaries for which the shares are created."

4  - Third Amendment to Inter Vivos Revocable Trust

Exhibit 30 – Page 30 of 44
PDF Page 222

Exhibit 30 – Page 31 of 44
PDF Page 223

THIRD AMENDMENT
TO
INTER VIVOS REVOCABLE TRUST
THE ANN M. WISNOVSKY TRUST

I, ANN M. WISNOVSKY, am the Grantor and Trustee under that certain Inter Vivos Revocable Trust, dated August 2, 2012, establishing THE ANN M. WISNOVSKY TRUST. On March 14, 2016, I executed a First Amendment to said trust. On February 23, 2017, I executed a Second Amendment to said trust. This Third Amendment supercedes the First Amendment and the Second Amendment, which shall be of no further force or effect. I hereby amend the said trust as follows:

The provisions of Section 3.3B are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"B. The Trustee shall make the following additional specific distributions:

i) The trust estate includes a 100% membership interest in Wisnovsky Land, LLC, an Oregon limited liability company ("Wisnovsky Land"). Grantor and Wisnovsky Land, LLC, have entered into a Redemption Agreement that creates a binding commitment for the redemption of one-half of the trust's membership interest in Wisnovsky Land. The purchase price for the redemption of such membership interest shall be paid pursuant to a promissory note in the amount of $200,000.00, $240,000.00 or $280,000.00, depending on the number of legal parcels in the real property owned by Wisnovsky Land on the date of closing of the redemption. The promissory note will be secured by a trust deed that will encumber the real property owned by Wisnovsky Land. The Trustee is directed to consummate the transaction described in the Redemption Agreement. The trust's remaining membership interest in Wisnovsky Land shall be divided into shares as follows: fifty percent (50%) for MARK A. WISNOVSKY; and fifty percent (50%) for MICHAEL J. WISNOVSKY. The shares as so established shall be distributed to the respective beneficiaries for which the shares are created. The Trustee shall distribute to each of JOANNE COUVRETTE and ROBERT F. WISNOVSKY an undivided one-half interest in

Exhibit 30 – Page 32 of 44
PDF Page 224

JOANNE COUVRETTE is removed as a Co-Trustee of the Trust. Grantor shall continue to serve as the sole Trustee of the Trust.

The provisions of Section 9.1 are revoked in their entirety, and in lieu thereof, the following provisions shall be substituted:

"9.1 Successor Trustee. In the event ANN M. WISNOVSKY shall die, resign, or become incapacitated, or cease to act as Trustee for any reason whatsoever, GEORGE WISNOVSKY is appointed as Trustee with full powers of the Trustee. In the event GEORGE WISNOVSKY shall die, resign, or become incapacitated, or cease to act as Trustee for any reason whatsoever, STEPHEN WISNOVSKY is appointed as Trustee with full powers of the Trustee. In the event STEPHEN WISNOVSKY shall die, resign, or become incapacitated, or cease to act as Trustee for any reason whatsoever, U.S. BANK, N.A., is appointed as Trustee with full powers of the Trustee."

As amended by this Third Amendment to Inter Vivos Revocable Trust, I hereby ratify and affirm the Inter Vivos Revocable Trust, dated August 2, 2012.

IN WITNESS WHEREOF, this Third Amendment to Inter Vivos Revocable Trust is executed on the _____ day of _____, 2017.

_____
ANN M. WISNOVSKY
                    "Grantor"

_____
ANN M. WISNOVSKY
                    "Trustee"

5  - Third Amendment to Inter Vivos Revocable Trust

# REDEMPTION AGREEMENT

THIS REDEMPTION AGREEMENT is entered into and shall be effective as of February 23, 2017, the "Effective Date", by and among WISNOVSKY LAND, LLC, an Oregon limited liability company (the "Company"), and ANN M. WISNOVSKY, TRUSTEE OF THE ANN M. WISNOVSKY TRUST, UTD 8/2/12 ("Member").

## Recitals:

A.  Member is the owner of a 100% Ownership Interest in the Company.

B.  Member and the Company desire to agree on a partial redemption of Member's Ownership Interest.

## Agreements:

1.  **Partial Redemption.** Following the date of death of Ann M. Wisnovsky, the Company shall purchase from Member and Member shall sell to the Company one-half of Member's Ownership Interest in the Company. Closing of the redemption shall occur not later than sixty (60) days following such date of death ("Closing Date").

2.  **Purchase Price and Security for Payment.** The "Purchase Price" which the Company agrees to pay to Member is the following: (a) if, on the Closing Date, the real property owned by the Company consists of one legal parcel, the Purchase Price shall be the sum of $200,000.00; (b) if, on the Closing Date, the real property owned by the Company consists of two legal parcels, the Purchase Price shall be the sum of $240,000.00; (c) if, on the Closing Date, the real property owned by the Company consists of three legal parcels, the Purchase Price shall be the sum of $280,000.00 . The Purchase Price shall be paid by the Company's execution and delivery to Member of a promissory note ("Note") in the form of the Note attached hereto, marked Exhibit "A". Payment of the Note shall be secured by a "Trust Deed" in the form of the Trust Deed attached hereto, marked Exhibit "B". The Trust Deed shall encumber the real property owned by the Company on the Closing Date, and it shall be executed by Company and recorded in the Official Records of Jackson County, Oregon.

3.  **Miscellaneous.**

3.1  Binding Effect. This Agreement is binding on and inures to the benefit of the parties and their respective heirs, personal representatives, successors, and assigns.

Exhibit 30 – Page 33 of 44
PDF Page 225

3.2    Amendments. This Agreement may be amended only by an instrument in writing executed by all the parties, which writing must refer to this Agreement.

3.3    Further Assurances. Each party agrees to execute and deliver such other documents and to do and perform such other acts and things as any other party may reasonably request to carry out the intent and accomplish the purposes of this Agreement.

3.4    Time of Essence. Time is of the essence with respect to all dates and time periods set forth or referred to in this Agreement.

3.5    Waiver. Any provision or condition of this Agreement may be waived at any time, in writing, by the party entitled to the benefit of such provision or condition. Waiver of any breach of any provision will not be a waiver of any succeeding breach of the provision or a waiver of the provision itself or any other provision.

3.6    Governing Law. This Agreement will be governed by and construed in accordance with the laws of the state of Oregon, without regard to conflict-of-laws principles.

3.7    Attorney Fees. If any arbitration, suit, or action is instituted to interpret or enforce the provisions of this Agreement, to rescind this Agreement, or otherwise with respect to the subject matter of this Agreement, the party prevailing on an issue will be entitled to recover with respect to such issue, in addition to costs, reasonable attorney fees incurred in the preparation, prosecution, or defense of such arbitration, suit, or action as determined by the arbitrator or trial court, and, if any appeal is taken from such decision, reasonable attorney fees as determined on appeal.

3.8    Injunctive and Other Equitable Relief. The parties agree that the remedy at law for any breach or threatened breach by a party may, by its nature, be inadequate, and that in addition to damages, the other parties will be entitled to a restraining order, temporary and permanent injunctive relief, specific performance, and other appropriate equitable relief, without showing or proving that any monetary damage has been sustained.

2 - REDEMPTION AGREEMENT

Exhibit 30 – Page 34 of 44
PDF Page 226

IN WITNESS WHEREOF, the parties have hereunto executed this Redemption Agreement to be effective on the date hereinabove set forth.

"Company"                          WISNOVSKY LAND, LLC
                                   By: ANN M. WISNOVSKY TRUST, UTD
                                       8/2/12, its Member

                                   By: _Ann M. Wisnovsky_
                                       ANN M. WISNOVSKY, Trustee


"Member"                           THE ANN M. WISNOVSKY TRUST,
                                   UTD 8/2/12

                                   By: _Ann M. Wisnovsky_
                                       ANN M. WISNOVSKY, Trustee

Exhibit 30 – Page 35 of 44
PDF Page 227

3 - REDEMPTION AGREEMENT

## Exhibit A

### PROMISSORY NOTE

$_____                    _____, 20___, Medford, Oregon

1.   Obligation; Loan Amount.

FOR VALUE RECEIVED, the undersigned ("Borrower") promises to pay to _____, Trustee of THE ANN M. WISNOVSKY TRUST, UTD 8/2/12, or order ("Noteholder"), the principal sum of _____ _____and NO/100 DOLLARS ($_____) with interest on the unpaid principal balance from the date of this note until paid at the rate specified in Section 3 below. Principal and interest shall be payable at such place as Noteholder shall designate.

2.   Loan Term.

All indebtedness owing to Noteholder pursuant to this promissory note shall be due and payable on or before the expiration of 10 years following the date hereof. This date shall be the "Date of Maturity" of the obligations evidenced by this promissory note.

3.   Interest Rate.

The interest rate applicable to the principal balance of this note is _____%, which is the Applicable Federal Rate for this promissory note established by the Internal Revenue Service during the month in which this note is executed. Interest shall be calculated on the basis of a 365-day year.

4.   Payments.

No payments are required of Borrower. Payments, if any, shall be applied first to interest and then to principal.

5.   Time of Essence; Attorney's Fees.

Time is of the essence hereof.  Borrower shall pay all of Noteholder's reasonable collection costs, including attorney's fees, even though no civil action is commenced.  If suit or action is brought to collect this note, the Noteholder shall be entitled to collect all reasonable costs and expenses of such suit or action, including, but not limited to, reasonable attorney's fees at trial and on appeal.

Exhibit 30 – Page 36 of 44
PDF Page 228

6.   Maximum Limit.

In no event shall any payment of interest or any other sum payable exceed the maximum amount permitted by applicable law.  If it is established that any payment exceeding lawful limits has been received, the Noteholder will credit the excess amount to principal, or, at its option, refund the same.

7.   Joint and Several Obligation.

Presentment, notice of dishonor and protest are hereby waived by all makers, sureties, guarantors and endorsers hereof.  This note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers and shall be binding upon them and their successors and assigns.

8.   Waiver; Cumulative Rights.

No delay or forbearance on the part of the Noteholder in the exercise of any power or right under this note or under any other instrument executed pursuant hereto shall operate as a waiver thereof, nor shall a single or partial exercise of any other power or right.  Enforcement by the Noteholder of any security for the payment hereof shall not constitute any election of remedies so as to preclude the exercise of any other remedy available.

9.   Governing Law, Venue and Jurisdiction.

This note has been executed and delivered in the State of Oregon and the laws of such state shall govern the validity, construction, enforcement and interpretation of this note.  Exclusive venue and jurisdiction for any dispute concerning this agreement shall be in Jackson County, Oregon.

10.  Headings.

The headings of the sections of this note are inserted for convenience only and shall not be deemed to constitute a part hereof.

WISNOVSKY LAND, LLC
By: ANN M. WISNOVSKY TRUST, UTD
        8/2/12, its Member

By:_____
        _____, Trustee

Exhibit 30 – Page 37 of 44
PDF Page 229

FOURTH AMENDMENT
TO
INTER VIVOS REVOCABLE TRUST
THE ANN M. WISNOVSKY TRUST

I, ANN M. WISNOVSKY, am the Grantor and Trustee under that certain Inter Vivos Revocable Trust, dated August 2, 2012, establishing THE ANN M. WISNOVSKY TRUST. On March 14, 2016, I executed a First Amendment to said trust. On February 23, 2017, I executed a Second Amendment to said trust, On July 28, 2017, I executed a Third Amendment to said trust.

Being of sound mind and body and wishing to amend the Trust providing for the equitable distribution of my estate to my beneficiaries I create this Fourth Amendment.

This Fourth Amendment supersedes the First Amendment, the Second Amendment, and the Third Amendment, which shall be of no further force or effect. I hereby amend the said trust as follows:

JOANNE COUVRETTE is restored as a Co-Trustee of the Trust.

The Provisions of Section 3.3 B and C are revoked in their entirety, an in lieu thereof, the following provision shall be substituted:

"B.  The stock of Valley View Winery, Inc., an Oregon corporation, has been previously transferred or gifted to MARK A. WISNOVSKY and MICHAEL J. WISNOVSKY;

C.  The rest, residue and remainder of this trust shall be divided into two (2) equal shares. One of such shares shall be distributed to JOANNE COUVRETTE and one of such shares shall be distributed to ROBERT F. WISNOVSKY.

As amended by this Fourth Amendment to Inter Vivos Revocable Trust, I hereby ratify and affirm the Inter Vivos Revocable Trust, dated August 2, 2012.

IN WITNESS WHEREOF, this Fourth Amendment to Inter Vivos Revocable Trust is executed on the _31ˢᵗ_ day of May, 2019.

_Ann M. Wisnovsky_
ANN M. WISNOVSKY, "Grantor"

_Ann M. Wisnovsky_
ANN M. WISNOVSKY, "Trustee"

Exhibit 30 – Page 38 of 44
PDF Page 230

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ San Diego _____ )

On __ May 31st, 2019 _____ before me, __ Nancy Ann Lichtman, Notary Public __
(insert name and title of the officer)

personally appeared __ Ann M Wisnovsky _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

NANCY ANN LICHTMAN
COMM. #2160213
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My Commission Expires 7/16/2020

Signature _____ (Seal)

Exhibit 30 – Page 39 of 44

PDF Page 231

# FIFTH AMENDMENT

## TO THE

## ANN M. WISNOVSKY TRUST

Prepared by:

Garrison F. Turner
Davis, Hearn, Anderson & Turner P.C.
515 East Main Street
Ashland, OR 97520
(541) 482-3111

Exhibit 30 – Page 40 of 44
PDF Page 232

# FIFTH AMENDMENT
## TO THE
## ANN M. WISNOVSKY TRUST

I, Ann M. Wisnovsky, am the Settlor of the Ann M. Wisnovsky Trust, which was created by a Trust Agreement dated August 2, 2012. I previously executed a First Amendment, a Second Amendment, and a Third Amendment to that Trust Agreement, and all three of those amendments were superceded and revoked by the Fourth Amendment that I executed on May 31, 2019. After consultation with counsel, I wish to further amend the Trust Agreement pursuant to the powers reserved to me in Section 11 of the Trust Agreement as follows:

1.     The second sentence of Section 10.1 is deleted and replaced by the following sentence: "When Co-Trustees are serving hereunder, the Co-Trustees must act together to perform any act that purports to bind the trust, and any writing requiring the signature of Trustees of the trust must be signed by both Trustees in order to be binding and have any legal force or effect. Any provision elsewhere in the Trust Agreement inconsistent with the previous sentence shall be construed in a manner to be consistent with the previous sentence."

In all other respects, the Trust Agreement dated August 2, 2012, as amended by the Fourth Amendment, shall remain in full force and effect.

DATED: This 8th day of June, 2019.

_____
Ann M. Wisnovsky, Settlor

THE FORGOING AMENDMENT IS ACCEPTED

_____          _____
Ann M. Wisnovsky, Co-Trustee              Joanne Couvrette, Co-Trustee

(Acknowledgment appears on the following page)

FIFTH AMENDMENT TO THE
ANN M. WISNOVSKY TRUST

- 1 -

DAVIS, HEARN, ANDERSON & TURNER, PC
515 East Main Street
Ashland, OR 97520
(541) 482-3111

Exhibit 30 – Page 41 of 44
PDF Page 233

## ACKNOWLEDGMENT

STATE OF OREGON        )
                       ) ss
County of Jackson      )

On the _8th_ day of June, 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared Ann M. Wisnovsky, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and acknowledged that she executed it.

_____
Notary Public for Oregon

OFFICIAL STAMP
**BRITTANI FRANCIS**
NOTARY PUBLIC-OREGON
COMMISSION NO. 950394A
MY COMMISSION EXPIRES MAY 11, 2020

Exhibit 30 – Page 42 of 44

PDF Page 234

FIFTH AMENDMENT TO THE
ANN M. WISNOVSKY TRUST

-2-

DAVIS, HEARN, ANDERSON & TURNER, PC
515 East Main Street
Ashland, OR 97520
(541) 482-3111

# REVOCATION AND TERMINATION OF REDEMPTION AGREEMENT

On February 23, 2017, Wisnovsky Land, LLC, an Oregon Limited Liability Company, and Ann M. Wisnovsky, as a trustee of the Ann M. Wisnovsky Trust UTD August 2, 2012, entered into a "Redemption Agreement." Attached to that agreement was "Exhibit A," an unsigned specimen form of a Promissory Note. That Redemption Agreement was entered into upon the recommendation of Ann's prior attorney and the urging of Mark Wisnovsky and Michael Wisnovsky.

The estate plan in effect at the itme the Redemption Agreement was executed is no longer in existence, and therefore, there is no purpose in having the "Redemption Agreement" in place. In fact, it is inconsistent with, and contrary to, the existing estate plan of Ann M. Wisnovsky.

Now therefore, pursuant to the powers reserved to the trustees of the Ann M. Wisnovsky Trust, which is the sole member of Wisnovsky Land, LLC, the Redemption Agreement is hereby revoked and terminated, effective immediately.

Dated: _____7/2/19_____

_Ann M. Wisnovsky_
Ann M. Wisnovsky, Co-Trustee of the
Ann M. Wisnovsky Trust

Dated: _7-2-19_

_Joanne Couvrette_
Joanne Couvrette, Co-Trustee of the Ann
M. Wisnovsky Trust

For Wisnovsky Land, LLC, and its sole Member::

Dated: _____7/2/.19_____

_Ann M. Wisnovsky_
Ann M. Wisnovsky Trust dated August 2,
2012, by Ann M. Wisnovsky, Co-Trustee

Dated: _7-2-19_

_Joanne Couvrette_
Ann M. Wisnovsky Trust dated August 2,
2012, by Joanne Couvrette, Co-Trustee

(Acknowledgment on next page)

Exhibit 30 – Page 43 of 44

PDF Page 235

## ACKNOWLEDGMENT

STATE OF OREGON          )
                         ) ss
County of Jackson        )

On the 2nd day of July, 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared Ann M. Wisnovsky and Joanne Couvrette, personally known to me or proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to this instrument, and acknowledged that they executed it.

```
OFFICIAL STAMP
DEANNA MONIQUE COSTEN
NOTARY PUBLIC-OREGON
COMMISSION NO. 965478
MY COMMISSION EXPIRES AUGUST 10, 2021
```

_____
Notary Public for Oregon

Exhibit 30 – Page 44 of 44
PDF Page 236